IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,

        Petitioner,

v.                         Civil Action No. 3:12-cv-33
                                     (Groh)

BARRY J. NACE, a member of
the West Virginia State Bar,

        Respondent.

## RESPONDENT'S RESPONSE TO PETITIONER'S MOTION TO REMAND

Now comes Respondent Barry J. Nace, by counsel, J. Michael Benninger and Daniel D. Taylor, in response and opposition to Petitioner Lawyer Disciplinary Board's Motion to Remand.  This Response is submitted under the provisions of 28 U.S.C. § 1447 and the applicable removal statute, 28 U.S.C. § 1442(a)(3) and LR Civ P 7.02.

## BASIS OF JURISDICTION

Respondent Nace asserts that the record now before the Court, including the Hearing Transcript from the ethics hearing held on October 10, 2011, attached as Response Exhibit A, and other filings in that matter establish a clear basis for removal to this Court because:  (1) under 28 U.S.C. § 1442(a)(3), he is an officer of the federal courts and should be provided a federal forum for determination of his duties and responsibilities and his federal defense, as articulated in

*Kolibash v. Committee on Legal Ethics of the West Virginia State Bar*, 872 F.2d 571 (4th Cir. 1989); and, (2) the HPS concluded, as a matter of law, that Respondent Nace was appointed by the Bankruptcy Court Order as Special Counsel under U.S.C. § 327(e) and determined that he was negligent in the performance of his official bankruptcy court duties under § 327(e); thus, the instant case "arises under" and/or is "related to" a bankruptcy case and vests this Court with original jurisdiction under § 1334(b).

**RESPONDENT BARRY J. NACE'S REASON FOR REMOVAL**

On March 21, 2012, the Hearing Panel Subcommittee ("HPS") of Petitioner Lawyer Disciplinary Board ("Petitioner LDB") issued its Report of Hearing Panel Subcommittee ("Report") in Respondent Barry J. Nace's ("Respondent Nace") underlying legal ethics case. The Report was received by Respondent Nace's counsel on March 26, 2012. The Report is one of the documents attached as "Exhibit A" to the Notice of Removal.

Respondent Nace and his counsel ascertained for the first time upon receipt of the Report that it was the HPS's finding, determination and conclusion of law that Respondent Nace was employed as Special Counsel to the Bankruptcy Trustee Robert W. Trumble pursuant to 11 U.S.C. § 327(e). The HPS also found, determined and concluded that Respondent Nace violated duties and obligations as Special Counsel to the Trustee and to

2

the Bankruptcy Court and, thus, was negligent and should be suspended for four months.

At all times relating to the underlying ethics case, Respondent Nace denied that:  He had ever been employed by the Bankruptcy Court as Special Counsel to the Trustee as he did not receive notice of same; he had any duties or obligations to the Trustee as the Trustee was not his client; and, he had committed any ethics violations related thereto.  Additionally, Respondent Nace asserted as his defense that the Trustee's negligence in performing his official supervisory duties, as defined by federal law and the *Handbook for Chapter 7 Trustees* (July 1, 2002) (attached as Response Exhibit B) ("Trustee Handbook"), caused the instant dispute.

According to the Report, the HPS specifically refused to consider Respondent Nace's argument and evidence presented at the hearing and stated, "**The Hearing Panel Subcommittee makes no finding whatsoever about whether the bankruptcy Trustee acted appropriately or inappropriately in this matter.**"  [Emphasis added.]  *See* Report, footnote, p. 24.  By refusing to consider the Trustee's negligence, the HPS effectively denied Respondent Nace, although determined by the HPS to be a federal court officer, the federal defense he proffered at the time of the evidentiary hearing held on October 10, 2011.  The Notice of Removal was thereafter timely filed on April 24, 2012.

3

Importantly, Respondent Nace and his counsel contend this Court, not the HPS or the Supreme Court of Appeals of West Virginia, should make the required findings of fact and conclusions of law as to whether Respondent Nace was employed as Special Counsel to the Trustee and whether he was negligent in the performance of his official duties, if any.  This is the command and purpose of § 1442(a)(3).  Also, if applicable, this Court should consider the Trustee's conduct as it relates to his management and supervision of Respondent Nace, under duties specified in the Trustee Handbook, in making its findings and conclusions.

After notice of removal was provided, the Supreme Court of Appeals entered its Order, dated May 17, 2012, staying Respondent Nace's state court lawyer disciplinary proceeding, pending action by this Court.  The Order is attached as Response Exhibit C.

## REASONS THIS COURT MUST EXERCISE JURISDICTION

The basis of Respondent Nace's removal of the state court lawyer disciplinary proceeding is the fact that the HPS concluded he was employed as Special Counsel, found him to be negligent, and refused, outright, to consider the negligent acts and omissions of the Bankruptcy Trustee who was required to supervise him in the underlying case.  Without doing so, the HPS could not have fully analyzed and properly acted as an

4

adjudicatory body upon Respondent Nace's federal defense, which included the following legal issues, raised in his Motion to Dismiss Statement of Charges (attached as Response Exhibit E) filed prior to the hearing held on October 10, 2011:

>     (1) that Respondent Nace was never employed by the Bankruptcy Court as Special Counsel for the Bankruptcy Trustee under 11 U.S.C. § 327(e);

>     (2) that Respondent Nace did not owe any legal or ethical duties to the Bankruptcy Trustee since he was not employed as Special Counsel and could not have formed an attorney-client relationship with the Trustee;

>     (3) that, in the alternative, if Respondent Nace was employed as Special Counsel under § 327(e), then he was not negligent in the performance and discharge of his official duties to the Bankruptcy Court and its Trustee; and,

>     (4) that, in the alternative, it was the Bankruptcy Trustee's own negligence that caused the instant dispute.

As this Court now knows from a review of the Report, the HPS dismissed all assertions and facts presented evidencing the Trustee's negligent acts and omissions and refused to consider them fully, in violation of Respondent Nace's due process rights.  In addition, this Court will note from a careful review of the Adversary Proceeding docketed in the Bankruptcy Case *In Re:  B. A. Miller*, D. Case No. 04-3365 and AP No. 10-136, that Respondent Nace has asserted the same issues as his federal defense to the Bankruptcy Court Trustee's legal malpractice civil action filed October 5, 2010, and currently pending before

Bankruptcy Judge Flatley.  The Trustee's Complaint and

Respondent Nace's Answer are attached as Response Exhibit H.

**PROCEDURAL AND TEMPORAL HISTORY OF THE CASE**

This history shall serve as a framework for clearer

understanding of the major relevant occurrences and filings in

the ethics case and related actions leading to the filing of the

Notice of Removal in the instant case:

- **September 27, 2004**—BK Case:  04-03365 – Barbara Ann Miller filed Chapter 7 Voluntary Bankruptcy Petition in Bankruptcy Court, Northern District of West Virginia

- **December 21, 2004**—Order entered by Bankruptcy Court discharging Debtor Barbara Ann Miller

- **March 4, 2005**—Bankruptcy Court Order entered granting application to employ Respondent Nace and Mr. Burke

- **June 17, 2005**—Respondent Nace and Mr. Burke filed Miller medical malpractice case in Circuit Court of Berkley County, West Virginia

- **July 13, 1009**—Robert W. Trumble, Esquire, filed Complaint with Petitioner Lawyer Disciplinary Board against Respondent Nace

- **October 5, 2010**—BK Case 04-03365/AP No. 10-136 - Trumble filed Bankruptcy Court adversary proceeding against Respondent Nace and Mr. Burke alleging legal malpractice

- **May 17, 2011**—Petitioner Lawyer Disciplinary Board filed Statement of Charges against Respondent Nace

- **July 17, 2011**—Respondent Nace served his Answer and Affirmative Defenses to Statement of Charges

- **October 4, 2011**—Respondent Nace filed Motion to Dismiss Statement of Charges

- **October 10, 2011**—Petitioner Lawyer Disciplinary Board held evidentiary hearing in Respondent Nace's case

- **March 21, 2012**—Hearing Panel Subcommittee of Petitioner Lawyer Disciplinary Board served, *via* U. S. Mail, Report of Hearing Panel Subcommittee on counsel for Respondent Nace

- **March 26, 2012**—Counsel for Respondent Nace received Report of Hearing Panel Subcommittee

- **April 24, 2012**—Respondent Nace filed Notice of Removal

- **May 17, 2012**—West Virginia Supreme Court of Appeals entered Stay Order of lawyer disciplinary proceeding

## DETAILED RECITATION OF MATERIAL FACTS IN RECORD

A careful review of the record now before the Court, including the Hearing Transcript from Respondent Nace's ethics hearing on October 10, 2011, reveals the following detailed material facts:

## THE LAWYERS AND THEIR PARTICIPATION IN RELEVANT OCCURRENCES

### Bankruptcy Trustee Robert W. Trumble

1.     Robert W. Trumble is a licensed lawyer in the State of West Virginia.  He has been licensed since 1984. Response Exhibit A (Hearing Transcript), p. 7.

2.     In 1994, Mr. Trumble was appointed by the United States Bankruptcy Trustee as a Panel Bankruptcy Trustee in the Northern District of West Virginia and has continuously engaged in bankruptcy practice in some type or form, including creditor representation, debtor representation, and trustee work since that time.  Hearing Transcript, p. 46.

3.     Mr. Trumble acknowledges that he is an expert in the field of bankruptcy law and procedure, and he was the Bankruptcy Trustee appointed in Barbara A. Miller's bankruptcy case filed on September 27, 2004.  Hearing Transcript, pp. 44-46.

4.     Mr. Trumble acknowledged that his duties as Bankruptcy Trustee in Ms. Miller's bankruptcy case, at all times relevant hereto, were governed by the provisions of Title 11, *United States Code*, and the United States Department of Justice's *Handbook for Chapter 7 Trustees*.  Response Exhibit B; Hearing Transcript, p. 48.

## Respondent Barry J. Nace

5.    Respondent Nace is a lawyer licensed to practice in the State of West Virginia.  He has been licensed since 1997. Hearing Transcript, p. 268.

6.    Respondent Nace is the managing partner of Paulson and Nace, with offices in Washington, D.C.

7.    Respondent Nace is 67 years old and has three sons, all of whom are lawyers practicing in his firm.  He has been practicing law since 1970 and is admitted in Pennsylvania (now inactive, by choice), Maryland, West Virginia, and Washington, D.C.  Hearing Transcript, pp. 314-315.

8.    Respondent Nace practices predominantly medical malpractice.  Hearing Transcript, p. 316.

9.    Respondent Nace was President of the Association of Trial Lawyers of America, previously known as ATLA and now called AAJ, in 1993 and 1994.  He was also past President of the D.C. Trial Lawyers Association, a long-time member of the West Virginia Trial Lawyers Association, and a frequent speaker and lecturer on the subjects of medical malpractice and trial advocacy.  He is also an elected member of the American Law Institute and holds membership in many important legal associations and organizations, including Civil Trial Advocacy Board Certification by NBTA and NBLSC.  Hearing Transcript pp. 316-317.

9

10.    Respondent Nace is a member of the American Board of Trial Advocacy and has tried more than 100 medical malpractice jury trials to verdict in his career.

11.    Respondent Nace has never been subject to any discipline by any of the bars in which he has been participating since 1970 and has never had any judgments against him in any legal malpractice action.   Furthermore, he had no difficulty in working with Mr. Burke in West Virginia during their 20-plus years of association.   Hearing Transcript, pp. 317-318.

12.    Respondent Nace was asked if he ever handled a bankruptcy debtor or creditor case in any district, and his response was "never."   Hearing Transcript, p. 18.

13.    When Lawyer Disciplinary Counsel Jessica H. Rhodes inquired as to Respondent Nace's familiarity with bankruptcy law during her direct examination, the following question and answer exchange demonstrates his level of knowledge and experience in that specialty:

[RHODES] Q.    And you weren't that familiar with bankruptcy law; is that correct?

[NACE]    A.    That familiar, no.  Not only was I not that familiar, but I wasn't familiar at all.  I knew nothing about bankruptcy.  I had never handled a bankruptcy case.  I never repre-sented anybody that was in bankruptcy, who had been in bankruptcy to my knowledge.  I've now learned a lot, but I didn't know then.

Hearing Transcript, pp. 277-278.

14.   Therefore, the overwhelming weight of credible evidence presented both through the testimony of the witnesses and the exhibits introduced establishes that Respondent Nace is, in fact, an expert in the prosecution of medical malpractice cases for the Plaintiff, the specific purpose of his employment as Special Counsel, under § 327(e) and had no knowledge or familiarity with bankruptcy law.

## THE PARTICIPANTS AND THE RELATIONSHIPS

### Barbara A. Miller and D. Michael Burke

15.   In March 2003, Barbara A. Miller's husband received medical treatment at City Hospital in the Martinsburg, West Virginia area.  He subsequently died, and she believed he was a victim of medical negligence.

16.   On February 5, 2004, Ms. Miller engaged D. Michael Burke as her lawyer to investigate her husband's potential medical-legal case and to represent her as the administrator of his Estate.

17.   At the time of accepting Ms. Miller's case, Mr. Burke intended to obtain the medical documentation and engage in his typical screening process to determine whether the case was viable from a liability and cost-benefit standpoint and whether or not to send it Respondent Nace for handling.  Hearing Transcript, 190-192.

11

18.   Ms. Miller and Respondent Nace did not sign a separate contingency fee agreement after Mr. Burke withdrew from the case, as Respondent Nace advised her that he would work under the written agreement she had executed with Mr. Burke. Hearing Transcript, pp. 272-273.

19.   A careful review of the entire record reveals that it does not appear that Respondent Nace had any contact with Ms. Miller until later in the review process of her medical-legal case, well after the filing of her bankruptcy case on September 27, 2004.

### D. Michael Burke and Trustee Robert W. Trumble

20.   Mr. Trumble testified that he has known Mr. Burke since moving to the Eastern Panhandle of West Virginia in 1992. Hearing Transcript, p. 113.

21.   Mr. Trumble and Mr. Burke enjoyed both a social and professional relationship prior to the events giving rise to this case.  Hearing Transcript, p. 114.

22.   Mr. Trumble's prior experience with Mr. Burke was, "in a couple cases like this case where he represented originally a client who had a personal injury case of some type and later declared bankruptcy."  Mr. Burke confirmed he had done so on two or three occasions in personal injury cases.  These cases did not involve Respondent Nace.  Hearing Transcript, pp. 114-115, 193-194.

23.  Until October 2008, Mr. Trumble exclusively utilized Mr. Burke as the point of telephone contact and the individual to whom written requests for information about the instant case were sent.  Hearing Transcript, pp. 77-78, 119, 192, 125-126.

24.  Understandably, because of their long-term, prior personal and working relationship, it was Mr. Burke to whom Mr. Trumble turned initially when the issues in this case arose concerning the resolution of the medical negligence case and payment to the Bankruptcy Court.  Hearing Transcript, pp. 122-123.

### D. Michael Burke and Respondent Nace

25.  Mr. Burke related he first met Respondent Nace in 1980 or 1981, when Respondent Nace was teaching as a volunteer at a week-long trial practice seminar.  Hearing Transcript, p. 217.

26.  Mr. Burke regularly got Respondent Nace involved in his medical negligence cases as he was familiar with him personally from seeing him or assisting him in bringing approximately 20 medical malpractice cases to verdict in West Virginia and being aware of his reputation as "one of the most experienced and skilled medical malpractice lawyers for plaintiffs in this region."  Hearing Transcript, p. 218.

27.   Mr. Burke testified that he was of the opinion that Respondent Nace was honest and ethical and had a positive attitude toward and adherence for all the rules of professional conduct.  Hearing Transcript, p. 220.

28.   The credible weight of evidence reveals that Mr. Burke and Respondent Nace possessed, for many years, a close personal and professional relationship built on years of service to clients in medical malpractice cases prosecuted throughout the various circuit courts in the State of West Virginia.

**Respondent Nace and Trustee Robert W. Trumble**

29.   When asked about his knowledge of Respondent Nace, Mr. Trumble responded to counsel's question as follows:

[KARLIN]   Q.   Now, I forgot to ask you one question. You've known of Barry Nace before this case, haven't you?

[TRUMBLE]  A.   Not that I'm aware of.

Q.   You haven't been aware – were you aware of the fact – you weren't aware of the fact that Mr. Burke had previously worked with Mr. Nace on cases?

A.   On behalf of anything related to the United States Trustee or my duties as a trustee?

Q.   No, no.  Just that he had, as an attorney involved in this part of West Virginia, brought cases in connection with a medical malpractice expert?

A.   No, sir.  I was not familiar with Mr. Nace's body of work prior to – prior to

14

> when Mr. Burke identified him as a co-
> counsel.

Hearing Transcript, p. 131.

30.  When asked about his contact with Mr. Trumble, Respondent Nace responded to counsel's questions as follows:

> If Mr. Trumble had just contacted, you know,
> me, because he knew I was the trial
> attorney.  I was the trial attorney.  He
> didn't know anything about me interestingly
> enough, but he knew I was the trial
> attorney.  If he had checked with me, asked
> me about the case at all, he would have let
> me know what was going on, I would have had
> some questions to ask, and there would be no
> reason for me not to say, "Okay, fine.  If
> we get the verdict, you know, we'll see what
> happens on it and follow through on it."...
>
> I never met Mr. Trumble before I was
> introduced to him in the courthouse, the
> federal courthouse, on another matter about
> a year ago by Mr. Burke and introduced us.
> I didn't know who I was being introduced to.

Hearing Transcript, pp. 329-330.

31.  At no time did Mr. Trumble and Respondent Nace ever communicate *via* telephone or through face-to-face contact concerning the matters involved in Ms. Miller's medical malpractice or bankruptcy cases.  Mr. Trumble never initiated any contact with Respondent Nace until his failed attempt by correspondence in October 2008.

32.  There are only three instances where Mr. Trumble and Respondent Nace communicated *via* written correspondence throughout the entire course of the period spanning nearly four

15

years—the time period in February 2005, before it was even determined that there was a viable case, and that Respondent Nace would handle same, until January 2009, over one year after the case was tried and a verdict rendered.   The relevant correspondence is jointly attached as Response Exhibit F.

33.   However, it was clear from the outset that this was not a standard personal injury case where an individual was the "owner" of the claim for money damages, but was instead a wrongful death case which can only be brought under West Virginia law by a duly appointed personal representative of a deceased person's estate.   Mr. Burke's contingency fee agreement executed by Ms. Miller on February 5, 2004, clearly stated that Ms. Miller was proceeding as the administrator of her husband's estate even though the style stated otherwise.   Thus, at all times, she was acting only in her representative capacity of her husband's estate and as a potential statutory beneficiary under *West Virginia Code* § 55-7-6.

34.   It remains an open question to this date, as there has been no evidence presented at the hearing on October 10, 2011, how the Bankruptcy Court could properly assert jurisdiction over Ms. Miller's husband's estate, and the wrongful death and survival act case it owned, insofar as it was not a personal asset of Ms. Miller subject to reach by the Bankruptcy Court or its Trustee appointed to retrieve assets on

16

behalf of creditors of her personal bankrupt estate.  At all times, she, along with her adult children, were the only potential statutory beneficiaries of any recovery when and if settlement and distribution of proceeds were approved by the Circuit Court under the strict procedures set forth in § 55-7-6(b).  It would be only at that time that Ms. Miller was under a duty to identify her share of the recovery in her husband's wrongful death case as an asset of her personal bankrupt estate subject to distribution to creditors.

35.  The record reveals that none of these technical legal issues were ever discussed among any of the lawyers in this case and were not recognized especially by Mr. Trumble acting as Trustee in Ms. Miller's personal Chapter 7 bankruptcy case.

36.  After being appointed as Bankruptcy Trustee, Mr. Trumble's first contact with counsel was his correspondence dated October 26, 2004, sent in error to Mark Jenkinson, a named member of Mr. Burke's firm.  The correspondence also contained Ms. Miller's authorization signed on October 3, 2004.  Response Exhibit F.

37.  Mr. Jenkinson was not involved in the case, and there is no record of any contact between Mr. Burke and Mr. Trumble at that time.  It is believed that it is possible that Mr. Jenkinson telephoned Mr. Trumble's office and advised them

17

that he was not personally involved in the case and that Ms. Miller's case was being handled by Mr. Burke.  Hearing Transcript, p. 13.

38.  The bankruptcy petition and the schedule of unsecured creditors' claims list a funeral bill, medical expenses from City Hospital and medical expenses for doctors. These expenses resulted from Mr. Miller's last medical course, which are damages in the wrongful death case as Mr. Miller's Estate expenses rather than Ms. Miller's personal expenses and debts.  Regardless, on December 12, 2004, Ms. Miller and the debts she listed were discharged from bankruptcy as a result of the Order entered by Judge Friend.

39.  From the date of filing her bankruptcy petition on September 27, 2004, through the creditor's meeting held and conducted by Mr. Trumble on October 21, 2004, on through the date of her discharge from bankruptcy on December 12, 2004, there is no record of any contact directly by either Ms. Miller or Mr. Trumble with Respondent Nace or Mr. Burke concerning same.

40.  However, after Mr. Trumble became aware of Mr. Jenkinson's non-involvement in the Miller case, he then sent a second letter, this time to Mr. Burke, his first from Mr. Trumble, dated January 11, 2005, which letter is nearly verbatim

to that sent to Mr. Jenkinson on October 26, 2004.  Response Exhibit F.

41.   Neither of Mr. Trumble's letters were sent to Respondent Nace or provided to him by Mr. Burke or his office. Response Exhibit F.

42.   In spite of the fact that Ms. Miller was only acting in a representative capacity for her husband's estate, on January 12, 2005, Mr. Trumble filed his designation of Ms. Miller's bankruptcy case as an asset case and entered his request to issue claims notices to all creditors based upon the fact that there was a potential medical malpractice case being reviewed at that time by Respondent Nace.

43.   Thereafter, by letter dated January 25, 2005, Mr. Burke wrote to Mr. Trumble and advised him that the Miller medical malpractice case was being reviewed by Respondent Nace, his co-counsel, and that it was impossible to place a value on her case or even the likelihood of success of recovery until the medical expert review was complete.  Mr. Burke further stated in his correspondence that medical malpractice cases usually do not settle and that they are normally hotly contested and resolved by a trial and verdict.  Mr. Burke sent a copy of his correspondence to Ms. Miller's bankruptcy counsel, William A. O'Brien.  However, a copy was not sent to Respondent Nace for

his file, and it is believed that he was not provided a copy of same by Mr. Burke's office.  Response Exhibit F.

44.  Apparently, in response to receipt of Mr. Burke's letter of January 25, 2005, Mr. Trumble's legal assistant sent correspondence dated January 27, 2005, to Respondent Nace at his 1814 N Street, NW, Washington, D.C. address.  The correspondence provided a blank copy of an affidavit for him to sign indicating his willingness to serve as "Special Counsel" in the referenced matter.  The matter referenced was Ms. Miller's personal bankruptcy case.  The fact that Mr. Trumble sent a separate letter to Respondent Nace certainly negates the statements made by him at the hearing that he believed that notice to Mr. Burke was actual or constructive notice to Respondent Nace—otherwise, there was no need to directly correspond with him at his office address.  Mr. Burke was provided the same correspondence by same date with attachments for his execution.  Response Exhibit F.

45.  By correspondence dated February 2, 2005, Mr. Burke returned the completed affidavit with a copy of his contingency fee contract with Ms. Miller, as requested by Mr. Trumble.  Response Exhibit F.

46.  By correspondence dated February 24, 2005, Respondent Nace sent correspondence to Mr. Trumble enclosing his signed affidavit, as requested, noting that Mr. Burke had already sent his as well.  Important to note is the fact that

Respondent Nace advised Mr. Trumble that his new office address would be changed to 1615 New Hampshire Avenue, Northwest, Washington, D.C. 2009.  Response Exhibit F.

47.  By February 24, 2005, Mr. Trumble had never spoken to or met Respondent Nace or otherwise requested any information concerning his ongoing evaluation and review of Ms. Miller's potential medical malpractice case.  Response Exhibit G; Hearing Transcript, p. 75; Trumble Deposition, pp. 43-44.

48.  Further, Mr. Trumble never explained to Respondent Nace that it was Mr. Trumble's role to supervise Respondent Nace's efforts in the prosecution of the medical malpractice case, that Respondent Nace had any duty or responsibility to keep Mr. Trumble informed of the status of the matter and the settlement of part or all of the medical malpractice claim or that Respondent Nace was required to submit any of the settlement proceeds to the Bankruptcy Court for handling.  This was an important issue as Respondent Nace had never been involved in any way with a bankruptcy case or a client who had filed bankruptcy prior to or during his representation.

49.  The Order Authorizing Trustee to Employ Special Counsel entered by Judge Friend on March 4, 2005, was not received by Respondent Nace.  Hearing Transcript, p. 319.

50.   The Certificate of Service filed on March 6, 2005, by the company providing Bankruptcy Court service of documents establishes clearly that service of the Order Authorizing Trustee to Employ Special Counsel was made by U. S. Mail on March 6, 2005, on Respondent Nace at the wrong address— his former address at 1814 N Street, NW, Washington, D.C.   Thus, Respondent Nace was actually unaware of any action having been taken by the Bankruptcy Court on the matters for which he executed the affidavit indicating his willingness to serve as Special Counsel if authorized to do so.

51.   On the question of providing Respondent Nace a copy of the Order entered by the Bankruptcy Court authorizing employment of special counsel, Mr. Trumble testified during his deposition in March 2010 as follows:

Q.   Okay.  Did you ever send Respondent Nace a
copy of the order allowing you to
employ him as special counsel?

A.   I don't have any—I don't have any
knowledge of doing that.

Q.   Do you have—did you have any communi-
cations with his office after the
order was entered on March 4th, 2005,
about this case?

A.   Not until October of 2008.

Trumble Deposition Transcript, pp. 43-44, marked as Exhibit G.

52.   On the issue as to whether Mr. Trumble ever obtained a retainer agreement with Respondent Nace or provided a

22

scope of work for him as Special Counsel, he testified in

deposition as follows:

> Q.   Do you have a retainer with Mr. Nace
>       or Paulson and Nace –
>
> A.   No, I do not.
>
> Q.   -- employing him as special counsel
>       in this case?
>
> A.   No.
>
> Q.   So at the time that you did have
>       communications with Mr. Nace prior
>       to October of 2008, you didn't have
>       authority to actually employ him,
>       is that correct, because the court
>       had not entered an order allowing
>       you to employ him, correct?
>
> A.   There had not been an order entered
>       allowing him to be employed.
>
> Q.   And after you had received an order
>       permitting you to employ him you had
>       no correspondence with him whatsoever
>       until October of 2008, correct?
>
> A.   That's correct.

Response Exhibit G.

  53.   The fact that Mr. Burke had experience with Mr.

Trumble in earlier personal injury cases and treated the

affidavit he signed as being "hired" by the Bankruptcy Trustee

should not be imputed to Respondent Nace.   Respondent Nace had

no knowledge of Mr. Trumble nor any experience working with him

in such a case and did not have the benefit of the personal and

professional relationship Mr. Burke shared with him.  Hearing
Transcript, p. 210.

      54.  Thereafter, by correspondence dated May 18, 2005,
Mr. Trumble's legal assistant requested the first status update
from Mr. Burke.  Even though it was known by Mr. Trumble that
Respondent Nace was co-counsel [Hearing Transcript, p. 77] and
was the lawyer responsible for conducting the medical-legal
review, no correspondence was sent or telephone call made to
Respondent Nace's office inquiring as to the status of the
matter.  There is no evidence that Mr. Trumble provided a copy
of this correspondence requesting a status update to Respondent
Nace for his review, consideration and action.  Response Exhibit
F; Hearing Transcript, p. 77.

      55.  Mr. Trumble testified under oath at the hearing
that the reason he did not send a status update request to
Respondent Nace was because he did not know him and his exact
testimony is set forth below:

[RHODES]      Q.    Okay.  If you look at what has
                 been Bates stamped 26 in Mr.
                 Burke's file and 27 in Mr. Nace's
                 exhibit notebook, that's a May 18,
                 2005, letter to Mr. Burke regarding
                 the status?

[TRUMBLE]    A.    That's correct.

             Q.    And why did you send this letter?

             A.    Well, to obtain a status report, to
                 find out what's going on in the case.

I have to – I'm required to make
periodic reports as to the status of
cases.  And, you know, in this case I
wrote a letter to Mr. Burke seeking
to determine the status of the case.

Q.   Why did you not send a letter to Mr.
Nace?

A.   First of all, I didn't know Mr. Nace.
I was informed that Mr. Nace had to
be employed as co-counsel, and so
therefore we made the application to
employ Mr. Nace.

I felt that he was familiar with
the procedures utilized by a trustee
when administering an asset of this
nature.  To be candid with you, it's
more convenient that it is anything
else.

The second reason is I've dealt
with Mr. Burke in the past.  I've
known him for many years.  He has
represented me as a bankruptcy trustee
in other cases, so I'm familiar with
his body of work.

I also – you know, Mr. Nace is
identified as of counsel both on his
letterhead – on Burke & Schultz
letterhead as of counsel for – if
I'm not clear on that, Mr. Nace is
identified as of counsel for Burke
Schultz law firm.

And, likewise, on Mr. Nace's
letterhead he uses the same address
as Burke & Schultz as his West Virginia
address.  So I really felt if I was
communicating with Mr. Burke, I was
communicating with both of them.

Q.   Okay.  And you were assuming – well,
you assumed they were talking to
each other about the case, as well?

25

A.   As co-counsel, yes, ma'am.

Hearing Transcript, pp. 22-24.

56.   Mr. Trumble further testified that without knowing the working relationship between Mr. Burke and Respondent Nace, he unilaterally made Mr. Burke his "contact person." This was done in spite of the fact that Respondent Nace was never consulted on the matter and there was nothing in the affidavit signed by Respondent Nace that indicated that he would be excluded in the communication stream between the Trustee and Mr. Burke.  The following questions and answers demonstrate this point by clear and convincing evidence:

[BENNINGER]   Q.   Were you still relying on – and
                   throughout this whole process,
                   is it going to be your position
                   that you were relying on Burke to
                   get whatever information you wanted
                   or notice you wanted to provide by
                   calling him or writing to him and
                   he would get it to Barry Nace?  Is
                   that it?

[TRUMBLE]      A.   Yes.

               Q.   Okay.

               A.   Mr. Burke was my contact person.  He
                   was identified initially as the
                   counsel representing the debtor in
                   the malpractice issue.  Mr. Burke
                   gave me no reason to believe that I
                   couldn't contact him to determine
                   the status of the case in my past
                   working relationship with Mr. Burke
                   in this and other bankruptcy matters.
                   I had no reason to believe that there

26

wasn't any communication with Mr. Nace concerning this issue.

Q.   But that wasn't the agreement in the affidavit or the application, was it? Mr. Nace never agreed to that term?

A.   What term are you referring to, Mr. Benninger?

Q.   That all communication related to what he was doing as the malpractice expert, the only person that tries these cases, was to provide the conduit for communication through Burke?  That was never spelled out anywhere in writing or in the affidavit or in the application, was it?

A.   Well –

Q.   Yes or no, please.

A.   No.  But I don't profess to know the working relationship between the two, Mr. Burke and Mr. Nace, but when somebody acts as co-counsel, I would think that both of them have equal opportunity to provide a status report.

Hearing Transcript, pp. 77-79.

57.  By correspondence dated May 24, 2005, Mr. Burke responded to Mr. Trumble's legal assistant and provided the requested update that "my co-counsel has notified the various potential defendants that our expert has determined that [they] were at fault in causing Mr. Miller's death."  Mr. Trumble's office was also advised that it could expect to take several years to complete the case.  Response Exhibit F.

27

58.   There is no evidence presented that Respondent Nace was sent or received a copy of Mr. Burke's May 24, 2005 correspondence to Mr. Trumble's office.

59.   On June 17, 2005, the Complaint in the Miller medical malpractice case was filed in the Circuit Court of Berkley County, West Virginia.

60.   Shortly after filing the Complaint, Mr. Burke advised Respondent Nace that he felt that he had a personal conflict with one of the Defendants named in the Miller Complaint.   An Amended Complaint was filed on July 8, 2005, showing Respondent Nace as the only counsel of record for Plaintiff.   Hearing Transcript, pp. 202-203.

61.   Ms. Miller's medical malpractice case proceeded through the normal course of discovery and there was no activity or contact initiated by Mr. Trumble or the Bankruptcy Court concerning the status of the malpractice case until Mr. Trumble's legal assistant sent correspondence dated July 27, 2007, to Mr. Burke, requesting a written status update, which correspondence referenced Mr. Burke's correspondence of May 24, 2005.   Response Exhibit F.

62.   The record reveals that Mr. Burke did not respond to Mr. Trumble's letter of July 27, 2007, but he did telephone Mr. Trumble's office and advised his legal assistant that he was

no longer involved in the case and that Respondent Nace was handling it.  Hearing Transcript, p. 250.

63.  Importantly, Mr. Burke testified at the hearing that he and Respondent Nace never discussed the Miller case from June of 2005 until they received Mr. Trumble's second request letter dated November 14, 2010.  Hearing Transcript, p. 250.

64.  Mr. Burke was asked about his understanding as to how Mr. Trumble and Respondent Nace were communicating, and he responded as follows:

[BENNINGER]   Q.   Up until then [November 14, 2008], what did you assume Mr. Nace to be doing vis-à-vis Mr. Trumble.

[BURKE]       A.   I assumed Mr. Trumble was keeping in contact with him on a regular basis as he had with me before I let his office know that I was out.

                   I didn't get any contact in 2006 whatsoever.

Hearing Transcript, p. 250.

65.  Mr. Burke also testified that it was his impression that Respondent Nace did not know he was working as the attorney for the Bankruptcy Trustee.  Hearing Transcript, p. 231.

66.  There is no reference presented that any further contact was initiated by Mr. Trumble's office with Mr. Burke or Respondent Nace until his correspondence dated October 10, 2008, sent both to Mr. Burke and Respondent Nace.  Response Exhibit F.

67.    Mr. Trumble testified at the hearing that he "learned" that Mr. Burke had not been involved in the case prior to October 10, 2008.   Hearing Transcript, p. 135.

68.    Mr. Trumble further admits that he kept no record or notes of any telephone calls he had in 2006 with Mr. Burke regarding the status of the case and Respondent Nace's involvement.   Hearing Transcript, p. 144.

69.    A copy of the Trustee's letter to Respondent Nace, dated October 10, 2010, was again sent to the wrong address, this time to 1814 "North" Street, NW, Washington, D.C.  Hearing Transcript, pp. 305-306.

70.    It was not until Mr. Trumble's legal assistant sent correspondence dated November 14, 2008, again to Mr. Burke and Respondent Nace, that Respondent Nace received the November 14th correspondence with the October 10, 2008 correspondence attached, now sent to the correct mailing address.   Hearing Transcript, pp. 306.

71.    Respondent Nace promptly responded to Mr. Trumble's correspondence by letter dated December 1, 2008, and indicated his willingness to collect the information sought and he requested that Mr. Trumble send him documentation supporting the statements made in Mr. Trumble's correspondence of October 10, 2008.   Hearing Transcript, pp. 307.

72.   In spite of the fact that there was an obvious failure of communication and lack of understanding among the lawyers involved, Mr. Trumble sent correspondence dated January 5, 2009, to Respondent Nace, with a copy to Mr. Burke, provided the requested information, recommended that Respondent Nace place his malpractice carrier on notice and threatened that Mr. Trumble "will be contacting the appropriate state bars in which you are admitted to report your disregard for the rules of professional conduct as it relates to the representation of me as the trustee with regard to this matter." Response Exhibit F.

73.   Respondent Nace responded to the terse tone and aggressive and threatening comments contained in Mr. Trumble's correspondence of January 5, 2009, by his correspondence of February 4, 2009, wherein he attempted to explain the occurrences and his understanding and knowledge of the events which had transpired over the years when he was representing the interests of the person he perceived and understood to be his client, Barbara A. Miller.  Response Exhibit F.

74.   Mr. Trumble did not respond to Respondent Nace's correspondence dated February 4, 2009, explaining his interpretation of the occurrences in the case; instead, he filed the instant ethics complaint on July 13, 2009, without first bringing the matter to the knowledge of the Bankruptcy Court or

31

attempting to resolve the matter further with counsel.  Hearing Transcript, p. 99.

## BANKRUPTCY TRUSTEE'S DUTIES IN CHAPTER 7 CASES

75.  One of the primary sources of Mr. Trumble's duties as Trustee in Ms. Miller's bankruptcy case arises from the standards and requirements set forth in the Handbook for Chapter 7 Trustees, July 1, 2002.  Hearing Transcript, p. 48.

76.  Initially, a Trustee must determine whether the services of a professional, including attorneys, are needed and whether the cost is warranted.  The Trustee "should determine at the outset the level of professional work required and the estimated cost and benefits associated with the work."  The Trustee, as a fiduciary and representative of the bankrupt estate, cannot void or "abdicate" his responsibility by employing professionals or delegating to them certain tasks. The most broad and encompassing duty is stated, "[i]t is critical that the trustee oversees the work performed by professionals and exercises appropriate business judgment on all key decisions.  The trustee must actively **supervise** estate professionals to insure prompt and appropriate execution of the duties, compliance with required procedures and reasonable necessary fees and expenses."  [Emphasis added.]  Response Exhibit B, pp. 8, 22-24; Hearing Transcript, p. 79.

32

77.   In the instant case, Mr. Trumble never contacted Respondent Nace nor sought any information about his skill level, the work to be performed, the chances of recovery or the cost involved in the Miller medical malpractice action.

78.   More importantly, at no time did Mr. Trumble, acting in his capacity as Trustee for Ms. Miller's personal bankruptcy estate, ever execute a separate contingency fee contract or any other fee agreement or employment agreement with Respondent Nace for work he was to perform in the underlying wrongful death action on behalf of Mr. Miller's estate.

79.   Mr. Trumble did not oversee the work performed by Respondent Nace or Mr. Burke and never advised them that it was necessary for him to do so or that they were to take any particular steps or perform any particular tasks with regard to their work in the underlying medical malpractice case being prosecuted on behalf of Mr. Miller's Estate.

80.   Nowhere in the *Handbook for Chapter 7 Trustees* does the burden or duties shift to the professional person to do any particular thing or act in any particular way other than to work diligently and competently in the specific manner and purpose for which they were retained—in this case, the prosecution of the wrongful death medical liability case on behalf of Mr. Miller's Estate.

33

81.   The duties imposed upon Mr. Trumble as Trustee are clear and mandatory and are clearly defined, in part, as follows:

> The trustee is a fiduciary and represent-
> tative of the estate.  Trustees cannot
> avoid or abdicate their responsibilities
> by employing professionals and delegating
> to them certain tasks.  It is critical
> that the trustee oversees the work
> performed by professionals and exercises
> appropriate business judgment on all key
> decisions.
>
> The trustee must actively supervise estate
> professionals to ensure prompt and
> appropriate execution of duties,
> compliance with required procedures and
> reasonable and necessary fees and
> expenses. ...

Response Exhibit B; Hearing Transcript, p. 79.

82.   As clearly expressed by Respondent Nace during the hearing in this matter, he perceived and believed at all times that his ethical duties ran to his client, Ms. Miller, with whom he closely worked to very successfully prosecute her husband's wrongful death action on behalf of his Estate. Hearing Transcript, p. 233.

83.   Mr. Burke testified as to Respondent Nace's state of mind about the identity of his client throughout the entire case and stated as follows:

[BENNINGER]    Q.   Now, albeit we now have the testi-
                    mony of Mr. Trumble that says that
                    should have been directed to him
                    first, but prior to receiving the

34

November 14 and subsequent information, to your knowledge did Barry Nace know that he had been officially appointed, even though he had signed an affidavit indicating his willingness to be so appointed?

[BURKE]   A.   No.  Barry did not think that he was working for the bankruptcy trustee.  He just didn't think – he had a client. Her name was Mrs. Miller, and that's his client, and that's to whom he gave his loyalty.

Hearing Transcript, p. 233.

84.   There is no proof by clear and convincing evidence that Respondent Nace knew at any time prior to receiving Mr. Trumble's letter of November 14, 2008, that the Bankruptcy Court had approved his employment as Special Counsel for the specific purpose at hand or that Respondent Nace had actually been retained.  Thus, it is established that Respondent Nace had no actual knowledge that he was under any obligation or duty to Mr. Trumble or the bankruptcy case.

85.   The record reveals that Ms. Miller testified at deposition on March 6, 2006, that the bankruptcy case had been resolved and completed and she had been discharged.  Respondent Nace understood that the bankruptcy case had been fully resolved.  Hearing Transcript, pp. 20-21.

### HANDLING OF THE MEDICAL MALPRACTICE RECOVERY

86.   As noted above, Ms. Miller's husband died intestate.

35

87.   In September 2006, Respondent Nace and his client entered into a partial settlement agreement with City Hospital, Inc., for the amount of Seventy-Five Thousand Dollars ($75,000.00).  A Release of All Claims was signed and an Agreed Final Order Approving Settlement of Wrongful Death Claim as to Defendant City Hospital, Inc., was entered by Judge Sanders on or about October 13, 2006.  Hearing Transcript, pp. 285.

88.   Thereafter, Respondent Nace proceeded to try the case against the remaining Defendants between October 30 and November 8, 2006, at which time the jury returned a verdict in favor of Plaintiff and against Dr. Jalazo and awarded the total sum of Five Hundred Thousand Dollars ($500,000.00).  Hearing Transcript, pp. 289.

89.   The Verdict Form set forth specific damages recoverable under the West Virginia Wrongful Death Act.  Again, any claim brought under the Wrongful Death Act can only be made by a deceased person's personal representative, not necessarily one's spouse.

90.   As noted above, due to Mr. Miller's intestate death, the proceeds, after attorney fees, case expenses and any other outstanding expenses, would be paid to all of Mr. Miller's heirs-at-law, including Ms. Miller and their adult children.  Thus, there can be no perceived factual or legal basis that the Trustee in this case would be entitled to seek recovery of

36

anything but that portion of the intestate distribution payable to Ms. Miller from the settlement made in September 2006 with City Hospital, Inc., and that portion of the verdict satisfied by payment after the case was ultimately resolved in March 2008.

91.  By Order entered February 12, 2008, the Supreme Court of Appeals of West Virginia refused the petition for appeal presented by Dr. Jalazo.

92.  Thereafter, Respondent Nace, in accordance with his normal procedure, received the settlement draft, obtained written authorization to endorse and deposit same into his firm's escrow account, made a written statement of account, had Ms. Miller sign same, and distributed the net settlement proceeds to her in the amount of Two Hundred Twenty Thousand Four Hundred Sixty-Seven Dollars Forty-Five Cents ($220,467.45), to be distributed in accordance with the intestate laws governing the estate which she was charged under law to administer.  Hearing Transcript, p. 297.

93.  Even though Respondent Nace requested, in his letter of September 26, 2006, that his client have her bankruptcy attorney contact him directly if she still had one, there was no response from the client or Mr. O'Brien indicating the bankruptcy was any longer an issue.  Hearing Transcript, p. 348.

94.   The Circuit Court, in completion of the
settlement as required by *West Virginia Code* § 55-7-6(b) entered
its Order Approving the Settlement and Distribution of the Net
Proceeds on October 13, 2006, and the proceeds were shortly
thereafter disbursed to Ms. Miller.  Hearing Transcript, p. 287.

95.   The overwhelming weight of the evidence
establishes by clear and convincing proof that Respondent Nace
properly handled, accounted for, maintained and distributed the
settlement proceeds and the funds paid in satisfaction of the
verdict in accordance with the Order of the Circuit Court of
Berkley County and in accordance with the jury verdict rendered
in Mr. Miller's medical malpractice case.  The date of the
distribution of the verdict amount was in March 2008.

96.   At the time of the completion of the medical
malpractice case and the distribution of the proceeds of same,
Respondent Nace had had no contact of any kind with Mr. Trumble
or his office or anyone else concerning this matter.  He
testified at the hearing that he believed the bankruptcy matter
had been resolved and the basis for his belief was reasonable as
his client had testified under oath in deposition in March of
2006 that the bankruptcy matter had been completed.

97.   Although he had signed the affidavit at issue in
February of 2005 indicating his **willingness** to be appointed as
Special Counsel, there has been no evidence presented that

38

Respondent Nace had been contacted by Mr. Trumble, Mr. Burke or advised by his client or her bankruptcy counsel that the bankruptcy case was still ongoing at the time of the partial settlement in September 2006 or that he had been approved by the Bankruptcy Court to serve as Special Counsel at the time of trial and verdict in November 2006.  This same statement is true for the time period encompassing the entry of the court order on February 12, 2008, refusing a petition for appeal and the distribution by Respondent Nace of the remaining funds in March 2008.

98.  All of the distributions of the settlement and funds paid in satisfaction of the verdict were recorded and documented in writing as required by all applicable standards of practice and ethics rules.

## ETHICS COMPLAINT AND ADVERSARY PROCEEDING

99.  Even though Mr. Trumble received two positive and informative written responses to his last two written inquiries sent to Respondent Nace, he never picked up the phone to telephone Respondent Nace to sort through the details of the confusion and the problem, despite the fact that the amount of money involved in the bankruptcy case was nominal.  Nor did he ever respond in writing to Respondent Nace's last correspondence of February 4, 2008.  Hearing Transcript, p. 99.

100. Instead, he filed an ethics complaint on July 13, 2009, accusing Respondent Nace and Mr. Burke of knowing and intentional ethics violations.  The legal malpractice case was filed against Respondent Nace and Mr. Burke in October 2010. Response Exhibit H.

101. The "goal" of filing the ethics complaint was to recover the money Mr. Trumble felt was due the bankruptcy estate.  Hearing Transcript, p. 137.

102. The weight of the credible evidence presented in this case, as demonstrated by Respondent Nace's last two pieces of correspondence to Mr. Trumble, would lead any reasonable person to believe that this dispute arose because of confusion, misunderstanding or mistake, and nothing more.  Response Exhibit F.

103. In spite of the fact that it was his duty as Bankruptcy Trustee to either bring the problem at hand to the Court's attention or to take further steps to supervise "Special Counsel," Mr. Trumble proceeded to file a legal malpractice civil action against Respondent Nace and Mr. Burke for recovery of the monies he believed to be due and owing Ms. Miller's bankruptcy estate.

104. Under cross-examination, Mr. Trumble admitted that he never provided a reasonable opportunity for Respondent Nace or Mr. Burke to respond or settle the matter:

40

[KARLIN]   Q.   Did you ever write a letter to Mr. Burke
                or Mr. Nace in which you said, "We can
                settle this for X amount of dollars"?

[TRUMBLE] A.   I did not write a letter.  I had a conver-
                sation with Mr. Burke.

           Q.   That was before the ethics complaint,
                correct?

           A.   That's correct.

Hearing Transcript, p. 148.

        105. Mr. Trumble further admitted that neither

Respondent Nace nor Mr. Burke had any motive or financial reason

that would have kept them from making sure the bankruptcy estate

got its share of the money.  The following question and answer

exchange demonstrates the point:

[KARLIN]   Q.   My point is this:  As far as you know,
                neither Mr. Nace nor Mr. Burke had any
                motive, any financial motive, that you
                know of to keep them from making sure
                the bankruptcy estate got its share
                of the money, did they?

[TRUMBLE] A.   No, not that I'm aware of.

           Q.   They didn't gain in any way by what
                happened in this case as far as you
                understand it, did they?

           A.   Not that I'm aware of.

Hearing Transcript, pp. 181-182.

        106. Further questioning revealed when asked:

[KARLIN]   Q.   Can you think of any explanation for
                what they did other than simply they
                made a mistake?

                          41

[TRUMBLE] A.   You know, initially, I thought that it was a mistake, and, quite frankly, that's why I really felt that if we could get it resolved even reducing commissions, if I could get the creditors.

         But after that was – there was no response or I was shunned, I didn't feel that there was any other alternative.  I felt that there was, you know, denial of any employment, denial of representation.  And so I don't know what their motivation was at that time.

Hearing Transcript, pp. 182-183.

107. In contrast to statements made by Mr. Trumble at the hearing, the credible evidence as presented by the other testimony at the hearing and the documentary evidence including Respondent Nace's last two pieces of correspondence to him in December 2008 and February 2009 reveal that no one was attempting to avoid responding to Mr. Trumble's inquiry.  The documents speak for themselves and show otherwise.  Response Exhibit F.

108. The record reveals that at no time prior to filing the ethics complaint in July 2009 did Mr. Trumble, his counsel or anyone acting on his behalf advise Respondent Nace or Mr. Burke as to the amount of creditor claims presented and other damages believed to be recoverable by him as Trustee of the Miller bankruptcy estate:

```
[KARLIN]   Q.    Did you ever tell Burke or Nace
                 before you filed the ethics
                 complaint on July 13, 2009, that
                 was the amount that they owed
                 plus whatever commissions?

[TRUMBLE]  A.    I don't believe that I talked to
                 them in specific amounts.
```

Hearing Transcript, p. 107.

109. At a minimum, it is perceived that Mr. Trumble owed Respondent Nace and Mr. Burke the courtesy of providing basic information regarding the amount which was claimed to be due and owing and allowing a reasonable period of time within which to correct the error, confusion and mistake.

110. Of particular importance is the fact that Mr. Trumble admitted during the hearing that he filed the ethics complaint for the purpose of recovering monies he believed due and owing the creditors of Ms. Miller's bankruptcy estate. This position and statement are incomprehensible given the fact that the Bankruptcy Court was never advised by Mr. Trumble prior to filing the ethics complaint and legal malpractice lawsuit as to the circumstances presented in this dispute. Hearing Transcript, p. 137.

111. After the Trustee filed his ethics complaint, Respondent Nace, by correspondence dated August 11, 2009, filed his verified response to same and advised Petitioner LDB (ODC), among other things, that he had not received notice of any

Bankruptcy Court Order appointing him as Special Counsel to the Trustee.  Response Exhibit D.

112. It is perceived that the only appropriate jurisdiction for resolution of this dispute should be the United States District Court since it was the Bankruptcy Court which appointed Respondent Nace as Special Counsel in this case.

<u>**ARGUMENT AND LEGAL AUTHORITY**</u>

I.  **REMOVAL UNDER § 1442(a)(3) IS PROPER BECAUSE THE HPS CONCLUDED THAT RESPONDENT WAS APPOINTED SPECIAL COUNSEL TO THE TRUSTEE PURSUANT TO BANKRUPTCY COURT JUDGE FRIEND'S ORDER AND, THEREFORE, WAS AN OFFICER OF A UNITED STATES COURT AND WAS ACTING UNDER COLOR OF HIS OFFICE AND IN PERFORMANCE OF HIS DUTIES DURING THE TIME HE IS ALLEGED TO HAVE PERFORMED NEGLIGENTLY.**

Section 1442(a)(3) provides, in part:

(a)  A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: . . .

(3) Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties; . . .

The Fourth Circuit, in the case of *State of North Carolina v. Carr*, 386 F.2d 129 (4th Cir. 1967), stated that:

To repeat, the central and grave concern of the statute is that a Federal officer or agent shall not be forced to answer for conduct assertedly within his duties in any but a federal forum.  Thus the

> statute looks to the substance rather
> than the form of the state proceeding;
> this is the reason for the breadth of its
> language.

*Id.* at 131.  The right of removal under § 1442(a) "is to be

broadly construed."  *Kolibash*, *Id.* at 576.

　　　　The federal officer removal statute, 28 U.S.C. §

1442(a), has a long history, "designed to protect federal

officers in the performance of their federal duties."  *Kolibash,*

*supra*, at 573 (citing *Mesa v. California*, 489 U.S. 121, 109

S.Ct. 958 (1989)).

　　　　While *Kolibash* involved a removal under § 1442(a)(1),

the purpose and intent of the statute and the Fourth Circuit's

reasoning applies equally to all those falling under the

statute's broad protection including, "any officer of the courts

of the United States."  Clearly, Respondent Nace, after the HPS

concluded as a matter of law that he was appointed as Special

Counsel by Bankruptcy Judge Friend's Order entered on March 4,

2005, falls squarely within the coverage of this removal

statute.

　　　　In *Ely Valley Mines, Inc. v. Hartford Accident and*

*Indemnity Company*, 644 F.2d 1310 (9th Cir. 1981), the Court said,

"the general policy underlying federal removal legislation is to

permit removal when there is a federal interest in allowing

access to a federal forum."  *Id.* at 1313.  The *Ely Valley Mines*

45

case presented a similar factual scenario where a receiver
appointed by a federal court was charged with breaching his
duties and obligations as ordered by the Court.  Accordingly,
the Court said:

> Where as here, a plaintiff is challenging a
> receiver's personal dereliction of court
> imposed duties and complaining of a receiver's
> conduct before the appointing federal court,
> the issues and defenses to be tried would
> involve an examination of the duties and
> obligations of the receiver as ordered by the
> appointing federal court.  As such, the acts
> of the receiver in issue are directly under
> color of office or in the performance of court
> imposed duties.  Since an examination of the
> receiver's act directly involves an
> examination of the appointing federal court's
> orders, there is a strong federal interest in
> providing federal court access.

*Id.*

In another case, *Conjugal Partnership Comprised by
Jones v. Conjugal Partnership Comprised of Panetta*, 734 F.Supp.
41 (D. Puerto Rico 1990), the Court, relying upon the reasoning
articulated in *Ely Valley Mines* in a case challenging the
exercise of a court reporter's official duties under color of
office, said, "therefore, because an investigation of the court
reporter's acts directly involves an examination of the federal
court's orders, there is a powerful federal interest in granting
access to the federal court."  *Id.* at 43.

In reviewing the limited number of cases deciding who
is "an officer of the court," under § 1442(a)(3), it should be

46

noted that neither the instant section nor any other federal statute defines the term "officer of the court."

Moreover, the case cited by Petitioner LDB is inappropriate to the instant action because the Bankruptcy Court in *In re Johnson* (1994 WL 163911), "*sua sponte* and without providing an opportunity for Special Counsel to respond, withdrew his original order authorizing the employment of Special Counsel." *Id.* at p. 1.  Such action terminating Respondent Nace's services has not been taken by Bankruptcy Judge Flatley in the Miller bankruptcy case or in the adversary proceeding initiated by the Trustee against Respondent Nace. Therefore, the *In re Johnson* case does not appear to support the contention made by Petitioner LDB.

The *In re Johnson* case does, however, support Respondent Nace's arguments because it focuses on the "narrow scope" of Special Counsel's duties under 11 U.S.C. § 327(e) which provides:

> **The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee and conducting the case**, an attorney that has represented the debtor, if in the best interests of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate which with respect to the matter on which such attorney is to be employed.  [Emphasis added.]

47

A careful review of the hearing transcript reveals that, as recited above, Bankruptcy Trustee Trumble acknowledged that Respondent Nace was hired as Special Counsel only after Bankruptcy Judge Friend entered the order granting his application.  Thus, it can only be concluded that Respondent Nace at all times relevant to the underlying ethics case and the instant action was acting as an officer of the Court, duly appointed by the Bankruptcy Court, by Order entered March 4, 2005, for the special purpose of having him prosecute Ms. Miller's state court medical malpractice case—not to engage in the practice of bankruptcy law as articulated by the HPS.

It was during that time period which Respondent Nace was employed as Special Counsel for the purpose of prosecuting the underlying medical malpractice case that the Trustee now alleges he breached his official duties and obligations. Clearly, Respondent Nace was performing under color of his office during this time period.  The ethics complaint filed against Respondent Nace by the Trustee is one of the documents attached as Exhibit E to the Notice of Removal.  The Trustee's legal malpractice complaint filed in the Bankruptcy Court adversary proceeding is attached as Response Exhibit H.

Surprisingly, Petitioner LDB's position taken in its recently filed Motion to Remand is also inconsistent with the HPS's findings of fact and conclusions of law set forth in its

48

report, giving Respondent Nace first notice that the HPS concluded he was employed as Special Counsel and breached his duties to the Trustee in more than one way.  The numerous findings of fact and conclusions of law set forth throughout the Report all dramatically reveal that the entire set of facts comprising the ethics case arose only after Respondent Nace was employed by Bankruptcy Court Order as Special Counsel for the Trustee, and not before.

II.  **PETITIONER LDB'S ARGUMENT THAT THE UNDERLYING LAWYER DISCIPLINARY PROCEEDING IS NOT A CIVIL ACTION FOR PURPOSES OF APPLICATION OF § 1442(a) IS WITHOUT MERIT AND DIRECTLY CONFLICTS WITH THE COURT'S HOLDING IN *KOLIBASH*.**

Surprisingly, Petitioner LDB argues, as it did previously in *Kolibash*, that a West Virginia lawyer disciplinary proceeding is not a "civil action or criminal prosecution commenced in a state court" under 28 U.S.C. § 1442(a) and is, therefore, not removable under the federal officer removal statute.  The Fourth Circuit directly addressed this argument and held, "we reject such a narrow reading of the removal provision." *Kolibash*, 872 F.2d at 576.  Therefore, this Court should conclude based upon the clear expression in *Kolibash* that the underlying state court proceeding "involves a hybrid, *quasi*-civil proceeding." *Id.*  The Fourth Circuit's decision in *Kolibash* is controlling authority on this point in this case.

III. **RESPONDENT NACE'S NOTICE OF REMOVAL WAS TIMELY FILED UNDER 28 U.S.C. § 1446(b)(3), AND HE DID NOT WAIVE HIS RIGHT TO SEEK REMOVAL OF THIS CASE BY DEFENDING THE CHARGES AND PARTICIPATING IN THE HEARING HELD ON OCTOBER 10, 2011.**

The Report issued by the HPS gave Respondent Nace his first notice that Petitioner LDB rejected his defense arguments that he was not employed as Special Counsel under § 327(e) based upon his lack of notice of entry of the Bankruptcy Court Order on March 4, 2005.  The Report was also final notice that HPS concluded that he acted negligently as court-appointed Special Counsel to the Trustee under § 327(e).  The Notice of Removal was filed on April 24, 2012, less than thirty (30) days from receipt of the Report by Respondent Nace.

Under 28 U.S.C. § 1446(b)(3):

A notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

This particular provision is that which is relied upon by Respondent Nace in making his timely filing of the Notice of Removal on April 24, 2012.

Moreover, the Report is only a recommended decision made to the Supreme Court of Appeals of West Virginia under Rule 3.10 of the West Virginia Rules of Disciplinary Procedure.  It is not a final order and, under West Virginia law, the Supreme

50

Court of Appeals utilizes a "*de novo* standard of review" of the record made before the HPS on all questions of law, application of law to fact and questions of appropriate sanctions. *Lawyer Disciplinary Board v. Kupec*, 202 W.Va. 556, 505 S.E.2d 619 (1998). *See also Committee on Ethics v. MacCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994); Syl. Pt. 2, *Lawyer Disciplinary Board v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). This procedural notation is important because the underlying ethics case was not final with the issuance of the Report. The Report clearly establishes that the HPS exceeded its jurisdiction in making findings of fact and conclusions of law that Respondent Nace was employed as Special Counsel under § 327(e) and that he neglected his duties to the Bankruptcy Court and Trustee – decisions that only this Court can make in this removed case.

The Fourth Circuit Court of Appeals has held that, since 28 U.S.C. § 1446(b) was passed by Congress in 1948, there was no further need or statutory basis for application of the waiver doctrine. In *Grubb v. Donogal Mutual Insurance Company*, 935 F.2d 57 (1991), the Court quoting from *Rothner v. City of Chicago*, 879 F.2d 1402, 1415 (7th Cir. 1989), held that only in "extreme situations" where a Defendant demonstrates a "clear and unequivocal intent" to remain in state court will waiver be found. *Grubb,* 935 F.2d 58-59. Additionally, the Court recognized that, "a waiver determination involves a factual

inquiry as to defendant's intent to waive" and, in this case, should necessarily involve a review of Respondent's actions evincing his intent to proceed to federal court if certain allegations, findings of fact and conclusions of law were made and of West Virginia procedural law providing for *de novo* review of lawyer disciplinary proceedings.   *Id.*

In *Commonwealth v. Jordan*, 488 F.Supp. 54 (E.D. Pa. 1979), the Court, citing the Fifth Circuit case of *Calhoun v. City of Meridian*, 355 F.2d 29 (5th Cir. 1966), held that:

> . . . A petition for removal filed after appeal from the police court before a *de novo* trial in the state court of record was a filing before trial within the meaning of 28 U.S.C. § 1446(c).

*Id.* at 55.  The Court in *Jordan* also held that the federal officer removal statute is not narrow or limited and "is binding on this court."   *Id.*

Petitioner cites one case in support of its position that Respondent Nace waived his right to remove this case.   *See Swan v. Community Relations-Social Development Commission*, 374 F.Supp. 9 (E.D. Wisc. 1974).   Respondent Nace requests that this Court follow the *Swan* court's analysis and examine Respondent Nace's actions prior to his removal of this case. Specifically, Respondent Nace urges this Court to examine the following in considering Respondent's pre-removal activity in this case, including:  (1) the Statement of Charges which does not

specifically state that Respondent Nace was employed by the Bankruptcy Court as Special Counsel to the Trustee; (2) the Answer and Affirmative Defenses filed by Respondent Nace specifically asserted that he had not been retained as legal counsel to the Bankruptcy Court or the Bankruptcy Trustee and specifically reserved his right to remove this matter under *Kolibash* and § 1442 should it be concluded that Respondent Nace was found to be so employed; (3) the Motion to Dismiss Statement of Charges filed by Respondent Nace on October 4, 2011, which contended that he had not been formally advised that he had been appointed as Special Counsel to the Bankruptcy Trustee by the Bankruptcy Court in this case; and, (4) at the hearing on October 10, 2011, Respondent Nace questioned the Trustee extensively about Respondent's appointment as Special Counsel and the Trustee indicated that he had not communicated that the Bankruptcy Court had approved and appointed Respondent Nace as Special Counsel in this case.

Further, in Respondent's post-hearing submission, entitled "Respondent's Findings of Fact and Conclusions of Law and Recommended Decision," Respondent Nace continued to contend and assert that he had not been advised by the Bankruptcy Trustee that the Court had appointed him as Special Counsel in this case and that no attorney-client relationship was formed

and no legal or ethical duties or obligations were established under the circumstances presented.

This Court must understand that Respondent Nace never had the burden of proof or production in the lawyer disciplinary proceeding. He was not in control of what facts were alleged and what evidence was produced at the hearing held on October 10, 2011. Based upon what was presented by Petitioner LDB, the HPS concluded that Respondent Nace was employed as Special Counsel to the Trustee and that he performed his duties negligently. It must be recalled that Respondent Nace has always denied these assertions and continues to do so at this time. To have required him to file his notice of removal prior to the HPS's concluding, as it did in its Report, would have forced him to speculate or guess as to how the evidence was to be decided by the HPS. It would have been premature to require him to have filed the notice of removal prior to receipt of the Report.

In spite of the above stated defensive actions, Petitioner LDB urges this Court to conclude that Respondent waived his right to remove the instant action. However, Respondent submits that this Court should apply *Swan* and *Jordan*, referenced above, and conclude that this is not the extreme situation and Respondent Nace has not indicated a clear and unequivocal intent to remain in state court.

IV.   **THE *YOUNGER* ABSTENTION DOCTRINE DOES NOT APPLY TO THIS CASE AS RESPONDENT NACE IS ENTITLED TO REMOVAL OF THE LAWYER DISCIPLINARY PROCEEDING TO THIS COURT UNDER § 1442(a)(3) BECAUSE THE HPS CONCLUDED AS A MATTER OF LAW HE WAS EMPLOYED AS SPECIAL COUNSEL PURSUANT TO BANKRUPTCY COURT ORDER AND WAS NEGLIGENT IN THE PERFORMANCE OF HIS OFFICIAL DUTIES TO THE TRUSTEE WHO IS THE COMPLAINING PARTY IN THE STATE LAWYER DISCIPLINARY PROCEEDING AND, AS SUCH, THE FEDERAL INTERESTS ARE PARAMOUNT TO ANY OF THE IMPLICATED STATE INTERESTS.**

Petitioner LDB's argument that the *Younger* doctrine applies in the instant case is misplaced and without factual or legal basis.  The Fourth Circuit, in *Moore v. City of Ashville NC*, 396 F.3d 385 (4th Cir. 2005), held that:

> A federal court should abstain from interfering in a state proceeding, even though it has jurisdiction to reach the merits, if there is (1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit.  (Citations omitted.)

*Moore,* 396 F.3d at 390.  This Court should immediately recognize that Respondent Nace has not raised any federal constitutional claim in the instant case.  Therefore, the third prong of the *Younger* doctrine is and cannot ever be satisfied in the instant case.

Moreover, the Fourth Circuit, in its *Kolibash* decision, clearly balanced the federal interest in protecting

the removal rights of a federal officer under § 1442(a) and the state interest in regulating professional lawyer misconduct, and the scale tipped in favor of federal interest being determined as paramount.  This conclusion also supports Respondent Nace's argument that the *Younger* doctrine simply does not apply in the instant case.

The Fourth Circuit plainly stated, in its *Kolibash* decision, that:

> Regulation of the legal profession admittedly implicates significant state interest, but the federal interest in protecting federal officials in the performance of their federal duties is paramount.

*Id.* at 872 F.2d 575.

The *Kolibash* court further noted:

> In his removal petition, for example, Kolibash demonstrates that his alleged misconduct grew out of acts performed by him in the course of his duties as a federal officer.  As the district court recognized, the state bar's charges arose out of Kolibash's alleged negligent supervision of one of his subordinates, which occurred by Kolibash was acting in his capacity as United States Attorney for the Northern District of West Virginia.

*Id.* at 574.

Like Respondent Nace in the instant case, Kolibash filed his answer to the State Bar's charges and denied any misconduct that occurred.  *Id.*

56

The Court also stated that:

> Kolibash's alleged misconduct, for
> example, arose out of a federal grand
> jury drug investigation and a subsequent
> criminal trial in federal district court.
> Significant federal interests are
> therefore involved regardless of whether
> Kolibash has a federal defense to the
> state professional disciplinary
> proceeding.

872 F.2d 575.

Again noting the underlying purpose and intent of §

1443(a), the federal officer removal statute, the Court in

*Kolibash* stated concisely:

> The central concern of the removal
> statute is that a federal officer or
> agent shall not be forced to answer for
> acts performed under color of his office
> in anything but a federal forum
> regardless of what label is attached to
> the proceeding.

(citing *North Carolina v. Carr, supra.; Id.* at 576.)

The *Kolibash* decision noted:

> The Committee on Legal Ethics is defined
> as an instrumentality of the West
> Virginia Supreme Court of Appeals and its
> procedures are adjudicatory in nature.
> The committee is authorized to hold
> evidentiary hearings, subpoena witnesses,
> take testimony under oath in an adversary
> proceeding, and otherwise conduct itself
> as a court.  It also makes factual
> findings and recommends attorney
> sanctions to the West Virginia Supreme
> Court of Appeals.  A committee
> investigation can result in public
> reprimands, suspensions, or disbarment of
> lawyers who practice in West Virginia.

57

> **To hold this proceeding outside the**
> **operation of the removal statute would be**
> **to elevate form over substance.  If a**
> **state's investigative body operates in an**
> **adjudicatory manner, and if a federal**
> **officer is a subject to its process, the**
> **statutory requirements of § 1442(a)(1)**
> **are satisfied.**

*Id.*  Finally, the Court in *Kolibash* said:

> A federal court's role under § 1442 is
> similar to that of a federal court
> sitting in diversity.  (Citations
> omitted.)  The federal officer removal
> statute permits a state action to be
> adjudicated on the merits in a federal
> court 'free from local interests or
> prejudice' (citations omitted) and a
> federal officer is therefore guaranteed a
> federal forum in which federal rules of
> procedure will be applied.

*Id.*

This Court should also know that Mr. Kolibash had been

deposed, the Committee on Legal Ethics deliberated concerning

the filing of the charges, and Mr. Kolibash filed his answer to

the statement of charges, all prior to removing the action.

Petitioner LDB cannot avoid HPS's findings of fact and

conclusions of law which, for the first time, clearly thrust

Respondent Nace, as an officer of the United States court, into

a position where he had to act to seek removal of this case

under § 1442(a)(3).

Moreover, the cases cited by Petitioner LDB in support

of its argument that the *Younger* extension doctrine applies to

the instant case, *Plouffe v. Ligon*, 606 F.3d 890 (8th Cir. 2010)

and *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515 (1982) are not factually similar to the instant case and do not apply because the state disciplinary proceedings filed against the attorney in *Plouffe* did not involve any action taken while he was serving as an officer of the courts of the United States.  Therefore, the attorney in *Plouffe* was not standing in the same shoes as Respondent Nace with regard to his actions entitling him to seek removal under § 1442(a)(3).  In addition, unlike *Plouffe*, Respondent Nace is not challenging any of the state court disciplinary rules or its procedures as being unconstitutional in the instant proceeding.

Likewise, the *Middlesex* case does not involve § 1442(a)(3) federal officer removal and revolves around a constitutional challenge to the disciplinary rules subject to the state disciplinary procedure within the jurisdiction of the New Jersey Supreme Court.

Petitioner LDB and its counsel have failed to perceive the significant distinction in Respondent Nace's case and the *Plouffe* and *Middlesex* decisions.  Again, neither case cited by Petitioner LDB involve § 1442(a)(3) removal and Respondent Nace is not making a constitutional challenge here to any of the West Virginia Rules of Professional Conduct or the underlying *quasi* civil adjudicatory proceedings held to date.

Therefore, based upon a careful reading of the authorities cited by Petitioner, this Court should know and understand that the *Plouffe* and *Middlesex* cases do not apply to any degree to the instant case.  Therefore, based upon the reasoning clearly set forth in the *Kolibash* decision, which makes certain that the federal interest in protecting a federal officer is paramount to the significant state interests in the regulation of the legal profession, the *Younger* extension doctrine simply does not apply.

WHEREFORE, Respondent Barry J. Nace respectfully requests that this Court deny Petitioner's Motion to Remand and immediately schedule this case for further proceedings.

Respectfully submitted,

s/ J. Michael Benninger_____
J. Michael Benninger, Esquire
W.Va. State Bar No. 312
Daniel D. Taylor, Esquire
W.Va. State Bar No. 10165
Benninger Law
PROFESSIONAL LIMITED LIABILITY COMPANY
P. O. 623
Morgantown, WV  26507
(304) 241-1856
mike@benningerlaw.com