# RESPONSE
# EXHIBIT A

FILE COPY

**D. MICHAEL BURKE and BARRY J. NACE HEARING**
10/10/11

SHEET 1   PAGE 1

BEFORE THE HEARING PANEL SUBCOMMITTEE
OF THE
LAWYER DISCIPLINARY BOARD

IN RE:  D. MICHAEL BURKE, ESQUIRE,
        A Member of the West Virginia State Bar

I.D. No. 09-05-354

Supreme Court No. 11-0813

                and

IN RE:  BARRY J. NACE, ESQUIRE,
        A Member of the West Virginia State Bar

I.D. No. 09-05-353

Supreme Court No. 11-0812

     TRANSCRIPT OF HEARING held on the 10th day of
October, 2011, beginning at 9:00 a.m., at the Holiday Inn,
301 Foxcroft Avenue, Martinsburg, Berkeley County, West
Virginia.

     BEFORE:  Debra Kilgore, Chairperson
              Sean Francisco, Member
              Cynthia Pyles, Laymember



CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 2   PAGE 2

APPEARANCES

On behalf of the Office of Disciplinary Counsel:

JESSICA H. DONAHUE RHODES, ESQUIRE
Office of Disciplinary Counsel
City Center East, Suite 1200-C
4700 MacCorkle Avenue, S.E.
Charleston, West Virginia 25304

On behalf of Respondent Burke:

ALLAN N. KARLIN, ESQUIRE
Allan N. Karlin & Associates
174 Chancery Row
Morgantown, West Virginia 26505

On behalf of Respondent Nace:

J. MICHAEL BENNINGER, ESQUIRE
Wilson, Frame, Benninger & Metheney
151 Walnut Street
Morgantown, West Virginia 26505

ALSO PRESENT:  Maura A. Lewis, Recorder

---

PAGE 3

I N D E X

| Witnesses | Examination by | Page No. |
|---|---|---|
| ODC's | | |
| Robert N. Trumble | Ms. Rhodes | 7 & 157 |
| | Mr. Benninger | 43 & 170 |
| | Mr. Karlin | 109 & 178 |
| D. Michael Burke | Ms. Rhodes | 188 |
| | Mr. Benninger | 217 |
| | Mr. Karlin | 246 |
| (Recalled by Mr. Karlin) | | 369 |
| Barry J. Nace | Ms. Rhodes | 268 & 337 |
| | Mr. Benninger | 313 & 361 |
| | Mr. Karlin | 336 |
| Respondent's | | |
| (None) | | |

E X H I B I T S

| Identification | Marked | Admitted |
|---|---|---|
| ODC's | | |
| Burke Exhibits 1 through 18 | | 365 |
| Nace Exhibits 1 through 19 | | 365 |
| Respondent Nace | | |
| Nace Exhibits 1 through 42 | | 367 |
| Nace Exhibit Number 41 | 173 | |
| Nace Exhibit Number 42 | 328 | |
| Nace Exhibits 43 through 45 | 377 | 377 |
| Respondent Burke | | |
| Burke Exhibits 1 through 9 | 377 | 377 |
| Certificate | | 378 |

---

PAGE 4

1  P R O C E E D I N G S
2                        (9:00 a.m.)
3          CHAIRPERSON KILGORE:  We are here in
4  the matter of In Re:  Michael Burke, Bar Number 550,
5  Supreme Court Number 11-0813, I.D. Number 09-05-354,
6  and In Re:  Barry Nace, Bar Number 7313, Supreme
7  Court Number 11-0812, I.D. Number 09-05-353.  Will
8  the parties announce their presence?
9          MS. RHODES:  Jessica Rhodes for the
10  Office of Disciplinary Counsel.
11          MR. KARLIN:  Allan N. Karlin on behalf
12  of Mr. Burke, and Mr. Burke is also present.
13          CHAIRPERSON KILGORE:  Thank you.
14          MR. BENNINGER:  Mike Benninger,
15  Morgantown, on behalf of Barry J. Nace, who is
16  present with me today.
17          CHAIRPERSON KILGORE:  Thank you.  In
18  the telephone pre-hearings we had in this matter, we
19  had all agreed we were going to have a consolidated
20  evidentiary hearing, and I understand that Ms. Rhodes
21  has a motion or an objection to make.
22          MS. RHODES:  Yes.  Because of the due
23  process involved with both Mr. Burke and Mr. Nace
24  regarding the consolidated hearings, because they are

---

PAGE 5

1  a separate statement of charges and the level of
2  culpability may be different, I believe we do have to
3  have separate hearings in the matter.
4          CHAIRPERSON KILGORE:  Okay.  Mr.
5  Karlin?
6          MR. KARLIN:  Mr. Burke is fully aware
7  of those issues, but we are confident that the panel
8  can separate out the two individuals and the two sets
9  of charges, and we think in the interest of judicial
10  economy it makes more sense to go forward with each
11  witness only testifying once in both cases.
12          CHAIRPERSON KILGORE:  And Mr.
13  Benninger?
14          MR. BENNINGER:  Thank you, Ms. Kilgore.
15  I have discussed this matter thoroughly with Mr.
16  Nace.  He understands that -- and he has authorized
17  me to do two things.
18          One, I would like to place on the
19  record that his hearing was previously scheduled for
20  a date later in November.  I appreciate the
21  cooperation of Ms. Rhodes, who suggested that maybe
22  today was a better day for all of us, and so I have
23  my client's knowing and intelligent waiver and
24  consent to move his hearing up to today.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 3   PAGE 6

PAGE 6

1  Secondly, I have discussed having a
2  joint evidentiary hearing today with him, and he has
3  consented, knowing that he has the right under our
4  Rules of Professional Conduct to have his own
5  singular hearing to where he would present his own
6  testimony and cross-examine at a different date and
7  time.
8  He waives that right and thanks you for
9  the cooperation of ODC and Mr. Burke and his counsel
10  to do it today, which we believe is in the best
11  interests of all parties, the State and ODC, and this
12  process.
13  CHAIRPERSON KILGORE:  Well, thank you.
14  And I think that for the reasons set forth by the
15  Respondents and in the interest of judicial economy
16  that we can go forward with one evidentiary hearing
17  with all parties knowingly waiving their rights to
18  separate hearings, so we will proceed with one
19  evidentiary hearing.
20  And, also, we have pending the motions
21  to dismiss of each of the Respondents.  Having
22  considered those motions, I believe under the Rules
23  of Lawyer Disciplinary Procedure we have to have an
24  evidentiary hearing, anyway.  That's one reason they

PAGE 7

1  will be denied.
2  Secondly, I think the hearing panel
3  members all believe that there are material facts in
4  dispute.  So with that being said, if you wish to
5  make opening statements, we will proceed.
6  MS. RHODES:  I'll waive opening
7  statements and just begin with the testimony.
8  CHAIRPERSON KILGORE:  All right.  Do
9  you want to proceed?
10  MS. RHODES:  The Office of Disciplinary
11  Counsel calls Robert Trumble.
12  (Witness Robert W. Trumble sworn.)
13  THEREUPON came
14  ROBERT W. TRUMBLE,
15  called as a witness on behalf of the Office of
16  Disciplinary Counsel, and having been first duly
17  sworn according to law, testified as follows:
18  DIRECT EXAMINATION
19  BY MS. RHODES:
20  Q    Could you please state your name for
21  the record?
22  A    My name is Robert W. Trumble.
23  Q    And how long have you been an attorney?
24  A    Since 1984.

PAGE 8

1  Q    And what are your areas of practice?
2  A    Civil litigation, commercial
3  litigation, and bankruptcy.
4  Q    And I understand that you are a
5  bankruptcy trustee?
6  A    I am.
7  Q    And how long have you been doing that?
8  A    I was appointed as a panel trustee in
9  1994.
10  Q    Okay.  And so that's quite a few years
11  of being a trustee?
12  A    That's correct.
13  MS. RHODES:  And it looks like on
14  July 13th, 2009 -- if you look under Tab 1, it's
15  going to be under both exhibit notebooks.  Both
16  Tab 1's are the same.
17  CHAIRPERSON KILGORE:  Mr. Burke's
18  notebook?
19  MS. RHODES:  Mr. Burke's and Mr. Nace's
20  are both the same starting out.
21  BY MS. RHODES:
22  Q    And do you recognize that document?
23  It's quite a few pages long.
24  A    Yes.

PAGE 9

1  Q    And what document is that?
2  A    This is the complaint that I filed to
3  the Lawyer Disciplinary Board as it relates to D.
4  Michael Burke.
5  Q    Okay.  And the other black notebook, if
6  you look under Tab 1 of that, what does that reflect?
7  A    This is a copy of the complaint that I
8  filed to the Lawyer Disciplinary Board as it relates
9  to Barry J. Nace.
10  Q    Okay.  And are those complaints similar
11  except the title page and the attorney being
12  complained of?
13  A    Yes.  My recollection is that they were
14  identical but for the original two pages.
15  Q    Okay.  And why did you file the
16  complaint in this matter?
17  A    I filed the complaint in this matter
18  because I had retained the services of Michael Burke
19  and his law firm and Mr. Nace and his law firm to
20  represent the bankruptcy estate of Barbara Miller, to
21  pursue Barbara Miller's -- in essence, the bankruptcy
22  estate's interest in a malpractice claim.
23  I followed the standard procedures
24  utilized by trustees in our district to apply for and

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 4   PAGE 10

1  obtain the authority to retain counsel.  I reported
2  on those cases as was required for my duties and
3  obligations as a trustee.
4       Q   Well, if you look at what has been
5  Bates stamped as 6 in both notebooks under Tab 1,
6  it's an October 26, 2004, letter.
7       A   Yes.
8       Q   Does that look familiar to you?
9       A   Yes.  That's a -- yes.  It is a letter
10 that I initially sent to Mark Jenkinson.  Mark
11 Jenkinson, unfortunately, was not involved in this
12 case.  I understand he is a partner with Mr. Burke,
13 but I sent that to him in error.
14      On the original bankruptcy petition and
15 schedules -- and I don't mean to jump ahead.  But on
16 the original bankruptcy petition and schedules, one
17 of the assets that's identified for Mrs. Miller is an
18 interest in a malpractice case.
19      And once we review the bankruptcy
20 petition and schedules and then conduct a creditors
21 meeting or sometimes even in advance, we determine
22 that there may be an asset available for the
23 creditors of the estate.  There is something that we
24 want to pursue in terms of attempting to generate

PAGE 11

1  funds to distribute to creditors.  And in this case
2  there was a malpractice claim.
3       And it would be the standard practice
4  that we would notify the attorneys that were then
5  representing Ms. Miller or the Miller estate to see
6  if they can determine or provide us with some
7  valuation, because we obviously are concerned as to
8  whether there is equity in the asset to pursue it for
9  the benefit of the creditors.
10      Q   And is this what this letter is, is
11 you're checking to see what the --
12      A   Yes.
13      Q   -- if there is any equity in this
14 asset?
15      A   Exactly.
16      Q   And why did you send it to Mr.
17 Jenkinson?
18      A   It was an error.
19      Q   It was an error.  Okay.  Obviously, the
20 letter does reference the bankruptcy case.  Do you
21 remember when you were appointed as trustee in the
22 bankruptcy case?
23      A   It would have been simultaneously with
24 filing Ms. Miller's bankruptcy case.  I believe it

PAGE 12

1  was September of 2004.
2       Q   Okay.  If I say September 27th, 2004,
3  would that sound correct?
4       A   That sounds correct.
5       Q   Okay.  And soon after that you had
6  like -- what is it called -- a meeting of creditors?
7       A   Right.  It's a meeting of creditors
8  pursuant to 11 United States Code, Section 341.  It's
9  a 341 meeting of creditors.
10      Q   Okay.  And after you sent this October
11 26th, 2004, letter -- it looks like attached to it
12 there is an authorization by Ms. Miller to get
13 documents and records.  What is that about?  That's
14 Bates Stamp Number 8.
15      A   When a debtor files for bankruptcy, all
16 of their assets -- quite frankly, all their
17 liabilities -- become part of a bankruptcy estate.
18 So, in essence, the right to pursue any type of
19 claim, the right to ownership in assets, belongs to
20 the bankruptcy trustee, subject to the debtor's
21 exemption and other issues.
22      When a debtor presents a matter where
23 they are currently represented by counsel, in order
24 to alleviate any concerns by counsel at the time, I

PAGE 13

1  have the debtors execute an authorization so I can
2  speak directly with that counsel concerning the
3  valuation of the asset itself, in this case the
4  malpractice claim.
5       Q   All right.  And if you turn to Bates
6  Stamp -- let's go to Bates Stamp 9 in both cases.
7  That's a January 11th, 2005, letter to Michael Burke.
8       A   That's correct.
9       Q   And I believe that's the same letter
10 you sent to Mr. Jenkinson, which is Mr. Burke's
11 information?
12      A   That's correct.
13      Q   And why did you send that to Mr. Burke
14 at that point?
15      A   Well, it was obviously a follow-up to
16 the previous letter.  Either we had not received a
17 response from Mr. Jenkinson, or to be candid I don't
18 recall whether Mr. Jenkinson called and said, "I'm
19 not involved in the case."
20      But as part of our administration
21 duties, as part of our follow-up as it relates to
22 this particular asset, we then sent a second letter
23 to Mr. Burke or a first letter to Mr. Burke as it may
24 be inquiring as to the valuation of the asset itself.

CHAMBERS COURT REPORTING
(304) 757-8367

SHEET 5   PAGE 14

1   Q   And if you turn to Bates Stamp 11 in
2   both cases --
3   A   Right.
4   Q   -- that's a January 25th, 2005, letter
5   from Mr. Burke to you?
6   A   That's correct.
7   Q   And what were you able to learn from
8   this letter?
9   A   Well, the first thing that -- in the
10  first sentence, obviously, it's that the potential
11  claim of Barbara Miller is being reviewed by Barry J.
12  Nace as co-counsel from Washington, D.C.  That's the
13  first time that we had been introduced to Mr. Nace as
14  co-counsel.  So that was the first thing.
15       He also indicated that until a medical
16  review is done, it would be impossible to give me an
17  evaluation of the case.
18       He then advised me that medical
19  malpractice cases do not settle with the same
20  frequency of automobile accidents and other types of
21  cases, other types of torts do.  They are difficult
22  and contested and result in trials.
23       That sent a message to me that to the
24  extent that there was value in this claim for the

PAGE 15

1   benefit of the estate, that it was not going to be
2   one that was going to be settled or resolved in a
3   short period of time.
4   Q   Were you able to get from this whether
5   there was any equity in this?
6   A   I was not able to determine that from
7   this particular letter.  However, because of the
8   unknown value of it, it would be the standard
9   practice to, in essence, proceed with the employment
10  of counsel to pursue it on behalf of the estate to
11  the extent that the recovery would yield benefits for
12  the creditors and for the estate.
13  Q   Okay.  And if you turn to Bates
14  Stamps 12 in both notebooks, it's a January 27th,
15  2005, letter to Mr. Nace.
16  A   Right.  This is a letter that I sent to
17  Mr. Nace with the enclosed application to employ, a
18  proposed order, and an affidavit.  This is a practice
19  that we utilize when we need to employ professionals
20  to represent the bankruptcy estate in such matters as
21  this.  We prepare the application.  And, in fact, the
22  application which is attached --
23  Q   Well, Bates Stamp 13 in both is the
24  letter -- I believe the same letter to Mr. Burke?

PAGE 16

1   A   Right.
2   Q   And then Bates Stamp 14 starts your
3   application; is that correct?
4   A   That's correct.
5   Q   Okay.  And what is this application?
6   A   This is an application to employ
7   special counsel.  A trustee in bankruptcy is
8   authorized to retain the services of professionals to
9   assist in the administration of the estate.
10       And by filing this application with the
11  court, it indicates that there is an agreement
12  reached with counsel, and that we do need court
13  authority ultimately to make sure that the
14  compensation is paid and that counsel is acting with
15  the court approval and authority.
16       And in this case the application
17  provides that it is going to be under the same terms
18  and conditions -- the representation would be under
19  the same terms and conditions as originally entered
20  into by the parties as set forth in the contingent
21  fee contract.
22  Q   So at some point you got the contract
23  between Ms. Miller and Mr. Burke and Mr. Nace?
24  A   That's correct.

PAGE 17

1   Q   Okay.  And if you look in paragraph 2
2   of your application, it talks about pursuing the
3   personal injury claim.  Can you explain that to me?
4   A   Well, other than to be embarrassed and
5   chagrined about the fact that it says "Personal
6   Injury," the only remark that I can say is that this
7   is a fairly standard form that's utilized, and
8   inadvertently instead of saying "Medical Malpractice"
9   it was "Personal Injury."
10  Q   Okay.  And attached to -- as Bates
11  Stamp 16 is a blank affidavit from Mr. Burke; is that
12  correct?
13  A   That's correct.
14  Q   And one for -- both of those are Mr.
15  Burke.  And 17, I believe, in Mr. Nace's is his
16  affidavit, blank affidavit; is that correct?
17  A   Well, I don't know how the notebooks
18  are arranged.  In Mr. Burke's -- or Mr. Nace's record
19  is -- 16 is Mr. Burke's blank affidavit and 17 is Mr.
20  Nace's blank affidavit.  That's correct.
21  Q   And why would you attach these
22  affidavits to the application?  Like what is the
23  significance of those?
24  A   The significance is that the attorneys

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 6   PAGE 18

1   are expressing their agreement to act as counsel.
2   They're also indicating that they have no adverse
3   interest to the estate.  In order to be qualified
4   as a -- or to be approved as a professional employed
5   by a trustee, they have to be disinterested.
6       Q    Would you have spoke to either Mr.
7   Burke or Mr. Nace prior to sending the application
8   and the affidavit?
9       A    I would have spoken with Mr. Burke.
10      Q    Do you recall that conversation?
11      A    I recall that I sent him the letter
12   previously.  To be candid with you, this time ago, I
13   don't recall a specific conversation.  I question how
14   I got Mr. Nace's address if I didn't talk with him,
15   but to say specifically, I don't recall any specifics
16   about the conversation.
17      Q    Do you think it was any conversation
18   regarding, "I'm going to send you an application, an
19   affidavit"?
20           MR. BENNINGER:  Objection.
21   Speculation.  He said he doesn't recall.
22           CHAIRPERSON KILGORE:  Sustained.
23   BY MS. RHODES:
24      Q    And what did you do upon receiving --

PAGE 19

1   you did receive the affidavit signed by both Mr.
2   Burke and Mr. Nace; is that correct?
3       A    That's correct.
4       Q    If you look at 18 under Mr. Burke's
5   exhibit notebook, I believe that's a February 2nd,
6   2005, letter.
7       A    That's correct.
8       Q    And enclosed was the completed
9   affidavit and a copy of the contract with Ms. Miller;
10   is that correct?
11      A    That's correct.
12      Q    And why would you need the contract
13   regarding Ms. Miller and Mr. Burke?  Why would you
14   need that?
15      A    Because, in essence, my agreement --
16   their agreement to represent me would be along the
17   same exact terms as the agreement that they had with
18   Ms. Miller.
19      Q    Okay.  So they would still be able to
20   get their attorney fees?
21      A    Exactly.  My agreement to compensate
22   them through the bankruptcy estate would be the
23   exact -- identical to as if Ms. Miller was, in fact,
24   the only party in the case.

PAGE 20

1       Q    Okay.  And if you look at Bates
2   Stamp 19 in Mr. Burke's and Bates Stamp 20 in Mr.
3   Nace's, I believe that's Mr. Nace's February 24,
4   2005, letter?
5       A    That's correct.
6       Q    Enclosed was the signed affidavit; is
7   that correct?
8       A    That's correct.
9       Q    And also at the bottom of that letter,
10   he told you to note his new address?
11      A    That's correct, as well.
12      Q    Okay.  And if you go to Bates Stamp 22
13   under Mr. Burke's --
14      A    Yes, ma'am.
15      Q    -- what is that?
16      A    Under Mr. Burke's, I believe that
17   that's Mr. Burke's signed -- or that's Mr. Nace's
18   signed affidavit.
19      Q    Okay.  And that was -- can you see
20   where it was notarized on?
21      A    Yes.  It was notarized on
22   February 24th, 2005.
23      Q    Okay.  And I believe that's reflected
24   as Bates Stamp 23 in Mr. Nace's?

PAGE 21

1       A    That's correct, as well.
2       Q    And if you turn to 23 in Mr. Burke's
3   and 24 in Mr. Nace's, is that Mr. Burke's affidavit?
4       A    That's correct.
5       Q    And can you tell when that was
6   notarized?
7       A    That was notarized February 1, 2005.
8       Q    Okay.  And I believe 24 in Mr. Burke's
9   and 25 in Mr. Nace's, that is the contract of
10   employment and authority to represent between Mr.
11   Burke and Ms. Miller; is that correct?
12      A    That's correct.
13      Q    And what did you do with that
14   information when you received it back from both Mr.
15   Burke and Mr. Nace?
16      A    I then filed the application together
17   with the attached affidavits together with the
18   contract of employment.  I filed that with the
19   bankruptcy court.
20      Q    Okay.  And if you look at Bates
21   Stamps 25 in Mr. Burke and 26 in Mr. Nace's, that is
22   the signed order authorizing you to employ special
23   counsel?
24      A    That's correct.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 7   PAGE 22

1     Q   Why do you need an order to employ
2   special counsel?
3     A   It's primarily for their -- for their
4   protection. If we have an order that provides that
5   they're authorized to proceed with the
6   representation, it also gives them the right to be
7   paid, to be compensated.
8     Q   Okay. And did you send this order to
9   either Mr. Burke or Mr. Nace?
10    A   Personally, I did not.
11    Q   Are you aware of any type of service of
12  them?
13    A   The bankruptcy court uses an electronic
14  service system, and the docket for the bankruptcy
15  court reflects that a copy of this order was served
16  on both Mr. Burke and Mr. Nace.
17    Q   Okay. So it's not your practice to
18  send that order?
19    A   No, it's not.
20    Q   Okay. And you don't do that in any
21  other cases?
22    A   I do not.
23    Q   Okay. If you look at what has been
24  Bates stamped 26 in Mr. Burke's file and 27 in Mr.

PAGE 23

1   Nace's exhibit notebook, that's a May 18, 2005,
2   letter to Mr. Burke regarding the status?
3     A   That's correct.
4     Q   And why did you send this letter?
5     A   Well, to obtain a status report, to
6   find out what's going on in the case. I have to --
7   I'm required to make periodic reports as to the
8   status of cases. And, you know, in this case I wrote
9   a letter to Mr. Burke seeking to determine the status
10  of the case.
11    Q   Why did you not send a letter to Mr.
12  Nace?
13    A   First of all, I didn't know Mr. Nace.
14  I was informed that Mr. Nace had to be employed as
15  co-counsel, and so therefore we made the application
16  to employ Mr. Nace.
17        The second reason is I've dealt with
18  Mr. Burke in the past. I've known him for many
19  years. He has represented me as a bankruptcy trustee
20  in other cases, so I'm familiar with his body of
21  work.
22        I felt that he was familiar with the
23  procedures utilized by a trustee when administering
24  an asset of this nature. To be candid with you, it's

PAGE 24

1   more convenient than it is anything else.
2         I also -- you know, Mr. Nace is
3   identified as of counsel both on his letterhead -- on
4   Burke & Schultz letterhead as of counsel for -- if
5   I'm not clear on that, Mr. Nace is identified as of
6   counsel for Burke Schultz Law Firm.
7         And, likewise, on Mr. Nace's letterhead
8   he uses the same address as Burke & Schultz as his
9   West Virginia address. So I really felt that if I
10  was communicating with Mr. Burke, I was communicating
11  with both of them.
12    Q   Okay. And you were assuming -- well,
13  you assumed they were talking to each other about the
14  case, as well?
15    A   As co-counsel, yes, ma'am.
16    Q   If you look at what has been marked as
17  Bates Stamp 27 in Mr. Burke's and Bates Stamp 28 in
18  Mr. Nace's, it's a May 24, 2005, letter from Mr.
19  Burke, I believe, to your legal assistant?
20    A   Yes.
21    Q   And what were you able to gain from
22  this letter?
23    A   Well, that it appeared that they had
24  been talking because his initial comment is that, "My

PAGE 25

1   co-counsel has advised that the various potential
2   defendants that are expert has determined that were
3   at fault in causing Ms. Miller's death. We are
4   awaiting responses to our assertions."
5         And he then advises me that the case
6   can be expected to take several years to complete.
7   It's not one that's very consistent with his initial
8   response to my inquiry as to the valuation of the
9   case inasmuch as it's not necessarily going to be a
10  case that is going to settle quickly and would
11  potentially result in trial. So although this
12  doesn't say "trial," it says it can take several
13  years to complete.
14    Q   Okay. And if you look at what has been
15  Bates stamped 28 in Mr. Burke's and 29 in Mr. Nace's
16  exhibit notebooks, that's a July 27th, 2007, letter?
17    A   That's correct.
18    Q   And, again, this was seeking a status;
19  is that correct?
20    A   That's correct.
21    Q   Okay. And what's the delay between the
22  2005 and 2007?
23    A   The delay is that because of the nature
24  of the case, because it's a malpractice type of

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 8   PAGE 26

1  claim, we may not have -- we obviously -- I don't
2  have any records where we sent a letter in 2006
3  seeking the status, a report or an update, but it's
4  fairly common practice, in particular with somebody
5  that we're familiar with, a law firm that we're
6  familiar with, that we will make a call to determine
7  the status of the case, either myself or a legal
8  assistant who would be assisting in monitoring the
9  case with me.
10      Q    And if you look at Bates Stamp 29 in
11  Mr. Burke's and Bates Stamp 30 in Mr. Nace's, it's an
12  October 10, 2008, letter to both Mr. Burke and Mr.
13  Nace?
14      A    Yeah.
15      Q    And what is this letter dealing with?
16  It's a two-page letter.
17      A    By October 10th of 2008, we had
18  discovered or determined or obtained information
19  that, in fact, the case had either been dissolved,
20  tried, settled, in some fashion had been resolved,
21  and that we were trying to determine what happened to
22  the money and what happened to the settlement, and,
23  in essence, why the estate wasn't notified of the
24  existence of a trial, or a verdict, or a resolution

PAGE 27

1  of some type, and why authority wasn't sought from
2  the bankruptcy court -- had there been a settlement,
3  why we weren't notified to obtain the proper
4  authority to resolve the issue.
5      Q    Do you recall how you found out about
6  the --
7      A    I believe that it was -- in 2008 it
8  would have been another call seeking a status report,
9  and we were informed that the case had been tried to
10  a verdict, and that the money had been distributed.
11      Q    What would have been the process had
12  they contacted you regarding settlement?
13      A    It's a fairly -- well, first of all, I
14  understand that it was not settled, and so there was
15  a trial.
16      Q    I believe there was part of it --
17      A    There was one part of it that was
18  settled.
19          Yeah.
20      A    Had they notified us of a settlement
21  aspect, we would have filed an -- first of all, I
22  would have asked them to advise me as to whether or
23  not it was an appropriate settlement, and then we
24  would have made a determination that it was, and then

PAGE 28

1      I would have filed an application seeking court
2  authority to approve the settlement.
3          In bankruptcy process, creditors are
4  given -- and other parties-in-interest are given
5  notice of everything that we do, so that if they have
6  any reason to object to the settlement or resolution
7  of the claim, they can certainly do so.
8      Q    And what about if you received a jury
9  verdict, you know, an amount from that?  Would that
10  be the same process?
11      A    A jury verdict, no.
12      Q    Okay.
13      A    Because there wouldn't -- there
14  wouldn't be anything to approve.  The fact that we
15  had retained counsel for the purpose of pursuing it,
16  the fact is that upon a jury verdict the practice
17  would have been or should have been that I was
18  notified that they had recovered, and that the
19  proceeds should have been turned over to the
20  bankruptcy estate for distribution, including the
21  payment of counsel, distribution of the debtor's
22  exemptible interest, and ultimately the distribution
23  to creditors.
24      Q    And explain that process.  After they

PAGE 29

1  would they get a jury verdict and they would give you
2  the money, how would you go about distributing that
3  money?
4      A    Well, I would -- initially, I would
5  seek to immediately distribute to counsel pursuant to
6  the order authorizing payment.  I would, in essence,
7  have them provide a settlement sheet as to the total
8  recovery, have them deduct their expenses, have them
9  deduct their attorney's fee, and turn over the net
10  proceeds to me.
11          So that just like any other civil
12  action, they would be compensated initially because
13  that's what the application and the order procedure
14  is all about, so that I can get my attorneys who
15  represent the estate compensated initially from in
16  this case the award that was given in the case.
17          The balance of the money would have
18  been turned over to the bankruptcy estate.  Now, the
19  only minor difference is that I may have also
20  authorized the distribution by counsel of the
21  debtor's exemptible interest in the gross recovery.
22          And if those two items would be taken
23  out on an appropriate settlement sheet, then the
24  balance of the funds would be turned over to the

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 9   PAGE 30

1  bankruptcy estate for distribution.
2      Q    And then that would be distributed to
3  the creditors?
4      A    That's correct.
5      Q    And any remaining would go to the
6  debtor?
7      A    Right.  In addition to the payment to
8  the creditors, there would be any other additional
9  expenses and administrative expenses and claims that
10  would be paid on behalf of the bankruptcy estate,
11  including trustee's commissions, commissions that
12  would be paid to me to administer the estate.
13      Q    And how are you -- like is that set by
14  statute as to what you are paid?
15      A    It is by statute, yes.
16      Q    And how is that set out?
17      A    In cases where there are assets, in
18  cases where the trustee actually recovers money for
19  the benefit of the creditors, we receive a statutory
20  fee compensation based on a formula, and you receive
21  25 percent of the first $5,000 in distribution, you
22  receive 10 percent of the next $45,000 of money
23  distributed, you receive 5 percent of the amount in
24  excess of $50,000 up to $1,000,000, and then you

PAGE 32

1      this letter?
2      A    Well, Mr. Nace responded to my letter
3  indicating that he did not receive the first request,
4  and I evidently had attached in my November 14th
5  letter a copy of the October 10th letter, and he
6  indicated that I had not sent the documents that were
7  attached to the October 10th letter.
8          And so he indicates that somebody had
9  called him several months ago, and he had told that
10  person that there was not a settlement and the case
11  was tried to a jury verdict and went to appeal and
12  reported by the Court of Appeals when they declined
13  to accept the defendant's petition.
14          In essence, he then questions why we
15  would need to obtain authority to settle since there
16  was no settlement.
17      Q    Would there have been any difference if
18  the case was appealed -- the jury verdict was
19  appealed?  What different steps would you take as
20  bankruptcy trustee?
21      A    There would be no difference until
22  ultimately money was recovered in some fashion,
23  either through settlement or an award was paid
24  pursuant to a jury verdict.

PAGE 31

1  receive 3 percent of the amount in excess of
2  $1,000,000.
3      Q    Okay.  And if you go to what has been
4  Bates stamped 31 in Mr. Burke's and 32 in Mr. Nace's,
5  that's a November 14, 2008, letter --
6      A    That's correct.
7      Q    -- to both Mr. Burke and Mr. Nace?
8      A    Right.
9      Q    And I believe with Mr. Nace's address,
10  it is different from the October 10, 2008, letter; is
11  that correct?
12      A    That's correct.
13      Q    Do you recall why you made that change?
14      A    I evidently sent it to the wrong
15  address.  I used an improper address to send it to
16  him.  And I had not received a response from Mr.
17  Burke, so I sent the second request, only this time
18  changing the address to Mr. Nace.
19      Q    Okay.  And if you go to what has been
20  Bates stamped as 33 in Mr. Burke's and 34 in Mr.
21  Nace's, that is a December 1st, 2008, letter from Mr.
22  Nace to you?
23      A    Yes.
24      Q    And what were you able to obtain from

PAGE 33

1      Q    Okay.  So until they got that money,
2  that's when it would come into play?
3      A    That's exactly right.
4      Q    So it just may take several months
5  longer?
6      A    Several years as indicated by counsel
7  initially.
8      Q    All right.  And if you look at what has
9  been Bates stamped 35 under Mr. Burke's and 36 under
10  Mr. Nace's, that's a January 5th, 2009, letter from
11  you to Mr. Nace?
12      A    That's correct.
13      Q    And what was this letter regarding?
14      A    Well, this is my response to Mr. Nace's
15  letter, providing him with the authority that I had
16  to act as the trustee and to provide him with the
17  information concerning the application and to employ
18  counsel in the order that was ultimately entered by
19  the court as a result of it.
20          I also provided him with the debtor's
21  allowable exemption as to what the exemption would
22  have been for Ms. Miller out of the initial proceeds.
23      Q    And I believe you attached the October
24  2008 letter and the attachments; is that correct?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 10   PAGE 34

1     A     That's correct.
2     Q     And if you look at what has been Bates
3  stamped 46 in Mr. Burke's --
4         CHAIRPERSON KILGORE:  What number?
5         MS. RHODES:  Forty-six (46) in Mr.
6  Burke's.  I believe it's 48 in Mr. Nace's.
7         BY MS. RHODES:
8     Q     It's a February 4th, 2009, letter from
9  Mr. Nace to you; is that correct?
10    A     That's correct.
11    Q     And what is this letter regarding?
12    A     This is Mr. Nace's response to my
13  request for information.  In essence -- in essence,
14  my understanding of this letter is that he did not
15  feel that he was acting as my counsel, and that he
16  had no reason to, in essence, respond to my requests,
17  and, in short, felt that my technique and my letters
18  to him were an attempt to bully him to cover up
19  mistakes of my own.
20         MR. BENNINGER:  Objection just for the
21  record that the letter is in evidence.  We do not --
22  we stipulate its admission, and it speaks for itself.
23  The recantation in the witness's own flavor is
24  inappropriate here.

PAGE 35

1         CHAIRPERSON KILGORE:  Denied.  I'll
2  deny the motion.
3         BY MS. RHODES:
4     Q     And what did you do upon receiving this
5  letter?
6     A     At that point I didn't feel that our
7  differences were reconcilable.  I felt that what may
8  have been an error, what may have been a mistake,
9  somebody didn't realize that they were employed as
10  counsel, was now something that I would have to
11  pursue in order to recover for the benefit of the
12  creditors of the bankruptcy estate of Barbara Miller.
13    Q     If you look at what is under Tab 10 of
14  Mr. Burke's and Tab 11 of Mr. Nace's.  Sorry about
15  that.  It's a little awkward.  And that's a
16  November 1st, 2010, letter from me to you regarding
17  the underlying case; is that correct?
18    A     That's correct.
19    Q     And I was asking some specific
20  questions regarding what was going on with the case;
21  is that correct?
22    A     That's correct.
23    Q     And if you turn under to Tab -- under
24  Tab 11 in Mr. Burke's and Tab 12 in Mr. Nace's --

PAGE 36

1     A     That's correct.
2     Q     -- your November 5th, 2010, response;
3  is that correct?
4     A     November 5th, 2010, is my response to
5  your letter.  Yes, ma'am.
6     Q     Okay.  And at that point in that
7  letter -- what does this letter basically tell me
8  regarding the bankruptcy estate?
9     A     Well, you had asked me a number of
10  questions.  Had the funds been recovered?  And the
11  answer to that was no.  We had not recovered any
12  money from the verdict or the settlement portion of
13  any recovery made on behalf of Ms. Miller for the
14  bankruptcy estate.
15         You asked whether or not the medical
16  malpractice case was listed as an asset of the
17  bankruptcy estate, and I identified that it was.
18  One of the particular questions on a bankruptcy
19  petition and schedules under the personal property,
20  Schedule B, is whether or not there are other
21  liquidated debts owing the debtor, and in this case
22  the medical malpractice case was, in fact,
23  identified.
24         You had asked me if the bankruptcy

PAGE 37

1  estate had been closed and what was the disposition
2  of the medical malpractice judgment, and I advised
3  you that, no, the bankruptcy estate had not been
4  closed, and that the bankruptcy estate was going to
5  be pursuing a claim against Mr. Burke and Mr. Nace
6  for malpractice related to their representation of
7  the bankruptcy estate.
8         And then you asked, if it had not been
9  closed, what is the course of action being taken
10  regarding the judgment of the medical malpractice
11  case, and it's a very similar response inasmuch as
12  the estate would be, in essence, pursuing claims
13  against Mr. Burke and Mr. Nace for the recovery of
14  the money that should have been turned over to the
15  bankruptcy estate from the jury verdict damage award
16  and the settlement.
17    Q     And that last letter you received from
18  Mr. Nace was in February of 2009, and by November of
19  2010 there had still been nothing filed in the
20  bankruptcy case regarding this malpractice verdict.
21  Why is that?
22    A     I'm sorry, now.
23    Q     Why hadn't something been filed in
24  regards to the recovery of the jury verdict or the

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 11  PAGE 38

1   settlement?
2       A    We had filed.  I believe in October of
3   2010 we, in fact, filed a malpractice claim.
4       Q    Okay.  And why was there the delay
5   between February 2009 and October --
6       A    There was a delay for two reasons.
7   First of all, I had to retain other counsel to pursue
8   the case.  Mr. Burke is a colleague.  I've known him
9   for several years.  It's not easy to find somebody
10  to, in essence, pursue a malpractice claim against an
11  attorney that practices in your area.
12          I contacted and had communications with
13  another attorney, who reviewed the issues over
14  several months, and, quite frankly, ultimately
15  declined to pursue it on behalf of the bankruptcy
16  estate.
17      Q    And if you look under what has been --
18  it's Tab 12 in Mr. Burke's and Tab 13 under Mr.
19  Nace's.  That's a December 20th, 2010, letter in
20  which I am again seeking additional information
21  regarding the bankruptcy matter; is that correct?
22      A    That's correct.
23      Q    And if you look under what is Tab 16 of
24  Mr. Burke's and Tab 17 of Mr. Nace's, it's a

PAGE 39

1   January 7th, 2011, response to my letter?
2       A    That's correct.
3       Q    And what does this letter inform me of?
4       A    It provided you with information
5   concerning the adversarial proceeding, malpractice
6   complaint, that had been filed against Mr. Burke and
7   Mr. Nace in the United States Bankruptcy Court
8   proceeding.  The complaint was filed on October 5,
9   2010.
10          It also identified certain other
11  pleadings that had been filed subsequent to the
12  filing of the initial action, including the
13  defendants' motion to dismiss, an order by the
14  bankruptcy court directing the trustee to respond.
15          The trustee's response was included,
16  the defendants' reply, and ultimately the order
17  entered by the court on December 29th denying the
18  defendants' motion to dismiss.
19      Q    And I believe in the phone conversation
20  we had last week, you said there was attached to that
21  certain documents -- in Mr. Burke's, it would be 463
22  through 468, and in Mr. Nace's, it would be 301
23  through 307 -- that are not part of the Barbara
24  Miller bankruptcy matter?

PAGE 40

1       A    I'm sorry.
2       Q    Am I telling you too many --
3       A    I'm sorry.
4       Q    -- too many numbers?
5       A    I'm lost a little bit right now, so
6   you'll have to help me out.
7       Q    463 under Mr. Burke's.  It would be
8   under Tab 16, Bates Stamp 463 through 468.
9       A    Bear with me just a moment, please.
10      Q    That's okay.  It's confusing.  I
11  understand.
12      A    Yes.  This is Mr. Burke's notebook.
13  Mr. Burke's notebook, Bates 0463 through 0468 are not
14  related to this proceeding at all.
15      Q    Okay.  And if you would prefer us not
16  to use those as --
17      A    They have no bearing on this case.
18      Q    Okay.  And that's the same in Mr.
19  Nace's, 301 through 307?
20          CHAIRPERSON KILGORE:  Do you want to
21  take them out of the notebook?  Is that what you want
22  to do?
23          MS. RHODES:  I would prefer that, yes,
24  but I don't know what counsel's --

PAGE 41

1           CHAIRPERSON KILGORE:  Unless there is
2   any objection, let's just go ahead and exclude 463 to
3   468 of Mr. Burke's notebook and --
4           MS. RHODES:  301 through 308 -- 307.
5           CHAIRPERSON KILGORE:  -- from Mr.
6   Nace's notebook.
7           MS. RHODES:  Yes.
8           CHAIRPERSON KILGORE:  And those will be
9   excluded from the evidence.
10          MR. BENNINGER;  No objection as we
11  understand it was just a simple error.
12          MR. KARLIN:  Which pages was that?
13          MS. RHODES:  463 through 468 in Mr.
14  Burke's.  It's under Tab 16.
15          THE WITNESS:  Do you want me to take
16  them out?  Do you just leave them out of --
17          MS. RHODES:  We'll get them.
18          THE WITNESS:  I finally found them.
19          CHAIRPERSON KILGORE:  Mr. Karlin?
20          MR. KARLIN:  No objections.
21          CHAIRPERSON KILGORE:  Okay.  They'll be
22  excluded from the notebooks -- excised from the
23  notebook.
24  BY MS. RHODES:

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 12   PAGE 42

1     Q    And is the adversary proceeding -- I
2    guess that's what it's called in bankruptcy court.
3    Is that still proceeding at this time?
4        A    It is.
5        Q    Where are you at in that case?
6        A    Pretrial and trial dates have been set.
7    Mediation dates are pending.  I think that there are
8    dispositive motion dates that have been set.  We pre-
9    tried the case, preliminarily pre-tried the case, and
10   given various dates for trial and for ultimately
11   pretrial.
12           MS. RHODES:  Okay.  At this time the
13   Office of Disciplinary Counsel has no further
14   questions.
15           CHAIRPERSON KILGORE:  Mr. Benninger, do
16   you want to go next?
17           MR. BENNINGER:  I do.  Thank you.  May
18   I be seated while I examine Mr. Trumble?
19           CHAIRPERSON KILGORE:  You may.
20           MR. BENNINGER:  Okay.  I would like to
21   provide Mr. Trumble with a copy of Respondent Nace's
22   exhibit book, if that would be okay, so he can refer
23   to it as well as ODC's group of exhibits.
24           MS. RHODES:  Did you bring an exhibit

PAGE 43

1    notebook?
2            MR. BENNINGER:  I have one right here
3    that I'm going to hand across to Maura.
4            CHAIRPERSON KILGORE:  Which one was it,
5    Mr. Benninger?
6            MR. BENNINGER:  It's the smaller one.
7            CHAIRPERSON KILGORE:  Thank you.
8            MR. BENNINGER:  May we proceed, Maura?
9            THE RECORDER:  You may.
10           MR. BENNINGER:  Okay.  Thank you.
11                   CROSS-EXAMINATION
12   BY MR. BENNINGER:
13       Q    Mr. Trumble, I have known you since law
14   school, as I recall, at WVU; is that correct?
15       A    I believe so, Mr. Benninger.
16       Q    Just so the record is complete, you and
17   I have known each other professionally as we worked
18   for the same firm at the time; McNeer, Highland,
19   McMunn, prior to Varner?
20       A    That's correct.
21       Q    And I've known your practice at least
22   back in the day of '84, '85 as being one of a
23   commercial transactional lawyer -- bankruptcy, real
24   estate -- and more in the business law area, at least

PAGE 44

1    in the initial part of your career; is that right?
2        A    I believe that that's accurate.  Yes,
3    sir.
4        Q    And even back as early as '84 when you
5    joined the firm in Clarksburg originally, you
6    performed a number of bankruptcies both for creditors
7    and debtors, correct?
8        A    That's correct.
9        Q    And you continued that practice.  I
10   believe you moved from the Clarksburg office.  After
11   you became a partner there, you moved over to
12   Martinsburg to head up and manage the firm's office
13   here; is that right?
14       A    That's correct.
15       Q    And you did that in or around '94, as I
16   recall?
17       A    1992.
18       Q    '92.  And you have been the managing
19   member of that firm here in Martinsburg since 1992?
20       A    That's correct.
21       Q    And I believe on direct examination you
22   revealed to us that based upon your training, skill
23   and long-term experience in the bankruptcy field, you
24   were then appointed by the U.S. Trustee as a trustee

PAGE 45

1    here in the Northern District of West Virginia, the
2    federal district?
3        A    That's correct.
4        Q    That encompasses and controls the
5    ongoings of the Bankruptcy Court, Judge Flatley now,
6    here in the Northern District of West Virginia?
7    Judge Flatley is the bankruptcy judge for the
8    Northern District of West Virginia, correct?
9        A    That's correct.
10       Q    He's the only one as I understand?
11       A    That's correct.
12       Q    He was previously a U.S. Attorney?
13       A    He was.
14       Q    So suffice it to say, or may I say
15   this, that you due to your practice, continual
16   practice in the field of bankruptcy -- debtors law,
17   creditors law, trustee, and so forth and so on -- you
18   have been continuously engaged in at least part of
19   your practice over the years since starting law,
20   since starting your professional career, to the
21   present in the matters attendant to bankruptcy law?
22       A    That's correct.
23       Q    And even today you still represent
24   creditors and debtors in bankruptcy matters that

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 13   PAGE 46

1  aren't involved where you are appointed as interim
2  trustee; is that correct?
3       A    That's correct.
4       Q    And so what percentage just fairly --
5  just so we have a flavor of your expertise in this
6  area, over the years has your percentage of
7  professional work in bankruptcy law been relatively
8  steady, or has it gone up, gone down?  Can you tell
9  us about that?
10      A    I can't tell you precisely.  I was
11  asked this question before.  And my response is going
12  to be about the same, and, quite frankly, it's going
13  to be between 40 and 50 percent of my practice is
14  related to bankruptcy practice in some type,
15  including creditor representation, debtor
16  representation, and trustee work.
17      Q    And is it fair that you have been
18  recognized as an expert in this field, bankruptcy?
19      A    I don't know that I've been qualified
20  as an expert in any capacity.
21      Q    Would you consider yourself as an
22  expert in bankruptcy law?
23      A    I know more than the average layperson
24  knows about bankruptcy.  Yes, sir.

PAGE 47

1       Q    Now, before I move to another area, can
2  you tell us your formal training that you have
3  received as a bankruptcy lawyer?  I assume it's been
4  through CLEs, working with other lawyers, handling
5  both creditor and debtor matters.
6       A    That's correct.
7       Q    And just so we know for the record,
8  Barbara Ann Miller was the debtor in this particular
9  case?
10      A    That's correct.
11      Q    Your work as a trustee, when you were
12  appointed by the United States Trustee --
13      A    Correct.
14      Q    -- your boss in Washington, D.C., did
15  you fill out an application?  Did you have to go
16  through training or have a test performed so that you
17  were certified or qualified to serve in that role?
18      A    My recollection is that the position
19  for a panel trustee was advertised, and I applied for
20  the position and was awarded the -- was awarded the
21  job, the contract.
22      Q    As I understand reading your testimony
23  in the lawsuit that you filed against Nace and Burke
24  seeking malpractice or professional negligence, you

PAGE 48

1  are a trustee over here, Tom Fluharty is the one in
2  Clarksburg, and who is the one in the northern
3  panhandle?
4       A    Marty Sheehan.
5       Q    Okay.  So there are basically three of
6  you that serve the Northern Federal District in West
7  Virginia at this time?
8       A    That's -- yes, sir.
9       Q    Okay.  In your work as trustee, can we
10  summarize generally before going specifically into
11  it, that your duties are set out by statute under
12  Title 11, United States Code?
13      A    Yes.
14      Q    And you have -- your duties are further
15  refined and defined by the handbook that's been
16  published by the United States Department of Justice,
17  the trustee handbook, which is Nace Exhibit Number 2
18  in the big book.
19           We'll refer to it later.  I don't know
20  if you have that one, but let me hand this to you
21  just in case I generally refer to it so you're not
22  caught off-guard.  And just confirm that I have
23  accurately copied the trustee handbook.
24      A    Mr. Benninger, I will assume that you

PAGE 49

1  have.  There are changes and updates, and I'm not
2  going to look at the entire document right now to
3  tell you.
4       Q    Bob, I've attempted to be fair with it.
5       A    I assume that you have been, sir.
6       Q    So in terms of your role and your work
7  in this Barbara Ann Miller case as interim trustee
8  that arose, I believe you said, contemporaneously
9  with her filing of her petition under Chapter 7.
10      A    Uh-huh.
11      Q    And the statute, Title 11 and its
12  subparts in that handbook, guide you in your role in
13  serving in that capacity?
14      A    Yes, sir.
15      Q    Is that pretty much the global universe
16  of what we can look to to see what you did right, or
17  wrong, or indifferent in this matter?
18      A    Yes.
19      Q    Okay.  Let me jump back to where you
20  ended your direct exam, and that was where I believe
21  Ms. Rhodes said, "Where are we now in the adversary
22  proceeding?"
23           Can you describe for us what an
24  adversary proceeding is as it relates to this case?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 14   PAGE 50

1   A   The bankruptcy case -- an adversary
2   proceeding is a civil action or a lawsuit filed
3   within the framework for the bankruptcy system.
4        Q   So it's a case within a case?
5        A   Yes. Well, it's -- yes, it's a case
6   within a case. It's an adversarial proceeding. It's
7   a civil action in this case filed as a core
8   proceeding as it relates to the bankruptcy of Barbara
9   Miller.
10       Q   And in this case, without going into
11  too much depth, I believe that the actual lawsuit,
12  the complaint that you've caused to be filed against
13  Nace and Burke is set forth in the records that are
14  before you, and it alleges just professional
15  negligence, malpractice -- legal malpractice, if you
16  will -- nothing more; is that right?
17       A   Legal malpractice, professional
18  negligence, and contract -- a breach of contract.
19       Q   Okay. But those are the standard
20  claims that we in West Virginia understand -- those
21  of us who sue lawyers know that the only two claims
22  that you can bring if you feel that a lawyer has done
23  something wrong is legal malpractice and/or breach of
24  contract, and that's what you asserted here?

PAGE 51

1   A   Yes, sir.
2        Q   Based upon what you perceived, I guess,
3   initially would be mistakes, errors, and oversights?
4        A   Initially, yes, sir.
5        Q   Okay. Now, in the status of that, it
6   wasn't brought on direct, but hasn't there been
7   recent filings by Mr. Nace and his counsel -- not me,
8   but his counsel in that legal malpractice case, in
9   the adversary proceeding? He has, in fact, made
10  certain filings recently, hasn't he?
11       A   There have been filings. Yes, sir.
12       Q   And just so we understand -- and we'll
13  come back to it a little later -- that he has filed
14  with the court and asked for permission in that
15  bankruptcy case to pay the amount of the creditor
16  claims that he now understands may be due and owing
17  based upon your calculations?
18       A   Yes. He has made an application to pay
19  the amount of the creditor claims as identified on
20  the claims register.
21       Q   And he has actually deposited a check
22  in that amount of $12,000 and some change, if you
23  will, into court?
24       A   I don't know that to be the case, Mr.

PAGE 52

1   Benninger. I assume that he has.
2        Q   Okay. Well, there's a docket sheet
3   that we'll come back to a little later. Also, just
4   so I know, you did mention that a mediation date is
5   set for a resolution by a third party person who has
6   been agreed to by you and your attorney -- who is
7   here with you, Mr. Prim, right?
8        A   That's correct.
9        Q   -- and Mr. Nace and his attorney, and
10  Mr. Burke and his attorney, not Mr. Karlin, somebody
11  else, correct?
12       A   There is a mediation. To be candid
13  with you, if the date has been set, I don't know that
14  it's been set yet.
15       Q   And when is that mediation scheduled so
16  hopefully this thing can be resolved?
17       A   I don't know that a mediation date has
18  been selected yet. There has been some discussion of
19  mediation dates, but I'm not exactly sure that we
20  have ultimately agreed to a mediation date. If I'm
21  mistaken on that, then --
22       Q   Oh, that's okay. But do you have a
23  person, a mediator, selected?
24       A   I believe that we have, yes.

PAGE 53

1        Q   And who is that?
2        A   I think Ellen Cappellanti.
3        Q   Okay. And she is well known to be a
4   bankruptcy expert?
5        A   Yes.
6        Q   Okay. And in this case -- and then
7   I'll move along -- in the adversary proceeding, is it
8   your understanding that Mr. Nace and Mr. Burke, and
9   their other attorneys handling that civil case, that
10  malpractice case, are accusing you of malpractice?
11       A   They are accusing me of not fulfilling
12  my duties as a trustee.
13       Q   I use the word "malpractice" loosely, I
14  guess, but they're saying that you didn't do certain
15  things to give them notice and to supervise and to do
16  other things that you as a bankruptcy trustee were
17  trained to do and should have done in the underlying
18  Barbara Ann Miller case?
19       A   That appears to be their defense, yes.
20       Q   Okay. Now, just so we understand, the
21  total global universe, then, of claims in Ms.
22  Miller's claims -- creditor claims was $12,000 and
23  some change? That's it?
24       A   Well, Mr. Benninger, that is the amount

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 15   PAGE 54

```
 1    of claims that have been --
 2       Q   Creditor claims?
 3       A   That is the amount of creditor claims
 4    that have been filed. And to the extent that that is
 5    the principal amount of their claims, that's true.
 6    And the only thing that I can add to that is that in
 7    cases where there would be excess income, excess
 8    funds to distribute, as we would potentially have in
 9    this case had the estate received the full amount of
10    the jury verdict award, then even those claims would
11    be entitled to the accrued interest that would be
12    paid on those claims from the period of time of the
13    bankruptcy filing forward.
14       So, you know, in essence, $12,730.49
15    which was paid into the court only pays the principal
16    amount, and there would be interest that would be
17    accrued on it.
18       It's a small amount, but I'm just
19    reflecting that that doesn't necessarily mean that
20    had the estate received all of the proceeds that
21    that's the sole amount that those creditors would
22    have received.
23       Q   Have you ever told Nace and Burke the
24    amount of the interest?
```

PAGE 56

```
 1       A   Yes, sir.
 2       Q   Okay. And the way to do that is how?
 3    How do we calculate that?
 4       A   There is an interest that is based on,
 5    for lack of a -- the interest that -- the United
 6    States Trustee's Office has a formula that is
 7    utilized to calculate the interest.
 8       Q   Okay. Well, I can assure you we'll
 9    come back to that at some point in the very near
10    future.
11       Let me turn to Tab 3 behind the small
12    book of Nace exhibits, and let's begin there, please,
13    and promptly move through them.
14       A   Okay.
15       Q   It is excerpts from the bankruptcy
16    petition filed on behalf of Barbara Ann Miller,
17    correct?
18       A   Yes, sir.
19       Q   And this is a Chapter 7 filing?
20       A   Yes, sir.
21       Q   And it was filed by a Mr. O'Brien,
22    William O'Brien, a member of the West Virginia Bar,
23    on page 2 of that?
24       A   Mr. O'Brien, yes.
```

PAGE 55

```
 1       A   No. I haven't communicated that with
 2    them.
 3       Q   Okay. So all that is of record now,
 4    then, is in the bankruptcy filings 12,000 something,
 5    but the interest has never been communicated to Burke
 6    or Nace for them to pay it even, as far as you know?
 7       A   Well, to be candid with you, Mike --
 8    Mr. Benninger, it wouldn't be for them --
 9       Q   It's informal.
10       A   -- it wouldn't be for them to pay. It
11    would be part of the administration of the estate to
12    distribute that money.
13       Q   I understand.
14       A   So there would be no -- necessarily no
15    reason for me to identify that interest was to be
16    accrued on that. Had they turned the money over to
17    the bankruptcy estate as they should have done, then
18    the interest would have accrued and the interest
19    would have been paid as part of the distribution.
20       Q   I understand. But there was a mistake
21    made, and as far as trying to rectify it, the
22    interest is something you believe that's still --
23    over and above what has already been paid in the
24    court by Mr. Nace needs to be also attended to?
```

PAGE 57

```
 1       Q   And on the third page of that exhibit,
 2    under that tab, it shows that she and Mr. O'Brien
 3    did, in fact, list the possibility that there might
 4    be a malpractice suit and listed Mr. Burke as the
 5    attorney, correct?
 6       A   That's correct.
 7       Q   And so that's from whence you began by
 8    communicating with Mr. Jenkinson behind Tab 5 in the
 9    October 26, 2004, letter, correct?
10       A   That's correct.
11       Q   And behind Tab 4 is the authorization
12    to which you referred earlier on in your direct exam
13    that you customarily send to a debtor to try to find
14    out what is going on when there may be some asset or
15    some other attorney already representing the debtor
16    pre-petition, pre-filing?
17       A   I obtain this generally at the
18    creditors meeting. And then, yes, I utilize that to
19    communicate with debtor's counsel if they have one
20    pre-petition, yes.
21       Q   Okay. Now, Exhibit Number -- Exhibit
22    Number 4 is the authorization. Is there an error --
23    a significant error on that authorization?
24       A   It appears that the date says 2003
```

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 16  PAGE 58

1  instead of 2004.
2      Q   Okay.  So the -- we start off with the
3  authorization containing an error on your form that
4  you utilize at that creditors meeting?
5      A   Uh-huh.
6      Q   Okay.
7      A   Yes, sir.
8      Q   Behind Tab 5, the error is that you
9  knew from the review of the petition and the schedule
10  to the petition that Mr. Burke, not Mr. Jenkinson,
11  was the attorney, and I think you readily
12  acknowledged that error on direct examination?
13      A   Yes, sir.
14      Q   And then moving forward, I note that we
15  have a date of filing on September 27, 2004, and
16  that's on the first page of Exhibit Number 3, the
17  stamp right there?
18      A   Yes, sir.
19      Q   And then behind Tab 6 of Nace exhibits,
20  we have the discharge of Ms. Miller very quickly on
21  December 21st, 2004, correct?
22      A   That's correct.
23      Q   So she is relieved as a debtor of any
24  further obligation to any creditor that may come

PAGE 59

1  along and make a claim, correct?
2      A   She received a discharge.
3      Q   Was this what we call a no asset case?
4      A   No, sir.
5      Q   What was it?
6      A   This was an asset case.
7      Q   Well, why was she discharged when there
8  was an asset that had yet to be determined or valued?
9  Because at this time of discharge you were the
10  trustee, correct?
11      A   I was.
12      Q   And you had no valuation because you
13  had never spoken to Mr. Nace at all at that time, by
14  December 21st, 2004, had you?
15      A   I had not spoken with Mr. Nace, no.
16      Q   And you had never gotten a value on
17  whether the case was even viable, whether it was
18  going to be filed?  That's talking about the med mal
19  case, that is, where her husband died and she was
20  simply acting as the administrator of the estate.
21  She wasn't personally injured physically, was she?
22      A   Not that I'm aware of.
23      Q   It was because of her husband's death
24  that she was then acting in her representative

PAGE 60

1  capacity on behalf of her husband's estate as you
2  understood it, correct?
3      A   I didn't know what capacity.  I hired
4  the Burke firm and the Nace firm to represent
5  whatever the estate's interest was -- the estate of
6  Barbara Miller's estate's interest was in that
7  medical malpractice claim.  Now, you know, you've --
8      Q   I understand that.
9          CHAIRPERSON KILGORE:  Let the witness
10  answer.
11          MR. BENNINGER:  But I don't think he
12  answered my question.
13          CHAIRPERSON KILGORE:  I think he's
14  getting to it.
15          THE WITNESS:  Your question was -- is
16  that had -- why this was an asset case.  We had filed
17  an asset designation in the case because of the
18  unknown value, because we wanted to preserve the
19  estate.
20          If we file a no distribution report,
21  then there is no possibility that we would be able to
22  pursue this case in the future.
23          So when we have a case of unknown
24  value, such as this, we file an asset designation and

PAGE 61

1  start the procedure that we utilize to retain counsel
2  or to contact counsel to determine that value and
3  then to pursue it on behalf of the estate, whatever
4  that estate's interest may be.
5  BY MR. BENNINGER:
6      Q   And those duties that you talk about
7  are set forth by statute in the handbook that you as
8  trustee have a certain list of things that you should
9  do when you find that there may be a claim, may be an
10  asset, but you started off in your official role
11  shortly after September 27, 2004?
12      A   That's correct.
13      Q   You were on board, fully engaged in
14  this case, by the time of discharge of her as a
15  debtor, by December 21st, 2004?
16      A   Granted.  But I'm not exactly --
17      Q   Yes?
18      A   Yes.  But the discharge has no bearing
19  on the estate's administration.
20      Q   Okay.  Tell me, between the time of
21  whenever you were appointed soon after September 27,
22  2004, and her discharge, for whatever that importance
23  is to you, what contact did you have with my client,
24  Mr. Barry J. Nace, about the value, his thoughts

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 17   PAGE 62

1 about the case? Do you even know if he had the
2 medical records or had ever talked to the client?
3     A    Between the date of filing and the date
4 of the discharge?
5     Q    Yes.
6     A    I didn't know that Mr. Nace was
7 involved in the case.
8     Q    Okay.
9     A    So no. The answer is I did not have
10 any contact with Mr. Nace.
11    Q    Okay. So the next thing that you file
12 after discharge is behind Tab 7, "Designation as an
13 Asset Case and Request to Issue Claims"?
14    A    Uh-huh.
15    Q    And that was January 11, correct?
16    A    That's correct.
17    Q    And that's the same day that you write
18 to Mr. Burke behind Tab 8; is that right?
19    A    Yes, sir.
20    Q    And he responds behind Tab 9?
21    A    That's correct.
22    Q    Okay. So this is the first time --
23 when you receive the January 25, 2005, letter is the
24 first time that you know that Barry Nace has anything

PAGE 63

1 to do with this case whatsoever; is that correct?
2     A    It's the first time I've seen Mr.
3 Nace's name involved in the case. Yes, sir.
4     Q    As far as you know from reviewing your
5 file in preparation for your prior deposition in the
6 adversary, working with Ms. Rhodes and coming here
7 today, your file does not have any -- possess
8 anything that shows that you had any contact by
9 phone, face to face, or communication with Barry Nace
10 prior to receiving notice that he may be involved in
11 the Barbara Ann med mal case on January 25, 2005, or
12 thereafter?
13    A    It's the first notice. Yes, sir.
14    Q    Okay. And then that's when you write
15 back. Actually, that brings me to a point. From my
16 reading about your work in this case, you had two
17 paralegals.
18       Christy Hook, who we've seen her name
19 in some of the correspondence, including the next
20 piece behind Tab 10, was she one of your certified
21 legal assistants -- CLA, certified legal assistant --
22 who was working with you throughout the Barbara Ann
23 Miller case?
24    A    Yes.

PAGE 64

1     Q    Was she the one assigned to this
2 particular case?
3     A    Yes.
4     Q    Okay. And so when we see her signature
5 on various correspondence throughout this record,
6 then she was the one that had been trained,
7 authorized and directed by you to make follow-up and
8 to do certain things?
9     A    Correct.
10    Q    So everything that she has signed is
11 with your authority?
12    A    Yes.
13    Q    Okay. The letter to Burke and Nace
14 behind Tab 10 and which is also behind ODC's various
15 exhibits were sent out by Christy Hook to them,
16 correct?
17    A    Yes.
18    Q    And this was just a standard form.
19 Again, the application contains an additional error
20 talking about a motor vehicle accident, and you've
21 acknowledged that?
22    A    Yes.
23    Q    But, nonetheless, it's a form that you
24 use, but yet was unsigned by you by the time it was

PAGE 65

1 sent out on January 27, 2005, correct? It was
2 unsigned?
3     A    It was.
4     Q    So up to this point, neither you nor
5 Christy Hook had ever picked up the phone to contact
6 Mr. Nace to see, "Hey, what do you think about this
7 case? Are you going to take it or not? Does it have
8 any value or not?" You didn't do that, did you?
9     A    I had no communication with Mr. Nace at
10 that time.
11    Q    And so in spite of not knowing that --
12 have you ever done a med mal case, Bob --
13    A    No.
14    Q    -- for the plaintiff or defense?
15    A    Not from a plaintiff standpoint, and I
16 don't recall being one from a defense standpoint.
17    Q    Okay. Do you know anything about how
18 to evaluate the efficacy, the viability, of such a
19 particular type of civil action?
20    A    I have some understanding of the
21 procedures that are required.
22    Q    Do you understand that in a case like
23 this that counsel must first obtain all medical
24 records for the person who is the patient, who may

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 18  PAGE 66

1  have been a victim?  You have to get all the records
2  and films?
3      A   I understand that, yes.
4      Q   And you understand that once that's
5  done and organized, then an expert has to be --
6  expert or experts have to be selected to review that
7  material to see if there was a medical error or
8  negligence?
9      A   I understand that -- I'll accept your
10 representation that that's the procedure.
11     Q   And then under -- at this time, in
12 2005, the Medical Professional Liability Act in West
13 Virginia required that you couldn't go just to file a
14 lawsuit, you had to get a screening, certificate of
15 merit?  You had to file a notice of claim and all
16 that kind of procedure?
17     A   Again, I'll accept your representation
18 that that's the procedure.
19     Q   But all that was something that you
20 could have asked Mr. Nace about, now that you know
21 about him involved, or Mr. Burke, but you didn't,
22 correct?
23     A   That's why I employed them, to take
24 care of those things.

PAGE 67

1      Q   But you hadn't yet employed them yet.
2      A   Well, I had.  And that's -- and I
3  think --
4      Q   January 27th you hadn't, Bob.
5      A   I had contacted Mr. Burke, and he had
6  responded to my -- to my letter and indicated that it
7  was being reviewed, and the purpose for the review
8  was to, in fact, to determine the evaluation of the
9  case.
10         I then proceeded to employ through a
11 standard procedure, which is to file -- to send in
12 the application, so that they could continue the
13 representation of the estate through the process that
14 you just described.
15         The estate is not equipped -- the
16 trustee in the bankruptcy estate is not equipped to
17 do that.  That's why we make the application.  That's
18 why we reach out to attorneys like Mr. Burke, who
19 then identifies Mr. Nace, who is -- Mr. Nace is his
20 of counsel on his -- on his letterhead.
21         I assume, right or wrong, that Mr.
22 Burke is in communication with Mr. Nace concerning
23 this matter.
24     Q   That is an important word, sir, and

PAGE 68

1  we'll come back to that.  But, in fact, a point of
2  fact and law, you as trustee have no authority to ask
3  Mr. Nace or Mr. Burke to do anything until a court
4  acts upon an application that you had not yet
5  submitted by January 27th; isn't that correct?
6      A   They were not authorized --
7      Q   Yes or no, please, may I?  And then an
8  explanation may follow.
9      A   They were not authorized, no.  There
10 was no order entered authorizing them.
11     Q   And so you hadn't hired them?
12     A   We had an agreement that they would
13 represent the estate or I wouldn't have sent them the
14 application.
15     Q   Where is the agreement, Bob --
16     A   The agreement is between --
17     Q   -- that you had with Barry Nace?
18     A   I don't have one with Mr. Nace.
19     Q   Have you ever had a contract -- a
20 contingency fee contract that you represented to the
21 court in your application that you were going to get
22 with counsel who was handling Mrs. Miller's med mal
23 case in state court?  Did you ever get a written
24 contract like you told the court you were going to?

PAGE 69

1      A   The contract that we --
2      Q   Yes or no, please.
3      A   No.
4      Q   But you told the court that in your --
5  when you finally signed your application and
6  submitted it on March 3, 2005.  The one you sent to
7  Nace and Burke on January 27th was unsigned, correct?
8      A   That's correct.
9      Q   It was a draft?  It was a form that
10 contained the error?
11     A   Uh-huh, yes.
12     Q   And even though that it contained the
13 error, it was returned to you.  The affidavit was
14 returned to you.
15         And you didn't submit that application
16 that continued to have the error and their affidavit
17 saying they're willing to work for you, and you
18 didn't get an approval until March 4th, 2005; isn't
19 that correct?
20     A   I did not get approval until March 4th,
21 2005.  That's correct.
22     Q   So even if they had agreed, even if you
23 had gotten a contract with one or two of them, which
24 you didn't, they still didn't have authority to act

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 19  PAGE 70

1  until they even got the order -- you got an order
2  entered; isn't that correct?
3      A   That's correct.
4      Q   Let's move to Tab 12.  This is a
5  document that you may not have seen.  It's a letter,
6  and I may address it.  Have you ever seen this letter
7  before --
8      A   No, sir.
9      Q   -- where Mr. Nace on February 16th is
10  sending out the medical records to a medical legal
11  review?
12          And he hasn't even -- by the time you
13  had sent out the January 27 application -- proposed
14  application, a proposed order, and the affidavits for
15  him to sign, he hadn't even sent out the medical
16  records to have them reviewed by an expert to
17  determine whether there was even a breach of the
18  standard of care in the Miller med mal case, had he?
19      A   Mr. Benninger, I have never seen this
20  letter before.
21      Q   Okay.  But you have -- and we will
22  provide evidence as to the status.  But you wouldn't
23  have known by February 16th because, again, neither
24  you nor Christy Hook had ever called and asked,

PAGE 71

1  "What's up, Barry?  What's going on?" --
2          MS. RHODES:  Objection.  Asked and
3  answered.
4          CHAIRPERSON KILGORE:  Sustained.
5  BY MR. BENNINGER:
6      Q   -- by February 16th?
7          CHAIRPERSON KILGORE:  Sustained.  Let's
8  move on.  Let's move on.
9          MR. BENNINGER:  Okay.
10  BY MR. BENNINGER:
11      Q   Now, February 24th you receive this
12  back?
13      A   Yeah.
14      Q   Okay.  Now, it's not until behind
15  Tab 14 that the bottom -- I'm going by the bottom of
16  the -- this is the PACER system, the ECF federal
17  filing system.
18      A   I also want to note that you -- he did
19  return the affidavit on February 24th -- Mr. Nace.
20      Q   He did.
21      A   And he also indicates his change of
22  address.  He also doesn't object to any
23  representation or error that's contained in the
24  application that was sent with it as to whether or

PAGE 72

1  not it was a personal injury case or medical
2  malpractice case.
3          He didn't object to the terms of the
4  representation as set forth in the application.  So I
5  was -- I believed that we had an agreement for
6  representation.
7      Q   Okay.  And you filed everything as it
8  was and actually signed this one --
9      A   That's correct.
10      Q   -- on page 22, ODC Stamp 22, but it was
11  not filed until March 3, 2005, correct?
12      A   That's correct.
13      Q   And there are five pages to the
14  exhibit.
15          MS. RHODES:  You said ODC.  Do you mean
16  Nace's?
17          MR. BENNINGER:  I said ODC 21, your
18  Bates Stamp 21.
19          MS. RHODES:  Oh, okay.
20          MR. BENNINGER:  But it's behind Nace
21  Tab 14.
22          MS. RHODES:  Okay.
23          MR. BENNINGER:  Just for the record, I
24  would like to note for the record's clarity, all

PAGE 73

1  Bates stamps are those of ODC, so some of my -- our
2  exhibits are copies of what was provided by ODC.
3          CHAIRPERSON KILGORE:  Okay.
4          MR. BENNINGER:  None of our exhibits
5  contain Bates stamps.
6          CHAIRPERSON KILGORE:  So when you say
7  like 23, this is the same 23 as in --
8          MR. BENNINGER:  That's correct.
9          CHAIRPERSON KILGORE:  -- the ODC's Nace
10  notebook?
11          MR. BENNINGER:  That's correct.
12          CHAIRPERSON KILGORE:  Okay.
13          MR. BENNINGER:  And I have duplicated
14  some, and I apologize for burdening the record, but I
15  thought it was important for sequencing.
16          CHAIRPERSON KILGORE:  Okay.
17  BY MR. BENNINGER:
18      Q   Now, moving to Tab 15, which contained
19  ODC 26, this is where Judge Friend, the bankruptcy
20  judge at the time, actually approved and authorized
21  Mr. Nace and Burke to serve as special counsel in the
22  case, correct?
23      A   That's correct.
24      Q   And the date of that is March 4, 2005?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 20  PAGE 74

1    A    That's correct.
2    Q    And still by this time there had been
3    no contact between you, your paralegal and Nace --
4    A    That's correct.
5    Q    -- other than the correspondence we've
6    already covered?
7    A    That's correct.
8    Q    So this is what, for all intents and
9    purposes, legally and factually, starts the time you
10   contend that Nace should have been aware that he was
11   acting as an attorney either on behalf of you, the
12   estate, Barbara Miller or somebody?  He should have
13   been aware?
14   A    I disagree with that representation.  I
15   believe that from the time that I contacted Mr. Burke
16   and Mr. Burke identified Mr. Nace as co-counsel, from
17   the time that I sent them the application with the
18   attached affidavits to sign, that there was an
19   agreement.
20        The fact that the court wouldn't
21   authorize it, there could be an objection, but as far
22   as my agreement with counsel to pursue the estate, we
23   had an agreement that they would pursue the case.
24        And the authorization is an

PAGE 75

1    authorization to proceed, to employ, and to provide
2    for compensation.  But as far as my understanding
3    with Mr. Burke, we had an agreement.
4    Q    And you are -- because of your
5    testimony you contacted Burke, you are saying that
6    that would equally apply with the same force and
7    effect to Mr. Nace --
8    A    Mr. Nace --
9    Q    -- even though you had no contact with
10   him?
11   A    Mr. Nace signed the affidavit, and
12   obviously did not object to any of the issues that
13   you've raised as to the errors in the application or
14   any of those other issues.  So, yes, it would apply
15   to him, as well.
16   Q    But you have given sworn testimony in
17   your deposition in the adversary proceeding, have you
18   not?
19   A    I have.
20   Q    And on March 21 of 2011 is when your
21   deposition was taken?
22   A    Yes, sir.
23   Q    And at that time you were questioned
24   about were Nace and Burke formally and legally

PAGE 76

1    authorized to act on behalf of anybody in the Barbara
2    Miller bankruptcy until and after Judge Friend
3    entered that order on March 4, 2005?  You were asked
4    that, right?
5    A    I don't recall whether I was or not,
6    Mr. Benninger.
7    Q    But isn't it a fact that they were not
8    authorized by court order to -- regardless of what
9    you said about you thought there was an agreement you
10   had, as a point of law and fact, they couldn't do
11   anything formally without that court order?
12   A    They were not officially authorized by
13   the court until November 4th.  As far as what they
14   could or could not have done, we had an agreement
15   prior to that time.
16        CHAIRPERSON KILGORE:  Did you misspeak?
17   March 4th?
18        THE WITNESS:  I'm sorry.  March 4th,
19   2005, is the date of the order where there was an
20   official order authorizing, but as far as my contact
21   with Mr. Burke as it relates to the representation
22   and his proffer that Mr. Nace was going to be
23   counsel, Mr. Nace's execution of the affidavit, and
24   his response to the affidavit without objection was

PAGE 77

1    indication to me that he was -- that he was on board
2    to pursue the case on behalf of the bankruptcy
3    estate.
4        MR. BENNINGER:  Okay.  I understand
5    your position.
6        THE WITNESS:  Thank you.
7    BY MR. BENNINGER:
8    Q    Moving forward, the next communication
9    you have knowing -- knowing all that you've testified
10   to behind 16, your legal assistant writes on May 18,
11   2005, for an update?
12   A    Correct.
13   Q    By this time you well knew that Nace
14   was involved in the case or had some interest in
15   moving forward in investigating the case, at least
16   investigate?
17   A    I was aware that Mr. Nace was involved,
18   yes.
19   Q    And can you describe for this committee
20   and for us why you didn't send Mr. Nace this letter?
21   A    Well, I --
22   Q    Were you still relying on -- and
23   throughout this whole process, is it going to be your
24   position that you were relying on Burke to get

## D. MICHAEL BURKE and BARRY J. NACE HEARING
### 10/10/11

SHEET 21   PAGE 78

1  whatever information you wanted or notice you wanted
2  to provide by calling him or writing to him and he
3  would get it to Barry Nace?  Is that it?
4      A   Yes.
5      Q   Okay.
6      A   Mr. Burke was my contact person.  He
7  was identified initially as the counsel representing
8  the debtor in the malpractice issue.  Mr. Burke gave
9  me no reason to believe that I couldn't contact him
10 to determine the status of the case in my past
11 working relationship with Mr. Burke in this and other
12 bankruptcy matters.  I had no reason to believe that
13 there wasn't any communication with Mr. Nace
14 concerning this issue.
15     Q   But that wasn't the agreement in the
16 affidavit or the application, was it?  Mr. Nace never
17 agreed to that term?
18     A   What term are you referring to, Mr.
19 Benninger?
20     Q   That all communication related to what
21 he was doing as the malpractice expert, the only
22 person that tries these cases, was to provide the
23 conduit for communication through Burke?  That was
24 never spelled out anywhere in writing or in the

PAGE 79

1  affidavit or the application, was it?
2      A   Well --
3      Q   Yes or no, please.
4      A   No.  But I don't profess to know the
5  working relationship between the two, Mr. Burke and
6  Mr. Nace, but when somebody acts as co-counsel, I
7  would think that both of them have equal opportunity
8  to provide a status report.
9      Q   Isn't it on page 824 of the Trustee's
10 Handbook, Nace Tab -- Nace Tab 2, your duty -- of the
11 big book -- your duty to supervise all professionals,
12 including lawyers, accountants, auctioneers, or
13 anybody that may be hired, to supervise them to make
14 sure that they're -- they know what's going on, there
15 is an effective stream of communication?  Isn't that
16 your duty, sir?
17     A   I have duties to supervise
18 professionals.  Yes, sir.
19     Q   And that duty of supervision would
20 include effective communication with that person
21 with whom you have apparently employed to assist the
22 bankrupt estate or you or the court?
23     A   And I believe that I did that.
24     Q   Okay.  Now, moving forward, behind

PAGE 80

1  Tab 17 you can see that Mr. Nace is sending along the
2  complaint to Mr. Burke for filing, simple filing,
3  correct?
4      A   I've never seen --
5      Q   Again, something that you weren't aware
6  of?
7      A   I've never seen the document before,
8  sir.
9      Q   Okay.  I understand.  And then we go
10 back up to July 27th.  The next tab is 18.  Your
11 legal assistant, Christy Hook, is again writing to
12 Mr. Burke.  No letter went to Mr. Nace?
13     A   That's correct.
14     Q   And just basically asking for an
15 update?
16     A   Yes, sir.
17     Q   Now, I see that Mr. Nace wasn't listed
18 on -- copied on this letter, on this particular
19 letter, but William O'Brien was.  He wasn't on the
20 earlier May 18th letter, was he?
21     A   What tab, sir?
22     Q   Look at Tab 18 in the small book, Nace
23 small book.
24     A   No.  That's what I'm -- you were

PAGE 81

1  referring to the previous letter.  I was asking --
2      Q   Yeah, May 18th.
3      A   Yeah.  What tab was that?
4      Q   May 18th was behind Tab 16.
5      A   No.  It does not appear that he was,
6  sir.
7      Q   Okay.  So we've got -- we've got your
8  legal assistant, who -- isn't it true, Bob, that
9  Christy was pretty much handling the whole thing at
10 this point without your input?
11     A   No.  I don't believe that that's
12 correct.
13     Q   Okay.  Well, then what was the purpose
14 of adding a different attorney, other than Mr. Nace,
15 in this equation asking for information?
16     A   I'm sorry.  I didn't -- I don't
17 understand your question.
18     Q   Well, what was the person of -- what
19 was the purpose of adding Mr. O'Brien?  You knew he
20 wasn't handling the med mal case, didn't you?
21     A   I honestly don't know why Christy added
22 his --
23     Q   Okay.
24     A   -- name to it, but he's debtor's

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

PAGE 86

1    Q    It was one or the other?
2    A    One or the other.  I didn't get a
3  response, so I sent out a second notice.
4    Q    Okay.  Now, this is a letter --
5  December 1 letter behind 21.
6    A    Yes.
7    Q    This is where Nace does acknowledge, "I
8  got your letter," and it speaks for itself.  So he
9  did respond once he got your letter to the right
10  address?
11    A    That's correct.
12    Q    Okay.  And by this time -- by this time
13  you were aware, weren't you, that there had been a
14  jury trial --
15    A    Yes.
16    Q    -- of the underlying case, actually
17  gone to a six-person jury, and that Mr. Nace had
18  succeeded on behalf of Ms. Miller to convince a jury
19  to award her money damages for her husband's death,
20  right?
21    A    I was aware that he -- that it -- yes.
22    Q    Okay.  And I believe you testified you
23  weren't sure how you were aware, but you learned it,
24  and that's what prompted you to start writing these

PAGE 87

1  notices?
2    A    That's correct.
3    Q    Okay.  So just so I'm clear, then, in
4  terms of the sequence and chronology of events, the
5  last time that you had anything directly from Barry
6  J. Nace was receipt of his February 24, 2005, letter
7  sending you back the application saying he is willing
8  to do something?
9    MS. RHODES:  Objection.  That's been
10  asked and answered.
11    MR. BENNINGER:  Well, it hasn't.
12    CHAIRPERSON KILGORE:  Just go forward.
13  Just answer the question and go on.
14    THE WITNESS:  Yes.
15    BY MR. BENNINGER:
16    Q    And then you responded on January 5,
17  2009, which is behind Tab 22, correct?
18    A    Yes, sir.
19    Q    And the last thing that you said -- I
20  want to draw your attention -- this was not discussed
21  on your direct examination.  You state -- read the
22  last paragraph, please, very quickly.
23        Is this where you tell Mr. Nace that
24  you are going -- he should place his malpractice

PAGE 88

1  carrier on notice and that you're going to be
2  contacting State Bars and reporting him to the Bar?
3    A    I did.
4    Q    And this comes on the heels of him
5  saying, "I just got your letter for the first time,
6  and what's going on"?  That's your response to him?
7    A    That was my response.  Yes, sir.
8    Q    You didn't tell him at any time, "Hey,
9  you owe us some money.  We want to sit down and talk
10  about how much"?
11    A    To be honest with you, Mr. Benninger, I
12  was surprised that he was not aware simply from the
13  standpoint he was acting as co-counsel with Mr.
14  Burke.
15        I believed that Mr. Burke and Mr. Nace
16  were acting as counsel, they were acting as co-
17  counsel.  I never received any notification from
18  either one of them or communication to the contrary.
19    Q    But you now know, don't you, after all
20  this, the malpractice lawsuit and going through this,
21  that Burke got out because of some concern with one
22  of his law partners over one of the doctors?  You now
23  know that he got out?  You may not have known, but he
24  did, correct?

PAGE 89

1    A    Well, another notice that wasn't given
2  to me as the -- as the client in this situation,
3  another thing that wasn't provided to me as to any
4  notification at all.
5    Q    As to the client thing, the Trustee
6  Handbook that's in front of you that you've
7  acknowledged has guided your duties, nowhere does it
8  describe you as a client when there is a professional
9  attorney hired as special counsel, does it?
10    A    He's hired on behalf of the estate, and
11  to the extent --
12    Q    That's right.
13    A    To the extent that I administer the
14  estate, I may use those interchangeably.
15    Q    But never once in this entire set of
16  handbook are you ever classified as a client, are
17  you?
18    A    I would have to review it in full form.
19    Q    I looked.
20    A    I would have to review it to be able to
21  respond to your question.
22    Q    Okay.  It's of record.  The statute --
23  now, let's go to the statute under which you believed
24  you were authorized to submit the application.  It's

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 24  PAGE 90

1    Title 11, USC 327, correct?
2       A    That's correct.
3       Q    He was hired -- he was hired under
4    Subsection (e), not (a), correct?
5       A    I would have to refer to the sections
6    in order to respond to that accurately.
7       Q    Are you familiar as a bankruptcy
8    practitioner that there is a significant distinction
9    between the hiring of general counsel and special
10   counsel under the Bankruptcy Code?
11      A    Yes.
12      Q    Okay.  What is the distinction?
13      A    The distinction is general counsel to
14   administer matters relating to the bankruptcy estate.
15   I'm not going to be able to quote it.  But special
16   counsel -- and particularly with matters such as this
17   nature -- as it relates to things that --
18   professionals that are required to assist the trustee
19   in the administration of the estate.
20      Q    Now, in terms of general counsel, he
21   becomes your lawyer to administer the estate, part of
22   your duties?  He assists you doing your duties under
23   (a), 327(a), correct?  It's a matter of law.
24      A    Do you have a copy of the code with

PAGE 91

1    you?
2       Q    No, but I can get it.
3       A    Yeah.  Let's get a copy of the code.
4            MR. BENNINGER:  May I?
5            CHAIRPERSON KILGORE:  Sure.
6            MR. BENNINGER:  Very quickly?
7            CHAIRPERSON KILGORE:  Sure.
8            (Brief pause.)
9            MR. BENNINGER:  May I approach the
10   witness?
11           (No response.)
12           MR. BENNINGER:  May I read it to you
13   because it contains my communications with my client
14   in e-mail format?  May I read it?
15           CHAIRPERSON KILGORE:  Sure.
16           MR. BENNINGER:  Thank you.
17   BY MR. BENNINGER:
18      Q    Title 11, USC Section 327, entitled
19   "Employment of Professional Persons.  (a). Except
20   as otherwise provided in this section, the
21   trustee . . ."  That's you, right?
22      A    Yes.
23      Q    ". . . with the court's approval, may
24   employ one or more attorneys, accountants,

PAGE 92

1    appraisers, auctioneers, or other professional
2    persons that do not hold or represent an interest
3    adverse to the estate, and that are disinterested
4    persons, to represent or assist the trustee in
5    carrying out the trustee's duty under this Title."
6            That's an (a), general counsel
7    designation, is it not?  That's what the courts who
8    have discussed this have called a general counsel
9    provision.
10      A    Okay.
11      Q    "(e).  The trustee, with the court's
12   approval, may employ for a specified special
13   purpose . . ."  In this case, the malpractice case of
14   Barbara Ann Miller.
15      A    Uh-huh.
16      Q    ". . . other than to represent the
17   trustee in conducting the case, an attorney that has
18   represented the debtor . . ."
19           In this case, Burke and Nace had
20   represented the debtor before -- pre-petition,
21   correct?
22      A    That's correct.
23      Q    ". . . if in the best interest of the
24   estate, and if such attorney does not represent or

PAGE 93

1    hold an interest adverse to the debtor or to the
2    estate with respect to the matter on which such
3    attorney is employed."
4            That's a different standard by which
5    the court will evaluate whether special counsel
6    versus general counsel is employed, correct?
7       A    Two different sections of the code.
8    Yes, sir.
9       Q    And which one did you use to seek court
10   approval?
11      A    It doesn't distinguish in the actual
12   application, but it does say special counsel as part
13   of the application form.
14      Q    And so you knew that Barry Nace was
15   representing the debtor herself at the time that you
16   asked that he assist for a special purpose only, and
17   that's the prosecution of the med mal case?
18      A    No.  Actually, I did not know at the
19   time.  I was not informed of Mr. Nace's involvement
20   until Mr. Burke's letter to me in January of 2005, at
21   which time Mr. Burke informed me that Mr. Nace was
22   acting as co-counsel.
23           At that point the application to employ
24   Mr. Burke and Nace was made as the application and

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 25   PAGE 94

1    affidavits were sent to both of them to be employed
2    as special counsel for this purpose.
3         Q    Without belaboring, you know that there
4    are cases that describe the duties and the
5    relationship between the trustee and general counsel
6    under the (a) provision, 327(a), and that of special
7    counsel for a particular matter where that lawyer
8    represented the debtor beneath in the lower case
9    before bankruptcy?  There's a distinction as to the
10   role of the attorney, is there not?
11        A    Other than to --
12        Q    Yes or no.
13        A    No.  I'm not familiar with what you're
14   speaking of.
15        Q    Okay.
16        A    No, I'm not.
17        Q    Okay.  You're not familiar with how
18   courts have described the role of special counsel
19   versus general counsel in the context of this case
20   and the facts here?
21             MS. RHODES:  Objection.  Asked and
22   answered.
23             CHAIRPERSON KILGORE:  Sustained.
24             BY MR. BENNINGER:

PAGE 95

1         Q    Okay.  Moving on, isn't it true that
2    the first time that you ever provided Mr. Nace with a
3    signed copy of the application where you sought court
4    approval to hire him as special counsel for the med
5    mal case only and the order entered by Judge Friend
6    on March 4, 2005, was in your letter -- attached to
7    your letter of January 5, 2009, where you threatened
8    to sue him and to file state ethics charges on him?
9    Isn't that true?
10        A    Your question was multiple parts.  The
11   first -- yes.  But the answer is yes.  The first time
12   that I provided him with a copy of the signed
13   application and the first time that I provided him
14   with a copy of the order would have been as attached
15   to that particular letter.
16        Q    Okay.
17        A    I also sent him a copy of the
18   application in an unsigned version which he responded
19   by signing the affidavit, and also the court served
20   him with a copy of the order, so he had those issues
21   already before him back in 2005.
22        Q    Well, you're aware that he asserts that
23   he did not receive service copy from the court, from
24   you or anyone else?

PAGE 96

1         A    I'm aware that that's what he asserts,
2    but I also am aware that --
3         Q    Well, do you have proof that he is
4    wrong?
5         A    I'm also aware that the court sent it
6    out pursuant to the ECF system, and it was sent to
7    the address that was listed for Mr. Nace, and despite
8    the fact that he changed his address during that time
9    period, there is no return of that envelope to the
10   court.
11             And as a matter of course, if envelopes
12   and mailings are not received, they're returned to
13   the court and made part of the docket.  And that
14   doesn't exist in this case, either.
15             So Mr. Nace says that he doesn't --
16   didn't get it, and I have no proof that he did other
17   than the fact that the court mailed it and it was
18   sent to the address, and Mr. Nace has testified in
19   his deposition that he had a forwarding mailing
20   address to his new address, so I don't see how he
21   couldn't have gotten it.
22        Q    You certified -- under your authority
23   under Rule 11 as a lawyer admitted to practice in
24   West Virginia, you certified in your application to

PAGE 97

1    the court certain things, did you not?  Look behind
2    22 where you send -- the first time you send the
3    signed one to him, the trustee's application.  Look
4    at page 2 of, please.
5             CHAIRPERSON KILGORE:  Which page?
6             MR. BENNINGER:  Page 2 of the
7    application behind Tab 22 of Nace.
8             THE WITNESS:  The question, sir?
9             BY MR. BENNINGER:
13        Q    Does the signed copy of the application
11   state over your signature, "I hereby certify that a
12   true and correct copy of the foregoing has been
13   furnished by US Mail postage prepaid to William
14   O'Brien, Burke, and Barry Nace"?
15        A    Yes.
16        Q    You did not do as you certified to the
17   bankruptcy court, did you?
18        A    My understanding --
19        Q    Yes or no, please.
20        A    Well, my understanding is that the
21   bankruptcy court reflects --
22             MR. BENNINGER:  Ms. Kilgore?
23             CHAIRPERSON KILGORE:  Let him answer.
24             THE WITNESS:  -- reflects that the

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 26   PAGE 98

```
 1    certificate of service was on the 3rd, and I signed
 2    this on the 2nd. Evidently, it wasn't electronically
 3    filed on the 2nd.
 4         BY MR. BENNINGER:
 5         Q    Yeah. But you certified you sent it,
 6    not that ECF sent it, correct?
 7         A    Yes, sir.
 8         Q    And you didn't do it, did you?
 9         A    No. Evidently, I did not.
10         Q    And other than what you've stated -- do
11    you have any evidence or information other than
12    you've already stated that Barry Nace ever received
13    the signed application and the executed order by
14    Judge Friend prior to receiving your letter of
15    January 5, 2009, whenever that was?
16         A    Other than what I've already testified
17    to, no, sir.
18         Q    And he received it -- there's a stamp
19    behind -- on the third page on Tab 22, his received
20    stamp, January 21, 2009, correct? Do you see it?
21         A    Bear with me. I see a stamp.
22         Q    Okay.
23         A    Is that the date?
24         Q    Yeah. That's his office practice.
```

PAGE 99

```
 1         A    I have no idea what that represents.
 2         Q    And so within less than two weeks of
 3    receiving your letter threatening to sue him,
 4    threatening to file Bar charges on him, and not
 5    providing him any amount that's due and owing or
 6    asking for any further information, he responds to
 7    you on February 4th, correct?
 8         A    If you're referring to Tab 23 and his
 9    February 4th, 2009, letter --
10         Q    I am.
11         A    -- yes.
12         Q    And you received that letter?
13         A    I did.
14         Q    And you took no further steps even to
15    respond to his letter through the time that you filed
16    the ethics complaint on July 13th, 2009, did you?
17         A    No, I did not.
18         Q    You didn't pick up the phone and call
19    him? In spite of what he didn't do -- and he didn't
20    call you, other than sending you the letter -- you
21    had no further communication through July 13, 2009,
22    when you filed the ethics complaint?
23         A    No, I did not.
24         Q    And then even after filing the ethics
```

PAGE 100

```
 1    complaint, you still had no further contact with him
 2    until you sued him for malpractice on October 5th,
 3    2010; no further inquiry saying, "Hey, here's what
 4    you owe me. Here's what you owe the estate, the
 5    court," whoever?
 6         A    I did not.
 7         Q    When did your duty to supervise the
 8    professional that you say somehow represented you --
 9    when did that end?
10         A    When did it end?
11         Q    When did it end to supervise? When did
12    your duty to supervise under the code and under the
13    handbook end vis-a-vis Nace and Burke?
14         A    I don't know I can respond to the
15    question as to when it ended. All I can say is that
16    it was very apparent to me after receiving Mr. Nace's
17    response that, (A), he was denying that he
18    represented the bankruptcy estate in the pursuit of
19    this particular matter, and that he did not feel that
20    there was any obligation on his part despite the
21    documents that I had sent him reflecting his
22    authorization.
23         You combine that with the fact that he
24    had signed the affidavit back in 2005, had received a
```

PAGE 101

```
 1    copy of the affidavit, and under the circumstances I
 2    didn't feel that there was anything more that I could
 3    do with Mr. Nace other than to pursue the claims that
 4    I did.
 5         I didn't feel that at that point there
 6    was any mistake or error. There was no -- there was
 7    no, "You're right. I forgot about this." It was
 8    purely a matter that there was going to be a denial
 9    that he was ever involved in the representation of
10    the estate, and I didn't feel I had any other
11    alternative.
12         Q    Isn't the first paragraph a response to
13    your last request? Because obviously he's pretty
14    upset about threatened to be sued and threatened to
15    have Bar complaints all over. He's licensed in many
16    states, no prior complaints.
17         A    That's what it says.
18         Q    And so you took that as a steadfast
19    position that you weren't going to further
20    communicate for the reasons you've stated?
21         A    That's correct.
22         Q    Back in the letter that preceded the
23    January 2009 letter where you threatened to sue him
24    at the end and to file these things, there was no
```

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 27  PAGE 102

1   indication that he wasn't going to work with you in
2   his earlier December 2008 letter, was there?  I mean,
3   what caused you to say such a thing in a letter --
4       A    Well, I think it goes back a little
5   bit --
6       Q    -- under the series of --
7       A    I think it goes back a little bit
8   further than that.  Isn't one part of his letters
9   indicating that he had talked with somebody from my
10  office, possibly me, and that he didn't know what I
11  was talking about at that time?  I mean, this is not
12  the first time that there was type communication.
13      Q    But he's responding to you --
14          MS. RHODES:  Tab 21.
15          MR. BENNINGER:  Excuse me.
16          MS. RHODES:  Tab 21 refers to that
17  December 1st, 2008, letter.
18          MR. BENNINGER:  It's all record.
19      BY MR. BENNINGER:
20      Q    But what caused you to go in that tone,
21  with that attitude, with that statement, and without
22  any further information just tell him what you
23  thought that there was owed, to give him a chance to
24  respond to it?  I mean, why, Bob?

PAGE 103

1       A    I didn't feel that I -- Mike, I already
2   answered the question.  I didn't feel --
3       Q    Okay.  You have.
4       A    I didn't feel I had an alternative.  I
5   didn't feel that there was anything more that I could
6   do.  I was in communication with Mr. Burke, and I,
7   again, felt that Mr. Burke was communicating with Mr.
8   Nace.
9       Q    I guess -- at the time that you send
10  this letter, were you still under obligation under
11  the trustee, under the trustee position, to supervise
12  him, to work with him, to guide him?
13      A    Not if I didn't feel that he was
14  acknowledging a relationship.  I mean, I don't know
15  when that ends in this particular scenario, Mike,
16  from the standpoint that Mr. Nace had indicated to me
17  by virtue of his letters that he did not represent
18  the estate, didn't know what I was talking about.
19      Q    Why didn't you just file something with
20  Judge --
21          CHAIRPERSON KILGORE:  Okay.  I think
22  we've heard enough of this issue, of this topic.  If
23  you want to move on to the next topic.
24          MR. BENNINGER:  Thank you.

PAGE 104

1       BY MR. BENNINGER:
2       Q    Did you simply file anything with Judge
3   Flatley at the time and say, "Hey, I've got a problem
4   with this appointee, with this counsel?  Here's the
5   communication.  We need to sort it out and set it for
6   hearing"?
7       A    No, sir, I did not.  I don't know that
8   there is a procedure that I could have done that.
9       Q    Tell me, then, in substance and in
10  total everything you did to supervise Nace and Burke
11  from the time they sent the affidavits to you until
12  the present.
13      A    Fair enough.  From the time that they
14  sent the affidavits to me, obviously, I sent a letter
15  requesting a status report in 2005.  On an annual
16  basis, I have to report on cases.  Sometimes that's
17  done by letter.  Sometimes it's done by telephone
18  communication.
19          In this case, I would have communicated
20  with Mr. Burke's office.  Again, I've already
21  answered the question.  I did not communicate with
22  Mr. Nace's office because of their co-counsel
23  relationship.
24          I report on those cases, and in this

PAGE 105

1   case I was led to believe that the case was going to
2   take several years based on the initial
3   representations made by Mr. Burke, several years and
4   was not likely to settle.
5           I rely upon that information, and I
6   also rely on my attorneys, people that I hire, to
7   communicate with me with developments in the case.
8   Again, the estate with my administration is the
9   client here, and that's what I expected them to do.
10          Had there been a development, had there
11  been mediation, had there been settlement
12  discussions, had there been a jury trial scheduled, I
13  expected Mr. Burke and/or Mr. Nace to pick up the
14  phone or write me a letter and identify that for me.
15      Q    Thank you.  Now, behind Tab 27 on a new
16  matter.  You now as of September 14, 2011, a couple
17  weeks ago, submitted an updated -- in the lawsuit,
18  the malpractice suit --
19      A    Yes.
20      Q    -- you submitted a supplemental
21  response identifying what you believe is due.
22      A    Yes.
23      Q    And the 12,730 is the total claims
24  filed by all creditors, so her entire bankruptcy was

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 28   PAGE 106

1  caused because she couldn't pay $12,000, apparently.
2      A    Mr. Benninger, I believe that that's
3  somewhat of a misrepresentation.  I'm just --
4      Q    Okay.  Well, tell me what it is.
5      A    It's a very small point.  But, you
6  know, there were more creditors that were identified
7  as part of the bankruptcy petition and schedules.
8  Twelve thousand, seven hundred and thirty dollars and
9  49 cents ($12,730.49) are creditors who filed claims
10 that appear to be legitimate claims.
11          If a creditor is identified as part of
12 a bankruptcy petition and they fail to file a claim
13 within the time period specified by the court, then
14 they don't share in the distribution.  So your
15 statement that $12,730 was the total amount of the
16 claims, I disagree with that.
17     Q    It's the estate amount that you were
18 after?
19     A    These are the amount of monies that
20 would be required to satisfy those creditors who
21 filed claims.
22     Q    And when was the first time that you
23 ever told Nace or Burke that that was the amount?
24     A    I talked with Mr. Burke early on

PAGE 107

1  about -- not early on, but in early 2009 about the
2  fact that we would have to pay creditor claims, and,
3  in essence, had offered to resolve the case at that
4  time for the amount of the claims that were filed
5  plus any trustee's commissions that would be earned
6  on that distribution.
7      Q    Did you ever tell Burke or Nace before
8  you filed the ethics complaint on July 13th, 2009,
9  that was the amount that they owed plus whatever
10 commissions?
11     A    I don't believe that I talked to them
12 in specific amounts.
13     Q    Okay.
14     A    I talked to Mr. Burke on an amount that
15 would resolve the issues in general terms, because
16 it's not -- because it's not stagnant.  It's not a
17 set amount.  There are -- as I indicated, interest
18 could potentially accrue on these things.  But even
19 notwithstanding that, let me just make --
20     Q    We admit that we owe interest.
21     A    Let me just make this clear.  I
22 communicated with Mr. Burke early on.  After the
23 series of letters in late 2008 and early 2009, I
24 communicated with Mr. Burke about an amount that

PAGE 108

1  would, in essence, resolve the issue, and we would
2  distribute the money to the estate creditors, and it
3  would be fine.
4          Mr. Burke indicated that he would
5  discuss it and get back to me.  I did not receive a
6  response to that communication.
7      Q    And in terms of the rest of this
8  summary that's on this exhibit, you're now claiming
9  you hired your own firm to sue these guys, and as a
10 consequence of additions to the creditor claims, your
11 fees and the law fees for your firm have now grown to
12 $62,487 according to your claim?
13     A    Right, yes.
14     Q    And, again, behind Tab 28 is the order
15 where Nace sought leave of the bankruptcy court to
16 make a filing and to pay the amount that was told to
17 them in your discovery for the creditor claims,
18 correct?
19     A    That's correct.
20     Q    And behind 29 is a copy of the filing
21 called "Line" -- I questioned that -- but his check
22 to the bankruptcy court for that amount, interest
23 still yet to be determined by some formula that
24 someone needs to tell us, right?

PAGE 109

1      A    Right.
2      Q    Because it's not in your filings?
3      A    It's not in my filings.  No, sir.
4          MR. BENNINGER:  Okay.  And then we go
5  on to the responses and so forth that I will not
6  cover.  At this point may I have just a moment to
7  confer?
8          CHAIRPERSON KILGORE:  Yes, you may.
9          MR. BENNINGER:  Thank you.
10         (Brief pause.)
11         MR. BENNINGER:  I pass the witness.
12 Thank you.
13         CHAIRPERSON KILGORE:  Thank you.  Let's
14 take a 10-minute break.
15         (WHEREUPON, a recess was taken.)
16         CHAIRPERSON KILGORE:  All right.  Mr.
17 Karlin, would you like to proceed?
18         MR. KARLIN:  Yeah.
19             CROSS-EXAMINATION
20 BY MR. KARLIN:
21     Q    Mr. Trumble, for the record, I don't
22 think we've ever met before, have we?
23     A    I don't believe so, sir.
24     Q    Nice to meet you.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 29   PAGE 110

1    A    Nice to meet you, as well.
2    Q    If I understand it, part of your
3    bankruptcy practice is to do a large number of what
4    we call no asset cases?
5    A    Yes.
6    Q    Am I correct that on average over the
7    last several years you get 80 to 100 new cases, new
8    bankruptcy cases, a month?
9    A    That's correct.
10    Q    Obviously, it strikes me that you don't
11    have time to spend a lot of time on each of those
12    cases.  Am I correct about that?
13    A    That would be an accurate statement.
14    Q    And am I also correct that you rely on
15    legal assistants to handle a lot of the work, if not
16    most of the work, that happens on most of these
17    cases?
18    A    I rely on my legal assistants to
19    prepare, obviously, the files associated with each
20    one of the cases.  I rely on my legal assistants to
21    do initial work-ups of the case -- in essence, to
22    identify what has been contained in the debtor's
23    bankruptcy petition and schedules in terms of their
24    disclosure of any assets and debts associated with

PAGE 111

1    those particular assets -- but I conduct the creditor
2    meetings myself personally.
3        Now it's on a twice-a-month basis that
4    we conduct creditor meetings, so in essence the 341
5    meeting that we referred to earlier is a meeting that
6    I personally conduct.
7        And, in essence, as part of that
8    process I go back through their bankruptcy petition
9    and schedules and again have them identify their
10    assets, their liabilities, and the debts associated
11    with them.
12    Q    Now, I understand that part, but on a
13    day-to-day basis if people call in they're more
14    likely to get your legal assistant than you, aren't
15    they?
16    A    I hesitate because I field a lot of
17    calls personally, but I'll agree with you that many
18    calls are directed to my legal assistant, yes.
19    Q    And your legal assistant, as we've
20    looked at, actually signs on your behalf or sometimes
21    under her own name correspondence that goes out to
22    people like Mr. Burke or Mr. Nace?
23    A    That's correct.
24    Q    In fact, if you didn't have that kind

PAGE 112

1    of help from the legal assistants, you really
2    couldn't effectively manage the caseload of
3    bankruptcy cases that you have?
4    A    If you don't have good assistants, it
5    would make it a very difficult practice.
6    Q    And because you're busy sometimes
7    mistakes get made, don't they?
8    A    Well, I'm not going to be --
9    absolutely.  I'm not going to profess to be perfect.
10    Q    Letters were sent to Mr. Jenkinson -- a
11    letter was sent to Mr. Jenkinson that should have
12    been sent to Mr. Burke?
13    A    That's correct.
14    Q    Addresses were -- mistaken addresses
15    were put on letters?
16    A    That's correct.
17    Q    That happens because you're busy?
18    A    Yes, sir.
19    Q    And when mistakes happen because you're
20    busy, that doesn't mean that you intended for those
21    mistakes to occur, does it?
22    A    No.
23    Q    And that doesn't mean that you had some
24    kind of willful intent to mislead or to cause a

PAGE 113

1    problem in the litigation of the case, does it?
2    A    Not if it's a mistake.
3        MR. KARLIN:  Now, you've known -- if it
4    please the panel, would it be permissible for me to
5    take my coat off?
6        CHAIRPERSON KILGORE:  Oh, go right
7    ahead.
8        MR. KARLIN:  Is that okay?  For some
9    reason I'm getting a little hot.
10        CHAIRPERSON KILGORE:  Because we turned
11    up the temperature.
12        MR. KARLIN:  Oh, okay.  Thank you.
13        MR. BENNINGER:  To speed me up?
14        CHAIRPERSON KILGORE:  We thought it
15    might help.
16        MR. KARLIN:  It was that or
17    waterboarding.
18        MS. RHODES:  I didn't get to vote.  I
19    just want to say that.
20        BY MR. KARLIN:
21    Q    Mr. Trumble, you've known Mr. Burke for
22    how many years?
23    A    I believe I've known Mr. Burke since I
24    moved to the Eastern Panhandle in 1992.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 30   PAGE 114

```
1        Q    And he has previously been involved in
2   some cases for the bankruptcy court?
3        A    Yes, sir.
4        Q    You also know him socially?
5        A    Yes.
6        Q    To your knowledge, has he ever
7   misrepresented anything to you?
8        A    Not to my knowledge.
9        Q    In fact, previously he has had a couple
10  of cases like this case where he represented
11  originally a client who had a personal injury case of
12  some type and later declared bankruptcy.  Am I
13  correct?
14       A    Yes, sir.
15       Q    And, in fact, in one or two other cases
16  you've gone through the same procedure and you've had
17  him authorized to represent as you see it the estate,
18  the bankrupt's estate, and to pursue the personal
19  injury case on behalf of the bankrupt estate,
20  correct?
21       A    Yes, sir.
22       Q    And in those cases he has done what you
23  think he is supposed to do, hasn't he?
24       A    Yes, sir.
```

PAGE 115

```
1        Q    He kept in -- he contacted you --
2        A    Yes.
3        Q    -- when cases were resolved?  Yes?
4        A    Yes.
5        Q    He did what he needed to do in order to
6   make sure that the money was handled appropriately
7   under the bankruptcy laws?
8        A    Prior to this case, I have not had any
9   problems with employing Mr. Burke as special counsel
10  to represent an estate.
11       Q    Okay.  And do you know of anything new
12  about Mr. Burke's personality, or character, or
13  integrity that would lead you to believe that he
14  intended in this case, for lack of a better word, the
15  bankruptcy estate to get stiffed?
16       A    No.  I don't know any change in his
17  character or his practice that he intended to.
18       Q    Okay.
19       A    I can only state -- and with all due
20  respect to Mr. Burke -- the fact is that we had
21  communications concerning this issue when it came to
22  light that the case had gone to trial, and in an
23  attempt to resolve it, I wasn't able to resolve it
24  with Mr. Burke despite my efforts to get the case
```

PAGE 116

```
1   resolved before it got into this posture.
2        Q    I understand that.  Well, let me go
3   there.  Let's talk about it.  I do appreciate that I
4   think you've agreed that you know nothing about his
5   personal -- his personality, his integrity, or
6   anything about him to suggest that he would have
7   intentionally tried to prevent the bankruptcy estate
8   from getting the money it was entitled to, true?
9        A    That's true.
10       Q    Okay.  Now, you said that you tried to
11  negotiate with him.  Do you recall?  Was this around
12  the time that you sent or just before the time or
13  around the time that you sent the letter to Mr. Nace
14  with a copy to him threatening to file ethics
15  charges?
16       A    It would have been around that same
17  time.  Yes, sir.
18       Q    Can you imagine -- did Mr. Burke ever
19  call you and tell you that he didn't think that he or
20  Mr. Nace owed anything to the bankruptcy estate?
21       A    Mr. Burke told me that he didn't think
22  he owed anything to the bankruptcy estate.
23       Q    And he told you that because he told
24  you that he had not actually been involved in the
```

PAGE 117

```
1   development or litigation of the case since
2   approximately 2005, true?
3        A    That's what he told me.
4        Q    And did you have any reason to
5   disbelieve that?
6        A    Other than the fact that that's the
7   first time that I had heard it.
8        Q    Okay.  We'll get to that in a minute,
9   too.  But basically when he told you that, you didn't
10  have any reason to disbelieve him, did you?
11       A    I had no reason to disbelieve him.
12       Q    And as you sit here today, you don't
13  have any reason to disbelieve that, do you?
14       A    No.
15       Q    Have you ever looked at the file of the
16  case in the court where it was litigated?
17       A    Yes, I have.
18       Q    And does the file not also corroborate
19  Mr. Burke by showing that after the initial stages of
20  the case his name does not appear on any certificates
21  of service or any pleadings of any kind, true?
22       A    Well, I think that some of the
23  attorneys continue to have him on their certificates
24  of service, whether or not that was in error or not.
```

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 31   PAGE 118

1   But to the extent that I observed in looking at the
2   court file that I had filed a motion to -- I don't
3   think he filed a motion to withdraw as much as they
4   amended their complaint to exclude Mr. Burke as
5   counsel.
6       Q   Wasn't what happened -- if you recall,
7   am I correct that what happened was an initial
8   complaint was filed that included his name on the
9   complaint?
10      A   That's correct.
11      Q   Although he didn't sign it?  Someone
12  signed it on his behalf?
13      A   That's what I understand.  Yes, sir.
14      Q   And shortly thereafter, before
15  anybody -- any of the defendants had answered, an
16  amendment complaint was filed without Mr. Burke's
17  name?
18      A   That's my understanding.  Yes, sir.
19      Q   And it is your understanding of the
20  Rules of Civil Procedure, also, that an amended
21  complaint can be filed without leave of court if it's
22  filed before there is any responsive pleadings?
23      A   That's my understanding.  Yes, sir.
24      Q   So as far as you could tell from

PAGE 119

1   reading the file, Mr. Burke, although his name may
2   have been on an initial complaint, there was then an
3   amended complaint filed, and he thereafter does not
4   appear as having signed any pleadings whatsoever in
5   that case?
6       A   It's my understanding that he did not
7   appear after that.
8       Q   And is it also your understanding that
9   he had -- whenever the monies came in, he was not
10  involved in the distribution of those monies?
11      A   I don't really have -- other than what
12  has been developed through discovery, I have no basis
13  to believe that he had any involvement in the
14  distribution.
15      Q   And from what has been developed in
16  discovery, isn't it also true that you have no basis
17  to -- no facts to support a belief that he did
18  anything to knowingly allow the funds to be
19  distributed without attending to the responsibilities
20  of the bankruptcy trustee?
21      A   Well, my issue with that particular
22  statement is the fact that, you know, letters were
23  sent to Mr. Burke prior to, now I realize, the filing
24  of the complaint in circuit court requesting status

PAGE 120

1   reports, to which he responded early on.
2       He responded to two letters, one in
3   January and one in May.  Another letter was sent in
4   July of 2007, to which there was no response.
5       My issue is that had Mr. Burke not been
6   involved in the case in 2007, that there would have
7   been some notification to me that he could no longer
8   represent the estate's interest, and that didn't
9   occur, either.
10      Q   I understand that piece, and we're
11  going to get back to that in a minute --
12      A   Okay.
13      Q   -- if you'll bear with me, Mr. Trumble.
14  My question simply is this.  You agree, don't you,
15  that there is no evidence of any kind to suggest that
16  Mr. Burke did anything to -- knowingly did anything
17  to prevent the monies that the estate was entitled to
18  from getting to the estate?
19      A   Knowingly?
20      Q   Yes.
21      A   Other than to -- other than the failure
22  to notify me.  Again, had I known that that was the
23  case, had Mr. Burke known that there was a bankruptcy
24  proceeding, which I believe that he did, having known

PAGE 121

1   that Mr. Nace was involved in the case -- it's my
2   understanding now that letters that I sent to him
3   were forwarded to Mr. Nace -- I don't think that Mr.
4   Burke can escape the knowledge of what was going on
5   in this underlying bankruptcy because things were
6   sent to him that were then communicated with Mr.
7   Nace.
8       Q   Mr. Trumble, would you agree with me
9   that there is a difference between a responsibility
10  to the bankruptcy estate in negligence for perhaps,
11  if you're right, failing to notify you that he was no
12  longer involved in the case and an ethics complaint,
13  or do you know?
14      A   I'm not going to try to draw that
15  conclusion right now.
16      Q   Do you have any reason at all to
17  believe that when the funds came in on Barbara
18  Miller's case Mr. Burke did anything -- or strike
19  that.
20      Do you have any evidence at all or any
21  reason to believe that when the funds came in for
22  Mrs. Miller's case that Mr. Burke in any way advised
23  Mr. Nace not to forward funds to the bankruptcy
24  court?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 32   PAGE 122

1    A    No.  I have no information that he did
2    that.
3    Q    Do you have any information to indicate
4    that he actually even did anything one way or another
5    to help or hurt the recovery of funds by the
6    bankruptcy court at the time when those funds came
7    in?
8    A    No.
9    Q    What you know is that as best you can
10   recall you don't remember being told or you have no
11   recollection of anyone ever telling you that he was
12   no longer involved in that case?  That's what you
13   know, correct?
14   A    That's what I know.
15   Q    And you also know that when the issue
16   arose in late 2008, early 2009, you and he spoke
17   about trying to get this matter resolved, didn't you?
18   A    That was in early 2009.
19   Q    And he certainly let you know at that
20   point that he had not been involved in the dis -- in
21   the case or in the distribution of the funds, true?
22   A    He let me know that he was not involved
23   in the case or the distribution of the funds.  True.
24   Q    And did it not sound to you like he was

PAGE 123

1    going to try and make some effort to get this
2    resolved?
3    A    He indicated that he was going to try
4    to make some effort, but I didn't receive a response
5    from him.
6    Q    I understand that.  We'll get to that,
7    too.  Now, let me then ask you the next question.
8    Did you understand that the funds largely went to
9    Mrs. Miller and Mr. Nace?
10   A    That's what I understand.  That's what
11   I was led to believe.  Yes, sir.
12   Q    That's what you understood back in late
13   2008, early 2009, correct?
14   A    Based on Mr. Burke's representation.
15   Q    And you understood from speaking to Mr.
16   Burke that he was going to talk to Mr. Nace about
17   what could be done to resolve this?
18   A    That's my understanding, yes.
19   Q    Did you not understand that when you
20   sent a -- strike that.  It wasn't too long after that
21   that you sent a letter threatening ethics complaints
22   against Mr. Nace and Mr. Burke, correct?
23   A    Yes.
24   Q    And between the time that you spoke to

PAGE 124

1    Mr. Burke and the time you sent your letters
2    threatening ethics complaints, what was there?  A
3    month?
4    A    Between the time that I spoke with Mr.
5    Burke?
6    Q    Was it weeks?
7    A    Weeks.
8    Q    Weeks?
9    A    Yes.
10   Q    So because Mr. Burke didn't get back to
11   you in weeks, you wrote a letter addressed to Mr.
12   Nace with a copy to Mr. Burke threatening to file
13   ethics complaints in any jurisdictions in which they
14   were admitted to practice, correct?
15   A    I felt that the estate was deprived of
16   the funds that were necessary to be turned over to
17   the estate.  Yes, sir.
18   Q    And you had numerous -- strike that.
19   And at that point threatening ethics, had you yet
20   looked at the court file to see what Mr. Burke's
21   actual role in the case was?
22   A    I had not looked at the court file at
23   that time.
24   Q    Had you spoken to any of the defense

PAGE 125

1    attorneys to find out what Mr. Burke's role in the
2    case was?
3    A    I had not.
4    Q    Had you called Mr. Burke back to say,
5    "It's been a couple weeks.  I haven't heard from you.
6    Before this gets out of hand, what's going on?  Can
7    we get this worked out"?
8    A    I did not call Mr. Burke.
9    Q    Did you write Mr. Burke a letter?
10   A    No, I did not.
11   Q    Did you -- I'm just curious.  Did you
12   ask your legal assistant -- was she still working for
13   you then, the one who signed these letters?
14   A    Yes.
15   Q    Do you recall asking her if she
16   remembered any conversations with Mr. Burke over the
17   years?
18   A    Over the years?
19   Q    Yeah.  Did you ask her, "Do you
20   remember . . ."
21   A    Yes, I asked her.  And as I testified
22   to earlier, we had communications with Mr. Burke's
23   office concerning the status of the matters, and they
24   were referred -- the simple response would be, "The

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 33   PAGE 126

1   case is still pending." There was nothing more that
2   was necessary for my files other than to report that
3   the case is pending.
4        And I relied upon my attorneys that I
5   was employed -- employing to represent the estate to
6   keep me informed of the developments, and that did
7   not occur.
8        Q   I understand you relied on your
9   attorneys. Isn't it true, sir, that when you went to
10  look at the records of what communications had come
11  from Mr. Burke to your office over the years orally
12  during telephone calls, there was absolutely no
13  record at all made by you or your legal assistants of
14  any of the conversations that you had with his
15  office?
16       A   There are no records that I can
17  identify. Yes, sir.
18       Q   And you'll agree with me that over the
19  years between 2005 and the letter in 2009 threatening
20  ethics complaints that your legal assistant had
21  conversations with Mr. Burke's office, true?
22       A   Yes, sir.
23       Q   But your legal assistant made no record
24  of what was said in any of those conversations?

PAGE 127

1        A   The record would not be specifically a
2   memo to the file or an electronic record. Many times
3   the conversations that we have are contained in
4   reports that we file with the United States Trustee's
5   Office concerning the activity or the status of the
6   case.
7        So the answer to the question is the
8   record would be the reports that I filed as to the
9   status of any particular asset case.
10       Q   We'll get to that in a second. The
11  point is your legal assistant and/or you did have
12  conversations with Mr. Burke over the years, but
13  there is absolutely no written record of any kind in
14  your file of this case as to what was communicated in
15  any of those conversations, no contemporaneous
16  record, true?
17       A   No, sir.
18       Q   Yes, it's true?
19       A   It's true. There is none.
20       Q   Now, you said the reports you file.
21  I'd like to talk about reports for a second. Can you
22  go to the letter of July 27th, 2007, which I believe
23  is in the first tab of the Disciplinary Counsel's
24  notebook?

PAGE 128

1        A   Yes, sir.
2        Q   Page 28.
3        A   Okay. I'm looking at 29, but I can --
4            MR. KARLIN: It's the book on the
5   floor, I think, Mr. Trumble.
6            CHAIRPERSON KILGORE: That's Mr.
7   Burke's.
8            MS. RHODES: He's looking at Mr.
9   Nace's.
10           MR. KARLIN: Yes. I want you to look
11  at ODC's book.
12           MS. RHODES: He's looking at it. It's
13  ODC's book on Nace.
14           MR. KARLIN: Okay. Got you.
15           THE WITNESS: I'm sorry, sir. What
16  Bates stamp number?
17           MR. KARLIN: Page 28.
18           THE WITNESS: Okay. Yes, sir.
19  BY MR. KARLIN:
20       Q   You refer to -- you say that -- you
21  request a report before August 17th, 2007. Do you
22  see that?
23       A   Yes, sir.
24       Q   Is that because you were under a

PAGE 129

1   reporting obligation at approximately this time to
2   provide the bankruptcy court with notification as to
3   what was going on in this matter?
4        A   Not the bankruptcy court, per se. It
5   may have been the bankruptcy court. But generally
6   what I refer to as my reporting requirements is that
7   we have to do a report to the United States Trustee's
8   Office, the Assistant United States Trustee's Office,
9   as to our cases.
10       Q   And am I correct that all that report
11  would say with regard to the Miller case is, "This
12  case still pending," or something to that effect?
13       A   Very simple. Yes, sir.
14       Q   So you wouldn't have to tell the
15  bankruptcy court -- excuse me -- the Office of
16  Bankruptcy Trustees -- I'm sorry. I forgot the term.
17       A   Assistant United States Trustee.
18       Q   The Assistant United States Trustee.
19       A   Yes.
20       Q   You wouldn't have to tell the Assistant
21  United States Trustee whether it was Mr. Burke or Mr.
22  Nace, would you?
23       A   No.
24       Q   You just say pending?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 34   PAGE 130

1    A    Pending.
2    Q    Now, you must have filed such a report,
3    didn't you?
4    A    Yes, sir.
5    Q    So somebody from Mr. Burke's office
6    must have communicated with either you or your legal
7    assistant sometime after July 27th, 2007?
8    A    Yes, sir.
9    Q    And I think we've established just a
10   few minutes ago that you have no contemporaneous
11   record of what that communication was, true?
12   A    That's correct.
13   Q    And from your examination of the
14   pleadings in the Miller case, isn't it also true that
15   as of July 27th, 2007, Mr. Burke had no involvement
16   in that case?
17   A    I learned that after the fact.  Yes,
18   sir.
19   Q    So Mr. Burke or someone from his office
20   spoke to you or someone in your office on July --
21   shortly after July 27th, 2007, true?
22   A    Yes.
23   Q    At a time when Mr. Burke was no longer
24   involved in the Miller case, true?

PAGE 131

1    A    Yes, sir.
2    Q    And you have no contemporaneous record
3    of that conversation, true?
4    A    That's correct.
5    Q    Now, I forgot to ask you one question.
6    You've known of Barry Nace before this case, haven't
7    you?
8    A    Not that I'm aware of.
9    Q    You haven't been aware -- were you
10   aware of the fact -- you weren't aware of the fact
11   that Mr. Burke had previously worked with Mr. Nace on
12   cases?
13   A    On behalf of anything related to the
14   United States Trustee or my duties as a trustee?
15   Q    No, no.  Just that he had, as an
16   attorney involved in this part of West Virginia,
17   brought cases in connection with a medical
18   malpractice expert?
19   A    No, sir.  I was not familiar with Mr.
20   Nace's body of work prior to -- prior to when Mr.
21   Burke identified him as a co-counsel.
22   Q    Well, it's not uncommon, is it, for
23   attorneys to have clients and then associate with an
24   attorney who has more expertise in a particular

PAGE 132

1    subject matter of the law?
2    A    As a general rule, I would -- I
3    would -- I don't think it's uncommon.  I don't know
4    how common it is, but certainly I wouldn't find that
5    an unusual practice.
6    Q    Okay.  Now, in October 2008 you sent a
7    letter, and this is the first letter that you sent, I
8    think Mr. Benninger has demonstrated, to both Mr.
9    Burke and Mr. Nace.  Am I correct?  Do I recall that
10   testimony previously correctly?
11   A    The first letter that I sent to them?
12   Q    This is the first time since -- let me
13   back up.  Way back when it all started, you sent each
14   of them a copy of the affidavit and the motion?
15   A    Right.
16   Q    After that, you never wrote directly to
17   Mr. Nace until October 10th, 2007?
18   A    No.  You're right.  You're right.  I
19   never did that.  But I do remember something that I
20   did do that I may have misspoken earlier that I want
21   to correct, is that when I filed the application Mr.
22   Benninger pointed out that there was a difference
23   between my certificate of service and the date that
24   the court shows the certificate of service.

PAGE 133

1         In that certificate of service showing
2    the filing of the application with the court -- with
3    the signed affidavits, those were both served on Mr.
4    Nace and Mr. Burke, as well.  So they're -- to the
5    extent that that's not a communication directly to
6    them, but they were copied and served with those
7    applications at that time.
8    Q    I understand that, but I'm really
9    trying to move towards a different point --
10   A    Okay.  I apologize.
11   Q    -- if you'll just bear with me.
12   A    Yes, sir.
13   Q    Okay.  I really -- that's not my point.
14   This is the first time since the initial mailing
15   where you -- strike that.  Over the last couple of
16   letters, you've gone to Mr. Burke?
17   A    Yes, sir.
18   Q    Not to Mr. Nace, correct?
19   A    In October of 2008, I believe, was the
20   first time that I communicated after February of 2005
21   with Mr. Nace.  In October of 2008 is when I
22   communicated and sent letters to -- a letter
23   addressed to both Mr. Burke and Mr. Nace.
24   Q    So for some reason you determined that

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 35   PAGE 134

1  you wanted to communicate not just with Mr. Burke
2  anymore, but with Mr. Nace, also; is that true?
3  A    Yes, sir.
4  Q    So is it not fair to assume that
5  somebody -- do you recall why? Do you recall
6  anything about the reason?
7  A    I think we learned that Mr. Nace was --
8  had tried the case, and it may have been that Mr.
9  Burke -- that we had to get information from him
10 concerning the case and the distribution.
11 Q    Isn't that because you talked to Mr.
12 Burke's office again and found out and understood
13 that Mr. Nace was the individual that pursued this
14 case, not Mr. Burke?
15 A    That's more than likely the case.  Yes,
16 sir.
17 Q    So sometime prior to October 10th you
18 knew that Mr. Burke had not been involved in the case
19 for a long period of time, true?
20 A    I don't know when Mr. Burke had not
21 been involved in the case, and that was really the
22 issue. I don't know when Mr. Burke was disassociated
23 from the case because it was never communicated with
24 me up until October or shortly before then when we

PAGE 135

1  learned that the case had been tried to a jury
2  verdict and the money had been distributed.
3  Q    Sometime prior to October 10th, 2008,
4  Mr. Trumble, you learned that Mr. Burke had not been
5  involved -- had not been involved in the trial and
6  distribution -- trial of the case and distribution of
7  the money, true?
8  A    True.
9  Q    So you now wrote Mr. Nace, correct?
10 A    Yes, sir.
11 Q    And not only did you write Mr. Nace,
12 but you called his office, didn't you?
13 A    I believe that I did, yes.
14 Q    And you called his office to find out
15 what had gone on with the case?
16 A    Right.
17 Q    And you learned again -- you confirmed
18 that Mr. Nace had pursued the case, not Mr. Burke,
19 true?
20 A    I don't know whether Mr. Burke's
21 involvement was discussed at that time.
22 Q    Well, in any case, prior to January
23 2009 you were well aware of the fact that Mr. Burke
24 had not been involved in the trial of the case, the

PAGE 136

1  pursuit of the case, or the distribution of the
2  funds, correct?
3  A    That's what Mr. Burke had evidently
4  advised me, but he had never notified me of anything
5  to that extent prior to that time.
6  Q    I understand that you're testimony, and
7  I think we all understand that.
8  A    Okay.
9  Q    Okay?
10 A    Yes, sir.
11 Q    That's your testimony.  Now,
12 nonetheless, Mr. Burke told you in late 2008, early
13 2009 that he was going to try and work with Barry
14 Nace to get this resolved?
15 A    He was going to try to get it resolved.
16 Yes, sir.
17 Q    And you waited, what -- I think we
18 said -- we've already established you waited a couple
19 of weeks -- a couple of weeks and then wrote the
20 letter to Mr. Nace with a copy to Mr. Burke
21 threatening to -- or stating you were going to --
22 stating you were going to pursue ethics violations in
23 every jurisdiction in which they worked, or words to
24 that effect?

PAGE 137

1  A    Yes, sir.
2  Q    Did you not think that might poison the
3  atmosphere for getting this resolved?
4  A    I thought it was a fair notice under
5  the circumstances.  I felt that the estate's interest
6  had not been adequately protected.  I felt that the
7  estate had -- there was from what I understand a very
8  significant jury verdict, a distribution of funds, no
9  notification to the bankruptcy court, or for that
10 matter me as the trustee of that estate, and the fact
11 is that money was gone.
12       And the ability to recover that was
13 ultimately what my goal was, is to recover that money
14 so that it could be properly distributed and
15 accounted for.
16 Q    And who did you consult with in
17 pursuing an ethics violation as a way of recovering
18 the money?
19 A    I didn't consult with anybody.  I felt
20 that it was -- it was -- I felt as the estate and as
21 me the administrator of that estate it was an issue.
22       Why my attorneys that I believed that I
23 had hired had gotten court authority to pursue the
24 case, had failed to notify me of, (a), the settlement

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 36   PAGE 138

1  of a portion of the case, and, (b), the ultimate
2  resolution and appeal and a verdict and a judgment
3  payment of $500,000 was not communicated with me in
4  any capacity.
5       Q    And what did you do before you
6  threatened to file ethics complaints to corroborate
7  whether what exactly Mr. Burke's role in all this
8  was, other than not notifying you that he was no
9  longer representing Mrs. Miller?  What did you do to
10 corroborate what his role was?  Anything?
11      A    No.
12      Q    What did you do to find out how much,
13 if anything, Mr. Burke had obtained from the
14 contingent fee?
15      A    I didn't know what the distribution
16 was.  Some of the information that I was seeking from
17 them when I wrote the letters was to provide me with
18 the settlement statement showing where the money went
19 and who it was distributed to.  I don't know who got
20 what.
21      Q    Well, did you think that perhaps you
22 ought to try and play that out before you threatened
23 an ethics complaint?
24      A    I didn't feel that I had any choice but

PAGE 139

1  to do what I did.
2       Q    You had no choice?
3       A    No.
4       Q    Just two or three weeks after speaking
5  with Mr. Burke, knowing he was going to settle it,
6  you thought you had no choice other than to threaten
7  an ethics complaint?
8       A    I don't think it's more than just two
9  or three weeks knowing what I did.  I think it's the
10 body of work from the time that I made the
11 application to hire them to the time that I
12 communicated with them about the case going back to
13 2005; that he advises me that he has co-counsel, that
14 it was a complicated case that's likely to go to
15 trial, that it's going to take three to four years to
16 resolve, the fact that I never received anything from
17 him as it relates to his inability to pursue the
18 case.
19           There has been no communication in
20 terms of, "I can't do it.  You'll have to contact Mr.
21 Nace."  It's the body of work.  It's not just three
22 to four weeks and a response.
23      Q    I understand the body of work.  You
24 know, you want to -- you're an attorney.

PAGE 140

1       A    Yes, sir.
2       Q    You had a fiduciary duty to the debtors
3  of some kind, didn't you -- or creditors?  I'm sorry.
4       A    I had a fiduciary duty to administer
5  the estate, yes.
6       Q    And your fiduciary duty includes trying
7  to collect the money.  I understand that.
8       A    Yes, sir.
9       Q    And you saw this one way -- this ethics
10 complaint as one way of facilitating the collection
11 of the money?
12      A    I didn't use an ethics complaint to
13 facilitate the collection of the money.  The ethics
14 complaint is what I believed was a violation of the
15 duties of the attorneys that were employed on behalf
16 of the estate to represent the estate's interest that
17 wasn't done.
18      Q    Mr. Trumble -- Mr. Trumble, in terms of
19 threatening the ethics complaints, did you review --
20 did you review the ethics statutes to determine which
21 statute -- which ethics rules you thought were
22 violated?  Did you actually read them?  Do you recall
23 which ones you read?
24      A    I don't recall whether I reviewed them

PAGE 141

1  specifically or not, sir.  I felt -- you know, again,
2  this is -- I felt that as a client, as somebody that
3  had employed counsel, in my role as the trustee in
4  administering that, I felt that there was a
5  disservice done in terms of the duty of the attorney
6  to represent the estate properly, and that's why I
7  filed the complaint.
8       Q    Do you understand, Mr. Trumble, I'm not
9  here right now suggesting that people don't -- I'm
10 not suggesting one way or another that people do or
11 don't have duties to the estate.  I'm just trying to
12 ask you questions that go to whether or not an ethics
13 violation occurred.  Okay?
14      A    Yes, sir.
15      Q    The issue of duties and who had the
16 duties and who owes the money is an issue that will
17 play itself out in the adversary proceeding, isn't
18 it?
19      A    Yes, sir.
20      Q    And if you're right, then the adversary
21 proceeding should result in the estate getting all
22 the money and all the interest it's entitled to,
23 correct?
24      A    If we are -- if we are successful in

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 37  PAGE 142

1  the adversary proceeding.
2      Q   And do you know -- are you aware of the
3  fact that Mr. Burke has made attempts to try and
4  resolve his share of the responsibility with your
5  attorney in the adversary proceeding?
6      A   There have been communications.  Yes,
7  sir.
8      Q   And are you aware that Mr. Burke -- or
9  I and Mr. Burke have been told that there is going to
10 be no resolution of the case with Mr. Burke unless
11 Mr. Nace joins in?
12     A   To the extent that that's
13 attorney-client privilege, I'm not going to
14 necessarily be able to answer questions of that
15 nature, as to the communications with my attorney
16 involved in that.
17     Q   Fair enough.  Is it your -- is it your
18 intent that there be no resolution by Mr. Burke
19 paying partial respons -- paying a portion of this
20 unless Mr. Nace joins in so the full amount of
21 whatever it is you claim is paid?  Is that your
22 intent?
23     A   My intent is not to exclude one or the
24 other, but my intent would be to rely on my counsel

PAGE 143

1  to advise me as to whether or not the estate can be
2  fully -- can recover fully if one person would happen
3  to be released or resolved, can you resolve one
4  without the other.  And, quite frankly, again, that
5  gets to privileged communication that I can't get
6  into.
7      Q   You can't discuss -- we'll get that
8  another way.  Don't worry, Mr. Trumble.  I appreciate
9  your -- I was not trying to invade your privilege.  I
10 apologize if it sounded like I did.
11         Do you have any reason to believe that
12 Mr. Burke and Mr. Nace are not fully capable of
13 satisfying any judgment that would be rendered
14 against them in the adversary proceeding?
15     A   I have no reason to believe that they
16 would not be capable of satisfying a judgment.
17     Q   How often do you have to file reports?
18     A   Annually.
19     Q   That's why we get one letter a year to
20 Mr. Burke?
21     A   In cases where there is prolonged
22 litigation, yes, sir.  Many times unless I'm --
23 unless I'm receiving reports from my counsel, I do
24 follow up with them to try to get some idea of what

PAGE 144

1  the status of the case is.
2      Q   Was there a letter in '06?
3      A   Not that I can -- a letter to Mr. Burke
4  or to Mr. Nace in '06?
5      Q   Yes.
6      A   No, sir.
7      Q   Did you do a status report in '06?
8      A   Yes, sir.
9      Q   What did you base it on if you didn't
10 write them?
11     A   It would have been a telephone
12 communication.
13     Q   Of which there is no record?
14     A   Yes, sir, there is not.
15         MR. KARLIN:  Excuse me.  Bear with me.
16 Mr. Benninger asked me to provide him with something.
17 It will just take me a second.  Unfortunately, the
18 papers are growing around me.
19         (Brief pause.)
20         MR. BENNINGER:  Thank you.
21         MR. KARLIN:  Excuse, you all.
22         CHAIRPERSON KILGORE:  Sure.
23         MR. KARLIN:  I'm just going over my
24 notes to make sure I haven't -- to see what I've

PAGE 145

1  missed.
2      BY MR. KARLIN:
3      Q   Have you ever checked your phone bills
4  to see if or when calls occurred between your office
5  and Mr. Burke or Mr. Burke's office?
6      A   I've not checked my phone bills.
7      Q   You said it was not easy to find
8  someone to pursue a case against Mr. Burke.  Who was
9  it you contacted?
10     A   I spoke with Terry Britt.
11     Q   Other than Mr. Britt, did you contact
12 anyone else other than your office?
13     A   No.
14         (Brief pause.)
15         MR. KARLIN:  I apologize, but it means
16 that --
17         CHAIRPERSON KILGORE:  That's okay.
18         MR. KARLIN:  -- I'm going to take less
19 of your time.
20         CHAIRPERSON KILGORE:  That's fine,
21 then.
22         MR. BENNINGER:  They're being gentle
23 with you, Al.
24         CHAIRPERSON KILGORE:  That's our

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 38   PAGE 146

1   teacher who's going out in the hallway to tell them
2   to be quiet.
3          MR. BENNINGER:  What does she teach?
4          CHAIRPERSON KILGORE:  Pardon?
5   MR. BENNINGER:  What does she teach?
6          MS. RHODES:  Oh, she's not a teacher.
7          CHAIRPERSON KILGORE:  Oh, she's not?
8   She's with the school system?
9          MS. RHODES:  No.  She's on various
10  commissions.
11         CHAIRPERSON KILGORE:  Oh, okay.
12         MS. RHODES:  She's a county
13  commissioner, and she serves on so many boards, like
14  you should hear.
15         (Brief pause.)
16  BY MR. KARLIN:
17      Q   On the issue of how much is owed, Mr.
18  Trumble --
19      A   Yes, sir.
20         CHAIRPERSON KILGORE:  I didn't hear
21  you.  I'm sorry.
22  BY MR. KARLIN:
23      Q   On the issue of how much is owed, do
24  you recall you were asked that at your -- I guess it

PAGE 147

1   was your deposition in the adversary proceeding?
2       A   Yes, sir.
3       Q   And you said you thought it was
4   $18,000?
5       A   Yes, sir.
6       Q   Then later in the adversary proceeding
7   you thought it was $12,000 plus interest?
8       A   I thought it was $18,000, and I think
9   that later in my deposition the claims register was
10  actually pulled and they reflected that it was
11  $12,730 in claims.
12         But the way the commission would be
13  calculated, quite frankly, $18,000 is less than
14  really what it would be.  The way a trustee --
15      Q   Go ahead.
16      A   The fact of the matter is that had this
17  been handled in an appropriate fashion, had the
18  estate received the funds that it was supposed to, my
19  commission would have been based not only on twelve
20  thousand, seven hundred and thirty-thousand
21  dollars -- seven hundred and thirty dollars
22  ($12,730), but it would have been based on any monies
23  that were paid to Mr. Nace or Mr. Burke's firm as a
24  result of their fee involved in this case, and it

PAGE 148

1   would have been based on any of the expenses that
2   they had to incur in the pursuit of the case.  I
3   would receive a commission on the totality of all of
4   those expenses that were paid.
5          So, quite frankly, $18,000 was less
6   than what the actual amount should have been, but I
7   was trying to calculate if we could get a -- if we
8   could have initially gotten the case resolved in
9   terms of the $12,000 to pay the creditors and some
10  interest and even a reduced commission, I was -- I
11  was willing to accept those issues.
12      Q   Did you ever write a letter to Mr.
13  Burke or Mr. Nace in which you said, "We can settle
14  this for X amount of dollars"?
15      A   I did not write a letter.  I had a
16  conversation with Mr. Burke.
17      Q   That was before the ethics complaint,
18  correct?
19      A   That's correct.
20      Q   Did you ever -- at your deposition,
21  though, however, you mentioned the 18,000 figure and
22  then you mentioned, "Well, I could count a hundred
23  thousand (100,000)."  Do you recall that?
24      A   I do.

PAGE 149

1       Q   Do you consider that a precise
2   statement?
3       A   No.  It wasn't a very precise
4   statement.
5       Q   And that was at your deposition in the
6   case where what was at issue was how much money was
7   owed?
8       A   I also indicated in my deposition that
9   it would be based on the actual expenditures,
10  administrative expenses, that the estate would have
11  to pay, including any attorney's fees.  I had not
12  calculated the actual damage amount at that time.
13         Subsequent to that we have, and we've
14  supplemented in the civil -- in the adversary
15  proceeding.
16      Q   And we'll get to that in just a minute.
17  My point is:  You went into a deposition in a case
18  where you were seeking Mr. Nace and Mr. Burke to pay
19  you a certain amount of money, correct?
20      A   I went into a deposition, yes, sir,
21  seeking recovery for the estate.  Yes, sir.
22      Q   And you went in as the trustee, the
23  person most -- best in a position to know how much
24  was owed to the estate, correct?

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 39  PAGE 150

1    A   That's correct.
2    Q   And at that time you knew what the
3  creditor obligations were, didn't you?
4    A   I didn't know the precise amount.  I
5  had not looked at the claims register prior to doing
6  that.
7    Q   You could have looked at the claims
8  register to know the precise amount before you walked
9  into a deposition in a case where you were seeking
10  Mr. Nace and Mr. Burke to pay you money, couldn't
11  you?
12    A   Yes, sir.
13    Q   So even in your deposition in the case,
14  which occurred in March of this year, you still
15  didn't know exactly how much you thought they owed
16  you, true?
17    A   I don't think that -- I don't think
18  that the amount that they owed me is limited just to
19  the claims amount.  I believed that they owed me the
20  money that they received that should have been turned
21  over to the estate, and then the estate would do its
22  own distribution in kind by paying its attorney's
23  fees and the expenses.
24        The fact of the matter is, is that the

PAGE 151

1  amount that they owe me is the 500,000 plus and then
2  allow me to do the distribution of that to the
3  creditors.  That's what's owed to the estate.
4    Q   Sir, you went into -- I don't want to
5  belabor it.  You went into that deposition even then
6  unprepared to say exactly how much was owed?
7    A   I had not calculated the damages at
8  that time.
9    Q   And the first time you actually gave
10  them an actual calculation of what you claimed was in
11  your discovery responses in, what, May of this year,
12  something like that?
13    A   I'll take your representation, sir,
14  whatever date you say it is.
15        MR. KARLIN:  I might be wrong on the
16  date.  Don't always take my representations.  Nace
17  Exhibit Number 26, I believe.
18        MR. BENNINGER:  That's correct.
19  BY MR. KARLIN:
20    Q   May 3rd, 2011?
21    A   What book are we referring to?
22    Q   The small Nace book, the small white
23  book.  Page 7 of that.
24    A   Yes.

PAGE 152

1    Q   And then you supplemented that in
2  Exhibit 27 with a supplemental breakdown that
3  included the attorney fees, the breakout of attorney
4  fees?
5    A   We supplemented it afterwards.  Yes,
6  sir.
7    Q   If you could, I just briefly want to
8  look at page 2 of Nace Exhibit -- small white book --
9  27, page 2.  This is where you list how much they
10  owe.  It's now 62,487?
11    A   Yes, sir.
12    Q   And that's in part because you're
13  taking -- you're charging -- your law firm is
14  charging $34,162.74 for the adversary proceeding?
15    A   That's what it's incurred to date.
16  Yes, sir.
17    Q   And of that $34,000 of the adversary
18  proceeding, approximately $10,000 are your billings?
19    A   Okay.  That's fine.
20    Q   Well, I don't want -- don't take my
21  word for it, again.  I have to admit -- as I've aged,
22  I've learned to admit I make mistakes.
23        Let's look at this exhibit.  If we go
24  to the next-to-the-last -- go almost to the end.

PAGE 153

1  There is an Exhibit 2, Plaintiff's Privilege Log, and
2  right before the Privilege Log is a listing -- okay.
3  It's page 39 of 39 of the fax.  Do you see there's
4  fax numbers on the attorney fee pages in the back?
5  Do you see 39 of 39?
6    A   I'm sorry, sir.
7        MS. RHODES:  It's under Tab 27.
8        MR. KARLIN:  Tab 27.
9        MS. RHODES:  If you go to the back of
10  that.
11        THE WITNESS:  All right.
12        MS. RHODES:  And go to the back of Tab
13  27 and work your way back because it's going to be
14  closer to the back.  I'm sorry.
15        MR. KARLIN:  No.  Your help is
16  appreciated.
17        MS. RHODES:  That was a fax, 39 of 39
18  is what we're looking at.
19        THE WITNESS:  Yes, sir.
20  BY MR. KARLIN:
21    Q   Does it not show basically that RWT --
22  that's you, right?
23    A   Yes, sir.
24    Q   So you want them to pay you for 59

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 40   PAGE 154

1   hours at $10,342?
2       A    Yes, sir.
3       Q    And pay Mr. Crim for 84 hours at
4   $14,331?
5       A    Yes, sir.
6       Q    And then in addition to that, am I
7   correct that not only do you want them to pay those
8   expenses, but you also add on a commission on those
9   expenses, right?
10      A    That's the way the calculation works.
11  Yes, sir.
12      Q    So you get to charge them your attorney
13  fees, right?
14      A    Yes.
15      Q    And then you get to charge a commission
16  on the attorney fees?
17      A    That's correct.
18      Q    Can you understand how even if people
19  agree with you that they owe you money, they might
20  want to argue a little bit or question a little bit
21  or at least raise some issues about how much?  Can
22  you understand that?
23      A    Well, I can understand that they may
24  raise some issues.  I can understand that the legal

PAGE 155

1   fees that are involved in this case have been driven
2   by many of the actions taken by the defendants, and
3   under the circumstances, you know, the legal fees are
4   absolutely necessary.
5       The interesting part of this, Mr.
6   Karlin, I think you have to understand that, quite
7   frankly, these legal fees to the extent that they
8   would be awarded would be -- we would still have to
9   apply potentially for approval of these legal fees.
10      Q    I understand that.  Here's where we --
11      A    And so there would be opportunity to
12  question those.
13      Q    Bear with me, Mr. Trumble.  We may
14  agree on more things than you think about.  One issue
15  is whether or not Mr. Burke should have provided
16  written notification to the bankruptcy court of the
17  fact that he was no longer to be involved in the
18  Miller case.  You agree with that, don't you?
19      A    I agree with that.
20      Q    That's an issue?
21      A    Not only to the bankruptcy court, but
22  to me as the trustee.
23      Q    To you as the trustee.  Now, that issue
24  may be treated differently -- may be,

PAGE 156

1   hypothetically -- are you with me -- differently in
2   the adversary proceeding than it might be in an
3   ethics proceeding?  Can you acknowledge that's
4   possible at least?
5       A    Possible.
6       Q    So even if Mr. Burke agrees with you --
7   and I have to be hypothetical here because there is
8   an adversary proceeding pending -- that he is in some
9   way responsible for this, he still may disagree with
10  you on whether or not that amounts to an ethics
11  complaint.  Can you see that?
12      A    I would assume that he disagrees or he
13  wouldn't be here today.
14      Q    And even if he agrees that he bears
15  some responsibility for the money the bankrupt estate
16  lost, he might still disagree with you on how you've
17  calculated the amount.  Can you recognize that?
18      A    I recognize that he may disagree with
19  the way that I've calculated the amount.  Yes, sir.
20      Q    He may still be the same person of
21  integrity and professionalism and reliability that
22  you've known him to be all these years that you've
23  known him, true?
24      A    True.

PAGE 157

1       MR. KARLIN:  I don't think I have
2   anything further.
3       CHAIRPERSON KILGORE:  Ms. Rhodes?
4               REDIRECT EXAMINATION
5   BY MS. RHODES:
6       Q    We talk about this idea of the special
7   counsel.  What's your normal practice as trustee when
8   you hire special counsel and seek status updates?
9       A    It's the same procedure that I've
10  described here in my testimony here today.
11      Q    Sending letters or calling --
12      A    Yes.
13      Q    -- and stuff like that?
14      A    Yes.  Many -- yes.  I mean, sending
15  letters, calling.  If it's somebody that I know or
16  have had dealings with before that I know are
17  familiar with bankruptcy court practices and can call
18  and obtain a brief status report as to, you know,
19  what elements, what's going on, that's not an
20  uncommon practice.  It's what we normally do.
21      Q    Would that be how you supervise the
22  professionals that you've hired?
23      A    Yes.
24      Q    Okay.  In your previous cases with Mr.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11



SHEET 41  PAGE 158

1  Burke, when you hired him as special counsel in those
2  other cases, how did you supervise him in those?
3      A   The same manner.
4      Q   The same manner?
5      A   Yes.
6      Q   Okay.  And there was never an issue in
7  those cases?
8      A   There was not.
9      Q   They spoke of the creditor claim, those
10  12,000 and odd dollars.  That does not include your
11  fees; is that correct?
12     A   That's correct.
13     Q   Okay.
14     A   I mean, again, you know, we talk a lot
15  about the way trustees are compensated, and it does
16  get very confusing.  Trustees in asset-based cases
17  get a commission on what they distribute, and that
18  includes creditor claims, so there is one component
19  of the $12,000 that you communicate -- that you get
20  paid a commission based on what you pay in actual
21  creditor claims.
22         And it's the formula that we've talked
23  about earlier.  It's the 25 percent of the first
24  5,000.  It's 10 percent of the next 45,000.  It's 5

PAGE 159

1  percent up to $50,000, and then 3 percent of the
2  mean -- or the formula that's utilized that you get a
3  commission on the actual creditor claims that are
4  paid.
5         You also get a commission on any
6  administrative expenses that the estate incurs to the
7  extent that they have to hire counsel, to the extent
8  that there is a recovery by counsel in litigation
9  such as this.
10        The fees that were paid to Mr. Nace
11  and/or Mr. Burke as a result of this are the basis
12  for which the trustee would receive a commission.
13        So it's in addition to the $12,000 that
14  you include not only $200,000 if it's a 40 percent
15  contingency on a $500,000 claim, but what's not
16  included in that representation in our supplemental
17  responses, quite candidly, is the expenses that they
18  may have incurred, nor is there -- I still don't have
19  a real firm grasp on whether or not the $75,000 is
20  included in there.
21        So to a certain extent the damages
22  that -- the amount of fees that were paid to Burke
23  and to Nace, or any combination of them, would be a
24  basis on which the trustee would receive some type of

PAGE 160

1  a commission.
2         Now, the attorney's fees for the firm
3  that are currently involved, which is my firm, are
4  based on the fact that we had to seek to recover
5  these damages.  We had to seek to recover this.
6         But for their failure to turn the money
7  over in the first place we would not have had to
8  incur any legal fees in the pursuit of this, and the
9  estate otherwise can't recover unless we recover
10  those particular fees.
11        And, yes, we can receive a commission
12  even on those fees.  And that's the way trustees are
13  authorized to seek compensation, you know.
14        And there are checks and balances
15  throughout the system.  All of these things are
16  subject to court review in terms of the compensation
17  that would be paid.
18        If I had gotten the money and sought a
19  fee on this, I still have to file a final report with
20  the United States Trustee's Office, who then approves
21  it, who then sends it to the court.
22        We send it to the court.  It goes out
23  to the creditors.  People, if they object to it or
24  feel that they need to object to it, can object to it

PAGE 161

1  at that time.  And the court has the ultimate
2  authority to approve those fees or not.
3         But in the litigation that we're
4  referring to and in this particular adversary
5  proceeding, we believe that our damages are comprised
6  of what is necessary to pay the creditors in full,
7  which would include an interest component.
8         We believe that the estate and the
9  trustee of the estate is eligible for compensation in
10  an amount equal to the commission that would be paid
11  to the attorney, and that would include the fees that
12  were paid to Mr. Nace and to Mr. Burke for their
13  contribution and to the attorneys that had to pursue
14  this claim on behalf of the estate.
15        And we're also seeking the recovery of
16  the actual attorney's fees that we've had to incur
17  just to recover this money, which we shouldn't have
18  had to have done in the first place.
19     Q   And they talked about -- Mr. Benninger
20  brought up the date of discharge of Ms. Miller from
21  the bankruptcy, which was fairly soon after she filed
22  the bankruptcy.  Can you explain to me like why there
23  could be a discharge and the bankruptcy estate still
24  be open?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 42  PAGE 162

1      A    It's -- the bankruptcies --
2  bankruptcies under Chapter 7 are particularly
3  designed that the credit -- the debtor is entitled
4  to -- it's called a fresh start.
5      So after somebody files for bankruptcy,
6  it's intended to be a fairly short procedure as it
7  relates to the debtor.
8      In essence, anywhere between
9  approximately 90 and 120 days from the date of filing
10 the debtor will receive the discharge unless there is
11 some objection by a creditor or by the United States
12 Trustee's Office or even by my office objecting to
13 the dischargability of a particular claim or to a
14 denial of discharge altogether.
15     In this case Ms. Miller filed a
16 bankruptcy.  There were no objections to her
17 discharge.  There were no creditors that objected to
18 a dischargability of a particular claim.  And so
19 therefore in the normal course of things she was
20 given a discharge.
21     But the bankruptcy estate, which
22 inherits all of the assets and all of the liabilities
23 and is charged with the duty of administering those
24 stays open until such time as I file a report stating

PAGE 163

1  that there are no assets available for the trustee to
2  administer and that there is no benefit to continued
3  administration, in which case I ask to be relieved of
4  my duties as a trustee, or in this case, as I did,
5  where we determined that there was an asset -- a
6  potential asset that had value to the creditors for
7  the distribution.
8      And once we file that asset report, we
9  ultimately get to a point where we recover money for
10 the benefit of creditors and file a final report with
11 the United States -- with the court seeking approval
12 of the distribution of the money that we recover, or
13 if we find that the asset that we're pursuing doesn't
14 have any value, like a piece of real estate -- if we
15 try to market or sell a piece of real estate and we
16 find that we can't sell it for its fair market value
17 and the amount of the debt either exceeds the fair
18 market value or the debt combined with the debtor's
19 exemption in the property exceeds what we can get out
20 of the property, but we give it our best shot.
21     If we find that we can't sell it
22 ultimately for an amount sufficient to pay the
23 creditors or have any equity remaining, then even if
24 we've declared it to be an asset case, we can

PAGE 164

1  withdraw that asset designation and file a no
2  distribution report in that situation.
3      But we try to look for equity because
4  for creditors that otherwise don't have collateral in
5  the form of secured interest in a piece of real
6  estate, a lien on an automobile of some type, their
7  only ability to recover for those unsecured creditors
8  is the money that's recovered by the trustee and then
9  ultimately distributed to them.
10     And sometimes that's a very small
11 percentage.  In this case it would have been 100
12 percent plus interest.
13     Also, I think that it's important and
14 fair enough to understand in this case that Mrs.
15 Miller would have ultimately -- despite the fees and
16 the trustee's commissions that would have been paid
17 on this, Mrs. Miller would have received a
18 substantial amount of excess funds.
19     In other words, once we paid all of the
20 estate expenses, once we paid all of the attorney's
21 fees, once we paid all of the commissions, once we
22 paid all of the expenses, there would have been money
23 left over.  Mrs. Miller would have received that
24 regardless.

PAGE 165

1      Q    And she was discharged before you hired
2  Mr. Burke and Mr. Nace?
3      A    Absolutely.
4      Q    And the affidavit that you sent to
5  both Mr. Burke and Mr. Nace clearly states under
6  Number 4 -- if you want to look at that, it would be
7  page 16 under Burke's or -- I'm not sure if it's 16
8  under Nace's or not.  It's 16 under both.
9      Under that, Number 3, it says that,
10 "I'm willing to accept employment by the trustee on
11 the basis set forth in the application to employ
12 filed simultaneously herewith."
13     You never got any indication from
14 either Mr. Burke or Mr. Nace that they had problems,
15 you know, with that application?
16     A    No.  And as I've indicated before and I
17 think that we've heard plenty of testimony, but not
18 only did they sign the affidavits, not only was this
19 sent to them for their approval together with the
20 application, but then after I got their affidavits
21 back and I sent them, I sent them copies of the
22 signed application together with copies of the signed
23 affidavits.
24     The only thing that wouldn't be signed



CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 43   PAGE 166

1   at the time that I served it on them would have been
2   the actual order which was ultimately entered by the
3   court.
4       Q    Okay.  So this application that you did
5   submit, it was approved by the bankruptcy court?
6       A    Yes, it was.
7       Q    And that's something that the court
8   routinely does with these applications?
9       A    It is.
10      Q    Did the court ever have a question
11  about those?
12      A    No.
13      Q    Mr. Karlin brought up about Mr. Burke
14  serving previously as special counsel and Mr. Burke
15  contacting you about cases being resolved.  Do you
16  recall how he would normally do that?
17      A    It would normally be by telephone.  You
18  know, the normal procedure would be -- is that if the
19  case -- and, again, without speaking as to a specific
20  case, but in my past dealings with Mr. Burke were
21  fairly normal.
22           If a case was getting ready to settle,
23  go to mediation, the attorney calls me, asks me, you
24  know, that -- to let me know that there is going to

PAGE 167

1   be some activity, either a settlement offer has been
2   made or they're going to mediation.
3           You know, I will ask them what I
4   think -- they think the value of the case is.  We
5   will then do a calculation as to whether or not there
6   is any equity in the benefit of the estate and what
7   we can agree to authorize.  And it's just normally in
8   a telephone conversation.
9           Occasionally -- occasionally, on a rare
10  occasion -- there may be a follow-up letter from the
11  attorney advising me that, you know, he has authority
12  to settle for such-and-such an amount, but generally
13  speaking it's, "Give me a call and let me know what's
14  going on in the case, and we'll determine whether the
15  estate has an interest in it or not."
16      Q    Did you have to hire Mr. Burke or Mr.
17  Nace?
18      A    I did not.
19      Q    And what do you mean by that?
20      A    Well, I don't -- when a case presents
21  itself in an asset-based case like this -- and as
22  indicated, Ms. Miller put on her bankruptcy schedules
23  that there was a malpractice claim and that Mr. Burke
24  was representing her in that interest -- the trustee

PAGE 168

1   is not obligated to hire the attorney that the debtor
2   has.
3           The trustee can, in fact, ask for all
4   of the documentation pertaining to the claim and can
5   employ counsel of their choice.  I was not under an
6   obligation to hire Mr. Burke or Mr. Nace in this
7   case.
8           I do that as a matter of -- a matter of
9   courtesy to a certain extent.  First of all, I think
10  that if the debtor has a relationship with an
11  attorney and they can continue with that
12  relationship -- in the event that the estate gets
13  involved in the case because the estate owns the
14  asset, but it's ultimately determined that, you know,
15  the amount of the damages are not going to exceed the
16  attorney's fees that are going to be paid to counsel
17  or not going to exceed the exemptible interest, then
18  at that point we no-asset the case.  We file a no
19  distribution report.  And then what happens is --
20  it's a term of art -- the asset gets abandoned back
21  to the debtor.
22           So we believe that if we can keep the
23  same attorneys in place and they're willing to accept
24  employment on behalf of the estate, in the event that

PAGE 169

1   ultimately the case doesn't have the value that we
2   think it does and we abandon it, then the debtor who
3   recovers the property by virtue of the abandonment is
4   left with the same attorney that got them to the
5   table in the first place.
6           So, no, the short answer is I don't
7   have to hire them.  I do because I think it's an
8   accommodation that benefits the debtor.
9       Q    Did Michael Burke ever provide a motion
10  to withdraw as special counsel?
11      A    No.
12      Q    Based on your knowledge, is he still
13  listed as special counsel in the bankruptcy estate?
14      A    To my knowledge, he is, yes.
15      Q    Okay.  And has the bankruptcy estate
16  always been entitled to the money from the medical
17  malpractice case of Barbara Miller?
18      A    Has it always been entitled to it?
19      Q    Yes.
20      A    Yes.  We're still administering that
21  asset as an asset of this bankruptcy estate.
22      Q    And that's why you hired Mr. Nace and
23  Mr. Burke?
24      A    Yes.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 44   PAGE 170

1    MS. RHODES:  I have nothing further.
2         RECROSS-EXAMINATION
3    BY MR. BENNINGER:
4    Q    On a matter of service, very promptly,
5    you have indicated in my questioning early on about
6    notice between February 24, 2005, when Mr. Nace sent
7    you back the signed affidavit and your January 7,
8    2009, letter to him threatening him and providing the
9    documentation requested, including the signed
10   order -- do you remember that?
11   A    Yes.  What date did you --
12   Q    You said there was nothing in between
13   except service?
14   A    Right.
15   Q    Because you didn't send it
16   independently of the court sending it to him, right?
17   A    My --
18   Q    Correct?
19   A    Yes, Mr. Benninger.  The court sent him
20   the order.  But I think the only other issue that I
21   raised was the fact that when I submitted the
22   application together with the affidavits to the
23   court, Mr. Nace and Mr. Burke were both served with
24   that, as well.

PAGE 172

1    Q    I don't -- I don't -- may I see it?
2    A    Well, you questioned me --
3         MS. RHODES:  It's in your notebook
4    under --
5         CHAIRPERSON KILGORE:  Twenty-one (21).
6         MS. RHODES:  -- 14.  Is that correct?
7    Is that what we're talking about?
8         MR. BENNINGER:  Okay.
9         THE WITNESS:  Yeah.
10   BY MR. BENNINGER:
11   Q    ODC Bates Stamp 21 and 22, 23.  Where
12   is there a certificate of service in that exhibit?
13   A    It's on page 22.
14   Q    Okay.
15   A    And it's the same certificate of
16   service that you questioned me about as to the date.
17   And it reflects that I furnished by US Mail postage
18   prepaid to William A. O'Brien, to D. Michael Burke at
19   85 Aiken Center, and to Barry J. Nace at 1814 N
20   Street, Northwest, Washington, D.C.
21   Q    And, in fact, you referenced that -- is
22   this the certificate of service that would have been
23   generated by the bankruptcy court?
24   A    I can't see the document.

PAGE 171

1    Q    Through the court?
2    A    No.
3    Q    Through your office?
4    A    Yes.
5    Q    So your sworn testimony here is you
6    sent them an independent copy and the court served
7    them a copy, two different services?
8    A    It's what my -- yes.  We would have
9    sent that to them by mail, yes.
10   Q    Where is your certificate of service?
11   A    Well --
12   Q    Because my records from ODC does not
13   provide any such certificate of service.
14   A    Okay.  What I'm looking at is a copy of
15   the actual trustee's application.
16   Q    What book, please?
17   A    Well, I'm looking at -- in this case
18   it's Michael Burke's, the ODC's booklet on Michael
19   Burke.  It's under Tab Number 1.  It's Number 20.
20   Q    I don't have that.
21   A    It's a document that you questioned me
22   about.  It's the one that's got the improper
23   certificate of service -- the improper date on the
24   certificate of service.

PAGE 173

1         MR. BENNINGER:  May I?  This has not
2    been provided to me in my booklet of exhibits.
3    BY MR. BENNINGER:
4    Q    Could you identify it, please?
5         MS. RHODES:  I would like to see it.
6    I'm not quite sure what it is, either.
7         (Brief pause.)
8         MR. BENNINGER:  May we move forward?
9    Oh, I'm sorry.
10        CHAIRPERSON KILGORE:  Do we want to
11   have this entered?
12        MR. BENNINGER:  Please.
13        THE RECORDER:  What is the number on
14   that?
15        MR. BENNINGER:  It would be Nace
16   Exhibit Number 41.
17        MS. RHODES:  Actually, you have like
18   duplicates of 1 through 7, so you need to fix that.
19        MR. BENNINGER:  Forty-one (41), please.
20        (WHEREUPON, Nace Exhibit Number 41 was
21   marked for purposes of identification.)
22   BY MR. BENNINGER:
23   Q    So let's take these one by one, Bob.
24   Okay?

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 45  PAGE 174
1    A    Yes, sir.
2    Q    Back to the first one; Nace Exhibit 14,
3  page 2. You certified that you sent as to Barry Nace
4  to 1814 N Street, Northwest. Now, you're aware now
5  that that is an incorrect address, correct?
6    A    It wasn't at the time.
7    Q    Look at his February 24, 2005, letter
8  to you --
9    A    Okay.
10   Q    -- which is Nace Exhibit 13.
11   A    Okay. And he says as of March 5th his
12 address would be changing to 1615 New Hampshire
13 Avenue. And at the time of the February 24th, 2005,
14 correspondence his address was 1814 N Street,
15 Northwest. On March --
16   Q    Now look at the court document.
17   A    On March --
18   Q    On March 6th --
19   A    You asked me about March -- the
20 certificate of service. On March 2nd, 2005, which is
21 when I filed or sent to the court the application
22 together with the affidavits, together with the
23 contract of employment -- on March 2nd, prior to his
24 address change, the address was 1814 N Street,

PAGE 175
1  Northwest, Washington, D.C. So at that time that was
2  the proper address.
3    Q    Now go to the court document that I
4  have marked as Nace Exhibit Number 41.
5    A    Yes, sir.
6    Q    What address does that have listed and
7  the date that it was entered in the ECF or electronic
8  system?
9    A    Well, I'm going to assume that this is
10 the certificate of service that was attached to the
11 order that was entered authorizing the employment of
12 counsel.
13   Q    I'll make that representation.
14        CHAIRPERSON KILGORE: It's to the
15 order; is that right?
16        MR. BENNINGER: Yes.
17        THE WITNESS: Yes, to the order.
18        MR. BENNINGER: It was attached to the
19 order.
20        THE WITNESS: And because it appears to
21 be dated -- appears to be dated March 4th, 2005.
22 BY MR. BENNINGER:
23   Q    Look at the bottom.
24   A    It says it was filed 3/6/05. My point

PAGE 176
1  being is -- you're right. It's 1814 N Street,
2  Northwest, Washington, D.C. What you don't have,
3  though, Mr. Benninger, is the fact that the court
4  docket that was produced during my deposition
5  reflecting that there had been an improper service
6  in, I think, 2010 on Mr. Nace reflected that the
7  letter was returned and filed with the court as a
8  returned letter.
9         There is no such corresponding return
10 of this order to Mr. Nace in 2005 anytime after -- at
11 all. There is no corresponding notice of a return
12 because of an improper address, together with the
13 fact that Mr. Nace testified that he, in fact, had a
14 forwarding address for his law firm, and that when
15 his address was changed he received address [sic]
16 from his old address.
17        So, I mean, you know, to my knowledge,
18 this was sent to 1814 N Street, but it should have
19 been forwarded. There's no record that it was ever
20 returned to the court.
21   Q    My point is: In spite of being told at
22 least one to two weeks before that that address would
23 be changing in the near future, that was the address
24 that was continued to be used on these documents?

PAGE 177
1    A    Yes, sir.
2    Q    Now, you remember testifying under oath
3  in the deposition on March 21, 2011, in the adversary
4  proceeding?
5    A    Yes, sir.
6    Q    Were you asked this question?
7  "Question: Okay. Did you ever send Mr. Nace a copy
8  of the order allowing you to employ him as special
9  counsel? Question.
10        "Answer: I don't have any -- I don't
11 have any knowledge of doing that." Do you remember
12 answering that?
13   A    Yes.
14   Q    Okay. Sir, can we contribute -- can we
15 agree on this: That at least to part, if not whole,
16 that this mess that we're embroiled in right now
17 appears from all the totality of the circumstances to
18 have been caused by a failure to communicate
19 effectively among the three lawyers involved in the
20 matter, to some degree or the other?
21   A    I don't -- I don't necessarily agree
22 with that representation.
23   Q    You disagree?
24   A    I do.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 46   PAGE 178

1  MR. BENNINGER:  That's all I have.
2  CHAIRPERSON KILGORE:  Mr. Karlin?
3  RECROSS-EXAMINATION
4  BY MR. KARLIN:
5  Q   Mr. Trumble, if I understand the way
6  fees are calculated, had this been done right, Mr.
7  Nace and/or Mr. Burke, if he had still been in the
8  case, would have been entitled to their full 40
9  percent contingent fee plus expenses.  Am I correct?
10  A   Yes, sir.
11  Q   The money that would have been owed to
12  the bankruptcy estate, had it been done properly,
13  would not have come from the attorney fees or costs
14  owed to Mr. Nace or, if he were still in the case,
15  Mr. Burke, correct?
16  A   I'm sorry.
17  Q   The money --
18  A   I'm not sure I followed your question.
19  Q   Bad question.  Let me rephrase it, Mr.
20  Trumble.  If I understand bankruptcy law, the
21  creditors and your commissions would all come
22  out of that portion of the recovery in Barbara
23  Miller's case that went to Barbara Miller?
24  A   The answer to your question is that

PAGE 179

1  would have been part of the net proceeds -- yes.  The
2  answer to your question is yes.
3  But understand that the fact is, had
4  the money been paid either through settlement or by
5  judgment, the full amount of whatever the funds are
6  those should have been turned over or may have been
7  turned over to the estate, and then the attorneys
8  would have been compensated, and after the attorneys
9  got compensated, the exemptible interest would be
10  paid, and the creditors would be paid.
11  So, you know, if you're trying to
12  divide that they got theirs and it's all the rest of
13  the money, it's not.  It's the estate was entitled to
14  all of the money subject to their right to receive
15  compensation.
16  Q   We'd finish quicker if you wouldn't
17  anticipate what you think I'm asking you about.  That
18  is not, in fact, what I'm asking you about.
19  A   I apologize.
20  Q   Bear with me and focus on my question,
21  and I'll finish quickly, I promise you.  Oops.
22  Dangerous to say for an attorney, but I'll try to
23  finish quickly, I promise you.
24  I just want to be clear.  I'm not sure

PAGE 180

1  I understood your answer.  However you do it -- if it
2  had all been done the way as you understand it should
3  have been done, Mr. Nace and Mr. Burke, if he were
4  still in the case, would get a 40 percent -- wind up
5  with a 40 percent contingent fee in their pocket,
6  correct?
7  A   Yes.
8  Q   Plus their expenses?
9  A   Yes.
10  Q   And to the extent that monies were
11  needed to pay the creditors, pay the bankruptcy
12  estate expenses, pay your commissions, that would
13  have come out of Mrs. Miller's share of the total
14  recovery, correct?
15  A   (No audible response.)
16  Q   Let me try it differently.  If it had
17  been done the way you say it should have been
18  done -- and I'm not quarreling with you on that.
19  A   I can't -- I can't agree with your
20  representation of "Mrs. Miller's share."
21  Q   Well, let me try it differently, then.
22  Let's just take a number.  Say there's $500,000.
23  A   Yes, sir.
24  Q   Goes to the estate, bankruptcy estate,

PAGE 181

1  correct?
2  A   Yes, sir.
3  Q   You still make sure that Mr. Nace gets
4  paid his $200,000, correct?
5  A   If there's -- in this case --
6  Q   In this case?
7  A   -- and assuming that there's $500,000
8  to distribute, yes.  If for whatever reason that
9  there wouldn't be enough money to distribute to
10  everybody on an equal share, there would be a pro
11  rata.
12  But in your situation with $500,000,
13  there was more than sufficient monies to pay Mr. Nace
14  and Mr. Burke their 40 percent plus expenses and
15  there was still money left over that could have paid
16  all of the expenses that were available -- that were
17  due, including commissions, and there was -- as I
18  indicated earlier, there would still be money left
19  over that would be returned on the back end to Mrs.
20  Miller as an excess distribution.
21  Q   My point is this:  As far as you know,
22  neither Mr. Nace nor Mr. Burke had any motive, any
23  financial motive, that you know of to keep them from
24  making sure the bankruptcy estate got its share of

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 47   PAGE 182

1   the money, did they?
2   A   No, not that I'm aware of.
3   Q   They didn't gain in any way by what
4   happened in this case as far as you understand it,
5   did they?
6   A   Not that I'm aware of.
7   Q   Indeed, they've lost a great deal,
8   haven't they?
9   A   I don't know.
10   Q   Well, they're here on an ethics charge,
11   aren't they?
12   A   They're here on an ethics charge. Yes,
13   sir.
14   Q   They've had to retain attorneys to
15   represent them, haven't they?
16   A   I assume they have. Yes, sir.
17   Q   And they're still facing proceeding,
18   indebtedness in the adversary proceeding, right?
19   A   That's correct.
20   Q   Can you think of any other explanation
21   for what they did other than simply they made a
22   mistake?
23   A   You know, initially I thought that it
24   was a mistake, and, quite frankly, that's why I

PAGE 183

1   really felt that if we could get it resolved even
2   reducing commissions, if I could get the creditors
3   paid.
4        But after that was -- there was no
5   response or I was shunned, I didn't feel that there
6   was any other alternative. I felt that there was,
7   you know, denial of any employment, denial of
8   representation. And so I don't know what their
9   motivation was at that time.
10   Q   Mr. Burke -- when you talked to him two
11   or three weeks before you threatened ethics
12   violations, Mr. Burke didn't deny that the bankruptcy
13   estate was owed this money, did he?
14   A   No, he did not.
15   Q   Mr. Burke has never denied to you that
16   the bankruptcy estate has an entitlement to some
17   funds, has he?
18   A   He has not.
19   Q   And he has never given you any
20   suggestion of any motive that he would have had not
21   to tell you that he was no longer in the case other
22   than he was busy, he forget, it was a mistake, has
23   he?
24   A   He has never really provided me with an

PAGE 184

1   explanation other than he had a conflict. I don't
2   know why he didn't notify me after he received my
3   correspondence and after -- after the communications
4   between the office. I have no idea why he didn't
5   respond to me.
6   Q   Do you have any information to suggest
7   that it was anything other than a mistake?
8   A   I don't know what it was.
9   Q   Do you have any information to suggest
10   that it was anything other than a mistake?
11   A   No.
12   Q   You sometimes get busy and forget to do
13   things, don't you?
14   A   I would be remiss if I said that I
15   did -- did not.
16   Q   Do you believe that Mr. Burke is any
17   different?
18   A   No.
19   Q   Now, you also said that you
20   informally -- the way it works in the Northern
21   District and the Eastern Panhandle is often the
22   conversations between trustees and attorneys who are
23   special counsel are informal telephone conversations?
24   A   That's correct.

PAGE 185

1   Q   And that would have been Mr. Burke's
2   experience with your office, wouldn't it?
3   A   Yes.
4   Q   You said that you could have hired
5   other attorneys to pursue this case. Since the
6   medical malpractice reforms that were passed in the
7   wisdom of our legislature, isn't it true, Mr.
8   Trumble, that there are not very many attorneys who
9   take these cases anymore?
10   A   I can't answer that question
11   quantitatively as to how many there are. I'm sure
12   that there are other attorneys who handle malpractice
13   claims.
14   Q   You haven't noticed that the number who
15   are willing to take cases in light of the
16   difficulties in prevailing in these cases and the
17   expenses incurred in these cases has declined
18   substantially?
19        MS. RHODES: Objection. Asked and
20   answered.
21        BY MR. KARLIN:
22   Q   Have you noticed that?
23   A   Mr. Karlin --
24        MR. KARLIN: I'm sorry. I should have

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 48   PAGE 186

```
1      waited for your rule.  I apologize.
2            MS. RHODES:  Objection.  Asked and
3      answered.
4            CHAIRPERSON KILGORE:  Just go forward.
5      BY MR. KARLIN:
6      Q    You don't know?
7      A    I don't know.
8      Q    And let me ask you one other question.
9      If Mr. Burke had stayed in the case and tried it with
10     Mr. Nace, and Mr. Nace and Mr. Burke had incurred 50,
11     60, 75 thousand dollars in expenses and lost the
12     case, who would have paid that?
13     A    There wouldn't have been any money to
14     pay it.
15     Q    They would have absorbed the loss,
16     right?
17     A    Absolutely.
18           MR. KARLIN:  I don't have anything
19     further.
20           CHAIRPERSON KILGORE:  Ms. Rhodes?
21           MS. RHODES:  I have nothing further.
22           CHAIRPERSON KILGORE:  Mr. Francisco, do
23     you have any questions?
24           MR. FRANCISCO:  I have no questions.
```

PAGE 187

```
1            CHAIRPERSON KILGORE:  Ms. Pyles?
2            MS. PYLES:  No, ma'am.
3            CHAIRPERSON KILGORE:  I believe you
4      have exhausted this witness.  I have no questions.
5      May the witness be excused?
6            MS. RHODES:  Yes.
7            MR. KARLIN:  No objection.
8            MR. BENNINGER:  No objection.
9            CHAIRPERSON KILGORE:  You may be
10     excused, Mr. Trumble.  Thank you very much for
11     appearing today.
12           THE WITNESS:  Thank you.
13           (Witness Robert W. Trumble excused.)
14           CHAIRPERSON KILGORE:  Let's take a
15     break for lunch.  If you want to go off the record,
16     Maura.
17           (WHEREUPON, a lunch recess was taken.)
18           THE RECORDER:  We're back on the
19     record.
20           CHAIRPERSON KILGORE:  All right.  Ms.
21     Rhodes, do you want to call your next witness?
22           MS. RHODES:  The Office of Disciplinary
23     Counsel calls Michael Burke.
24           (Witness D. Michael Burke, II, sworn.)
```

PAGE 188

```
1            THEREUPON came
2                    D. MICHAEL BURKE, II,
3      called as a witness on behalf of the Office of
4      Disciplinary Counsel, and having been first duly
5      sworn according to law, testified as follows:
6                    DIRECT EXAMINATION
7      BY MS. RHODES:
8      Q    Could you please state your name for
9      the record?
10     A    D. Michael Burke, II.
11     Q    And when were you admitted to practice
12     in West Virginia?
13     A    In 1979.
14     Q    And where do you -- what county do you
15     mainly practice in?
16     A    Mainly Berkeley, some Jefferson,
17     occasional Morgan and Hampshire and Hardy.
18     Q    Okay.
19     A    Largely Berkeley.
20     Q    I'm sorry.
21     A    Largely Berkeley.
22     Q    Okay.  And in the beginning of 2004
23     were you approached by a Barbara Miller about a case?
24     A    It was in 2004, but I don't recall
```

PAGE 189

```
1      when.
2      Q    Okay.  If you look at what has been --
3      I don't know which black one is referred to as your
4      case.  That one.  If you look under Tab 1, Bates
5      Stamp 24.
6      A    I met with her on February 5th of 2004.
7      Q    Okay.  And that's when you entered into
8      the contract of employment and authority to
9      represent?
10     A    Yes, ma'am.
11     Q    And what kind of case was this
12     regarding?
13     A    It was a medical negligence case.
14     Q    And that involved her deceased husband?
15     A    Yes, ma'am.
16     Q    And you were going to take 40 percent
17     of the case?
18     A    Well, the contingent fee in a medical
19     malpractice case is 40 percent.  It's a little bit --
20     it's higher than the usual.
21     Q    Okay.  And why is that?
22     A    Well, it normally involves an
23     expenditure of tens of thousands of dollars in
24     expenses to get the case to court.  They're much more
```

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 49 PAGE 190

1  difficult.  I usually associate counsel in the case,
2  who gets most of the fee.  But that's a pretty
3  standard fee in medical negligence cases.
4      Q      And I believe in both your deposition
5  with me and Mr. Nace's deposition with me, you know
6  how to pretty much weed through these cases to get to
7  ones that you think are somewhat viable?
8      A      Well, I do an initial weeding.  I get
9  calls.  I probably get about 20 calls a week and set
10 up about one appointment a month, maybe two.
11     Q      And what you weed out, you send on to
12 Mr. Nace?
13     A      I get some in, and I'll often meet with
14 someone and talk to them, and determine if the -- the
15 analysis is often a little bit -- it seems backwards
16 because we start with, if it's successful, frankly,
17 is there going to be a likely verdict, a verdict
18 that's going to be enough to justify the time and the
19 expenses.
20          And even if I think there's negligence,
21 because of the hoops that we have to jump through and
22 the costs involved, if it's a -- if it's a case where
23 it might win $50,000, that's simply not worth it for
24 the client or the attorneys.

PAGE 191

1      Q      Okay.  And that's how you determine
2  whether -- cases to take or to send on to Mr. Nace?
3      A      Well, I look at that, and then if I've
4  got a question, I'll call Barry, Mr. Nace, and I'll
5  discuss it with him and ask him what he thinks on a
6  case of -- a close case as far as damages, and we'll
7  look at the -- you know, if what the client says is
8  true, do we think there is negligence, and if there
9  is, then I'll send them up, but I go through the
10 initial screening process.
11     Q      Okay.  And that's what you did with Ms.
12 Miller's case, correct?
13     A      If I recall.
14     Q      Okay.  And you did end up forwarding
15 the case on to Mr. Nace for his review?
16     A      I did.
17     Q      And just because you forward it to him
18 doesn't mean you guys are taking that, but you're
19 looking into it?
20     A      Oh, that's true.  There are many cases
21 we don't take.
22     Q      And so how involved were you in the
23 case from signing Ms. Miller in 2004 until the case
24 was filed in July of 2005?

PAGE 192

1      A      We acquired -- we handle discussions
2  with the client, acquire the records, send the
3  records -- I get the records and send them to Barry
4  Nace.
5          He'll do an initial review, and
6  sometimes he'll say, "This is not a case I'm
7  interested in."  If it is a case he's interested in,
8  he will forward it to a medical expert, who will then
9  review it and get back to Barry, who will then decide
10 at that point whether to take the case.
11     Q      Okay.  And you believe that's what
12 happened in this case?
13     A      Apparently.
14     Q      Okay.  And were you aware when Ms.
15 Miller filed for bankruptcy?
16     A      I wasn't aware when she did.  I know
17 that she did.
18     Q      Okay.  Do you recall being contacted by
19 Robert Trumble about Ms. Miller's bankruptcy estate?
20     A      I remember getting a letter from him.
21     Q      Okay.  Do you recall talking to him on
22 the phone before that?
23     A      I don't have an independent
24 recollection of that, no.

PAGE 193

1      Q      Okay.  If you look at what is Bates
2  stamped 6 under Tab 1, it's an October 26th, 2004,
3  letter from Mr. Trumble to Mark Jenkinson, who is an
4  attorney -- is that a fellow attorney in your office?
5      A      Yes.  That's the first contact we had.
6  That letter came in, and, of course, Mark didn't know
7  what was going on because he didn't know who Barbara
8  Ann Miller was.
9      Q      Okay.  And then some months after that,
10 if you look at what has been Bates stamped 9,
11 January 11, 2005, you received a letter from Mr.
12 Trumble?
13     A      Yes.
14     Q      Okay.  And you had previously --
15 January 25, 2005 -- that's Bates Stamp 11.  That was
16 your response to that letter from Mr. Trumble,
17 correct?
18     A      Yes, ma'am.
19     Q      And as it has been testified to, you
20 had previously represented Mr. Trumble as special
21 counsel in bankruptcy cases?
22     A      Two or three times.
23     Q      Two or three times?  Okay.
24     A      Maybe more.  I've been practicing too

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 50  PAGE 194

1  long.  I can't remember all of the cases.
2      Q    Okay.  I think in your deposition you
3  said between two and ten.  You weren't correct -- you
4  weren't positive?
5      A    I can specifically remember two and
6  maybe three, and there may be more.
7      Q    Okay.
8      A    But I'm getting old, and I've got too
9  many -- had too many cases.
10      Q    And on January 27th, 2005, if you look
11  under Bates Stamp 13, that is a letter from -- well,
12  it was Christy Hook for Mr. Trumble to you with the
13  application to employ special counsel order and the
14  original affidavit.  Did you receive all those
15  documents?
16      A    I believe so.
17      Q    Okay.  And what did you do upon receipt
18  of those documents?
19      A    I think I signed the affidavit and
20  returned it to Mr. Trumble.
21      Q    Okay.  Did you ever forward that on to
22  Mr. Nace?
23      A    Possibly.  I don't have -- at this
24  point I don't have -- I don't remember how Mr. Nace

PAGE 195

1  got involved in it.  I don't know whether I forwarded
2  a copy of mine or I asked for another copy, but
3  somehow Mr. Nace got a copy.
4      Q    Okay.  Well, if you look at Bates
5  Stamp 12, that's a separate letter to him dated the
6  same day, to Mr. Nace.
7      A    Oh, okay.
8      Q    But you would have been unaware of that
9  because you're not copied on that in any way?
10      A    Yeah.
11      Q    Did you speak to Mr. Trumble about the
12  application and the affidavit prior to him sending
13  you this letter on January 27th, 2005?
14      A    I'm not certain if I did or not.  I may
15  have when I finally got the letter that was sent to
16  Mr. Jenkinson.
17      Q    And you had no problem with signing the
18  affidavit or adhering to the application to employ?
19      A    No.
20      Q    And you did sign that affidavit on --
21  it's going to be under -- it's going to be 23 --
22  February 1st, 2005, correct?
23      A    Yes, ma'am.
24      Q    And under that three, you were willing

PAGE 196

1  to accept employment by the trustee on the basis set
2  forth in the application to employ, correct?
3      A    Correct.
4      Q    Okay.  And at that point you were still
5  involved in Ms. Miller's case?
6      A    Not as -- yes, I was.  I was still
7  representing her.
8      Q    Okay.  Not as what?
9      A    I may not have been as actively
10  representing her --
11      Q    Okay.
12      A    -- at that point as I had been earlier,
13  because at some point we acquire the records, we pass
14  them on, and then there is a period of inactivity.
15      Q    Okay.  If you go under -- and I'm going
16  to go ahead and do this.  If you go under Tab 2,
17  that's a July 16th, 2009, letter from me to you
18  opening the complaint.  Do you recall receiving that
19  letter?
20      A    Yes, indeed.
21      Q    Okay.  And under Tab 3, August 25th,
22  2009, that's your response along with several
23  attached documents?
24      A    Yes, it is.  But I'd like to point out

PAGE 197

1  that I think I made a mistake in this.
2      Q    Okay.  And do you want to talk about it
3  now?
4      A    It's up to you.  But at some point -- I
5  wasn't sure at one point whether my secretary or I
6  called, and I think I put in here that my secretary
7  called Mr. Trumble after the July 27 letter, but
8  having had an opportunity to think about this case in
9  much greater detail over the past few years as it has
10  been litigated in the bankruptcy court and by your
11  office, I am certain that I am the one who called Bob
12  Trumble's office after getting the July 27, 2007,
13  letter.
14          And I left a message.  I talked to a
15  woman.  And I told her that I was no longer in the
16  case; that Mr. Nace, the co-counsel in the case, was
17  handling it without my involvement.
18          And I gave her Mr. Nace's phone number
19  of (202) 463-1999, and I told her if there was
20  anything going on she needed to contact Mr. Nace
21  because I was out of the case and didn't -- you know,
22  I pretty much wasn't -- I wasn't involved in it at
23  all at that point.
24      Q    And you got information from Mr.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 51  PAGE 198

1   Trumble that he was seeking information for the
2   bankruptcy case, is that correct, after the July
3   2007?
4       A   Well, he was looking for --
5       Q   The status?
6       A   Apparently.
7       Q   Okay.  And even at that point you never
8   filed a motion to withdraw from the bankruptcy case?
9       A   I did not.
10      Q   And in receiving the application to
11  employ special counsel, it does refer to a personal
12  injury case.  Did you have issues with that in the
13  application or the order?
14      A   No.
15      Q   Okay.  And that wasn't something you
16  thought you needed to address before you signed the
17  affidavit?
18      A   It was -- it's not a significant -- it
19  wasn't an issue.  It was a sign of sloppiness, but it
20  wasn't an issue from my standpoint.
21      Q   Okay.  And on May 18th, 2005 -- and
22  we're going to go back and forth, and I'm so sorry
23  about that.
24      A   That's all right.

PAGE 199

1       Q   It's going to be Tab 26.  Actually, it
2   might be attached to yours.
3           CHAIRPERSON KILGORE:  Page 26?
4           THE WITNESS:  I was going to say, I
5   only go up to Tab 15.
6           CHAIRPERSON KILGORE;  Right.
7           MS. RHODES:  Wait a minute.  I'm going
8   to do this differently.  Actually, let's go to 69.
9   It's under Tab 3.  So stay at 53, and if you could
10  flip up to 69.
11  BY MS. RHODES:
12      Q   And that's a May 18th, 2005, letter
13  from Christy Hook for Mr. Trumble to you, correct?
14      A   Correct.
15      Q   And this is your Exhibit 7 that you
16  attached to your response, correct?
17      A   Yes.
18      Q   Okay.  So you received that asking
19  for -- this was asking for a status, correct?
20      A   Well, it says, "Provide me a written
21  report."
22      Q   Okay.  And in there, there is some
23  writing, you know, in the blank space below the
24  "Senior Legal Assistant," and it says, "Mailed copy

PAGE 200

1   to Nace's office 5/23/05."  That's not your
2   handwriting, correct?
3       A   That is not.
4       Q   Whose handwriting is that?
5       A   My secretary's.
6       Q   And why would she have mailed that to
7   Mr. Nace's office?
8       A   Because he wasn't -- we didn't know
9   whether he got one or not.  The other letter,
10  apparently he sent me one and sent Barry one, but I
11  wasn't sure he was sending one to Barry or we -- for
12  some reason or another, we wanted to make sure Barry
13  got this, and we weren't sure that he had gotten it.
14      Q   Okay.  And this is a -- do you direct
15  them to put that notation on letters that you know?
16      A   No.  But I probably said, you know,
17  "Make sure Barry . . . send a copy of this to Barry."
18      Q   Okay.  And do you know if you ever got
19  that back?  Is there anything in your file to reflect
20  that that letter came back or anything like that, the
21  copy, the copy that was --
22      A   That we mailed to her?
23      Q   Yes.
24      A   No.  We have his address.

PAGE 201

1       Q   So it didn't come back to you?
2       A   No.  We have an accurate -- at all
3   times we had Mr. Nace's accurate address.
4       Q   Okay.  And in your response on page 53
5   in what has been numbered as paragraph 8, you stated,
6   "On May 23rd, 2005, I forwarded a copy to Gabriel
7   Assaad, an attorney in Mr. Nace's office, who was
8   working on the Miller case," and you also called Mr.
9   Assaad to inquire about the status.  Who is this Mr.
10  Assaad beyond being an attorney in Mr. Nace's office?
11      A   He was an associate.  He was working at
12  his office.  And Barry tries cases and he is in
13  depositions a lot, and normally Gabe is easier -- was
14  easier at that time to contact.  So I contacted him
15  and said, "What's going on with the Miller case?"
16      Q   Was that the person -- were you
17  directed by Mr. Nace to speak to Mr. Assaad about the
18  case, or was that your decision?
19      A   No.  It was something I did because --
20  and I may have even called down and asked for Barry
21  and Barry was in trial or in deposition, and I said,
22  "Well, let me speak to Gabe."
23      Q   Okay.  And in that you said, "I
24  forwarded a copy."  Are you referring that you had

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 52  PAGE 202

```
1    your secretary do that?
2       A    Right.  I directed her to do it.
3       Q    Okay.  And it looks like at some point
4    in 2005 it was determined that, especially in regards
5    to -- if you look at 70, at Bates Stamp 70, that's
6    your May 24, 2005, response to Ms. Hook saying
7    that -- you know, that somebody was at fault in Mr.
8    Miller's death, and you were awaiting responses to
9    those, correct?
10      A    Yes.
11      Q    Okay.  And Exhibit 9, starting at 71,
12   which is the complaint filed by Barbara Miller for
13   the estate of Paul Miller against various defendants,
14   and it looks like that was filed July 8th, 2005,
15   correct?
16      A    I think that may be the amended
17   complaint.
18      Q    That's the amended complaint?  Okay.
19   Yeah, it is.  And between that time, between May of
20   2005 and July of 2005, you had discovered a personal
21   conflict in the case?
22      A    Yes.  Ron Harman in our office said one
23   of the doctors that we were considering suing was his
24   neighbor.  He told me that would be -- make things
```

PAGE 203

```
1    difficult for him.  He asked me if I would not get
2    involved in a case against his neighbor, and I said I
3    would not.
4       Q    Okay.  And so it wasn't like an ethical
5    kind -- not like a conflict under the Rules of
6    Professional Conduct?
7       A    Well, unless Mrs. Miller -- you know,
8    if something goes wrong with the case and she says,
9    "Well, that's because Ron Harman lives next to Dr.
10   Jalazo."
11      Q    Yeah.
12      A    She may have had the perception that
13   there could have been something, but I didn't do it
14   as a legal conflict, but just an accommodation to a
15   guy I worked with to not sue his neighbor.
16      Q    And did you inform Ms. Miller that you
17   were withdrawing from the case?
18      A    Yes.
19      Q    And if you look at what has been Bates
20   stamped 77, a July 25th, 2005, letter.
21      A    Yes.
22      Q    And you explained the conflict, and
23   that you were no longer handling the case and Mr.
24   Nace was; is that correct?
```

PAGE 204

```
1       A    Yes.  But she would have known from the
2    beginning that Mr. Nace would have been involved in
3    the case.
4       Q    And how would she have known that?
5       A    I would have told her.  In all medical
6    malpractice cases I associate Mr. Nace.  This is what
7    he does.  This is pretty much all he does.
8       Q    Do you have his name in your contract
9    of employment or authority to represent?
10      A    No.  I've been using the same contract
11   for probably the last 30 years with a couple of minor
12   changes, and I haven't added it, and never had -- it
13   was never an issue.
14      Q    And do you know if -- I'll move on.
15   July 27th, 2007.  If you look at what has been Bates
16   stamped 78, that's a letter from Mr. -- well, from
17   Ms. Hook for Mr. Trumble to you, again, regarding a
18   written report, looking for the status of the case;
19   is that correct?
20      A    Correct.
21      Q    And on there under the -- on the right
22   side, again, it says, "Mailed to Gabe and faxed 8/8
23   of '07."
24      A    Correct.
```

PAGE 205

```
1       Q    And that "Gabe" we're assuming is --
2       A    Would have been Gabriel Assaad.
3       Q    Okay.
4       A    And you'll notice I didn't respond --
5    the other one is in -- it says "written report."  I
6    never sent a written report, so I don't know -- if
7    Mr. Trumble is looking for a written report and
8    didn't get one, I would have thought he would have
9    followed up.
10      Q    Well, I mean, the May 18, 2005, you
11   responded May 24th, 2005, with a written letter.
12      A    Exactly.  That would have been what I
13   would have done.  Had I been involved in the case, I
14   would have sent a written report as requested.  In
15   this case I did not.
16      Q    Okay.  And then on -- you have
17   marked -- it's going to be 79.  You attached the
18   November 14, 2008, letter from Ms. Hook for Mr.
19   Trumble to you and Mr. Nace?
20      A    What was the question?
21      Q    Well, that is -- is that the letter,
22   Bates Stamp 79, the second request?
23      A    Yeah.  It says second request, but
24   that's the first letter I got --
```

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 53   PAGE 206

```
1        Q    Okay.
2        A    -- at this point out of the blue.
3        Q    And what did you do in response to that
4   2008 letter?
5        A    I don't specifically recall, but I
6   probably called Barry or Barry called me and said,
7   "Did you get that letter?" or he called me and said,
8   "Did you get that letter?"
9             And he said, I remember, "Did you ever
10  get a first request?" And I said, "No, I never got a
11  first request." And he said, "I never got a first
12  request, either." So neither one of us got a first
13  request.
14            We get a second request which suggests
15  that we're, you know, not cooperating and we're --
16  but we never got the first one, and Mr. Trumble never
17  picked up the phone and called me and said, "Hey, I
18  sent you a letter. Am I going to get a response?"
19            I get something that says, "Second
20  Request. Your cooperation in this regard is greatly
21  appreciated."
22       Q    And did you have any contact with Mr.
23  Trumble after receiving this letter?
24       A    Not immediately --
```

PAGE 207

```
1        Q    Okay.
2        A    -- that I recall. He was asking
3   questions about a case that I had been out of for
4   three -- almost three and a half years.
5        Q    And even at that point you still didn't
6   file a motion to withdraw in the bankruptcy estate?
7        A    I did not.
8        Q    And you did receive a copy of the
9   ethics complaint, correct?
10       A    I did.
11       Q    And you filed your response?
12       A    I did.
13       Q    And there now has been in the
14  bankruptcy case an adversary proceeding filed against
15  you; is that correct?
16       A    Correct.
17       Q    And why didn't you contact Mr. Trumble
18  or the bankruptcy court to withdraw from the case?
19       A    In hindsight, I should have. Let's
20  contrast two situations. If I'm representing someone
21  and I'm on the case by myself and I want to withdraw
22  and I don't know what the client is going to do, I
23  think it's important to give the client an
24  opportunity to hire another attorney, to locate
```

PAGE 208

```
1   competent counsel, because I'm not -- I'm out of the
2   case.
3             I should have moved to withdraw in this
4   case, but Barbara Miller had the most competent
5   medical malpractice attorney that I know. He has
6   tried more cases in eastern West Virginia -- more
7   cases period, more civil cases, than probably any
8   other attorney in the area, and she was well
9   represented at that time by the best guy -- the best
10  malpractice attorney in the area.
11            And the fact that I wasn't actively
12  involved in the case at that point in terms of
13  producing a result for her wasn't as important as
14  having Barry Nace as her lawyer.
15       Q    Okay. How familiar are you with
16  bankruptcy law?
17       A    I used to handle some Chapter 7
18  bankruptcies, but I don't -- I don't practice
19  bankruptcy now. Probably 15, 20 years ago I did some
20  Chapter 7 no-asset cases.
21       Q    Would you say you're more familiar with
22  it today since dealing with this adversary proceeding
23  and these proceedings -- more than, say, back in
24  2006?
```

PAGE 209

```
1        A    Indeed.
2        Q    Okay.
3        A    I've been going to school on it.
4        Q    Is Barry Nace listed as of counsel on
5   your letterhead?
6        A    Yes, he is.
7        Q    And is he aware of that?
8        A    Yes, he is.
9        Q    And, you know, depending on your level
10  of knowledge of the bankruptcy law and the fact that
11  you've been previous special counsel for the
12  bankruptcy estate, would you have known there had to
13  be an order approving you as special counsel?
14       A    Yes with qualification, because I'm not
15  sure -- I saw a proposed order. I never saw an order
16  that -- when I look at it more carefully, it says
17  there was a request for permission to hire us.
18            I never saw the order granting
19  permission to hire us or the next step, which I
20  suppose logically would have been to hire us, but
21  I've done this in the past, and, honestly, I've never
22  delved into the niceties of it, but it's kind of a
23  little slipshod the way it has been handled,
24  actually.
```

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 54   PAGE 210

1    Q    Well, what did you think when you
2    signed the affidavit? What did you think you were
3    doing when you signed that affidavit?
4    A    I treated it as we were, you know,
5    hired by the bankruptcy trustee to prosecute the
6    case.
7    Q    And at that point you were aware that
8    this case, this medical malpractice case, was an
9    asset to the bankruptcy court?
10   A    Yes.
11   Q    And you obviously have dealt in the
12   past with Mr. Trumble as a trustee. And what was his
13   practice with you as to getting status or these
14   written reports? Was it like he did here with the
15   letters to you or calls?
16   A    More often it was calls. But those are
17   much simpler cases, and they get resolved in a much
18   shorter period of time. And he might send a letter
19   or two.
20   Q    Okay. And he indicated that all of
21   those previous cases you contacted him upon
22   resolution of the case. Is that correct?
23   A    Yes.
24   Q    And why didn't you contact him upon

PAGE 211

1    resolution of Ms. Miller's medical malpractice case?
2    A    I didn't know when it was resolved. I
3    was out of the case.
4    Q    And what do you believe -- what do you
5    feel the responsibility is of clients when you
6    represent them in the case? Like do you believe they
7    should contact you about the -- asking you what's
8    going on with the case?
9    A    Most of my clients do.
10   Q    Okay. Did you ever receive a referral
11   fee from Mr. Nace in this case?
12   A    No.
13   Q    And that's in opposition to what you
14   spoke to at your deposition; is that correct?
15   A    That is correct.
16   Q    And why did you get that wrong?
17   A    I thought that I had been paid. I got
18   some checks from Barry about the -- sometime in, I
19   guess, '07 -- '07, '08. And in preparing in the
20   adversary proceeding, I went back and checked my
21   records to see what I had gotten from Mr. Nace,
22   because I knew there -- I thought I had gotten paid.
23   It was my recollection I had gotten paid.
24        But I was mistaken, apparently, because

PAGE 212

1    I can't find any record of it. Barry can't find any
2    record of it. He can't find cancelled checks to me.
3    Because I've asked his office, and they've searched
4    and said that they never sent me any checks. And I
5    think I was just simply mistaken.
6    Q    Okay. And you said, "He may have sent
7    me five to ten thousand dollars," but you're saying
8    that's incorrect now?
9    A    Yeah. Because in subsequent
10   conversations since then Barry said, "Well, there
11   were a couple other cases that we settled, and you
12   got a fee for 5,000 on one case and a fee for 10,000
13   on another case and another check on another case."
14        And all I can surmise is I was just
15   mistaken because I can find no verification in any of
16   my records, in any 1099, in any -- I note every check
17   that comes into my office. I record it. And it's
18   not there, and Barry doesn't have a record of it, so
19   the only conclusion I can draw is I was wrong.
20   Q    But you did -- your office at least
21   paid the filing fee for the complaint in this matter,
22   is that correct, for the complaint filed for Ms.
23   Miller's case?
24   A    That wouldn't surprise me. I was out

PAGE 213

1    of town when it was -- when the initial case was
2    filed, so that wouldn't surprise it. It wouldn't
3    surprise me.
4    Q    Why didn't you notify Mr. Trumble that
5    you were withdrawing from Ms. Miller's case?
6    A    Inadvertence. I should have. I knew
7    that Mrs. Miller was in good hands. And I should
8    have.
9    Q    And if you look -- it's going to be
10   under Tab 9 that is submitted under seal. That is
11   your client file in this matter. You can open it up
12   and take that red tab off. Do you agree that that's
13   the file you provided to me during your sworn
14   statement?
15   A    Most of this looks familiar. There are
16   some things here I don't -- if I saw them, it's been
17   a long, long time.
18   Q    Okay.
19   A    But I don't see anything here that --
20   and I don't remember all of this bankruptcy stuff
21   being in my file, but probably it might be there.
22   Q    Okay. And if you go under Tab 8,
23   that's the transcript of your -- well, we're going to
24   go back here just to make sure that it's clear.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 55 PAGE 214

```
1    Under Tab 6, it's a subpoena for your appearance to
2    give a sworn statement with me; is that correct?
3         A    Yes, ma'am.
4         Q    And then under Tab 7 is the service of
5    that subpoena?
6         A    Yes, ma'am.
7         Q    And we may have changed -- I believe we
8    changed the place of that.  But under Tab 8, that's
9    your -- the transcript of your deposition?
10        A    Tab 8?
11        Q    Yeah.  That's the transcript of your
12   sworn statement?
13        A    Sworn statement, yes.
14        Q    And Tab 9, if you go to 294 --
15        A    I mean, I don't have any reason to
16   doubt.  I just don't know that all this -- I
17   haven't looked at my file.
18        MS. RHODES:  That's fine.  I'm not
19   saying you're doubting me, but if you could turn to
20   294.
21        MR. BENNINGER:  I'm sorry.  What page
22   was that?
23        MR. KARLIN:  Two ninety-four (294).
24        MS. RHODES:  Two ninety-four (294).
```

PAGE 215

```
1         THE WITNESS:  Yes.
2    BY MS. RHODES:
3         Q    Is that a fax cover sheet to Gabriel
4    from Lacy -- or is it Lucy?
5         A    Lacy.
6         Q    Okay.  -- dated 8/8/07?  And on there,
7    there's -- it looks like it was a little post-it
8    note -- "Per Gabe, send to him.  He will handle"?
9         A    That's what it says.
10        Q    Okay.  And that's not your writing,
11   correct?
12        A    That is not my writing.
13        Q    And then at 295 is the July 27, 2007,
14   letter?
15        A    Yes.
16        Q    And it said, "Mailed to Gabe and
17   faxed"?
18        A    That's what it says.
19        Q    Okay.  So you never -- when did you
20   become aware that Ms. Miller's complaint -- the
21   medical malpractice case had -- were you aware that
22   it had went to jury and got a verdict at any point?
23        A    Yes.  But I have no recollection of
24   when that was.
```

PAGE 216

```
1         Q    Okay.  Were you aware that it was
2    appealed, that decision was appealed to the West
3    Virginia Supreme Court?
4         A    At some point later, I learned that.
5         Q    Okay.
6         A    Yeah, later, sometime later.
7         Q    Okay.
8         A    May I get some water?
9         CHAIRPERSON KILGORE:  Certainly.
10        (Brief pause.)
11   BY MS. RHODES:
12        Q    You did sign the affidavit and send
13   that back to Mr. Trumble.  Did you ever take any
14   steps to look at the bankruptcy case on PACER or get
15   any documents from it?
16        A    No.
17        Q    And like you said, there appears to be
18   some of that in what I am saying was the file you
19   provided me with, so at some point you did go back
20   and look at those?
21        A    When I got the ethics complaint, yes.
22        Q    Okay.  And that was the first time you
23   went to look at that?
24        A    Yes.
```

PAGE 217

```
1         MS. RHODES:  At this time I don't have
2    anything further.
3         CHAIRPERSON KILGORE:  Mr. Benninger?
4         MR. BENNINGER:  Briefly.
5              CROSS-EXAMINATION
6    BY MR. BENNINGER:
7         Q    Mr. Burke, how long have you known Mr.
8    Nace?
9         A    I met him at a conference -- he was an
10   instructor -- probably in 1980 or '81.
11        Q    And are you familiar with his
12   reputation among lawyers as being one of the most
13   experienced and skilled medical malpractice lawyers
14   for plaintiffs in this region?
15        A    I am familiar with his reputation, and
16   I am familiar with his skill level.  I've seen him
17   try 15 or 20 cases to jury from Lewis County, West
18   Virginia, to Jefferson County, West Virginia, to
19   Grant County, Berkeley -- several in Berkeley,
20   several in Jefferson.
21        Q    What reputation does he enjoy among the
22   trial bar for being a specialist in med mal cases?
23        A    There's none better.
24        Q    Your personal opinion, I guess, is
```

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 56   PAGE 218

1  based on you having tried cases with him and
2  observing him do so?
3      A    Yes.  He has gotten results in cases
4  that are very difficult.  He's knowledgeable in
5  medical malpractice.  He knows the law.  He knows the
6  medicine.  And there's no one better.
7          The fact that I tell someone, "If, you
8  know, Barry is on the case, I'll be on the case.  If
9  Barry is not interested in the case, I'm not
10  interested in the case."
11      Q    What is your personal opinion of him as
12  being a competent medical malpractice lawyer?
13      A    He's probably the most competent one
14  I've ever seen try a case.
15      Q    Have you ever known Barry Nace to be
16  involved in any bankruptcy proceeding at any time
17  during the period you have known him?
18      A    No.
19      Q    Any member of his firm ever engage in
20  that type of practice as far as you know?
21      A    No.
22      Q    Can we agree that based on your years
23  of knowing him and his three sons, who have enjoyed
24  practicing with him for various times who are here

PAGE 219

1  observing -- any of them ever participating in
2  bankruptcy?
3      A    Not that I've been aware of at all.
4      Q    Do you have an opinion based upon
5  working with him on how many cases?  Can you estimate
6  how many medical mal or other personal injury cases
7  for the plaintiff, because I know that's your
8  practice?
9      A    At some level of involvement,
10  probably -- I was trying to figure it out, and I --
11  maybe two -- it started out maybe one a year or every
12  other year, and as many as two, three, four a year
13  for almost 30 years probably.
14          Greater frequency a few years ago
15  before the medical malpractice reforms were passed,
16  but it has to be 20 or more.  Probably 20 or more
17  that were tried, and probably another 15 or so that
18  were settled, and some that we got involved in and
19  realized there wasn't a case, and we simply explained
20  to the client that, "We thought there was something
21  here.  We can't get an expert.  We're going to have
22  to not take your case."
23      Q    Where I was heading very promptly
24  was --

PAGE 220

1      A    I'm sorry.
2      Q    -- based upon your experience with him
3  over the years, have you had a chance to develop a
4  personal opinion about his attitude toward and
5  adherence for all the Rules of Professional Conduct?
6      A    Yes.
7      Q    And what is your opinion?
8      A    He is as honest and an ethical human
9  being as I know.
10      Q    And would you, based upon your
11  experiences in this case with him and the problems
12  associated for you and him in the adversary
13  proceeding and in this proceeding, hesitate going
14  forward ever working with him again?
15      A    Would I hesitate?
16      Q    Correct.
17      A    Absolutely not.
18      Q    Now, most recently your involvement
19  with him is in the landmark case of McDonald --
20      A    Yes, sir.
21      Q    -- versus?
22      A    City Hospital and Dr. Ahmed.
23      Q    And it is the landmark case most
24  recently decided by our West Virginia Supreme Court

PAGE 221

1  of Appeals on med mal?
2      A    Yes, it is.
3      Q    And you and he were directly involved
4  challenging the constitutionality of some of the
5  provisions of the MPLA?
6      A    Yes.
7      Q    Medical Professional Liability Act.
8      A    That is correct.
9      Q    In terms of -- did you after receiving
10  contact from Mr. Trumble, however that was -- the
11  Jenkinson letter, a phone call or from Christy Hook,
12  whoever it was -- communicate with Barry and just ask
13  him to sign whatever was sent to him for the
14  bankruptcy proceeding?
15      A    I think so.  I think he may have gotten
16  his own.  And he said, "What's the . . ."  You know,
17  we probably discussed it briefly.  I said, "Well, she
18  filed bankruptcy, so we've got to sign these papers
19  to proceed with her case."
20      Q    And other than that, did you have any
21  further discussions with him up until -- even
22  including the time when apparently you or your
23  secretary attempted to send over something to Gabe
24  Assaad, his associate?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 57  PAGE 222

1   A   We never discussed the Miller case at
2   all from probably June of '05 until we got Mr.
3   Trumble's, quote, "Second Request," unquote, letter.
4   Q   Okay.  Now, do you know whether or not
5   whatever your secretary faxed over, sent over, or did
6   with regard to Gabe Assaad ever got to Barry Nace --
7   A   I have no idea.
8   Q   -- or got to his file?
9   A   I have no idea.
10   Q   What do you know about Gabe Assaad and
11   his involvement personally in the Miller case, if
12   anything?
13   A   Very little of substance.  He was a
14   contact person for me.  I mean, frankly, he was -- he
15   was an attorney, but he was -- he was above a
16   secretary, but I don't know that he had much
17   authority and autonomy in the office.
18   He was more -- for example, Barry's
19   three sons work for him.  They do more lawyer-like
20   things than Gabe did.  Gabe did more leg-work type
21   things.
22   Q   Okay.  To your knowledge, do you have
23   any information in your file or a personal
24   recollection that, in fact, Barry Nace ever received

PAGE 223

1   any information from your office through Gabe Assaad
2   or any other way concerning the matters which have
3   been discussed on direct examination, the letters at
4   294 or 295 of your booklet?
5   A   No.  And with what happened, I would
6   assume that he probably didn't.
7   CHAIRPERSON KILGORE:  I'm sorry.  What
8   was your answer?
9   THE WITNESS:  I would say that -- I
10   would assume that he probably didn't.
11   CHAIRPERSON KILGORE:  Didn't?
12   THE WITNESS:  Did not receive --
13   personally, personally.  I would think that he didn't
14   actually -- he may not have seen them, and I think
15   that he may have -- the lack of activity -- well, let
16   me back up.
17   I was out of the case, so he wouldn't
18   have contacted me at that time.  But in retrospect,
19   had Mr. Nace received some of those letters, I would
20   have expected there to be more communication between
21   Mr. Nace and Mr. Trumble during that period of time
22   after I got out of the case.
23   BY MR. BENNINGER:
24   Q   In the years of working with him, now

PAGE 224

1   over 20, have you ever known of or experienced Barry
2   Nace ever ignoring something of this nature --
3   A   No.
4   Q   -- brought to his attention?
5   A   Never.
6   Q   In fact, you've seen the responses that
7   he did when he did get the second notice that you
8   referred to?
9   A   I have never seen him not respond to
10   something that needed a response.
11   Q   In terms of -- so my question is, then:
12   Regardless of what contact you had with Trumble, that
13   does not necessarily mean or should we conclude that
14   Barry Nace ever personally was aware of any of it; is
15   that correct?  Is that an accurate statement?
16   A   That's an accurate statement.
17   Q   And, in fact, Barry Nace has told you
18   subsequent to this happening, "I didn't know about
19   that, and I didn't receive those letters"?
20   A   He has told me that.
21   Q   And have you found anything in anything
22   that has been presented by ODC, your own file, or
23   anything that has been discussed among you two that
24   would suggest that that is an inaccurate position --

PAGE 225

1   A   No.
2   Q   -- or he's telling something that's not
3   completely true?
4   A   No.  I'm sure it's true.  And his one
5   response to a letter that Mr. Trumble sent where he
6   said, "Someone that may have been you called me."  It
7   was pretty clear that if it was Bob Trumble that they
8   hadn't had much communication because Barry wasn't
9   even sure who it was.
10   Q   Okay.  Now, during this period of time
11   did you know Barry Nace personally to have been very
12   active in trials --
13   A   Yes.
14   Q   -- and depositions?  And, in fact, was
15   it not and continues to be your standard process in
16   cases where you're working together he would utilize
17   your office to take depositions, especially in cases
18   like against City Hospital and local doctors?
19   A   Sure.  We're there.  I mean, we're --
20   we work together on all the local malpractice cases
21   with an excep -- couple of exceptions that I can
22   think of, and this is one of them.
23   Q   Now, in terms of -- and in this case,
24   the Miller case, did Barry Nace ever once hold a

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11



SHEET 58   PAGE 226

1    client meeting with Ms. Miller in your office?
2        A    Not that I'm aware of.
3        Q    Take a deposition?
4        A    No.  In fact, we arranged for another
5    law firm -- we contacted -- we suggested to Barry
6    that he contact a real estate firm, the Conrad law
7    firm, Randy Conrad, and I think his sister was
8    working with him at that time.
9            And they had both worked for Pill &
10   Pill, which is an affiliate -- we own the building
11   together, so I knew Randy and Kanette Conrad.  And so
12   we told them to just contact Randy, he would
13   cooperate.  Randy said it would be fine, he would
14   make office space available.
15           So we stayed out of it, and Randy
16   Conrad's office provided office space for Barry to do
17   what he had to do in Martinsburg.
18       Q    Okay.  So, in essence, then, your
19   contact with Barry Nace about this case was drawn to
20   a close shortly after the complaint was filed through
21   your office while you were away apparently by Mr.
22   Schultz; is that right?
23       A    He signed it.  I was on vacation.  And
24   I came back and realized what had happened.

PAGE 227

1        Q    And it's my understanding that based
2    upon your request to Mr. Nace, he simply filed an
3    amended complaint going forward in his name only,
4    leaving yours off, and that was the way that -- you
5    all felt that that's how you would effectuate your
6    withdrawal from the case?
7        A    We thought that was the quickest.  It
8    was certainly the quickest because you couldn't even
9    have a hearing before the judge if you filed the suit
10   until everyone gets joined and the answers get filed
11   and the issues are joined, and then we go before the
12   judge.  That would have really been months.
13           But this way, since no service had been
14   done, you can file an amended complaint without leave
15   of court at any time before service is effected, and
16   that was the quickest way to do it.
17           And we thought that way when the doctor
18   got served, he wouldn't see my name on it and by
19   implication Ron Harman's, because it was Burke,
20   Schultz, Harman & Jenkinson, and that way that would
21   keep Ron out of it and he could say hello to his
22   neighbor.
23       Q    In terms of -- based upon your review
24   of the matter and your participation in it to the

PAGE 228

1    degree you've described, when was it that you
2    understand and know that Barry Nace first received
3    notice that there had been some official court action
4    appointing him or granting the application filed by
5    Mr. Trumble naming him as special counsel?
6        A    I'm not sure I understand the question.
7    I mean, we got the initial papers in early '05.
8        Q    Were those the proposed -- the proposed
9    application and proposed order?
10       A    Yeah.  There was an affidavit, an
11   application, and a proposed order that said, "I
12   give . . . the judge gives authority to the trustee
13   to hire a lawyer."
14       Q    But that was before the order was
15   entered, correct?
16       A    Yes.
17       Q    And what I'm talking about, when was it
18   that you first received notice that the judge had
19   acted in any way, up or down, granting or denying Mr.
20   Trumble's application?
21       A    I never saw a copy of a signed order
22   until after the adversary proceed -- maybe after the
23   adversary proceeding, but certainly after the ethics
24   complaint was filed.  I never saw it until it was --

PAGE 229

1    probably it would have been '08.
2        Q    Okay.
3        A    Latter part of '08, at the earliest.
4        Q    Did you receive -- you've heard Mr.
5    Trumble testify that you and Mr. Nace were on the
6    service list that he certified to the court, that he
7    sent you a copy and Mr. Nace a copy.  Did you ever
8    receive such an order --
9        A    No.
10       Q    -- signed by him?
11       A    No.
12       Q    And an application signed --
13       A    I did not.  I reviewed my file
14   thoroughly looking for documents, and the only
15   documents I got were the --
16       Q    The draft --
17       A    -- the affidavit, the request to
18   appoint counsel, and a proposed order.  That's it,
19   period.
20       Q    Am I accurate in review of the records
21   provided to me that the -- on October 10, 2008, the
22   letter -- the first notice, if you will, from Mr.
23   Trumble some three years -- three and a half years
24   after this action in March of '05 -- you didn't get

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 59  PAGE 230

1    that letter, either?
2        A    I did not.
3        Q    And then the second notice of
4    November 14th, 2008, was the one -- did you receive
5    that one?
6        A    I did receive that one.
7        Q    And at that point there was still no
8    order attached or any filings officially made in the
9    bankruptcy case, were there?
10       A    No.  And he attached a copy of his
11   first letter, and he said there were attachments to
12   that.  I got the letter that said "Second Notice" on
13   it, and I got a copy of -- attached to that was a
14   copy of the first letter, but no -- I think there
15   were attachments referenced in the first letter, and
16   we never got those.  I never got those.
17       Q    And then did you receive a letter that
18   Barry Nace sent back to Mr. Trumble?
19       A    Yes, somewhere.  I've seen it.
20       Q    Yeah, you've seen it.  It's in our set
21   of discovery.  And then Mr. Trumble's what I'll call
22   the lawsuit and ethics complaint letter in January of
23   '09?
24       A    Yes.

PAGE 231

1        Q    Am I accurate to understand -- is it
2    fair for me to understand that upon this record that
3    is the first time that you received notice and a copy
4    of the official order entered by the court and filed
5    in the matter appointing you and Nace as special
6    counsel?
7        A    I don't really have any independent
8    recollection that it was attached to the letter.
9        Q    Okay.  But, nonetheless, would it have
10   been earlier than that --
11       A    No earlier than that.
12       Q    -- based on your review of your own
13   file?
14       A    No.
15       Q    And to your knowledge in your
16   discussions with Barry Nace, co-counsel up to a point
17   in time, that's when he first learned that there had
18   been official action taken to actually appoint him to
19   go forward in some manner for or with the trustee on
20   behalf of Ms. Miller?
21       A    Yes.  Because Barry didn't know -- it
22   was -- Barry was totally unfamiliar with the
23   bankruptcy procedure, and he didn't under -- and I
24   know he didn't know anything about it.

PAGE 232

1        Q    Okay.
2        A    And he hadn't gotten anything prior to
3    that.
4        Q    Based upon your knowledge of the case,
5    do you know of any facts that are known or presented
6    to you by ODC, by our filings, or anything else that
7    you know firsthand where he failed to act in a
8    diligent manner on behalf of Ms. Miller?
9        A    No.
10       Q    And after he received notice that he
11   didn't act -- notice in writing from Mr. Trumble
12   directly to him -- that he took action to immediately
13   respond?  Whether it was in the right tone, right
14   words, or for whatever reason, he was responding in a
15   timely manner and diligently, correct?
16       A    Every time he got any communication to
17   which a response was reasonably expected, he sent out
18   a response.
19       Q    Do you have any information where that
20   he in any way knowingly or intentionally or with some
21   state of mind implicating the Rules of Professional
22   Conduct mishandled funds or monies in any way out of
23   the ordinary that he with his scope of experience
24   would have utilized in handling the funds he

PAGE 233

1    recovered both in early settlement and then the
2    trial and verdict for Ms. Miller?
3        A    No, no.
4        Q    And you have seen in the filings the
5    settlement summaries that are required by our Rule
6    1.5 showing where the monies were in and out?
7        A    Yes.
8        Q    Now, albeit we now have the testimony
9    of Mr. Trumble that says that should have been
10   directed to him first, but prior to receiving the
11   November 14 and subsequent information, to your
12   knowledge did Barry Nace know that he had even been
13   officially appointed, even though he had signed an
14   affidavit indicating his willingness to be so
15   appointed?
16       A    No.  Barry did not think that he was
17   working for the bankruptcy trustee.  He just didn't
18   think -- he had a client.  Her name was Mrs. Miller,
19   and that's his client, and that's to whom he gave his
20   loyalty.
21       Q    To your knowledge, in any of the
22   communications up to the time of the last one from
23   Mr. Trumble to you and Nace indicating, "I'm filing.
24   I'm going to sue you.  I'm going to file complaints,"

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 60  PAGE 234

1   was there ever any amount of money or any request for
2   anything specific like that from Trumble before he
3   goes on and does his thing?
4       A   Well, Mr. Trumble and I had a
5   conversation probably in late December of -- well,
6   the years are running together.
7       Q   '08? Was it after you received the
8   November 2nd notice?
9       A   Probably '08. It was after we received
10  the second request. And Barry sent a letter back
11  saying, "I don't know what you're . . . Really, I
12  don't know what you're talking about. You're going
13  to have to explain this to me because I don't know."
14  And I don't know whether Mr. Trumble thought he
15  was --
16      Q   Playing games?
17      A   Yeah. -- playing games, being silly,
18  or, you know, just being difficult, but Barry didn't
19  know. He doesn't know -- he doesn't know about this
20  stuff.
21          And so the next -- and so I was talking
22  to Mr. Trumble about -- you know, I said, "Bob, what
23  are we talking about here?" And he says, "Well, it's
24  about $12,000 for the . . . 12 or 13 thousand dollars

PAGE 235

1   for the creditors and maybe $5,000 for my commission.
2   We're talking about 17 or 18 thousand dollars."
3          And before I had had an opportunity
4   even to discuss that with Barry -- because I
5   explained to Bob. I said, "Bob, I never had any
6   money. You want me to pay you money that I never
7   had."
8          His complaint was that I didn't turn
9   over money that I had received that should have gone
10  to the trustee. I said, "Bob, I never got that
11  money."
12      Q   Of course.
13      A   But when I talked to -- at that point
14  when I was going to communicate to Barry about what
15  he was talking about, Bob Trumble had filed a
16  letter -- or sent Barry Nace a letter, sent me a
17  copy, saying, "We're going to sue you. We're going
18  to file ethics complaints." And at that point, you
19  know, that made it difficult to discuss settlement.
20      Q   Well, what happened then? Did you have
21  discussions with Mr. Nace at or about that time when
22  that letter comes out from Trumble?
23      A   Yes. Barry was not very happy, to say
24  the least.

PAGE 236

1       Q   And then I guess there was a response
2   letter in February of 2009 that's part of the record
3   where he sent back to Mr. Trumble addressing
4   immediately in the opening paragraph of his letter
5   the threats that he had received?
6       A   Yeah. I think Barry viewed it as an
7   attempt to bully him and blackmail him and threaten
8   him in order to get him to pay money, and that just
9   wouldn't sit well with most people, and, you know,
10  Barry Nace is not a guy that will be bullied.
11      Q   In terms of -- in terms of -- you had a
12  conversation with Trumble about the matter. Do you
13  know whether or not Trumble ever had such a
14  conversation with Nace before going forward?
15      A   I'm unaware of any, and I'm pretty sure
16  there was none.
17      Q   Other than an explanation -- do you
18  have an explanation -- based upon having lived
19  through this circumstance and having reviewed it in
20  response to this complaint and the lawsuit for legal
21  malpractice filed against you and Nace, an
22  explanation as to what happened in your opinion?
23      A   A perfect storm of lack of
24  communication. I got out of the case because of the

PAGE 237

1   conflict. Mrs. Miller was well represented by Barry.
2   We went all of '06 and never -- I don't remember
3   getting any calls. I did not get a phone call in
4   '06.
5          I got a letter in '07. I left a
6   message that he needed to communicate with Barry's
7   office, not with me. Barry didn't really know what
8   was -- he knows malpractice cases better than anyone
9   I know. Does he know bankruptcy? No.
10         I believe Barry when he says he's never
11  had a client to file bank -- that ever filed
12  bankruptcy. I can't say that with my clientele.
13         And it was just a perfect storm of lack
14  of communication. It was lack of communication.
15  Barry didn't understand. Trumble didn't communicate
16  with Barry. I was out of the picture. And it was
17  just -- that's just it, lack of communication.
18      Q   Do you know of any act or statement
19  attributed to or made by Barry Nace that suggested to
20  you that he in any way intended or knowingly violated
21  or wanted to violate or intended to violate any rule
22  for which he and you are now charged?
23      A   Well, of course not, because -- and
24  there would be no motivation to do anything, but it

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 61   PAGE 238

```
 1    wouldn't affect us in any way, because if we follow
 2    the rules our compensation remains exactly the same.
 3          I've been involved in these cases, and
 4    it doesn't affect what happens with us. We get
 5    approval from the bankruptcy court. Mrs. Miller
 6    probably -- receipt of her money gets delayed a
 7    little bit, and some of the money pays some
 8    creditors, but it doesn't really truly affect us at
 9    all.
10          So if we have a choice, we're going to
11    follow the rules because it really doesn't affect us.
12    We have no motivation at all to ever not follow these
13    rules.
14          And it was -- you know, honestly, I
15    don't think it gives rise to an ethical problem in
16    what I think of ethics. I should have moved to
17    withdraw. I was -- I accept that as -- you know, I
18    should have moved to withdraw, but nothing unethical.
19       Q   Did you observe a change in attitude or
20    a stiffening in resolve to act in response to Mr.
21    Trumble's last communication?
22       A   You mean the one where he threatened --
23       Q   Yes. What did you observe personally
24    in that regard, the change, if there was one, in
```

PAGE 239

```
 1    Mr. --
 2       A   In Mr. Nace?
 3       Q   -- Nace's feelings and attitude toward
 4    how to -- what to do and how to resolve this thing?
 5       A   Prior to that time, Barry was trying to
 6    understand how all this worked. He was -- he said --
 7    he just didn't understand how it worked.
 8          And after that, the attitude was, "I
 9    don't know who this guy thinks he is. He is going to
10    threaten . . . He wants me to resolve something and
11    he resolves it by threatening me with litigation and
12    an ethics complaints. That's not how you resolve a
13    problem."
14          You know, it just didn't work, and it
15    stiffened his spine, and it made him angry. It
16    ticked me off, too, but Barry really got -- when he
17    was -- because the letter went to him, not to me. I
18    just got a copy of it. But when he got threatened,
19    it made him justifiably angry.
20       Q   In terms of -- when was it, then, after
21    that letter, Barry's response in February of '09,
22    that you and he ever received any information from
23    Mr. Trumble about what was claimed to be due and
24    owing or even the possibility of how much?
```

PAGE 240

```
 1       A   It was a couple years later through the
 2    discovery process in the adversary proceeding that we
 3    found out. I think at some point when Mr. Trumble's
 4    deposition was taken, we found out how much the
 5    creditors -- the approved creditors' claims were,
 6    which is the $12,700 figure that was discussed
 7    earlier.
 8          But until then, we really didn't -- and
 9    then I guess you could apply the calculation to it,
10    but Mr. Trumble even in his deposition didn't say,
11    Here's what . . . here's what we need from you guys.
12    Here's what I'm suing you for in the adversary
13    proceeding. Pay it and let's be . . . let's be done.
14    We're here to collect a debt. We need to get this
15    paid and let's go."
16       Q   Okay. And as of today, you've seen the
17    most recent filings that are made a part of the
18    record September of this year, supplemental discovery
19    responses.
20          Now the number has grown from 12,700
21    plus interest, which you were more than ready to pay
22    if somebody tells how much, and up to $62,000 now,
23    including fees for his own law firm and commissions
24    on those fees?
```

PAGE 241

```
 1       A   Well, it's a moving target, and I'm
 2    waiting to see if he tries to tack onto that charge
 3    Mr. Crim's time here today and Mr. Trumble's time to
 4    testify in the ethics complaint, whether we're going
 5    to get billed for that, too.
 6       Q   In terms of -- you were advised that I
 7    was recently in Washington, D.C., in the office of
 8    Barry Nace to try to review everything that I could
 9    see with regard to the matter, including whether or
10    not you had ever been paid anything on a referral fee
11    in this matter? You're aware of that, correct?
12       A   Well, I knew you were down there.
13       Q   Yeah, among other -- for other reasons.
14       A   Okay.
15       Q   And you have been advised by me and
16    your attorney that upon a careful and exhaustive
17    review of his records -- IOLTA records, trust
18    records, and everything that was available -- that
19    you did not, in fact, receive any monies, check or
20    cash, from Barry Nace as a result of the Miller
21    matter? You're aware of that, what we've told you?
22       A   I'm aware of that now. And, honestly,
23    I had thought that I had gotten something.
24       Q   Okay.
```

## D. MICHAEL BURKE and BARRY J. NACE HEARING
### 10/10/11

SHEET 62   PAGE 242

1    A   But I was -- I was just wrong.
2    Q   Okay. And you've testified on direct
3  examination that your review of the records revealed
4  that you have not found anything, either?
5    A   No. And I have looked and looked and
6  looked again.
7    Q   And that is consistent with you having
8  felt that your law partner's personal conflict of
9  having a neighbor and Barry not having -- even using
10  your office during this period of time, that you
11  would not expect such a referral fee under those
12  circumstances?
13    A   No, not at all.
14    Q   Now, in terms of -- you and Mr. Nace
15  are represented by other counsel in the adversary
16  proceeding, not Mr. Karlin and I, but are you aware
17  that upon learning and having verification of the
18  creditor claims, the total amount, that Barry Nace
19  has made full payment without requesting you to
20  participate --
21    A   That's correct.
22    Q   -- of that amount and is waiting for
23  further direction from the court and/or that process
24  to determine what is legitimately due and owing?

PAGE 243

1    A   That's my understanding, that payment
2  has been made. I know there was a request to pay it.
3  I think it's been paid. And you're correct, just
4  waiting for the court to tell us what to do.
5    Q   And there has been an attempt to find
6  Mrs. Miller, but she is absent, address unknown? Is
7  that your understanding?
8    A   More my assumption than my
9  understanding.
10    Q   Okay. But that Mr. Nace out of his own
11  funds has made such a payment to make sure that that
12  system -- the integrity of that system and no
13  creditors are damaged, even though there are
14  questions as to some of the claimed creditors may be
15  the very same people claiming medical bills and
16  services for which they were sued?
17    A   Yeah. If you committed malpractice, I
18  don't think you can commit malpractice and collect
19  the money for the services that you malpracticed on
20  someone with.
21    Q   But that remains an issue that Mr.
22  Trumble in his discharge of his due diligence needs
23  to sort out, if any of those creditors are claiming
24  when it's not appropriate?

PAGE 244

1    A   Yeah. If their claims aren't
2  appropriate, I presume the trustee would take care of
3  that.
4    Q   Are you aware of anything else that you
5  have suggested or think Mr. Nace should do as the
6  repository and the distributor of the verdict amounts
7  that should be done at this moment under the contest
8  that now is pending in the adversary proceeding?
9    A   No.
10    Q   To your knowledge, are the issues that
11  Mr. Trumble has raised concerning interest yet to be
12  determined by him or anyone else, any amount of
13  commission and the fees for him, Mr. Crim and his law
14  firm, the same firm, the commissions on that -- all
15  will be resolved in due time either through mediation
16  or by the bankruptcy court in the adversary
17  proceeding?
18    A   Yes. That's not a proper subject for
19  this proceeding.
20    CHAIRPERSON KILGORE: I agree, so we
21  can cut that line of questioning short.
22    MR. FRANCISCO: We're done with that.
23    MR. BENNINGER: Okay. I just want to
24  make a complete record.

PAGE 245

1    CHAIRPERSON KILGORE: I understand.
2    MR. BENNINGER: I'm sorry.
3    CHAIRPERSON KILGORE: But we
4  understand, and we understand where you're going, and
5  we understand that you need to make a complete
6  record, but we also are not going to make any ruling
7  on damages.
8    MR. BENNINGER: Okay.
9    CHAIRPERSON KILGORE: Right?
10    MS. PYLES: Uh-huh.
11    MR. BENNINGER: I just wanted to make
12  sure that we have it, because I don't know you
13  people. Unfortunately, I've never met any of you,
14  and I'm just concerned. Now, with that admonition, I
15  pass the witness.
16    CHAIRPERSON KILGORE: Mr. Karlin?
17    MR. KARLIN: Could I have a short
18  break?
19    CHAIRPERSON KILGORE: You may.
20    (WHEREUPON, a recess was taken.)
21    THE RECORDER: We're back on the
22  record.
23    MR. BENNINGER: I wouldn't dare ask any
24  more questions.



D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 63   PAGE 246

1    CHAIRPERSON KILGORE:  Mr. Karlin?
2        CROSS-EXAMINATION
3    BY MR. KARLIN:
4        Q    Mr. Burke, I think they've covered most
5    of what I wanted to cover, but I would like to clear
6    a few things up.  First of all, Mr. Harman, the
7    attorney in your office who asked you not to pursue
8    Ms. Miller's case, do you recall the name of his
9    neighbor?
10       A    Dr. Jalazo, I think.
11       Q    And do you recall -- are you now aware
12   from what you've learned about the case as to who the
13   verdict was against?
14       A    I think it was against Dr. Jalazo.
15       Q    Okay.  Because of Mr. Harman's concern
16   about not wanting to offend his neighbor, what steps
17   did your office take to distance yourself from the
18   Miller case once you made a decision to do so?
19       A    Ceased contact with Barry Nace and his
20   office about the case at all.  The only contact I --
21   well, I sent Mrs. Miller a letter.  We filed the
22   amended complaint, ceased all contact with Barry and
23   his office to discuss the case, and just tried to
24   distance ourself from it as much as we could.

PAGE 247

1        I did nothing on the case and didn't
2    even know what happened when it happened.  I mean, I
3    found out later what happened, but at the time it was
4    taking place I had no knowledge whatsoever what was
5    going on.
6        Q    Were you consulted in any way about the
7    distribution of the funds that Ms. Miller received
8    either in the earlier settlement or the final
9    verdict?
10       A    Absolutely not.
11       Q    Your office, was it available to -- I
12   think you answered this, but just for clarification.
13   Was your office available for depositions or other
14   things that Mr. Nace needed in this particular case?
15       A    No.  We had requested that he use
16   another law office and made arrangements to have him
17   use a real estate law firm in close proximity to
18   ours.
19       Q    Okay.  Now, you said you didn't contact
20   him, but you previously testified about receiving
21   certain letters from Mr. Trumble.  Do you recall
22   that?
23       A    Yes.
24       Q    And this Gabe Assaad -- is that the

PAGE 248

1    name of the individual?
2        A    Yes, sir.
3        Q    You may have answered this, and I
4    apologize if you did, but why did you think to call
5    Mr. Assaad?  What was there -- what was it -- what
6    did you know?
7        A    He was easier to get in contact with
8    than Barry because Barry tries cases.  He goes to
9    trial, and he deposes doctors and defendants, and
10   his -- excuse me -- he's in court.  Gabe was -- I
11   don't know that he had any cases that were his cases
12   and he was responsible for them.
13       Q    Did you know Mr. Assaad from -- did you
14   know Mr. Assaad outside of contacting him on the
15   Miller case?
16       A    There were other cases that Barry and I
17   worked.  I remember he went to Elkins.  We tried one
18   in Elkins for a week, and I think Gabe was there for
19   at least part of it.
20       Q    Okay.  And so why was Mr. Assaad the
21   one that you chose to contact?
22       A    He was just easier to get a hold of,
23   and I wanted to limit contact in this case -- in the
24   Miller case with Barry.

PAGE 249

1        Q    Okay.
2        A    I just wanted to just not -- just try
3    to extricate myself from the Miller case as much as I
4    could.
5        Q    Now, there were notes -- I don't want
6    to go back over all the letters, but there are
7    various what looks like pencil notations on some of
8    these letters.
9        A    Yes, sir.
10       Q    Whose notations are those?
11       A    Lacy Godby.
12       Q    And who is that?
13       A    A secretary in my office.
14       Q    You testified, Mr. Burke, about your
15   belief that Mr. Nace was not aware of what his
16   obligations might be or at least what Mr. Trumble
17   considered his obligations to be in the bankruptcy
18   court.  Do you recall that?
19       A    Yes, sir.
20       Q    If we can go back in time prior to late
21   2008, at that time were you aware that Mr. Nace did
22   not know what Mr. Trumble thought his obligations
23   were?
24       A    Not until after we got the -- the first

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 64  PAGE 250

1  notion -- the first inkling I had was the letter that
2  said "Second Request." That's the first time I knew
3  that there might be any issue whatsoever.
4      Q   Up until then, what did you assume Mr.
5  Nace to be doing vis-a-vis Mr. Trumble?
6      A   I assumed Mr. Trumble was keeping in
7  contact with him on a regular basis as he had with me
8  before I let his office know that I was out. I
9  didn't get any contact in 2006 whatsoever.
10     I got the contact in '05. I think it
11  was May. Nothing the later half of '05. Nothing in
12  '06. I got the July 27, '07, letter, which -- and at
13  that point I called Mr. Trumble's office and left a
14  message saying, "I'm not in this case. You need
15  to -- if you have an inquiry, call Mr. Nace."
16     And for all I knew, they had sent me a
17  letter and sent Barry an identical letter at the same
18  time, and I wanted to make sure that they knew I was
19  out.
20     Q   And you left that message with whom?
21     A   It was not the receptionist. I was
22  transferred to someone else. It was someone working
23  on the bankruptcy cases, so it could have been
24  Christy Hook or there may have been someone else

PAGE 251

1  working there. It might have been Christy Hook.
2      Q   Okay. And the next letter after the
3  2007 letter -- that's also the one you had faxed to
4  Mr. Assaad?
5      A   Yes.
6      Q   And the next contact you had was the
7  November 2008 letter that said "Second Request"?
8      A   Correct.
9      Q   Now, just for the record, when Mr.
10  Trumble assigned -- assigns -- or excuse me --
11  arranges for an order to have you become special
12  counsel in a bankruptcy case, do you recall ever
13  being provided with any written set of instructions
14  from Mr. Trumble as to what the obligations were?
15     A   Never.
16     Q   Okay. You knew what they were,
17  basically, because you had done it before?
18     A   We had never had one that went into
19  litigation. If I had someone who had filed
20  bankruptcy, oftentimes it was because of debts they
21  had more likely in what I would do, an automobile
22  accident case.
23     And if I had a client who was getting
24  threatened by creditors, sometimes they would file

PAGE 252

1  bankruptcy, and we would, you know, call Mr.
2  Trumble's office when we settled the case and got his
3  permission as to distribution.
4      But we never had one that went into
5  litigation at all. Most of them were handled
6  relatively quicker from case opening to resolution.
7  I don't know if that answers your question.
8      Q   I think you did. And is it fair to say
9  that were this to happen again, you would handle it
10  differently?
11     A   Yes. I would definitely move to
12  withdraw in a formal fashion with the bankruptcy
13  court.
14     Q   Anything further that we haven't
15  covered that you would like to tell the panel?
16     A   I think not. Well, this has probably
17  been covered. The whole ethics complaint, I even --
18  when Mrs. Rhodes took my statement, I told her if the
19  intent is to collect money and pay the creditors,
20  filing an ethics complaint I didn't think was the
21  proper method to do that, and if it couldn't be
22  worked out, that there needed to be an adversary
23  proceeding filed and let the bankruptcy judge tell me
24  and/or Mr. Nace what we needed to do to make it

PAGE 253

1  right, but not file an ethics complaint because I
2  don't think what either one of us did, in my mind at
3  least, rises to unethical conduct that is detrimental
4  to a client or to the administration -- the fair
5  administration and proper administration of legal
6  matters.
7      Q   Nonetheless, you accept your
8  responsibility for your failure to properly address
9  the bankruptcy court?
10     A   I should have filed a motion to
11  withdraw, and I did not, and I should have.
12     MR. KARLIN:  I have nothing further.
13     THE WITNESS:  Thank you.
14     MS. RHODES:  I don't have anything
15  further.
16     CHAIRPERSON KILGORE:  Mr. Francisco, do
17  you have any questions?
18     MR. FRANCISCO:  I've actually just got
19  a few. Prior to this last case with Mr. Miller that
20  Mr. Trumble corresponded with you about -- I just
21  want to try to do this in a summation -- you had done
22  this approximately five or six times previously with
23  Mr. Trumble?
24     THE WITNESS:  Maybe. The most recent

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 65   PAGE 254

1  one was a fellow named Donald Newcomb. We had his
2  case, and it turned into a dram shop act. I don't
3  know how much detail you want me to get into.
4        MR. FRANCISCO: You don't have to get
5  into a lot of detail.
6        THE WITNESS: But we knew there was a
7  likelihood of a recovery of $40,000, 20,000 of
8  liability and 20,000 of underinsured under his own
9  policy. The bills were in excess of that. We knew
10 he could exempt everything. I advised him to file --
11 that bankruptcy was probably a good thing to do.
12       As it turned out, we found out there
13 was -- we pursued a dram shop case against the bar
14 owner that sold the defendant beer when he was
15 visibly intoxicated, and we were able to -- I worked
16 with Mark Jenkinson on that case and got a
17 substantial recovery, which went through the
18 bankruptcy.
19       We got approval for -- I don't think we
20 sent the money. I think we held the money, and the
21 bankruptcy trustee approved the fee and the payment
22 of certain expenses because things that had been
23 discharged that we didn't think we would be able to
24 pay ended up getting paid, certain medical expenses

PAGE 255

1  that were properly -- I guess they filed their
2  paperwork to get those expenses paid.
3        MR. FRANCISCO: Okay. But you knew
4  under whether it's a special counsel agreement or a
5  general counsel agreement, there were certain duties
6  and obligations expected of you?
7        THE WITNESS: Yes, sir.
8        MR. FRANCISCO: And you had worked with
9  Mr. Nace for approximately 20 years?
10       THE WITNESS: Since '80, '82, maybe
11 earlier.
12       MR. FRANCISCO: So almost 30 years?
13       THE WITNESS: Almost 30 years.
14       MR. FRANCISCO: And approximately --
15 I'm just once again guesstimating -- over 50 cases,
16 whether they be settlements, trials, and/or just
17 cases you decided not to carry on?
18       THE WITNESS: If not that many, close
19 to it.
20       MR. FRANCISCO: And so you had a good
21 working relationship with him and a knowledge of his
22 office practices?
23       THE WITNESS: Well, at least -- I don't
24 know about how much I knew about his office

PAGE 256

1  practices, but I had a close working relationship.
2        MR. FRANCISCO: And how long had you
3  known Gabe Assaad?
4        THE WITNESS: A year or two maybe, at
5  the most.
6        MR. FRANCISCO: Well, prior to this
7  last year with Gabe Assaad, who was your go-to
8  between your office and Mr. Nace's office when he was
9  so busy?
10       THE WITNESS: He wasn't as busy. There
11 was another partner, Lee Norwin, that I dealt with
12 from time to time, and I dealt with secretaries as
13 opposed to Gabe.
14       And I don't know if there was another
15 attorney there or not at that time, but there were
16 other -- there may have been other associates. But
17 if Gabe hadn't been there, I would have talked to a
18 secretary.
19       But oftentimes -- well, it was easier
20 to explain things to Mr. Assaad because he was an
21 attorney. So he was easier to --
22       MR. FRANCISCO: Had you ever had a
23 breakdown in communication between your office and
24 Mr. Nace's office prior to this?

PAGE 257

1        THE WITNESS: I'm not sure what you
2  mean by "a breakdown in communication."
3        MR. FRANCISCO: Had there ever been --
4  had there ever been a time when you wanted to
5  correspond a direct thought to Mr. Nace's office and
6  it came out some subsequent time later that that
7  thought was not directed to Mr. Nace?
8        THE WITNESS: Not that I can think of.
9        MR. FRANCISCO: And Lacy Godby, your
10 secretary --
11       THE WITNESS: Yes.
12       MR. FRANCISCO: -- how long has she
13 worked for you?
14       THE WITNESS: She does not work for me
15 anymore. She worked for --
16       MR. FRANCISCO: How long had she worked
17 for you?
18       THE WITNESS: At that time? Well, she
19 worked for us maybe a year or two, went and had a
20 baby, and at that time I think she was part-time.
21 She came back and was working part-time at that time.
22       MR. FRANCISCO: But you were her direct
23 supervisor?
24       THE WITNESS: Yes, sir.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 66  PAGE 258

1   MR. FRANCISCO:  And it was under your
2   instruction that she forward these correspondences
3   from Mr. Trumble to Gabe on behalf of Mr. Nace?
4   THE WITNESS:  Yes.
5   MR. FRANCISCO:  And you testified at
6   length that it's your opinion and your understanding
7   that Mr. Nace has no detailed or intimate
8   knowledge -- or up until this time with Ms. Miller's
9   case -- with any bankruptcy proceeding?
10  THE WITNESS:  That is true.
11  MR. FRANCISCO:  But yet you thought it
12  was important to send all of your correspondences
13  from Mr. Trumble to Mr. Nace's office?
14  THE WITNESS:  Well, I didn't send all.
15  I sent some of them. The ones that were sent to both
16  of us -- some of the letters -- some of the early
17  letters were sent to both of us, had both names on
18  them.
19  MR. FRANCISCO:  Okay. Your testimony
20  earlier was you assumed -- even on the letters that
21  you got independently that were not cc'd to anyone
22  else, you assumed that Mr. Nace's office got the same
23  correspondence?
24  THE WITNESS:  Yes. We were both co-

PAGE 259

1   counsel, so I really assumed he did. But since I
2   didn't see his name on it and it wasn't addressed to
3   him and me, I sent to him as a matter of course just
4   to make sure that it was sent to his office.
5   MR. FRANCISCO:  Okay. So you
6   understand you had these duties and obligations,
7   right, as a trustee?
8   THE WITNESS:  Yes, sir.
9   MR. FRANCISCO:  And you signed that
10  affidavit knowing that that was an undertaking that
11  was in the works, that you were going to be assigned
12  as special counsel for the trustee?
13  THE WITNESS:  Yes, sir.
14  MR. FRANCISCO:  And you received the
15  order thereafter stating that you were appointed
16  special counsel?
17  THE WITNESS:  No, I never did.
18  MR. FRANCISCO:  Okay. You started to
19  receive correspondence from Mr. Trumble, and I grant
20  you none in 2006; that Mr. Trumble was still involved
21  in the case and still had some expectation or
22  assumption that you were involved in the case?
23  THE WITNESS:  Well, I learned that in
24  '07 when I got the July 27, '07, letter.

PAGE 260

1   MR. FRANCISCO:  Okay.
2   THE WITNESS:  And, frankly, it
3   surprised me when I got it, because it had been so
4   long, I assumed that he had been doing this with Mr.
5   Nace the entire time.
6   MR. FRANCISCO:  Okay.
7   THE WITNESS:  It was almost two years
8   since I had gotten anything, and I had closed my
9   file. I was out of the case.
10  MR. FRANCISCO:  And even though you
11  didn't do a motion to withdraw -- and I understand
12  that you understand you need to change that practice
13  next time -- why didn't you pick up the phone and
14  call Mr. Trumble or send him a letter at that time
15  that, "Sorry about the misunderstanding. I hadn't
16  heard from you for two years. I didn't know I was in
17  the case. But you need to know I'm no longer
18  involved with this case"?
19  THE WITNESS:  I did do that. I asked
20  for Mr. Trumble, and they sent me to his assistant.
21  That's when I left a message to call Barry Nace's
22  office, gave him the phone number, told him I was no
23  longer representing Mrs. Miller, hadn't been
24  representing Mrs. Miller for more than two years.

PAGE 261

1   MR. FRANCISCO:  Did you ever do it in
2   writing and forward then Mr. Nace's phone number and
3   address?
4   THE WITNESS:  I did not. I assumed
5   they had his number and address since he was special
6   counsel as well as I was special counsel.
7   MR. FRANCISCO:  I guess where I'm
8   getting at is I hear a contradiction a little bit
9   that you knew Mr. Nace was not involved with
10  bankruptcy law and therefore maybe ignorant of it.
11  THE WITNESS:  Well, I found out later.
12  I didn't know until all this came about that he had
13  never had a client who filed bankruptcy.
14  MR. FRANCISCO:  And you wanted to cease
15  contact with the Miller case because of your
16  partner's relationship with his neighbor?
17  THE WITNESS:  Correct.
18  MR. FRANCISCO:  But yet you thought it
19  was important enough to send all of the
20  correspondences you were getting from Mr. Trumble to
21  Mr. Nace's office?
22  THE WITNESS:  Well, one letter.
23  MR. FRANCISCO:  Well, there were at
24  least two or three letters with notations on them,

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 67  PAGE 262

1  "Forward to Gabe."
2       THE WITNESS:  There might have been
3  two, but the one -- I know the '07 letter was.
4       CHAIRPERSON KILGORE:  '07, '05, and
5  then the fax for '07.
6       THE WITNESS:  Okay.  Well, that was --
7  yeah, the '07 letter was, I think, mailed and faxed,
8  and then the '05.
9       MR. FRANCISCO:  No, two '07, or maybe
10 the first --
11      CHAIRPERSON KILGORE:  Two letters.
12 Just one was a fax and a letter sent at the same
13 time.
14      THE WITNESS:  Yeah.  It was the same
15 letter faxed and mailed, or she was directed to do
16 that.  And the only other one, I think, was '05 when
17 I was still -- it was May of '05, and I hadn't gotten
18 out of the case yet.
19      MR. FRANCISCO:  Did you ever write a
20 letter or an e-mail or call Barry Nace and say,
21 "Listen, I'm not involved in this case, but this
22 letter reminded me we're still special counsel as
23 trustees -- for the trustee in this case.  Do you not
24 understand what is going on?  Do you need help with

PAGE 263

1  this"?
2       THE WITNESS:  I did not do that.
3       MR. FRANCISCO:  I don't have any
4  further questions.
5       CHAIRPERSON KILGORE:  Ms. Pyles?
6       MS. PYLES:  No, thank you.
7       CHAIRPERSON KILGORE:  Mr. Burke, I do.
8  Just kind of as a follow-up, I think you testified
9  earlier that when you signed that affidavit to be
10 employed as special counsel, you treated it as
11 though, "We were hired to prosecute the case," right?
12      THE WITNESS:  Yes, ma'am.
13      CHAIRPERSON KILGORE:  So at that point
14 when you signed the affidavit, you considered that
15 you had been retained?
16      THE WITNESS:  I did.
17      CHAIRPERSON KILGORE:  And so whether or
18 not you ever got the order from the court did not
19 affect your understanding that you were retained by
20 the trustee as special counsel at that point?
21      THE WITNESS:  It did not.
22      CHAIRPERSON KILGORE:  Okay.
23      THE WITNESS:  I mean, I assumed I was
24 representing the trustee.

PAGE 264

1       CHAIRPERSON KILGORE:  Okay.  I have no
2  more questions.  Well, then you sent the -- that May
3  '05 letter was -- you had your secretary send that to
4  Gabe Assaad, correct?
5       THE WITNESS:  I'm certain about the '07
6  letter.  I'm not --
7       MS. RHODES:  It's going to be under
8  Tab 3, page 69.
9       THE WITNESS:  Tab 3?
10      MS. RHODES:  Three (3).  And it's going
11 to be Bates Stamp 69.
12      THE WITNESS:  Okay.
13      MS. RHODES:  I believe that's what
14 you're talking about.
15      THE WITNESS:  Yes.
16      CHAIRPERSON KILGORE:  Right.  We're
17 talking about, right, the May 18, right, 2005,
18 letter.  That handwritten is your secretary, "Mailed
19 copy to Nace's office 5/23/05," right?
20      THE WITNESS:  Yes.
21      CHAIRPERSON KILGORE:  And then again on
22 August 8, '07, you had that July 27, '07, letter
23 faxed and mailed to Gabe, right?
24      THE WITNESS:  Yes.

PAGE 265

1       CHAIRPERSON KILGORE:  And why did you
2  send them to Gabe Assaad?
3       THE WITNESS:  Because he was easier to
4  contact.  Barry was always in trial.  And I figured
5  Gabe would see that it got taken care of.
6       CHAIRPERSON KILGORE:  And before or
7  since, have you ever had word that Mr. Assaad did not
8  communicate to Mr. Nace what you had communicated to
9  Mr. Assaad?
10      THE WITNESS:  I think there were
11 problems in that office, that I thumbed out after Mr.
12 Assaad left that some things that were supposed to
13 have been done weren't done.  They had some problems
14 with Mr. Assaad, but I'm not the best person to
15 address those.
16      CHAIRPERSON KILGORE:  And do you,
17 yourself, know whether any communications that you,
18 yourself, had with Mr. Assaad that were intended for
19 Mr. Nace did not get to Mr. Nace?
20      THE WITNESS:  I didn't know one way or
21 the other.  I assumed that if they went to Gabe that
22 they made it to Barry.
23      CHAIRPERSON KILGORE:  Okay.  I have no
24 more questions.  Okay.  Can this witness be excused

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 68  PAGE 266

1   back to the table, I guess?
2       MR. KARLIN:  Can I just think for a
3   second if we get a follow-up on your questions?
4       CHAIRPERSON KILGORE:  Sure.
5   BY MR. KARLIN:
6       Q   I think it's clear, but just so I
7   understand, what was your assumption about Barry
8   Nace's knowledge of bankruptcy court prior to
9   November 2008?
10      A   I thought he had some knowledge of it,
11  not a working knowledge.  I mean, I knew he wasn't a
12  bankruptcy attorney, but I thought he might know more
13  than as I later learned he did not know.
14      Q   Are you a bankruptcy attorney?
15      A   I used to handle some Chapter 7s, some
16  simple, I guess -- back when the bankruptcy code was
17  a lot simpler, and I had clients with no assets and
18  lots of debts.
19      Q   In any of your conversations with Barry
20  Nace prior to November 2008 or anyone in his office,
21  did you -- in any conversations with Barry Nace or
22  anyone in his office prior to that, did they indicate
23  they weren't aware of what it meant to submit the
24  special counsel papers?

PAGE 267

1       A   Not that I recall.
2       Q   And what you testified to before about
3   your understanding that Barry Nace did not know about
4   bankruptcy law you learned when?
5       A   I learned probably in December of '08
6   and thereafter.
7       MR. KARLIN:  I have nothing further.
8       CHAIRPERSON KILGORE:  Nothing further.
9   You can be excused back to the table, I guess.
10      THE WITNESS:  All right.  Thank you.
11      CHAIRPERSON KILGORE:  Back to your own
12  table.
13      THE WITNESS:  Thank you very much.
14      CHAIRPERSON KILGORE:  Thank you.
15      (Witness W. Michael Burke excused.)
16      CHAIRPERSON KILGORE:  Ms. Rhodes, do
17  you want to call your next witness?
18      MS. RHODES:  Yeah.  The Office of
19  Disciplinary Counsel -- watch the cords.
20      MR. KARLIN:  Oh, I'm being very
21  careful.  What I want to do is just swap my used
22  glass for a clean glass if someone else wants one.
23      MS. RHODES:  I call Barry Nace.
24      (Witness Barry J. Nace sworn.)

PAGE 268

1       THEREUPON came
2                   BARRY J. NACE,
3   called as a witness on behalf of the Office of
4   Disciplinary Counsel, and having been first duly
5   sworn according to law, testified as follows:
6                   DIRECT EXAMINATION
7   BY MS. RHODES:
8       Q   Please state your name for the record.
9       A   Barry Nace, N-a-c-e.
10      Q   And when were you admitted to practice
11  law in West Virginia?
12      A   In West Virginia?
13      Q   Yes.
14      A   1997 perhaps.
15      Q   That wasn't a trick question.
16      A   I don't know.
17      Q   Where do you mainly practice law, or at
18  least where is your office located?
19      A   My office is in Washington, D.C.  I
20  practice mostly in Washington, D.C., mostly
21  Montgomery County, and the Panhandle here in West
22  Virginia.
23      Q   And are you familiar with the Barbara
24  Miller medical malpractice case?

PAGE 269

1       A   Yes.
2       Q   And how are you familiar with it?
3       A   I was the trial attorney that handled
4   her case.
5       Q   And --
6       A   From beginning to end.
7       Q   Were you contacted by Mr. Burke
8   regarding Barbara Miller's case?
9       A   Yes, I was.
10      Q   And how were you contacted by him?
11      A   I don't know.  Either by -- probably by
12  telephone, probably calling me up.  What he usually
13  does, he would call me up and say, "I have talked to
14  somebody," or, "I have some records.  Do you want to
15  take a look at them?"  I'd say, "Okay."
16      Q   And that's a result of your quite a few
17  years of working together with Mr. Burke on these
18  types of cases?
19      A   I don't know if it's as a result of
20  that, but over the years it would happen in different
21  ways.  Sometimes he would call me with a case and
22  have questions about whether there is a case there,
23  and I would just give him my advice, yes or no, for
24  no charge.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 69 PAGE 270

1  Sometimes he would call me and say,
2  "What do you think? Should I get the records?" I'd
3  say, "Yes," or, "No." Sometimes he might call and
4  say, "I have the records. Would you like to take a
5  look at them?" You know, there's all kinds of ways
6  that it could happen.
7      Q   Are you listed of counsel on Mr.
8  Burke's letterhead for his law firm?
9      A   I have been listed as of counsel.
10 That's correct.
11     Q   And how long has that been?
12     A   I don't know. Maybe 20 years or so.
13     Q   And at the bottom of your letterhead, I
14 believe on the right part at the bottom part -- and
15 I'm trying to find a letter -- it says, "Martinsburg,
16 West Virginia"?
17     A   I think -- at one time I think it did.
18     Q   Okay. And I believe the letters you
19 sent to Mr. Trumble, starting in December 2008 --
20 it's going to be under Tab 1, that black notebook
21 right to your --
22         MR. BENNINGER: I made him a copy of
23 the notebook.
24         MS. RHODES: Oh, okay.

PAGE 271

1          MR. BENNINGER: It should be the same.
2          MS. RHODES: It's Tab 1, Bates Stamp
3  34.
4          THE WITNESS: Yes.
5  BY MS. RHODES:
6      Q   And in that bottom right-hand it says,
7  "Martinsburg, West Virginia"?
8      A   Yes, it does.
9      Q   What is that supposed to indicate?
10     A   I'm sorry. I was coughing.
11     Q   What is that supposed to indicate?
12     A   It just indicated that I practiced in
13 West Virginia, and that if I had to meet somebody in
14 West Virginia, I could meet them in Martinsburg, West
15 Virginia, if I wanted to. That's about all.
16     Q   Okay. And do you recall when you
17 specifically started being involved in Ms. Miller's
18 case?
19     A   Not specifically, no. But if we go
20 through the records, I can give you a pretty good
21 idea.
22     Q   Okay. Well, it looks like she signed
23 her employment contract with Mr. Burke on February
24 5th, 2004. Does that sound right to you?

PAGE 272

1      A   February 5th, 2004 --
2      Q   Yes.
3      A   -- that she signed with him?
4      Q   Yes. That would be Bates Stamp 25 --
5      A   Okay.
6      Q   -- under Tab 1.
7      A   Right. This is the contract of
8  employment between Ms. Miller and Mike Burke.
9      Q   Okay. And did you ever sign a separate
10 contract of employment?
11     A   I did not.
12     Q   And why is that?
13     A   Well, because Mike usually got the
14 contracts of employment, the retainer agreements
15 signed, and I would go along with what he had.
16     Q   And did you still not get a separate
17 contract when he chose to separate himself from the
18 case?
19     A   No, I did not. I just told her I'd go
20 along with the con -- with the agreement that she had
21 signed with him.
22     Q   Okay. Were you aware that Ms. Miller
23 filed for bankruptcy in September of 2004?
24     A   No, I was not.

PAGE 273

1      Q   Do you recall when you became aware of
2  that?
3      A   Sometime when Mr. Trumble started
4  sending letters to me later in '08.
5      Q   So you did not know about the
6  bankruptcy in February of 2005 when you signed the
7  affidavit?
8      A   I knew that -- I guess I knew there was
9  a bankruptcy at that time, but I didn't know
10 anything -- I've heard so much since then, for
11 example, about discharge and all that kind of stuff.
12 I didn't know anything about that at the time.
13     I suppose when I signed the document
14 that I was asked to sign, I signed it. I guess it
15 went through my head that there was a bankruptcy, but
16 it meant nothing to me, really.
17     Q   Well, if you look at what has been
18 Bates stamped 12, it's a January 27, 2005, letter --
19     A   Yes.
20     Q   -- to you from Christy Hook for Mr.
21 Trumble?
22     A   Right.
23     Q   Did you receive that letter?
24     A   Yes.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 70  PAGE 274

1    Q    And that was at your 1814 North Street,
2  Northwest, address?
3    A    No.  It wasn't at 1814 North Street,
4  Northwest.  What it says there is 1814 N Street,
5  Northwest --
6    Q    Okay.
7    A    -- which is not North Street.
8    Q    Okay.
9    A    There was another one sent to North
10  Street at a later time by somebody else, which was
11  also incorrect.
12    Q    Okay.  Was that sent by Mr. Trumble?
13    A    Yes.
14    Q    Okay.  So you did receive that?
15    A    Yes.
16    Q    And did you receive the things that
17  were attached to it, the copy of the application, the
18  order and the original affidavit?
19    A    It's my recollection that I received
20  the affidavit to sign.  When Mr. -- my attorney was
21  down there with me in Washington going through the
22  record -- going through the boxes of records, he
23  found, I believe, an unsigned application and also --
24  I think that's it.  And a proposed order that we've

PAGE 275

1  seen since then.  But I do not recall seeing that,
2  and I did not have that in my file.
3    Q    So you're saying you didn't receive
4  that or you're saying you don't remember receiving
5  those items?
6    A    I'm saying I do not ever recall seeing
7  anything other than this letter and the affidavit.
8    Q    Can we say that if you had not seen the
9  affidavit or the order, which is listed in that
10  letter, that you would have responded to Mr. Trumble
11  or Ms. Hook saying, "I didn't receive the copy of
12  these that were listed in the letter"?
13    A    No, we can't say that.
14    Q    Well, I mean, you did it when you got
15  the letter in November of 2008.  You said these
16  things weren't attached to it.
17    A    Yes.  But that's a little bit
18  different.  At that point in time it was being basically
19  -- seeing something new to me.
20    Q    Okay.  Well, let's look at the
21  affidavit, 17, that's the blank affidavit, and we can
22  look at the signed one which is under -- we'll look
23  at your signed one at 23.
24           In that affidavit, you state -- and

PAGE 276

1  that is your signature and you signed that February
2  24th?
3    A    Yes, it is.
4    Q    Number 3 of that, it says, "I am
5  willing to accept employment by the trustee on the
6  basis set forth in the application to employ filed
7  simultaneously herewith."  So did you read that
8  application before you signed this affidavit?
9    A    No.
10    Q    And why did you sign a document stating
11  that you were accepting employment on the basis of
12  something that you had not seen?
13    A    Because I recall calling up Mr. Burke
14  and asking about this.  "I have this affidavit."  And
15  basically he said to me, "Well, you have to sign that
16  and send it back."  I said, "Okay."
17           At that point in time, when he started
18  this in January of '05, I still had not taken the
19  case.  I was still at that point investigating, and I
20  had not yet decided to take the case.
21           Mr. Burke asked me to sign this because
22  it was something that had to be done, and I did it.
23  And I was satisfied if Mike thought I should do it,
24  I'd do it.  I had faith in Mike, so I signed it and

PAGE 277

1  sent it back.
2    Q    What did you think you were doing when
3  you signed the affidavit?
4    A    Saying that I was willing to accept
5  employment, not that I was accepting employment.  I
6  was willing to do it, if I took the case, for
7  example.
8    Q    And you're saying you never saw a blank
9  order of the order authorizing the trustee to employ
10  special counsel?
11    A    You mean the signed order by the judge?
12    Q    The proposed order that was -- that has
13  been listed as attached to the January 27, 2005 --
14    A    My recollection is I did not see that
15  proposed order at that time.
16    Q    Okay.  So you were unaware that Mr.
17  Trumble was going to submit this to the bankruptcy
18  court for approval?
19    A    I didn't really think about it when you
20  get right down to it at the time.
21    Q    And you weren't that familiar with
22  bankruptcy law; is that correct?
23    A    That familiar, no.  Not only was I not
24  that familiar, but I wasn't familiar at all.  I knew

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

1   nothing about bankruptcy.  I had never handled a
2   bankruptcy case.  I never represented anybody that
3   was in bankruptcy, who had been in bankruptcy to my
4   knowledge.  I've now learned a lot, but I didn't know
5   then.
6        Q    Were you aware then that Mr. Trumble
7   had to get permission from the bankruptcy court to
8   employ you as counsel?
9        A    Did I know that?
10       Q    Yes.
11       A    I doubt it.
12       Q    And if you look under paragraph 2, it
13   says that, "I am experienced in rendering legal
14   services of the same nature for which I am being
15   employed on behalf of . . ."
16       A    Right.
17       Q    ". . . the bankruptcy estate."
18       A    Right.
19       Q    What was your understanding of that?
20       A    That if I was going to be employed by
21   the bankruptcy estate, I was willing to do so; that I
22   was willing to -- that I was experienced in doing
23   those kind of services of a medical malpractice
24   nature.

PAGE 279

1        Were you aware of at that point on the
2   basis of the January 25th -- excuse me -- 27th, 2005,
3   letter that -- and it refers to the bankruptcy case
4   number in Barbara Miller's name on that -- were you
5   aware at that point that the medical malpractice case
6   would be an asset to the bankruptcy estate?
7        A    No.  I would not have even thought
8   about that.
9        Q    Did you ever call Mr. Trumble with
10   questions about the affidavit?
11       A    I did not.  I was not at that point in
12   time, January 27th, involved in representing Mrs.
13   Miller at that time.
14       Q    But yet you still signed the affidavit?
15       A    Yes, I did.
16       Q    And you supplied that -- and you sent
17   that affidavit back to Mr. Trumble, correct?
18       A    Yes, I did.
19       Q    And in going through with the medical
20   malpractice case, it does look like in -- May 18th,
21   2005 -- excuse me -- I'm going to go back to the
22   bankruptcy case that Mr. Burke was sent a letter
23   asking for the status and the written report of the
24   bankruptcy case, and he has noted in his exhibits

PAGE 280

1   that he mailed a copy to your office on 5/23/05.  Did
2   you receive that letter?
3        A    It is not in my file.  I have no
4   recollection of ever seeing it.
5        Q    Okay.  Now, that doesn't say that it
6   was sent to Mr. Assaad.  It just says that he mailed
7   a copy to Nace's office.  Is it common practice that
8   you don't see mail that comes into your office?
9        A    It is not on mine, by the way, that I
10   have here.
11       Q    Well, do you want to go to Mr. Burke's?
12       A    Is it common -- wait.  You asked me if
13   it is common practice that I don't see mail that
14   comes into me.
15       Q    Yes.
16       A    No, it's not common practice.  I do
17   usually see mail that comes into me, at least as of
18   that time.  So I conclude, since it's not in the file
19   and I have no recollection of seeing it, that it did
20   not come to my office.
21       Q    Okay.  And Mr. Burke testified he
22   didn't receive that back, so you don't know what
23   happened to it?
24       A    Well, I do know what happened to the

PAGE 281

1   person that supposedly sent it to me.  I know about
2   that.
3        Q    And who was that?
4        A    Lacy Godby.
5        Q    Uh-huh.
6        A    I know that she was eventually fired
7   from the office.  As I understand it, there was an
8   issue of embezzlement that she had committed.  I know
9   that.
10       Q    And how do you know that?
11       A    Because I was told that by Mr. Burke in
12   his office.
13       Q    What about Mr. Assaad, did you have
14   issues with him?
15       A    Did I have issues with Mr. Assaad?  Mr.
16   Assaad was a Virginia Bar member.  I don't know what
17   to say.  Did I have issues with him?  He was there in
18   the office.
19       Q    Did you ever have issues with him not
20   giving you faxes or mail?
21       A    That wasn't generally his job to give
22   me faxes or mail.
23       Q    Okay.  It looks like on or about June
24   17th, 2007, a complaint was filed in regards to the

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11



SHEET 72  PAGE 282

1   medical malpractice case.
2       A    I don't think that's correct.
3            MR. BENNINGER:  2005.
4            MS. RHODES:  Oh, excuse me.  2005.
5   That's going to be under Tab 16.  Wait a minute.
6   It's going to be under Tab 14.  It's the docket
7   sheet.
8            MR. FRANCISCO:  I'm sorry, Ms. Rhodes.
9   Tab 14 of what page?
10           MS. RHODES:  Four twenty-one (421),
11  yeah.  It's under Tab 16.
12           THE WITNESS:  Tab 16?
13           MS. RHODES:  Yes, 421.  I'm sorry.
14           THE WITNESS:  Okay.  I have it.
15  BY MS. RHODES:
16      Q    And that is the complaint filed in the
17  Barbara Miller for the estate of Paul Miller's
18  estate, correct?
19      A    Yes.
20      Q    On page -- it's page 427 -- you sign
21  that along with -- it refers to "D. Michael Burke"
22  by . . . and I think that's Mr. Schultz's signature;
23  is that correct?
24      A    I think it is his signature.

PAGE 284

1   of 2006 a partial settlement was reached with one of
2   the defendants; is that correct?
3       A    There was a partial settlement reached.
4   If you could refer me to that page, I could tell you
5   if you're right about the date.
6       Q    Yes.  It's going to be under Tab 18.
7   That's the client file that you provided to me.  It's
8   under seal because it's a client file.  If you take
9   that red tab off of there.
10      A    That's what I provided?
11      Q    Yes, that's what you provided to my
12  office.
13      A    Okay.  So what page do you want me to
14  look at?
15      Q    Four (4) -- excuse me -- 249.
16      A    Two forty-nine (249).  Okay.  This
17  wasn't the entire file, you realize.
18      Q    I asked you, that's what you brought to
19  me?
20      A    Yes.  And I also offered to get you
21  more if you wanted it, and you said you don't want
22  more, right?
23      Q    Yes.
24      A    Okay.  All right.

PAGE 283

1       Q    Were you aware at that time that Mr.
2   Burke was no longer wanting to participate in the
3   case?
4       A    I don't know if I was aware of it or
5   not, or if I had forgot.  But I know that
6   subsequently he came back and he called me and told
7   me that he shouldn't be involved in the case for the
8   reasons that he stated to that point.
9            And as of that time, when I was told
10  that, the easiest thing to do was to file an amended
11  complaint with his name off of it.
12      Q    Which is what you did on July --
13      A    Which is what I did.
14      Q    -- on July 8th, 2005, which starts at
15  428?
16      A    Yeah, that appears to be correct.
17      Q    And 434 only your name is listed on
18  there, correct?
19      A    Well, I haven't got there yet, but I
20  bet your right.
21      Q    Page 434.
22      A    Yes, that's correct.  With my address
23  of New Hampshire Avenue, Northwest.
24      Q    Okay.  And I believe around September

PAGE 285

1       Q    Okay.  And that's the partial
2   settlement?
3       A    That would have been the partial
4   settlement.
5       Q    Okay.  And that was for $75,000?
6       A    That's right.
7       Q    And that was just one of the
8   defendants; is that correct?
9       A    That was -- yes, that was one of the
10  defendants, City Hospital.
11      Q    And did you seek permission of the
12  bankruptcy estate to settle that matter?
13      A    I did not.
14      Q    And why did you not?
15      A    It wasn't anything that was on my mind
16  or on my radar.  There wasn't anything in our file
17  that was saying anything about bankruptcy, because
18  when my file was opened, my file was opened when the
19  lawsuit started, basically.  It wasn't --
20      Q    So anything you received prior to that
21  would have become part of the file?
22      A    Eventually it would become part of the
23  file, if it was there to become part of the file, but
24  it wasn't -- it wasn't really a file until I said,

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 73 PAGE 286

PAGE 286

1  "Let's send this to an expert to have look at it."
2      I get things all the time that I don't
3  open files on because I do not get involved with the
4  case. If I decided to send a case to an expert,
5  then, yes, I would open a file. We would get a file
6  going and we open various sections of the file.
7      Q  And it looks like on 250 you wrote a
8  check to Ms. Miller for ten thousand dollars and one
9  hundred and twenty-three -- twenty-six dollars
10  ($10,126). Excuse me.
11     A  And page 251 explains why.
12     Q  Yes. And it looks like you took
13  attorney's fees out of that of 30,000?
14     A  Yes, 40 percent.
15     Q  And your expenses as to date, I'm
16  assuming, or was that all of the expenses or just
17  partial?
18     A  The expenses as of that time would have
19  been $27,373.84. She would have been provided with a
20  statement of everything that got to that 27,000.
21     Q  Uh-huh.
22     A  And because I knew that she was always
23  wanting money on it, I wanted to make sure that she
24  got something. So rather than keeping anything for

1  Looking at page 256, on the 30th day of October,
2  apparently is when the trial started.
3      Q  Uh-huh.
4      A  Somewhere close, I guess.
5      Q  Okay.
6      A  But it had taken some time to get to
7  that point.
8      Q  And you did have that jury trial in
9  which you were the -- you were the single counsel in
10  that matter?
11     A  I was single counsel, although one of
12  my sons who was waiting for Bar results, Jonathan,
13  sat at the table with me to help.
14     Q  Okay. And the verdict in that case,
15  if you want to look under Tab 16, 446.
16     A  You can see it on 258, if you want.
17     Q  Okay. Well, this is the court's
18  record.
19     A  The same -- I guess it's the same
20  thing.
21     Q  I don't know if that's a signed --
22     A  Okay, 446.
23     Q  That's the verdict form from the jury,
24  correct?

PAGE 287

PAGE 289

1  what I knew was going to be at least a $75,000 bill,
2  I kept $7500 and gave her the rest.
3      Q  Okay. And that agreed final order
4  approving, 252 through 254, was signed by the circuit
5  judge; is that correct?
6      A  Yes, it was. And nobody objected to
7  that.
8      Q  And you had to get permission from the
9  court to settle that matter?
10     A  That's right, and I did. And that was
11  signed by all of the other attorneys in the case at
12  the time.
13     Q  And I believe that check was dated that
14  you paid her was dated October 2nd, October 2nd,
15  2006? It's 250.
16     A  Yes.
17     Q  Okay. And was that right before the
18  trial in the matter?
19     A  Was that right before the trial?
20     Q  Yeah. Did you settle that with that
21  defendant?
22     A  I don't --
23     Q  You don't --
24     A  -- think it was right before the trial.

1      A  Yes.
2      Q  And it looks like it was signed by the
3  foreperson on November 9th, 2006, correct?
4      A  If that's what it says. Yeah.
5      Q  So that was a fairly lengthy trial, and
6  it looks like Dr. Jalazio [sic] -- I hope I'm saying
7  that right -- was the one that was found a hundred
8  percent at fault in the matter, correct?
9      A  Yes.
10     Q  And there was a $5,000 [sic] judgment
11  by the jury; is that correct?
12     A  A total of 500,000.
13     Q  Okay. Yes. And that verdict became
14  final on or about February 5th, 2007. Does that
15  sound correct?
16     A  I don't know. I'd have to check.
17     Q  Okay.
18     A  What page are you referring to?
19     Q  Well, it's going to -- the order is
20  signed by the judge regarding the verdict that's
21  dated January 4th, 2007.
22     A  Yeah. I see that on page 453.
23     Q  Yeah. But that verdict was ultimately
24  appealed; is that correct?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 74  PAGE 290

PAGE 290
1    A    Yes, it was.
2    Q    And that appeal was filed, it looks,
3  June 4th, 2007?
4    A    It looks that way.
5         Okay.  And did you participate in the
6  appeal in the matter?
7    A    I did it all.
8    Q    You did?
9    A    I did it all.
10   Q    Okay.  Did you have to file a response
11 to the petition?
12   A    You know, I don't honestly remember if
13 I did or not.  Looking at this --
14   Q    I'm not trying to give you a trick
15 question.  Ultimately the court refused the appeal.
16   A    Right.
17   Q    And it says you provided a written
18 response.
19        MR. BENNINGER:  The order on 497 does
20 show a proper response.
21        THE WITNESS:  Well, what I can't tell
22 is whether not -- from this is whether or not the
23 court asked me to file a response to their petition.
24 I don't think they did, but I'm not really sure.

PAGE 291
1  BY MS. RHODES:
2    Q    Well, the order from the West Virginia
3  Supreme Court said that you came and presented to the
4  court her written response and opposition.
5    A    So they did?
6    Q    Yeah, on 497.  On the 3rd day of July,
7  2007.
8    A    Okay.  Then I did.
9    Q    Okay.  And I'm not trying to confuse
10 you there.
11   A    I don't remember.  But if it says I
12 did, I guess I did.
13   Q    We can trust that that order from the
14 court is correct.
15   A    That's more work I did.  How's that?
16   Q    And I believe around July 27th of 2007
17 is when Mr. Trumble sent Mr. Burke another letter
18 asking for the status of the medical malpractice
19 claim.
20   A    What page are you on?
21   Q    We're going to go back under Tab 1.
22   A    Tab 1.  At page 29?
23        Page 29, yes.
24   A    July 27th he sent a letter to Mr. Burke

PAGE 292
1  and copied Mr. O'Brien, but did not copy me.
2    Q    Yes.  Now, Mr. Burke states that he
3  sent a copy and faxed a copy to Mr. Assaad at your
4  office.
5    A    I think he said he asked Lacy Godby to
6  do that.
7    Q    Okay.  And did you receive those?
8    A    Did not; not in our file.
9    Q    And, again, looking at that order -- I
10 don't know if you looked at the date of it -- but on
11 July 27, 2007 --
12   A    Which order?
13   Q    Excuse me.  The order on 497.  It's
14 actually February 12th, 2007.  The West Virginia
15 Supreme Court did refuse the petition for the appeal;
16 is that correct?
17        MR. BENNINGER:  February 12th, 2008.
18        MS. RHODES:  I'm sorry.  Yeah.  There's
19 too many numbers.
20        THE WITNESS:  I don't know what you're
21 asking me.
22        BY MS. RHODES:
23   Q    The West Virginia Supreme Court refused
24 the appeal, correct?

PAGE 293
1    A    The West Virginia Supreme Court,
2  according to page 497, refused the petition for
3  appeal on February 12th of 2008.
4    Q    Okay.  So pending the time frame for
5  the appeal, you did not receive any of the settlement
6  money, is that correct, or the jury verdict money?
7    A    No.
8    Q    Okay.
9    A    You don't usually receive the money if
10 you are appealing, unfortunately.
11   Q    Yeah.  And so at that point you hadn't
12 received any money, but when you received the word
13 from the West Virginia Supreme Court that they
14 refused the appeal at some point soon after that you
15 received the money; is that correct?
16   A    No.  I don't know how soon afterward it
17 was.  I did receive some money.
18   Q    If you look --
19   A    I'm sure you've got something here that
20 says exactly when.
21   Q    I'm not sure it says exactly when, but
22 if you look under Tab 10, page 6 -- excuse me -- 268.
23 Actually, I will tell you when.  At 269.
24   A    Okay.  269, right.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 75   PAGE 294

1    Q    And 269, I believe, contains the check
2  you received.
3    A    Okay.
4         And --
5    A    And that would have been the verdict
6  plus interest less the 75,000, if I recall correctly.
7    Q    Yeah.  I believe you were contacted by
8  opposing counsel that the earlier settlement would be
9  deducted out of the 500,000.
10    A    I think I tried to oppose that with the
11  court, but was probably not successful on that.
12    Q    Okay.  And 268 is your statement of the
13  account --
14    A    Right.
15    Q    -- breaking it down as to --
16    A    Right.
17    Q    -- what's going on?  At any time did
18  you submit your -- this amount to the bankruptcy
19  court?
20    A    No, I did not.
21    Q    And why did you not?
22    A    It wasn't something that I was aware of
23  at the time.  I had not heard anything from anybody
24  about bankruptcies since back in January of 2005.

PAGE 295

1    Q    Okay.  You do admit though that you
2  have a copy of the signed affidavit, correct?
3    A    Yes.
4    Q    And what file was that kept in?
5    A    I don't know what file it was kept in,
6  because the file is so extensive at this point.  I
7  really don't know.
8    Q    So you never would have put that into
9  her medical malpractice case?
10    A    No.  The way it usually happens is,
11  typically, if we have a -- once we file the lawsuit,
12  get the claim going, we will then try to find out
13  whether or not there is a lien.  That's after things
14  are started.
15         Is there a lien from Medicare, from
16  Medicaid, from Blue Cross Blue Shield, et cetera?
17  And when we get -- that information comes in, that's
18  put into a section of the file.
19         And you didn't have a section for
20  bankruptcy?
21    A    I wouldn't have had a section for
22  bankruptcy under any circumstances.  It was never --
23  bankruptcy was never on my radar for anything,
24  really, in my practice in 40 years.

PAGE 296

1         We didn't ask people if they were in
2  bankruptcy or had been in bankruptcy.  It was not one
3  of the questions that we ask.  We would ask about
4  Medicare, Medicaid, Blue Cross Blue Shield.
5    Q    Well, would you have asked Ms. Miller
6  about it since you signed that affidavit?
7    A    No.  In fact, when I signed the
8  affidavit I probably didn't meet Mrs. Miller for many
9  months after that.
10    Q    When do you find out the information
11  about the Medicaid liens, doctor bills, liens?
12    A    Usually, after a lawsuit is filed, you
13  start inquiring.  You ask for records many times.
14  We'll send a letter to a Dr. Smith and Dr. Smith will
15  send something back.  You might see it then.  Then
16  you might get a letter from Blue Cross Blue Shield.
17  It happens during the course of the case once it's
18  been filed.
19    Q    But you asked for medical records prior
20  to the filing of the suit, correct?
21    A    I don't think I did in this case.  As I
22  told you earlier, I think the records came directly
23  from Mr. Burke.
24    Q    Okay.

PAGE 297

1    A    I don't think any doctor -- in this
2  case it would have been City Hospital only.  City
3  Hospital would not have had any reason to send me a
4  lien, a lien letter.  They were a defendant in the
5  case.  They would make a counterclaim if they wanted
6  to.  The same way with Dr. Jalazo and the other
7  doctors involved.  So they wouldn't send me a lien.
8         And I don't think she had insurance, so
9  it wouldn't have been Blue Cross Blue Shield or
10  anything like that.  That's my recollection.
11    Q    And from that money, the jury verdict,
12  you provided Ms. Miller $220,467.45, correct?
13    A    Yes.
14    Q    And I believe you paid that to her?
15    A    Individually and as a personal
16  representative of the estate of Paul Miller,
17  deceased.  That's what I would have done.
18    Q    Yeah.  On March 5th, 2008.  It's at
19  271.
20    A    Seventy-one (71)?
21    Q    Yeah.
22    A    Right.  That's what I said, right.
23    Q    Okay.  And in your -- if you go under
24  Tab --

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 76  PAGE 298

1    A    I'm sorry.  What?
2    Q    If you go under Tab Number 1 of the
3   exhibit notebook, that was the complaint Mr. Trumble
4   filed against you with our office, correct?
5    A    Tab Number 1?
6    Q    Tab Number 1.
7    A    Yes.
8    Q    And under Tab 2, that's a July 16,
9   2009, letter from our office to you regarding the
10  complaint?
11   A    Wait a minute.  I'm sorry.
12   Q    That's okay.
13   A    Tab 2 is what you sent me, right?
14   Q    Yes.
15   A    Okay.  Yes.
16   Q    And Tab 3, that's your August 11th,
17  2011, response, correct?
18   A    Yes.
19   Q    And under -- on page 55, Number 11, you
20  state on January 27, 2005 -- excuse me.  It's Number
21  12. -- the first one above it says that they were
22  asking you to sign an affidavit.
23            Under 12, you said, "I did so routinely
24  and saw no other document or heard anything else."

PAGE 299

1   What was routine about signing that document?
2    A    Well, what was routine about signing it
3   was Mr. Burke asked me to sign it, so I routinely
4   signed it if he asked me to do something.
5            I did not -- when I was brought into
6   the case to do something, I was brought in as a trial
7   case.  I would do the discovery.  I would do the
8   trial.  I would do most of the motions.  That would
9   be basically my function on it.
10           And paragraph 11, I said, "On January
11  27, 2005, Mr. Trumble, through a certified legal
12  assistant, sent a letter to me and Mr. Burke asking
13  us to sign an affidavit."
14           And then I also put in there, "I saw no
15  other document . . ." which is what I think I have
16  been saying all along, ". . . nor heard anything else
17  about the matter," which is what we know to be the
18  situation.
19   Q    And I believe under Tab 6 is an
20  additional response.
21   A    I'm sorry.  Tab what now?
22   Q    Six (6).
23   A    Six (6).  Yes.
24   Q    It's an additional response from you?

PAGE 300

1    A    Yes.  I think that was in response to
2   something else that Mr. Trumble had sent to me.
3    Q    Correct.  And under Tab 7, that was a
4   subpoena --
5    A    Excuse me.  I'm sorry.  That was in
6   response to something else that Mr. Trumble had sent
7   to you --
8    Q    Okay.
9    A    -- and you asked me to respond, which I
10  did pretty promptly.
11   Q    And under Tab 7 and Tab 8, those are a
12  subpoena for you to appear to testify at a sworn
13  statement?
14   A    Yes.  And when your office called me, I
15  told you that a subpoena would not be necessary.  I
16  would be happy to do it.  You wanted a subpoena.  I
17  said, "Okay, fine.  I'll accept it.  Send it to me."
18   Q    Okay.  And under 9, that's a copy of
19  your transcript; is that correct?
20   A    Yeah.  There were a few typos in it,
21  but yes.
22   Q    And in your sworn statement you did
23  state that you did send Mr. Burke a check --
24   A    I did.

PAGE 301

1    Q    -- as a referral fee in the matter?
2    A    What page are you on?
3    Q    One thirty-seven (137).  It's going to
4   be page 41 at the top.
5    A    Okay.  I have that.
6    Q    But it's going to Bates stamped 137.
7    A    What I told you on that page, you asked
8   me if you -- if I gave him a referral fee, quote, "or
9   anything like that," end quote.  And I said, "No."
10           What I did -- we usually work on a case
11  where it was either 25 percent or a third of whatever
12  you got out of the case.  On this on, I will tell you
13  I sent him a check when it was all over, just as a
14  courtesy.  It wasn't a big check, just as a courtesy.
15  That's what I thought had happened.
16           But I had brought along statements from
17  our general ledgers that show that, in fact, in that
18  period of time I did send Mike Burke on three
19  different occasions checks for cases that I had
20  settled that he had referred to me and had been
21  involved in.  That's what I was thinking about, yes.
22           In fact, one of my sons basically told
23  me that I shouldn't send a check to him since he
24  wasn't in the case and there might have been a

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 77   PAGE 302

1   conflict. So, as it turns out, I did not.
2   Q   Okay. So you were mistaken during
3   sworn statement?
4   A   Yes, I was.
5   Q   Why did you never follow up with the
6   affidavit?
7   A   Why did I never follow up?
8   Q   Yes, with this signed affidavit that
9   you sent.
10   A   What do you mean why did I not follow
11   up?
12   Q   Why did you not call Mr. Trumble about
13   the affidavit?
14   A   I don't know why I would have, first of
15   all. I signed it. I admit that I signed it. But
16   then it was out of my mind once I decided to get in
17   the case and I worked on the case. That's what I
18   did, I worked on the case.
19   And I never heard another word from my
20   boss, as I understand it to be, Mr. Trumble. I never
21   heard another word from him, the person who is
22   supposedly, according to the Code, as I now
23   understand it, supervising and watching everything
24   that I did and consulting with me, his so-called

PAGE 303

1   employee under the Code, and so I never heard of
2   anything. I never had anything to do with the man.
3   Q   At the sworn statement, do you agree
4   that you stated, "I guess I was aware of the
5   bank . . . that there was a bankruptcy concerning Ms.
6   Miller," when you signed the --
7   A   Okay. I think that's what I said here.
8   Q   -- signing the affidavit. So at some
9   -- you were aware that there was a bankruptcy pending
10   concerning this medical malpractice case?
11   A   Well, you've taken that a little bit
12   out of context, ma'am, because I was aware when I
13   signed the affidavit that there was a bankruptcy.
14   What that meant after that, when I
15   didn't hear anything more from him or the court, I
16   heard nothing more from anybody, it meant nothing
17   more to me.
18   In my practice, I file orders, proposed
19   orders, daily, when you're filing motions or
20   something. Proposed orders. That means nothing
21   until the order comes back signed by the court.
22   So that order, that proposed thing that
23   I filed, meant nothing until I was given back
24   notification that, in fact, I had been appointed.

PAGE 304

1   Q   Well, you weren't familiar with
2   bankruptcy law at that point?
3   A   No, I wasn't. No.
4   Q   So you didn't know there had to be an
5   order appointing you or authorizing him to employ
6   you?
7   A   I know that. An order is an order once
8   it's signed. That's when it becomes an order. I
9   know that much for anything.
10   Q   And you did get a copy of that proposed
11   order?
12   A   The proposed order?
13   Q   Yes.
14   A   I'm told the proposed order is my file.
15   I don't recall seeing it at the time.
16   Q   Okay. And the proposed order also
17   refers to the personal injury case?
18   A   I saw that later. I saw that later.
19   When all of this starting happening, then I saw it.
20   And I noticed in there -- I believe it actually says
21   motor vehicle accident.
22   Q   Uh-huh.
23   A   If I'm not mistaken. Whatever it says
24   is what it says.

PAGE 305

1   Q   So if you had the proposed order, you
2   didn't make issue of the fact that it referred to a
3   different type of case?
4   A   No, I didn't make any issue of it. It
5   just wasn't -- in January of '05, I guess it was, it
6   wasn't important to me at that point in time.
7   It would have been important if
8   somebody had contacted me and said, "Hey, here is
9   what's going on. You tell me what's going on.
10   What's the status? What's happening?" But nobody
11   ever did that, inform me. Which is the
12   responsibility, as I understand it, of the trustee.
13   Q   On October 10, 2008, Mr. Trumble said
14   he sent you a letter regarding the fact that the case
15   had been settled.
16   A   Uh-huh.
17   Q   And that's going to be under Tab 1,
18   Bates Stamp 30.
19   A   Tab 38?
20   Q   Tab 1, Bates Stamp 30.
21   A   Thirty (30). Okay. And if you look at
22   that, you will see that it's sent to me at Paulson &
23   Nace at 1814 North Street, Northwest, which is not
24   1814 N Street, Northwest, and is not the new address

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 78   PAGE 306

1   that I had given to Mr. Trumble when I sent the
2   affidavit back to him with my letter saying on March
3   4th or 5th, whatever it was, we were moving and we
4   were going to be at New Hampshire Avenue.
5        So it was wrong both as far as zip
6   code.  It was wrong.  It was the wrong name of the
7   street.  It was wrong on the address.  It never came
8   to me.
9        Q    And November 14, 2008 -- this one will
10   be Bates Stamp 32 -- is his second request for
11   information.
12       A    Well, the second request was not a
13   second request, it was a first request.  And you'll
14   notice, by the way, the same person who was sending
15   these other things was Christy Hook, who was signing
16   for Mr. Trumble.
17       She is the one that signed on the 14th,
18   also sent the second request, which it wasn't for us,
19   it was a first request.  I understand Mr. Burke
20   didn't get it, either, the first time around.
21       Q    Okay.  I believe you stated that the
22   attachments to the first letter --
23       A    And the attachments weren't there.
24       Q    Okay.  And --

PAGE 307

1        A    Which I said in my letter, I think,
2   December 1, 2008, just two weeks later.
3        Q    Yes.  But in that letter you stated,
4   "Somebody called me several months ago on the
5   telephone and I talked to them and it may have been
6   you."  So somebody did contact you prior to December
7   1st, 2008, about this case, correct?
8        A    I said on December 1st, 2008, in my
9   letter, that somebody -- I don't know who it was --
10   called me on the telephone and I talked to them.  I
11   didn't know who it was.  I didn't know anything about
12   it.  But I told them, "Hey, let me know what's going
13   on.  What do you want?"
14       Q    And it says --
15       A    That's what I did.
16       Q    And you said that there was not any
17   settlement and that the case was tried by jury
18   verdict?
19       A    Yes.
20       Q    That's not completely correct because
21   there was a partial settlement, correct?
22       A    Well, the partial $75,000 was a very
23   partial thing.  The important thing --
24       But it was a settlement?

PAGE 308

1        A    Well, yeah, technically there was a
2   settlement.  But I think if anybody looked at this
3   they would say it was a jury verdict.  Any attorney,
4   any trial attorney, would refer to this as a trial.
5        Q    And on January 5th, 2009, Mr. Trumble
6   sent you a letter?
7        A    It was about a month plus later, yes.
8        Q    And that was during the holiday season.
9   Excuse me.  That attached the October 13, 2008,
10   letter and the attachments that were to that letter?
11       A    The attachments for the fist time, yes.
12       Q    And you're saying that's the first time
13   you saw the signed order authorizing you?
14       A    Absolutely.
15       Q    Did Mr. Burke ever tell you and when he
16   told you to go ahead and sign the affidavit that that
17   meant you were being employed by the bankruptcy
18   trustee?
19       A    I don't recall anything like that.
20       Q    Did you ask like, "Why am I signing
21   this?  What does this affidavit do"?
22       A    No.  And you know what, I wished I
23   hadn't signed it, and I wish I had never got involved
24   in this case on behalf of Mrs. Miller, either.  But I

PAGE 309

1   was asked to sign it and I did.
2        Q    And you didn't question anything in
3   regards to like what you were being accepted -- how
4   you were accepting employment, how you were going to
5   be paid?
6        A    Well, it may sound stupid to you; but,
7   no, I did not question it.  Mike asked me to do it.
8   And my relationship that I had with Mike over the
9   years, I had no problem doing it.
10       Q    And in the years that you've handled
11   cases with Mr. Burke, has there ever been trouble in
12   communication between your office and his office?
13       A    Not that I'm aware of.
14       Q    And anything that --
15       A    Other than, other than -- I am a trial
16   attorney -- there were times I would be in trial for
17   six, eight weeks at a time.  That would happen.
18       And so you could say, was there a
19   problem then?  Yes, there was.  If it was a serious
20   problem, I'm sure they would talk to somebody else.
21       Now, I will also tell you during this
22   period of time, in March of 2008, I think it was --
23   and I have the calendar there for that particular
24   time.  Was it March 2008?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11



SHEET 79  PAGE 310

1   MR. BENNINGER:  '07.
2   THE WITNESS:  '07. -- March 2007 when
3   this letter was probably sent to me.  In March of
4   2007, I was in a trial in Washington D.C. in the
5   second week of a trial when I became septic because I
6   was probably a victim of malpractice myself,
7   ironically.
8   I had a small procedure done to my foot
9   and I developed MRSA.  I ended up in the hospital
10  where I was for two weeks and six operations later
11  and about 12 weeks of PICC line antibiotics.  I was
12  in a wheelchair.  I was a pretty sick person.
13  I was home during some of that time
14  when I wasn't in the hospital, and I did it on my
15  computer at home.  Nobody sent me any e-mails.  I
16  could have been reached by computer.  And, in fact, I
17  would have been happy to get work sent to me by
18  e-mail at home.
19  BY MS. RHODES:
20  Q   So it was acceptable for Mr. Burke to
21  speak to you, an associate, or a secretary at your
22  office regarding a case if you were not available?
23  A   It would certainly be acceptable for
24  them to do it.

PAGE 311

1   Q   Okay.
2   A   But he also could have called me at
3   home and he could have e-mailed me.
4   Q   Is that normally what he did, called
5   you at home regarding the cases?
6   A   He could have.  No, it wasn't normally
7   at home; recuperating from six operations, either.
8   Q   And it looks like January 5th, 2009,
9   Mr. Trumble sent you the letter.  We already talked
10  about that.  February 4, 2009, you filed a response
11  to Mr. Trumble's January letter; is that correct?
12  A   What tab are you at?  What page?
13  Q   It's Tab 1, page 48.
14  A   February 4th, 2009, I sent a letter
15  back to Mr. Trumble.
16  Q   Okay.  And since that time an adversary
17  proceeding has been filed against you, correct, in
18  the bankruptcy estate?
19  A   Yes, it was.
20  Q   And that was in October of 2010?  Would
21  that sound --
22  A   Sounds about right to me.
23  Q   Why did you accept employment in a
24  bankrupt -- well, why did you sign the affidavit in a

PAGE 312

1   bankruptcy case if you weren't familiar with
2   bankruptcy?
3   A   You've asked me that three or four
4   times, and I'll give you the same answer again.  I
5   signed it because I got this.  I talked to Mr. Burke
6   and said, "What is this?  What am I supposed to do?"
7   And, basically, I was told sign the affidavit and
8   send it back.  And I did.  That's what I did.  It was
9   a mistake for me to do that in retrospect.  That's
10  why I did it.
11  Q   During the underlying medical
12  malpractice case during the depositions prior to the
13  trial or during the trial, was Barbara Miller ever
14  questioned about her bankruptcy?
15  A   Oh, I'd have to look at her deposition.
16  I don't know.
17  Q   Okay.  So if those questions were
18  asked, would you have objected to those?
19  A   I don't know what I would have done.
20  If you have the deposition.  I don't know what I
21  would have done.
22  Q   I don't have the deposition in front of
23  me.
24  A   Well, I don't know what I would have

PAGE 313

1   done.  I don't know if they were asked, and I don't
2   know what I would have done.
3   MS. RHODES:  I have no further
4   questions at this time.
5   MR. BENNINGER:  Do you want me to go
6   last?
7   CHAIRPERSON KILGORE:  It's up to you.
8   CROSS-EXAMINATION
9   BY MR. BENNINGER:
10  Q   Mr. Nace, a little background about
11  you.  How old are you?
12  A   I'm 66.
13  Q   And you have three children?
14  A   I do.
15  Q   All lawyers and who have been with us
16  watching, observing this proceeding?
17  A   That's correct.  Although one had to
18  leave to catch a plane somewhere.
19  Q   Okay.  And you are married?
20  A   Yes, I am.  Thirty-eight (38) years.
21  Q   And you have practiced law since 1969,
22  as I understand it?
23  A   Yes.  Well, I graduated in 1969.
24  Q   Where did you go to school?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 80   PAGE 314

1      A    Dickinson.
2      Q    And is that Penn State?
3      A    It is now.  It wasn't then.  At the
4  time, Dickinson School of Law was an independent
5  school, not associated with Penn State.
6      Q    Okay.  I shouldn't have asked that
7  question.
8      A    I know.
9      Q    So you became licensed, I assume, in
10  what state first?  And just tell us all the states
11  you're licensed in.
12     A    All right.  In those days when you
13  graduated from law school in Pennsylvania, if you
14  wanted to become a member of the Pennsylvania Bar,
15  you would have to serve a six-month preceptorship
16  after you took the exam and passed it.  I took the
17  exam and I passed it.
18         I had in a job in 1969 in -- right
19  outside of Washington D.C.  So I went to Washington
20  D.C., immediately took the Maryland Bar.  I passed
21  the Maryland Bar.
22         And then I got waived into the D.C.
23  Bar.  And no sooner than that happened, because this
24  all happened in about a three-year period of time,

PAGE 315

1  Pennsylvania dropped their requirement and now I
2  could be admitted to the Pennsylvania Bar.  So I was
3  admitted to the Pennsylvania Bar.
4         So I guess I was admitted to those
5  three bars by 1972, and I was -- by then I was
6  practicing -- starting to practice in private
7  practice with another gentleman named Earl Davis, who
8  was kind of my mentor, in Washington.
9         After that, I joined with another
10  attorney named Richard Paulson, and we practiced
11  almost exclusively medical malpractice law and
12  product liability law.
13         And then Mr. Paulson died early, and I
14  continued the firm, and had -- a couple of times had
15  some other people with me.  And I think at one time
16  there were like seven attorneys in the firm, and then
17  it got down to where there was one attorney in the
18  firm, and now there is myself and my three sons, and
19  one person has been with me before she decided to
20  stop practicing and start a family, which she did,
21  and then she came back to me about ten years later to
22  work with me.
23     Q    And then in 1977 you joined -- you took
24  exams and joined the West Virginia Bar?

PAGE 316

1      A    Yeah.  At some point in time I was
2  starting to do a lot more work in West Virginia and I
3  was becoming pro hac vice, and I just decided on my
4  own that if I'm going to be up here doing that much
5  work that I ought to take the exam.
6         I had to take something called the -- I
7  think it was called the ethics exam, as a matter of
8  fact, if I'm not mistaken, which I took.  And having
9  not prepared for it too long, because I was out of
10  school too long, I surprised myself and passed it,
11  and I got admitted to the West Virginia Bar.
12     Q    And so as far back as you can recall,
13  you have been a trial lawyer?
14     A    I've been a trial lawyer, yes.
15     Q    For plaintiffs?
16     A    For plaintiffs.
17     Q    In predominantly medical malpractice
18  cases?
19     A    Predominantly.
20     Q    In your professional associations, have
21  you had the good fortune of achieving the highest
22  position in ATLA, Association of Trial Lawyers of
23  America, now called AAJ?
24     A    I served as -- in numerous offices and

PAGE 317

1  finally became president of ATLA in 1993-'94.
2         And after that I was -- I also at some
3  point time became board certified in both civil
4  litigation, and then also by the American Board of
5  Professional Liability in medical malpractice.
6         I subsequently was asked to serve with
7  the board of the National Board of Legal Specialty
8  Certification, which is the ABA certifying who, and
9  then I was asked to be president of that association.
10  I was president of that association for two years in
11  mid 2000 something or other.  I did that.
12     Q    And your resume is behind Nace Tab 1?
13     A    Yes, I think it is.
14     Q    The supplemental list, if they care to
15  look at it.  Without going on further about your --
16  approximately how many jury trials have you
17  participated in and completed in your career, if you
18  know?
19     A    More than a hundred because at some
20  point you have to have a hundred in order to be at
21  the highest level in something called ABOTA, American
22  Board of Trial Advocacy, and I'm at that level.
23     Q    In terms of -- have you ever been
24  disciplined by any of the board bars that you have

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 81  PAGE 318

1    been participating in since 1969 or thereafter?
2        A    I have not.
3        Q    Have you ever had any judgments against
4    you in any malpractice actions?
5        A    I have not.
6        Q    Have you prior to do this had any
7    difficulty of note or significance in working for the
8    20 plus years with Mr. Burke over here in West
9    Virginia in cases he has referred to you?
10       A    No.
11       Q    Have you ever -- for the record, have
12   you ever handled a bankruptcy debtor or creditor case
13   in any court in any district?
14       A    Never.
15       Q    To your knowledge, have you ever had a
16   bankruptcy involved in one of your med mal cases?
17   And I'll move on.
18       A    Never.
19       Q    Okay.  And, again, ignorance of the
20   matter, you've described your lack of knowledge in
21   the matter.  However, at any time prior to receiving
22   the attachments to the January 5, 2009, letter sent
23   to you and eventually received by you -- what I call
24   the malpractice and bar complaint letter from Mr.

PAGE 319

1    Trumble -- did you receive the order that was
2    formerly signed back in March of 2005, almost four
3    years prior?
4        A    Did I receive the signed order?
5        Q    Yes.
6        A    I did not receive the signed order.
7        Q    And you have redoubled your effort to
8    look throughout your whole file?
9        A    And you came down and went through the
10   whole file, and the answer is no.
11       Q    And to your knowledge, has anybody
12   brought to your attention that there was ever a
13   problem with you serving in whatever capacity that
14   arose from you signing the affidavit -- which you
15   don't dispute, do you?
16       A    That I signed it?
17       Q    Yeah.
18       A    No, I signed it.
19       Q    Of course, you never disputed that?
20       A    I signed it.
21       Q    Has there ever been anybody, including
22   Burke, Trumble, the court, or anybody else, ever
23   brought to your attention there was a problem in the
24   way you handled your case with Ms. Miller, other than

PAGE 320

1    this claim and that lawsuit?
2        A    Absolutely not.  And I am quite certain
3    if you contacted the judge, Judge Sanders, or any of
4    the defense attorneys, they would say it was handled
5    very well.  The verdict was -- I think the offer from
6    the other defendants, I think it was nil.  I don't
7    think there was any.
8             Now, in terms of -- let me move
9    forward.  After you got the letter of January of 2009
10   and you responded in February of 2009 to Mr. Trumble
11   -- and I note that it's here for them to read, the
12   Board to read.  We won't go through it.  But, your
13   first paragraph responded to his last.  Did I
14   accurately state that in my cross-examination of Mr.
15   Trumble?
16       A    Yes.
17       Q    His last paragraph said what it said
18   directed toward you and Mr. Burke, and you addressed
19   that first in your letter, did you not?
20       A    I think so.  I'd like to look at it.
21   Is that Tab 23?
22       Q    It is.
23       A    Is that what you're referring to?
24       Q    Yes, it is, sir.

PAGE 321

1        A    Okay.  Yes.  That was in response to
2    his letter, which is Tab 22.  The last paragraph of
3    his letter said -- suddenly he says to me:
4             "Your actions have violated your duty
5    to me as your client.  I strongly recommend that you
6    place your malpractice carrier on notice regarding
7    your breach.
8             "Furthermore, I will be contacting the
9    appropriate State Bars," plural, "at which you are
10   admitted to report your disregard for the Rules of
11   Professional Conduct as it relates to the
12   representation of me as a trustee with regard to this
13   matter."
14            My response to that, my first
15   paragraph --
16       Q    And, sir, we don't need you to read it.
17       A    Okay.
18       Q    I mean, I'm just directing you.
19       A    Okay.  Well, after -- when I received
20   that, when I saw that paragraph, I was quite upset
21   about it.
22            And is this something that routinely
23   happens in your practice or was this something new
24   for you?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 82   PAGE 322

1    A    It has never happened to me before.
2    This is new.
3    Q    In terms of the --
4    A    And quite hurtful.
5    Q    In terms of -- at any time up to this
6    point when you responded, and clear up to the point
7    where Mr. Trumble files the ethics complaint on July
8    13th, 2009, had he or anyone, Christy Hook or anyone
9    else, said, "Hey, you owe us a certain amount of
10   money or a range of amount of money"? Or, "Stop what
11   you're doing. Let's have a meeting. Let's somehow
12   come together face-to-face on this thing and see
13   where we are"?
14   A    No. The simple answer is no. And in
15   my letter, December 1, I said, "I will try to get
16   what you want. Send me what you think supports your
17   position and why you are making the request that you
18   are making and the authority for that."
19        And because he had used the phrase in
20   his letter, "debtors allowable exception," I said,
21   "Please advise as to the quote 'debtors allowable
22   exception'", end quote. I don't think I had any
23   slightest idea what that meant at the time, but I
24   said it.

PAGE 323

1        And, no, never was I told what it is
2    that should have been paid. I heard him say today
3    how money should have been turned over. That wasn't
4    even said to us until that letter in January, I think
5    it was. That was the first time.
6        And nobody said how much was owed to
7    the creditors, some of which I suspect, because the
8    way they're labeled in the docket, may have been
9    defendants in the malpractice case. I don't know.
10   You can't tell.
11   Q    In spite of that concern --
12   A    Right.
13   Q    -- have you and your attorneys in the
14   adversary proceeding when you learned and had some
15   confidence or comfort level with the amount of
16   creditor claims, at least the creditor claim, you
17   made a deposit out of your own funds to try to make
18   that right --
19   A    I made it --
20   Q    -- without asking Mr. Burke or anybody
21   else? Did you do that recently?
22   A    I made a deposit out of my own personal
23   funds consistent with the figure that was provided
24   finally by Mr. Trumble, or his attorney, and to the

PAGE 324

1    exact dollar. Today I heard about interest.
2    Q    Are you willing to pay the interest if
3    anyone ever calculates it and submits it?
4    A    If someone were to decide -- the court
5    were to decide that it was my responsibility, yes.
6    Yes, that's what's in court right now.
7    Q    And are you asking -- and you are
8    desirous that the bankruptcy court hear your pleas
9    and your evidence and then determine and ask what
10   amount, if any, is further due and owing, and you
11   will -- are seeking relief in that case?
12   A    Right.
13   Q    Are you concerned, as I am, that you
14   continuing to press your position adverse to Mr.
15   Trumble in that adversary proceeding may have some
16   adverse effect on this proceeding?
17   A    No.
18   Q    You're not?
19   A    Well --
20   Q    I am.
21   A    -- let's put it this way.
22        CHAIRPERSON KILGORE: We're not.
23        MR. BENNINGER: Okay. Then I'll move
24   on.

PAGE 325

1        THE WITNESS: Let me answer. Let me
2    answer that, if I could, because I've been trying to
3    find out what the dollars are that are involved.
4    I've been trying to find that out for a long period
5    of time.
6        We also believe and had filed in the
7    court below, or in the other court in the lawsuit, a
8    claim for comparable negligence, and expert opinions
9    have been filed, which squarely say --
10       (Cell phone rings.)
11       MR. KARLIN: Excuse me. I'm trying to
12   turn it off and I hit the wrong thing. I apologize.
13       THE WITNESS: -- which squarely say
14   that the trustee in this case didn't do what he
15   should have done. So is it his fault? Is it my
16   fault? Is it Burke's fault? Is there a shared
17   fault? Is there a comparable negligence involved
18   here? That remains to be seen. I know what my
19   opinion is, but it's up to the court to decide.
20       But regardless of that, I put money up
21   for the creditors so that the creditors -- and we
22   know who they are -- they're not hurt on the case. I
23   did that voluntarily.
24   BY MR. BENNINGER:

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 83   PAGE 326

1    Q    At any time did you -- and I am going
2  to cover all the various and numerous citations to
3  our Rules of Professional Conduct that is alleged
4  that you have knowingly and intentionally violated by
5  clear and convincing evidence.
6         Did you at any time knowingly or
7  intentionally violate any of the rules that have been
8  cited?
9    A    Absolutely not.  And the thought of it
10 is ridiculous because when distribution was made, I
11 didn't get anything out of what happened other than
12 what everybody agrees the attorney was entitled to.
13        I put up and invested my own money of
14 $75,000 roughly -- you can add the figures up --
15 $75,000.  That didn't come from the estate, from Mr.
16 Trumble or anybody else.  That came from me.  And I
17 put that up for which I received a fee of
18 approximately $200,000.  Not exactly good odds in
19 these things.
20   Q    And you've heard Mr. Trumble say that
21 there is nothing wrong with the fee that you charged
22 or the agreement?
23   A    Right.
24   Q    You never had a contract with him.  He

PAGE 327

1  never came to you like he said in the application,
2  "I'm going to get a contract under the same terms"?
3    A    Never, never.
4    Q    And you heard under Mr. Karlin's
5  examination that you put up 75,000 of your money,
6  your firm's money, to advance the ball for Mrs.
7  Miller, and Mr. Trumble said if you had lost there
8  would have been no money to repay you for that?
9    A    That's right.
10   Q    You've heard that for the first time
11 here today?
12   A    That's right.  But I will also say
13 that's the risk that we take as plaintiffs lawyers.
14 I took that risk.  If I had lost, I wouldn't have
15 gotten the 75,000 back, and I wouldn't have gotten
16 any fee.  And I had to go through the entire
17 appellate process to get that.  And I took part of my
18 fee and I put that into the court.
19   Q    And, lastly, if there is any need to
20 supplement the record, you have gone at my request
21 and with your staff and looked to try to make sure
22 that the most accurate statement was made in this
23 record for this committee, subcommittee, as to
24 whether or not Mr. Burke ever received a dime for his

PAGE 328

1  involvement or referral.  And your conclusion is
2  what?
3    A    He did not receive a dime for this case
4  in any way.
5    Q    And you have brought your general
6  ledger and the checks that are written and the
7  statement of accounts that you found from digging
8  around in your files if the Committee thinks it's
9  necessary --
10   A    The statement of accounts correspond to
11 the amounts that the checks were written for, so you
12 can see what they were written for, and they are not
13 written -- they were written to him, but were not
14 written to Miller.
15        CHAIRPERSON KILGORE:  Can we make that
16 an exhibit for the record?
17        MR. BENNINGER:  Absolutely.  And I'm
18 showing that right now, for the record --
19        CHAIRPERSON KILGORE:  Sure.
20        MR. BENNINGER:  -- I think we only
21 brought one copy since we --
22        CHAIRPERSON KILGORE:  We'll have copies
23 made.  Let's mark that.
24        (WHEREUPON, Nace Exhibit Number 42

PAGE 329

1  was marked for purposes of identification.)
2        MR. BENNINGER:  Thank you.  And I know
3  she may want to exam them.
4        MS. RHODES:  Uh-huh.
5  BY MR. BENNINGER:
6    Q    It is your conclusion, then, that Mr.
7  Burke was out of the case, you didn't participate
8  with him in his office or out, you didn't send him
9  any money, and you don't dispute anything that he has
10 said in terms of his lack of knowledge as to whether
11 or not you received any notice from Trumble or from
12 -- through Assaad through however it was sent to his
13 secretary, if it was sent at all?
14   A    No.  In fact, the fact that he came to
15 me and said that there was this neighbor or somebody
16 that was -- that new somebody in his firm that put up
17 the wall.  That put up the wall to the point that I
18 didn't even do depositions and use his office.  I
19 went elsewhere.  We just completely had a wall there.
20 We didn't talk about the case at all.
21        If Mr. Trumble had just contacted, you
22 know, me, because he knew I was the trial attorney.
23 I was the trial attorney.  He didn't know anything
24 about me interestingly enough, but he knew I was the

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

1 trial attorney. If he had checked with me, asked me
2 about the case at all, he would have let me know what
3 was going on, I would have had some questions to ask,
4 and there would be no reason for me not to say,
5 "Okay, fine. If we get the verdict, you know, we'll
6 see what happens on it and follow through on it."
7     But to me, to this day, it never made
8 any sense to as to why he is sending letters to
9 O'Brien, who I never met. I don't know who Bill
10 O'Brien is other than I have seen his name. I've
11 never met him.
12     I never met Mr. Trumble before I was
13 introduced to him in the courthouse, the federal
14 courthouse, on another matter about a year ago by Mr.
15 Burke and introduced us. I didn't know who I was
16 being introduced to. I don't know if I would have
17 said hello. But I was introduced to him.
18     And why I was not ever being sent --
19 why I, the trial attorney in the case, was not being
20 asked for information to me is beyond belief.
21     Q   Lastly, do you have an opinion, based
22 on you living through this experience and having
23 firsthand knowledge about it, that Mr. Burke did
24 anything wrong under the Rules of Professional

PAGE 331

1 Conduct?
2     A   I think Mr. Burke not only didn't do
3 anything wrong, I don't think he had any real reason
4 to get out of the case. I think he was being way
5 aboveboard doing that. And, ironically, if he had
6 not gotten out of the case at all, this probably
7 never would have happened, you know, because he knew
8 something about bankruptcy and I didn't.
9     So his being -- trying to be overly
10 ethical, if you want to call it that, that kind of
11 led to this problem with a lack of communication that
12 occurred in this case. That to me is what happened.
13     Q   Do you have any information that
14 anybody intentionally failed to communicate with the
15 other? There seems to be three lawyers here that
16 just didn't effectively communicate throughout this
17 many years that this case was ongoing through the
18 appeal and resolution?
19     A   It looks pretty clear to me that Mr.
20 Trumble intentionally did not try to correspond with
21 me. I don't know why. He had my name supposedly
22 from the January 5, 2005 -- whatever year that was.
23 He had that. And he didn't try to correspond with me
24 for whatever reason until 2008.

PAGE 332

1     Q   Let me ask you. The deposition that he
2 gave, on March 21st, 2011, is one of our exhibits in
3 the first book, if the Committee -- and that's where
4 he answered those questions. I think your son,
5 Christopher, examined him. And it's Deposition -- or
6 Respondent's Exhibit Number 3 to the deposition.
7     MS. RHODES:  You're going to have to
8 change that number because you've got two 3s.
9     MR. BENNINGER:  Well, the supplemental
10 list.
11     MS. RHODES:  Okay.
12     MR. BENNINGER:  Yeah.  Whatever I need
13 to do, Jessica, I'll do it.  Okay?
14 BY MR. BENNINGER:
15     Q   But the entire deposition where he has
16 to address why that happened or if there was an
17 explanation is in there, is it not, where he admits
18 he didn't do it?
19     A   If you look at page 43 and 44 of his
20 deposition, he admits he had no communication with me
21 until October of 2008.  He had no retainer with me.
22 The question:  "Do you have a retainer with Mr. Nace
23 or Paulson and Nace?"
24     "No, I do not."

PAGE 333

1     "Employing him as special counsel in
2 this case?"
3     "No."
4     Q   Page 43 and 44 of his deposition?
5     A   Forty-three (43) and 44.  And then he
6 was asked, "So the time that you did have
7 communications with Mr. Nace prior to October of
8 2008, you didn't have authority . . . did not
9 . . . didn't have authority to actually employ him,
10 is that correct, because the court had not entered an
11 order allowing you to employ him, correct?"
12     Answer:  "There had not been an order
13 entered allowing him to be employed."
14     So there was -- he couldn't employ me.
15 Despite what he was trying to say today, he couldn't
16 employ me until the court said, "You can employ him."
17     Q   And he so stated under oath on page 43
18 and 44 of his deposition?
19     A   Yes.  And once the court signed the
20 order, he never sent us a copy of that order.  He
21 said both today, yes, he did, and he also said he
22 didn't.  In his deposition, he admits he did not.
23     So he never, never contacted me.  Never
24 sent anything to me, anything that he would have done

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 85 PAGE 334

1  at all to me, from Trumble to Nace, consistent with
2  what he's supposed to do under Chapter 7.
3      Q   You mean the handbook?
4      A   In the handbook, Chapter 7. Anything
5  at all would have prevented this whole thing from
6  occurring.
7          Anything else to the extent that is
8  determined from looking at the evidence, the
9  testimony, the records, that you somehow failed, did
10  you intend to do so in making any mistakes or errors?
11  Did you intend to do anything?
12      A   Absolutely not. And when the
13  allegations are made, that are made, they're pretty
14  hurtful after you've done -- you try to do what I
15  have tried to do all these years.
16          I also -- I've been appointed by the
17  court, the D.C. Court of Appeals, to do things for
18  them, like serve on committees. I've been asked by
19  judges from time to time to serve as a mediator to
20  get a case settled. I've given all this time
21  throughout my life voluntarily. You don't get paid
22  for any of that stuff, and I've done it.
23          And to have somebody come in and tell
24  me that I am unethical because of this kind of stuff

PAGE 336

1                      CROSS-EXAMINATION
2  BY MR. KARLIN:
3      Q   You've worked with Mike Burke now for
4  many, many years, correct?
5      A   Yes.
6      Q   In many, many cases?
7      A   Yes.
8      Q   Have you ever known him to conduct
9  himself in any matter that caused you to question his
10  ethics or integrity?
11      A   No. Of all the people I've worked
12  with, literally around the country, I have never
13  worked with anybody more willing to do what was asked
14  of him as a local attorney and do it the right way.
15      Q   Is there any question in your mind that
16  if Mike Burke had known that you did not understand
17  the consequences of the bankruptcy he would have told
18  you if he had thought you didn't understand it?
19      A   I'm sure he would have. I have no
20  doubt about that.
21      Q   And just so I understand, there was
22  nothing inappropriate of him communicating with Mr.
23  Assaad, was there?
24      A   No, there was nothing inappropriate for

PAGE 335

1  is hurtful, knowing what I've been accused of and
2  told that I've got to -- all the Bars are going to be
3  informed about this.
4          Well, that's only part of it. I also
5  have to notify the National Board of Trial Advocacy.
6  I've got notify the American Board of Professional
7  Liability. I've got to notify our carriers. For all
8  of this to happen like this is dangerous. It's
9  harmful. It hurts.
10          I can tell you that I go to bed -- I
11  think of this every night. This thing has been
12  hanging over us for a long time, and I think that if
13  somebody is saying that you're unethical because of
14  this -- and that's really -- that hurts. That hurts
15  a lot.
16      Q   Is there anything else you want to tell
17  the three-member subcommittee that I have failed to
18  ask you or thought to ask?
19      A   No, I think that is enough.
20          MR. BENNINGER: I pass the witness.
21  Thank you.
22          MR. KARLIN: I think it's almost at
23  this point anticlimactic to ask you any questions,
24  Mr. Nace, but I do have a few.

PAGE 337

1  him to do that. My question is -- that I have is:
2  I'm very doubtful that Lacy Godby and Christy Hook,
3  two paralegals, were doing what they were supposed to
4  be doing for their bosses.
5      Q   You think Mr. Burke may have been
6  mislead by his paralegal as to whether she passed
7  something to Mr. Assaad?
8      A   Right.
9      Q   Okay. Is there anything at all that
10  you know about Mr. Burke that would ever suggest to
11  you that he would intentionally cause the kind of
12  problem that brought both of you here today?
13      A   Absolutely not.
14          MR. KARLIN: I have nothing further.
15  Thank you, Mr. Burke.
16          THE WITNESS: You're welcome.
17          CHAIRPERSON KILGORE: Ms. Rhodes?
18                      REDIRECT EXAMINATION
19  BY MS. RHODES:
20      Q   Would you agree under the application
21  to employ special counsel that it refers to the
22  retainer contract entered in between Ms. Miller and
23  Mr. Burke?
24      A   Please speak up. I couldn't hear you.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 86  PAGE 338

1    Q    Would you agree that the trustee's
2    application to employ special counsel referred to the
3    contingency fee arrangement?  That's how he is hiring
4    you and Mr. Burke -- and he attached it as an exhibit
5    -- between Ms. Miller and Mr. Burke was the agreement
6    he was using to retain you and Mr. --
7    A    What do you want to ask, because that's
8    kind of got a loaded question on it?  What do you
9    want me to answer to that?
10   Q    Well, I mean, you're saying there was
11   no retainer agreement, but --
12   A    There was no retainer agreement between
13   me and Mr. Trumble as a trustee.  He did not come to
14   me and hire me to be his attorney or his employee.
15   Q    Are you saying that the application
16   referring to that under the contingency fee
17   arrangement with the same terms and conditions, as
18   originally entered into by the party herein, that
19   referring to that agreement does not enter that --
20   make an agreement between you two?
21   A    I don't think it does, no.  And I think
22   if you read the Code, Section -- Title 11, Section
23   379 or 97 -- we have it over there.
24            MR. BENNINGER:  327(e).

PAGE 339

1            THE WITNESS:  What is it?
2            MR. BENNINGER:  327.
3            THE WITNESS:  -- 327 makes it clear
4    under Section (e) of that, that I was not his
5    attorney.  He was my boss, technically.  I was his
6    employee.  And he has to come to me and talk to me
7    about what should be done, and he should have entered
8    into an agreement with me.  My agreement was with
9    Mrs. Miller.
10           BY MS. RHODES:
11   Q    Actually, that agreement was with Mr.
12   Burke and Ms. Miller, correct?
13   A    That's right.
14   Q    And you didn't enter into a separate
15   agreement with Ms. Miller, did you?
16   A    No.  But I told you before and I told
17   Mrs. Miller I always agreed that we were going by the
18   agreement that she signed with Mr. Burke.
19   Q    And I believe that's what Mr. Trumble
20   was doing, the same way, was going by the agreement
21   set forth between the parties.
22   A    My responsibility -- my client at all
23   times was Mrs. Miller.  I owed my allegiance to Mrs.
24   Miller.  If he wants me to owe an allegiance to him

PAGE 340

1    as an attorney, he should have come to me and asked
2    me to enter into an agreement with him.  He didn't
3    have to do that he if he had just contacted me and
4    said, "Will you do this?"  I would have said, "Yes, I
5    will do this.  I will go along with that."
6    Q    And you don't believe the affidavit is
7    an agreement?
8    A    No, I don't believe the affidavit is an
9    agreement.  The affidavit says I was willing to do
10   it.
11   Q    Did you ever --
12   A    Willing to do it.
13   Q    Did you ever review the bankruptcy file
14   prior to signing the affidavit?
15   A    I wouldn't even know where to see the
16   bankruptcy file much less review it.
17   Q    Even though at the top of the affidavit
18   it refers to the Bankruptcy Court for Northern
19   District of West Virginia and the case number?
20   A    I could have gone over and found it, I
21   guess, in the federal court, but I never do anything
22   like that.  I'm never involved with bankruptcy.  And
23   if somebody had said, "You might check this out," I
24   would have done it.

PAGE 341

1            The person with the most expertise in
2    this whole thing was Bob Trumble, not Barry Nace and
3    not Michael Burke.  It was Bob Trumble.
4            MS. RHODES:  I have nothing further.
5            CHAIRPERSON KILGORE:  Mr. Francisco, do
6    have questions?
7            MR. FRANCISCO:  No.
8            CHAIRPERSON KILGORE:  I have a couple
9    of questions, Mr. Nace.
10           THE WITNESS:  Yes, ma'am.
11           CHAIRPERSON KILGORE:  First of all,
12   this Exhibit 42, how can you tell -- because I see
13   several Burke Schultz.  That's the firm.  Mr. Burke
14   and Schultz is with him.
15           THE WITNESS:  Yes.
16           CHAIRPERSON KILGORE:  So I see several
17   checks, Burke Schultz, and then some notations.  How
18   do you know what was for the Barbara Miller case and
19   what was not?
20           THE WITNESS:  May I approach?
21           CHAIRPERSON KILGORE:  Sure.
22           THE WITNESS:  Okay.  Here we have three
23   statements of accounts.
24           CHAIRPERSON KILGORE:  Uh-huh.

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 87  PAGE 342

1  THE WITNESS: You will see proceeds
2  going to a client and so on on three of these. You
3  can follow them through over here and you can see
4  35,000 went to Schultz on a case, and somewhere there
5  -- there is the 35,000.
6  CHAIRPERSON KILGORE: Okay.
7  THE WITNESS: And we took off --
8  blacked off the name of the person. And the same
9  thing would be -- here is another one for 7667.
10  CHAIRPERSON KILGORE: Uh-huh.
11  THE WITNESS: And if you go over here,
12  you'll find one, right there, 7667 to Burke & Schultz
13  on a case. And the last one which was -- and those
14  were both in March of '08. This last one is in July
15  of '08 for 20,000, and if you look at the last page,
16  you'll see there is a $20,000 fee that he got.
17  CHAIRPERSON KILGORE: Okay. So you
18  tied those into other cases, right?
19  THE WITNESS: Yes. And if you wanted
20  me to give you the name of the cases, of course, I'd
21  be happy to do so, but I don't think it's really
22  necessary.
23  CHAIRPERSON KILGORE: But there are
24  other checks to Burke & Schultz here that aren't tied

PAGE 344

1  CHAIRPERSON KILGORE: Okay. All right.
2  I understand. Thank you.
3  THE WITNESS: Okay. You're welcome.
4  CHAIRPERSON KILGORE: I do have a few
5  more questions.
6  THE WITNESS: Okay.
7  CHAIRPERSON KILGORE: So as I
8  understand it, Mr. Nace, January 27, 2005, you did
9  receive the letter on behalf of Mr. Trumble which the
10  letter says enclosed the application to employ
11  special counsel, the proposed order and the
12  affidavit, right?
13  THE WITNESS: Yes. I received the
14  letter.
15  CHAIRPERSON KILGORE: You received the
16  letter that said those three things?
17  THE WITNESS: Yes.
18  CHAIRPERSON KILGORE: And you say you
19  got the affidavit?
20  THE WITNESS: Yes.
21  CHAIRPERSON KILGORE: But you did not
22  get the application and you did not get the proposed
23  order?
24  THE WITNESS: I didn't recall seeing

PAGE 343

1  into cases?
2  THE WITNESS: Well that's because --
3  yes. One says, "Client Expenses."
4  CHAIRPERSON KILGORE: Uh-huh.
5  THE WITNESS: The other one says,
6  "Client Expenses." And probably under the third one
7  he didn't have any client expenses. Does that answer
8  your question?
9  CHAIRPERSON KILGORE: No.
10  THE WITNESS: Okay. Let me try --
11  CHAIRPERSON KILGORE: What does "Client
12  Expenses" mean?
13  THE WITNESS: Well, on the, for example
14  -- I can show you one.
15  CHAIRPERSON KILGORE: For those same
16  cases. Is that what you're saying? It would be
17  client expenses for those same cases?
18  THE WITNESS: Yes.
19  CHAIRPERSON KILGORE: Okay.
20  THE WITNESS: See, here is one that
21  says, "Less Expenses Due." Our expenses on this case
22  were $6300. That was a settlement. All right? And
23  that's how much he said he had -- probably he got the
24  medical records. That would be my guess.

PAGE 345

1  it, but I also said that when counsel came down and
2  went through the boxes he found it.
3  CHAIRPERSON KILGORE: Found what?
4  THE WITNESS: He found the application
5  and the proposed order.
6  CHAIRPERSON KILGORE: So you did
7  receive them, then?
8  THE WITNESS: Apparently, yes.
9  CHAIRPERSON KILGORE: Okay. Can we
10  look at your letter to ODC in response to the
11  original complaint, page 58 of their notebook.
12  MS. RHODES: It's going to be under Tab
13  3.
14  CHAIRPERSON KILGORE: Right. Page 58,
15  your paragraph, Number 43.
16  THE WITNESS: Tab 58? I mean, page 58?
17  CHAIRPERSON KILGORE: Correct, 58.
18  THE WITNESS: Yes.
19  CHAIRPERSON KILGORE: And this is your
20  letter to Ms. Donahue at that time in response to the
21  original complaint that had been filed, right?
22  THE WITNESS: Yes.
23  CHAIRPERSON KILGORE: Okay. Your
24  paragraph 43, you say in that paragraph that you had

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 88   PAGE 346

1  -- in 2006 you reached a partial settlement with one
2  defendant for $75,000, made a distribution to Barbara
3  Miller, not knowing then anything about the
4  bankruptcy, right?
5         THE WITNESS:  Right.
6         CHAIRPERSON KILGORE:  And then you said
7  -- let's see.  "She never mentioned anything about a
8  bankruptcy to me."  Mr. O'Brien never contacted you.
9  "Had I been aware then or at any time that she was in
10  bankruptcy proceedings, I would have done whatever I
11  was ordered to do by the court," right?
12         THE WITNESS:  Right.
13         CHAIRPERSON KILGORE:  Let's look at Mr.
14  Burke's notebook.  Page 296 of Mr. Burke's notebook.
15         MR. KARLIN:  Which tab?  I'm sorry.
16         CHAIRPERSON KILGORE:  Page 296.  It
17  would be Tab 9.
18         THE WITNESS:  Okay.
19         CHAIRPERSON KILGORE:  This is the file
20  from Mr. Burke's office of this case.  And are you at
21  page 296?
22         THE WITNESS:  Yes.
23         CHAIRPERSON KILGORE:  This is your
24  letter to Ms. Miller dated September 26, 2006.

PAGE 347

1         THE WITNESS:  Okay.
2         CHAIRPERSON KILGORE:  And it is --
3  contains the release from the hospital, right?
4         THE WITNESS:  Right.
5         CHAIRPERSON KILGORE:  Paragraph 1.
6  "This is the settlement for $75,000.  I need you to
7  sign it in front of a notary, and you can call Lacy
8  at Mike Burke's office," right?
9         THE WITNESS:  Right.
10         CHAIRPERSON KILGORE:  Paragraph 2.  "I
11  need you to sign the authorization."  And then the
12  third sentence, "Presumably you have a bankruptcy
13  attorney, and if so, that person should call me so I
14  know whether or not a check can be written to you,"
15  right?
16         THE WITNESS:  Okay.
17         CHAIRPERSON KILGORE:  So you knew at
18  that time?
19         THE WITNESS:  To answer her question
20  that I was asked, "Did something come up in the
21  deposition?"  Perhaps it did.
22         CHAIRPERSON KILGORE:  Well, you knew
23  when you wrote this letter when you were sending or
24  getting ready to settle that she had a bankruptcy

PAGE 348

1  attorney and she was in bankruptcy at that time?
2         THE WITNESS:  Probably sometime around
3  that because of her dep -- I bet there is something
4  in her deposition that says that, as we sit here now.
5  I don't know what her deposition said.  That's
6  probably --
7         CHAIRPERSON KILGORE:  And you asked her
8  to have -- you asked her to have her attorney call
9  you --
10         THE WITNESS:  Okay.
11         CHAIRPERSON KILGORE:  -- so you know
12  "whether or not a check can be written to you,"
13  right?
14         THE WITNESS:  Okay.
15         CHAIRPERSON KILGORE:  Did that attorney
16  call you?
17         THE WITNESS:  Presumably not.
18         CHAIRPERSON KILGORE:  Did you check
19  with Ms. Miller to see that she had, in fact,
20  contacted her bankruptcy attorney?
21         THE WITNESS:  I honestly don't
22  remember.  I don't know.
23         CHAIRPERSON KILGORE:  Do you recall
24  following up with Ms. Miller at all to see whether

PAGE 349

1  she had done anything in her bankruptcy proceeding?
2         THE WITNESS:  I just don't remember on
3  that.  I'm trying to see if there is anything here
4  that might --
5         CHAIRPERSON KILGORE:  But you at least
6  knew there was some reason that perhaps a check could
7  not be written to her?
8         THE WITNESS:  I don't know if I really
9  knew that there was some reason that it couldn't be
10  written, but I probably heard her say something.  I'm
11  betting there is something in the deposition about
12  bankruptcy.
13         CHAIRPERSON KILGORE:  And at least at
14  that time you had in the file the affidavit that you
15  had signed with the trustee, right?
16         THE WITNESS:  It would have been in my
17  file somewhere probably, because we know I had it.
18         CHAIRPERSON KILGORE:  And, Mr. Nace, I
19  note that this letter, this September 26th, 2006,
20  letter, came from Mr. Burke's file, not yours.  It
21  hasn't been disclosed by you in this case.
22         THE WITNESS:  I don't know.
23         CHAIRPERSON KILGORE:  So do you mean
24  it's not in your file?

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 89  PAGE 350

1  THE WITNESS: I don't know. You say it
2  hasn't been disclosed. I don't think I have been
3  asked. I have my entire correspondence section,
4  which is about that thick. I have it. If you want
5  it, you can look at it.
6  CHAIRPERSON KILGORE: Well, what I'm
7  getting at, Mr. Nace, I mean, you provided ODC with
8  the disbursement statement and the settlement
9  statement to Ms. Miller for the 75,000, the check and
10  the disbursement statement for the verdict and the
11  settlement of the verdict also, but not this letter.
12  THE WITNESS: Well, there's a lot of
13  things I didn't provide, lots of things. Because I
14  wasn't -- and I said, "Is there anything else that
15  you want?"
16  CHAIRPERSON KILGORE: Well, she
17  wouldn't know about this letter, would she?
18  THE WITNESS: No. You can see what I
19  took down, which is about that thick. And I offered
20  -- I told her at the time I have files that are many,
21  many, many files. "Is there anything else you want?
22  You let me know whatever it is." If anybody asked
23  for the entire file, they could have had it.
24  But I flew from Dulles to Charleston

PAGE 351

1  and I wasn't taking all of that with me. I just took
2  some things that I thought might be appropriate. And
3  if she wanted anything else, I told her to ask me for
4  it and tell me what you want. I didn't hear anything
5  else until the charges were brought.
6  CHAIRPERSON KILGORE: I have no more
7  questions. Thank you.
8  MR. FRANCISCO: I have a couple based
9  upon that. Mr. Nace, when was it again that Mr.
10  Burke apprized you of his conflict? Do you remember?
11  THE WITNESS: All I can really say for
12  sure it was some time -- look at the date on the
13  complaint.
14  MR. FRANCISCO: Which is July 2005.
15  THE WITNESS: The date on the amended
16  complaint. Somewhere in that time frame he called me
17  up and told me he couldn't be on the complaint. I
18  believe he thinks he told me that ahead of time,
19  before I filed the complaint, and he may have. I
20  just don't remember. But it certainly would have
21  been somewhere around that time.
22  MR. FRANCISCO: And it's your testimony
23  earlier that as soon as he told you that, one, you
24  remedied the situation by immediately filing a second

PAGE 352

1  amend -- an amended complaint?
2  THE WITNESS: Right.
3  MR. FRANCISCO: Okay. Totally removing
4  his name from that file?
5  THE WITNESS: Yes.
6  MR. FRANCISCO: Your testimony was also
7  that you decided not to call him or talk to him about
8  the Barbara Miller case?
9  THE WITNESS: Right.
10  MR. FRANCISCO: And that as soon as he
11  told you about that conflict, the wall was
12  immediately built up?
13  THE WITNESS: Yes.
14  MR. FRANCISCO: How does he even have a
15  copy of this, then?
16  THE WITNESS: I don't know. I don't
17  know. But I do know that there was no discussion. I
18  don't know when he got that letter. We may have got
19  that letter after all of this happened. I don't know
20  when he got it. But I know that we did not discuss
21  it at all, because there was no reason to.
22  MR. FRANCISCO: And the other thing.
23  Your testimony earlier, I think -- and this is what
24  I'm trying to figure out -- first of all, your

PAGE 353

1  contingency fee in any medical malpractice case is
2  standard 40 percent?
3  THE WITNESS: Right.
4  MR. FRANCISCO: And I think I
5  understood you to say that when you and Mr. Burke do
6  collaborate on cases, one that he can't stay in and
7  you decide to take, that he gets somewhere between 25
8  percent or two-thirds, depending on the amount?
9  THE WITNESS: Twenty-five (25) percent
10  of one-third.
11  MR. FRANCISCO: Okay. Twenty-five (25)
12  percent of one-third. So 25 percent of your 40
13  percent?
14  THE WITNESS: Right.
15  MR. FRANCISCO: Okay. And your
16  settlement in this case -- the amount your firm got
17  in this case was approximately two hundred and
18  sixteen thousand dollars, two hundred and forty-three
19  cents -- $216,243 and some odd cents. Does that
20  sound about right? Which is listed on page --
21  THE WITNESS: Roughly, because it would
22  be 40 percent of the 500,000 total, and some
23  percentage of the interest after that.
24  MR. FRANCISCO: And then your costs

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 90   PAGE 354

1  deducted from that were $44,288?
2       THE WITNESS: That's on the second
3  part, and there is some part on the first part which
4  I thought was 23,000.
5       MR. FRANCISCO: I lost the page. No,
6  I think the 23,000 was from the original 75.
7       THE WITNESS: That's right. So 23,000
8  plus the 43, whatever that fee was that you gave me,
9  which is --
10      MR. FRANCISCO: Right. I'm just
11 talking about from the four eighty-five, forty-one
12 eighty-eight, which you got 216.
13      THE WITNESS: Okay.
14      MR. FRANCISCO: I'm just talking about
15 that.
16      THE WITNESS: Okay.
17      MR. FRANCISCO: Minus the expenses on
18 that figure leaves $171,900 -- $171,955.
19      THE WITNESS: Okay.
20      MR. FRANCISCO: So, theoretically, if
21 Mr. Burke would have been able to work with you on
22 this case, would you agree -- if you need to
23 calculate it or whatever -- his fee would have been
24 roughly between 40 and 43 thousand dollars?

PAGE 355

1       THE WITNESS: Well, it would be either
2  25 or a third of my fee, whatever that comes to.
3       This was also, by the way, the first
4  time -- I think that was the only time that I ever
5  did a case in West Virginia without somebody in Mr.
6  Burke's office.
7       I remember an occasion where somebody
8  else asked if I could get in the case, and they did,
9  but it's the only time I did not have a West Virginia
10 -- a local West Virginia attorney working with me on
11 the case.
12      MR. FRANCISCO: The disbursements made
13 to Barbara Miller were on March 5th, 2008.
14      THE WITNESS: Okay.
15      MR. FRANCISCO: And your office
16 received your disbursement February 28, 2008; is that
17 right?
18      THE WITNESS: I don't know. What page
19 are you looking at so I can --
20      MR. FRANCISCO: Page 268.
21      THE WITNESS: In what?
22      MR. FRANCISCO: In the ODC's book
23 referencing you.
24      THE WITNESS: Okay. 268?

PAGE 356

1       MR. FRANCISCO: Yes, sir.
2       THE WITNESS: They're not --
3       MR. FRANCISCO: It would be under Tab
4  10.
5       THE WITNESS: Okay.
6       MR. FRANCISCO: Which should be page
7  268; 268 and 269 both reference it.
8       THE WITNESS: Okay. All right.
9       MR. FRANCISCO: And so you would agree
10 that's February 28th, 2008?
11      THE WITNESS: Yes. Page 268, yeah.
12      MR. FRANCISCO: And on the general
13 ledger form you provided us, you have disbursement
14 checks for consulting fees to Burke Schultz on March
15 3rd, 2008 and March 6th, 2008; is that correct?
16      THE WITNESS: I'm sorry. On page 268?
17      MR. FRANCISCO: No, no. I'll show it
18 to you. It's your Exhibit 42, the one Ms. Kilgore
19 just went over with you.
20      THE WITNESS: Yes.
21      MR. FRANCISCO: You have disbursements
22 and fees on March 3rd and March 6th of 2008 for
23 consulting to Burke Schultz?
24      THE WITNESS: There is a fee on the --

PAGE 357

1  if it tells you. You can see it's the Moats case.
2  It's not the Miller case if that is what you're
3  asking.
4       MR. FRANCISCO: Right. I'm talking
5  about -- both of these refer to Sharon Moats?
6       THE WITNESS: I don't think so. The
7  first one refers to the consulting fee of $35,000.
8       MR. FRANCISCO: Correct.
9       THE WITNESS: Plus this one.
10      MR. FRANCISCO: Uh-huh.
11      THE WITNESS: And you see the 498 is
12 right below it, I believe.
13      MR. FRANCISCO: Uh-huh.
14      THE WITNESS: Right?
15      MR. FRANCISCO: Right.
16      THE WITNESS: That's a case. That's
17 not the Miller case.
18      MR. FRANCISCO: Okay.
19      THE WITNESS: All right. And the next
20 one, if you go further down, where it says "7666",
21 that is what is on here. And it says, "Expenses."
22 It looks like 1,387. That's not the Miller case.
23      MR. FRANCISCO: Okay.
24      THE WITNESS: The same thing with the

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 91 PAGE 358

1    third one.
2         MR. FRANCISCO:  Well, and that's the
3    thing.  I mean the other ones are -- you have -- we
4    have the Paul Miller and Moats case specifically
5    commentated on the expenses.  I just find it curious
6    that the two consulting fees to Burke Schultz around
7    the same time as this add up to $43,000.
8         THE WITNESS:  Thirty (35) plus 6 -- or
9    76 is $44,000.
10        MR. FRANCISCO:  Forty-three (43)
11   thousand.
12        THE WITNESS:  35,333 and 7666; 42 --
13   43.  Okay.  Forty-three (43) and forty some cents.
14        MR. FRANCISCO:  Right.
15        THE WITNESS:  Yes.  Okay.
16        MR. FRANCISCO:  I'm just curious.
17        THE WITNESS:  Well, if you want me to
18   give you the names of those two lines, I would be
19   happy to do so if you really want to see those.
20        MR. FRANCISCO:  That's okay.
21        THE WITNESS:  That's up to you two.
22        MR. FRANCISCO:  That's all.
23        CHAIRPERSON KILGORE:  Any follow-up?
24        THE WITNESS:  I'm sorry.  I don't

PAGE 359

1    understand what you were saying as far as -- what is
2    the connection you are trying make here so I can
3    explain it to you?
4         MR. FRANCISCO:  I really don't
5    understand the ledger, especially when you look at
6    the time and the monies involved with the Miller case
7    that you've broken down on February 28th, 2008, as
8    well as the fact that there is this wall, but yet
9    there is no wall.
10        THE WITNESS:  There's what?
11        MR. FRANCISCO:  The wall that you said
12   you built up was never built up.  He's got a letter
13   in his file from you to a client saying that, "Here
14   is the money.  I know you have a bankruptcy attorney.
15   I don't even know if I should pay this out."
16        But yet there is a wall between your
17   firm and his firm that you say is built that you are
18   not even corresponding about the Miller case.
19        THE WITNESS:  Right.  I don't know when
20   he got that letter.  That could have been after all
21   of this stuff started happening when stuff was put
22   together.  I don't know.
23        But I'm trying to figure out what your
24   interest is on the fees that were paid.  If you're

PAGE 360

1    trying to suggest that somehow there was some fee
2    paid to him on that, it wasn't.
3         There were three cases.  I can give you
4    the names of the three cases and bring you the
5    statement of accounting if you want that.  I'm
6    representing that to you.  The expenses to Paulson &
7    Nace I can give you if you want.
8         I'll be happy to send you the list, and
9    it's probably in here somewhere, that's going to be
10   several pages long that's going to show every dollar
11   that was spent for experts, as well as, depositions,
12   medical records, et cetera, et cetera, et cetera.
13        And it's going to add up to $44,288.36.
14   That's what it's going to add up to.  I'll be happy
15   to get that for you.
16        MR. BENNINGER:  And we would like to
17   ask for leave to allow the record to be open for us
18   to do that.
19        CHAIRPERSON KILGORE:  Sure.  That's
20   fine.
21        MR. KARLIN:  Can I just see that before
22   we're done.  I have never seen the ledger myself.
23        CHAIRPERSON KILGORE:  Maura?  Thank
24   you.  So are there any other follow-up questions, Mr.

PAGE 361

1    Benninger or Mr. Karlin?
2         MR. BENNINGER:  I have none.  Thank
3    you.
4         MS. RHODES:  I don't know if he does
5    after reading those.  I have nothing further.
6         (Brief pause.)
7         MR. BENNINGER:  I have a question of my
8    client.
9         CHAIRPERSON KILGORE:  Okay.
10        MR. BENNINGER:  About the letter that
11   you raised out of the documents apparently submitted,
12   which is ODC page number 296 out of Burke's exhibits.
13                  RECROSS-EXAMINATION
14   BY MR. BENNINGER:
15   Q    And there was a question by a member of
16   the counsel -- Committee about the wall.  Was a copy
17   of this letter shown at least on the typed format
18   going to Mr. Burke?
19   A    I don't know.
20   Q    I represent to you that --
21   A    I can look.  I don't know.
22   Q    Well, you have it there, 296.
23   A    296?
24   Q    Yeah.  Just look at it, because I'm

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 92  PAGE 362

1  using Mr. Burke's records.  It's in the big notebook
2  in black.
3       MS. RHODES:  It's not that notebook,
4  Mr. Nace.  It's the other one.
5       MR. FRANCISCO:  The other one, Mr.
6  Nace.  That's your notebook.
7  BY MR. BENNINGER:
8   Q    Just look at it to see if you copied
9  him on that letter?
10  A    Apparently not.
11  Q    Does it appear to be a one-page letter?
12  A    Yes.
13  Q    And did you folks in the adversary
14  proceeding, which started back in October of '010,
15  2010, had you engaged in the exchange of discovery?
16  A    Yes, we have.
17  Q    And do you have any knowledge or
18  recollection of ever sending this letter to Mr. Burke
19  in real time back in '06?
20  A    I don't think so because there is no
21  "cc" to him.  There would be a "cc."
22       MR. BENNINGER:  And the problem is in
23  terms of when this may have been disclosed by him --
24  if we can have that date when you -- can we establish

PAGE 363

1  from the record when he provided?  Was it the day of
2  the sworn statement whatever he provided?
3       MS. RHODES:  Yes.
4       MR. BENNINGER:  Is that when he would
5  have --
6       MS. RHODES:  Yes.
7       MR. BENNINGER:  I'm asking just to
8  clear the record up.
9       MS. RHODES:  Yes.  Yes is my answer.
10       MR. BENNINGER:  Okay.  Do you have a
11  date?  I guess I have it here.
12       CHAIRPERSON KILGORE:  His sworn
13  statement was March 30, 2010.
14       MR. BENNINGER:  Okay.  Well into
15  discovery and subsequent to much of the discovery.
16  BY MR. BENNINGER:
17   Q    And so to answer Mr. Francisco's
18  question, did you maintain to the best of your
19  knowledge and ability a wall after it was disclosed?
20  A    Abs --
21  Q    And this letter did not penetrate that
22  wall between you and Mr. Burke's office until at
23  least after the adversary proceeding commenced and
24  discovery ensued?

PAGE 364

1  A    To the best of my knowledge.  And if
2  you look at the statement of expenses that's attached
3  to that, too, you will see exactly what the statement
4  of expenses looks like, and the same thing will
5  appear somewhere for the subsequent distribution from
6  the appeal and the judgment, which will total up
7  exactly the figure that we looked at before.
8       MR. BENNINGER:  And I have no further
9  questions.  And I would just ask, for completeness of
10  the record, whatever documentation to supplement the
11  information we have provided, this Exhibit 42, we're
12  happy to make in whatever format this Committee would
13  like to see in.
14       CHAIRPERSON KILGORE:  Okay.  Mr.
15  Karlin, did you have any questions you wanted to ask?
16       MR. KARLIN:  Because of this coming up,
17  could we just have a very short break so I can speak
18  to my client and not have to whisper here?
19       CHAIRPERSON KILGORE:  Certainly.  Do
20  you want to take five or ten minutes?
21       MR. KARLIN:  Yes.  Could we do that?
22       CHAIRPERSON KILGORE:  Sure.
23       (WHEREUPON, a recess was taken.)
24       THE RECORDER:  Okay.  We're back.

PAGE 365

1       CHAIRPERSON KILGORE:  Okay.  Mr.
2  Karlin?
3       MR. BENNINGER:  I have one question.
4       CHAIRPERSON KILGORE:  Okay.
5  BY MR. BENNINGER:
6   Q    Mr. Nace, I failed to ask you, the
7  opinion that you have has it been supported by an
8  independent trust bankruptcy trustee expert and have
9  you submitted the same into the record?
10  A    Yes, at Tab 38 of the binder that you
11  provided to the court, there is an expert designation
12  or a trustee who has set forth what his opinions were
13  about what happened in this whole matter and
14  indicating that he will be testifying as an expert
15  witness in the underlying case concerning the
16  responsibilities of Mr. Trumble having not been met.
17  I think that's under Tab 38.
18       MR. BENNINGER:  That's all I have.
19  Thank you.
20       CHAIRPERSON KILGORE:  Mr. Karlin?
21       MR. KARLIN:  I have no further
22  questions, but I would like the opportunity -- well,
23  I have no further questions.
24       CHAIRPERSON KILGORE:  All right, then.

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 93 PAGE 366

1   MR. BENNINGER:  I have no questions.
2   No witnesses.
3       CHAIRPERSON KILGORE:  Okay.  Wait a
4   second.  Do you rest, Ms. Rhodes?
5       MS. RHODES:  I ask that the -- that it
6   be admitted into evidence concerning Mr. Burke,
7   Exhibits 1 through 18, and Mr. Nace, 1 through 19.
8       CHAIRPERSON KILGORE:  Any objection?
9       MR. BENNINGER:  None.
10      MR. KARLIN:  None, Your Honor.
11      CHAIRPERSON KILGORE:  Okay.
12      (WHEREUPON, ODC Burke Exhibits 1
13  through 18 and ODC Nace Exhibits 1 through 19 were
14  admitted into the record.)
15      MS. RHODES:  And with that, I rest.
16      CHAIRPERSON KILGORE:  All right.  Mr.
17  Benninger, do you have any witnesses?
18      MR. BENNINGER:  I have presented our
19  defense in the case due to cross-examination of Mr.
20  Nace.  I see no need to further belabor the record
21  with that.
22      And at this time, I rest subject to
23  moving the exhibits, and I'm told by Maura I need to
24  rearrange because I had the original set, 1 through

PAGE 367

1   7, and a supplemental list of 1 through 40, and that
2   doesn't seem to work for this process.  So I need to
3   do something about that.
4       CHAIRPERSON KILGORE:  But you are
5   moving for the admission of those exhibits?
6       MR. BENNINGER:  I am.  In whatever
7   format she tells me she wants them in.
8       CHAIRPERSON KILGORE:  Right.  Any
9   objection?
10      MS. RHODES:  No objection.
11      MR. KARLIN:  None.
12      (WHEREUPON, Nace Exhibits 1 through 42
13  were admitted into the record.)
14      CHAIRPERSON KILGORE:  All right.  Mr.
15  Karlin, do you have witnesses?
16      MR. KARLIN:  Yes.  I would like to
17  recall Mr. Burke for a few brief questions.  Before I
18  do that, let me say I also submitted a limited set of
19  exhibits, one of which is an overlap of one that is
20  already admitted, that is my Exhibit 7 I believe is
21  also Burke -- Nace Exhibit -- I'm not sure of the
22  exact number.
23      However, I have spoke to Ms. Rhodes
24  previously and I determined last night that by

PAGE 368

1   mistake I had not included all of the e-mails between
2   and myself and Mr. Crim, and I spoke to her about
3   perhaps supplementing those.
4       CHAIRPERSON KILGORE:  All right.
5       MR. KARLIN:  And she has no objection,
6   but I need to show her which ones, and I would
7   request that the record be left open for one week for
8   me to supplement those with additional e-mails just
9   so they're complete.  I didn't want to give an
10  incomplete set.
11      CHAIRPERSON KILGORE:  All right.
12  That's fine.  We'll do that, then.  And then this is
13  your notebook.  Do you want this admitted?
14      MR. KARLIN:  Yes.  Well, can I hold off
15  admitting it subsequent --
16      CHAIRPERSON KILGORE:  Okay.
17      MR. KARLIN:  -- subject to it being
18  recreated with filling in the missing e-mails?
19      CHAIRPERSON KILGORE:  So you're going
20  to redo the whole thing and supplement it?
21      MR. KARLIN:  Yes.  So it's correct and
22  in chronological order.
23      CHAIRPERSON KILGORE:  All right.  Are
24  you going to make it any bigger than this?

PAGE 369

1       MR. KARLIN:  I few pages.
2       CHAIRPERSON KILGORE:  Okay.  Because
3   this is the most reasonable one I've seen.
4       MR. KARLIN:  We would then briefly
5   -- oh, we have to go back on.  Are we on the record?
6       THE RECORDER:  We are.
7       MR. KARLIN:  I would recall Mr. Burke.
8   THEREUPON came
9           D. MICHAEL BURKE,
10  recalled as a witness on his own behalf, and after
11  having been previously duly sworn according to law,
12  testified as follows:
13      THE WITNESS:  Do I need to be re-sworn?
14      CHAIRPERSON KILGORE:  No, you're on the
15  same oath.
16      MR. KARLIN:  The oath lasts at least 24
17  hours.
18      THE WITNESS:  Okay, good.
19          DIRECT EXAMINATION
20  BY MR. KARLIN:
21      Q   Mr. Burke, you were present when Mr.
22  Nace was being queried about how it could be that a
23  letter to Barbara Miller regarding the $75,000
24  settlement came to appear in your file, and you were

CHAMBERS COURT REPORTING
(304) 757-8367

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 94  PAGE 370

1  present for that, correct?
2      A   Yes, sir.
3      Q   Do you recall actually seeing this
4  letter which is page 296 of Tab 9 of the ODC notebook
5  exhibits for you prior to very recently?
6      A   Prior --
7      Q   Or when do you recall first seeing it?
8      A   What time is it?  About half an hour
9  ago.
10     Q   Is it fair to say that you had not
11 carefully reviewed your file?  You had provided it to
12 the ODC, but had not carefully --
13     A   Apparently not.  Because I just said,
14 "Copy everything and send it."
15     Q   Do you recall seeing that back in 2006?
16     A   No.
17     Q   While you were -- everybody was -- at
18 least some of us were sitting here scratching our
19 heads about it, did you review the pages adjacent to
20 it?
21     A   Yes.  And I've read the letter.
22     Q   Okay.  And based upon that, do you have
23 what you believe may be the explanation as to how
24 this got into your file?

PAGE 371

1      A   Yes.
2      Q   Can you explain to the panel first --
3  well, let me back up for a second.  I want to call
4  your attention to paragraph 3 of page 296, the
5  letter.  There is a reference in that to Lacy.
6      A   Yes.
7      Q   And can you remind or reiterate who
8  Lacy is?
9      A   She was a secretary that worked for me
10 from time to time, and she was working for me at that
11 time.
12     Q   And just to keep the record clean, that
13 is the same Lacy that Mr. Nace previously indicated
14 that you may have had some serious problems with?
15     A   Yes.  We're waiting for the grand jury
16 to meet this month.
17     Q   Okay.  That was all subsequent to the
18 time that you assigned her to send documents to Mr.
19 Assaad, correct?
20     A   Yes.
21     Q   Back when you were having her send
22 documents to Mr. Assaad, you didn't know about the
23 problems that later developed, true?
24     A   Absolutely not.

PAGE 372

1      Q   Okay.
2      A   I would be -- well, I'd be a lot better
3  off had I known that.
4      Q   Okay.  She was fired when you learned
5  of that?
6      A   Yes.
7      Q   In any case, this paragraph 3 refers to
8  Lacy.  Am I correct?
9      A   Yes.
10     Q   Can you turn to page 297, the following
11 page.
12     A   I know what it is.
13     Q   Okay.  Can you explain to the panel
14 what you understand page 297 is?
15     A   It's a release that has been notarized
16 by Lacy Godby, the Lacy who was subsequently fired.
17     Q   Okay.
18     A   Who was working in my office at the
19 time.
20     Q   And this is the same Lacy that's in
21 paragraph 3, September 26th, 2006, letter, at 296?
22     A   Yes.
23     Q   And go ahead and put the pieces
24 together as to what in your best judgment apparently

PAGE 373

1  happened.
2      A   Barry sent the letter to Mrs. Miller
3  with the release enclosed.  Mrs. Miller got it,
4  contacted Lacy to get the release notarized.  Lacy
5  notarized it and made a copy of the letter and the
6  release and put it in the file.  I never saw it until
7  today.
8      Q   It would be the letter releasing the
9  other documents that you would have received?
10     A   Yes, because I'm not even sure what the
11 others are.
12     Q   Okay.  Were secretaries in your office
13 -- did they notarize documents for clients and former
14 clients from time to time?
15     A   Yes.  As long as they could see them
16 sign it or they had an ID and could verify that that
17 was the person whose signature appeared on the
18 document.
19     Q   Under the practice in your office at
20 the time, would Lacy Gods -- is it Godsby?
21     A   No "s".
22     Q   -- have had to request your permission
23 to notarize this?
24     A   No, if it was a client or a former

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

1    client.  And we're next to the DMV and people come
2    over.  I really don't like to do that, but sometimes
3    the receptionist does that, signs titles.
4         Q    Under the normal course of practice, if
5    it was a client such as Mrs. Miller, would she have
6    then made a copy of it and stuck it in the file?
7         A    Apparently, out of an abundance of
8    caution.  And Lacy may not have known -- she wouldn't
9    have known everything that was going on with the ins
10   and outs of the case.
11        To the best of your knowledge, do you
12   have any other -- did you ever receive any -- do you
13   have any similar documents like this in your file for
14   the ultimate disposition of monies on the payment of
15   the verdict of $500,000 that ultimately Mr. Nace got
16   in the case?
17        A    I don't think so, but I can't swear
18   that somehow they didn't end up there.  But I haven't
19   seen them.
20        Q    Okay.  In any case, is there anything
21   in the record that shows that you were actually --
22   copied this letter for Ms. Miller?
23        A    No, because I looked for that because I
24   was trying to understand how I got it.  And it

1    occurred to me that that's what happened; Mrs. Miller
2    got it, brought it in, Lacy notarized it, made a
3    copy; and -- because she was a former client.
4        And Lacy is probably the one who sent
5    out the request for all the medical records so she
6    had to deal with Mrs. Miller from time to time
7    earlier in the -- when I was active in the case.  So
8    they had at least talked before.
9        MR. KARLIN:  I have nothing further.
10       CHAIRPERSON KILGORE:  Anything further?
11       MS. RHODES:  No.
12       MR. BENNINGER:  Nothing.
13       CHAIRPERSON KILGORE:  All right.  Well,
14   this hearing is adjourned.  Well, wait a second.  Go
15   ahead.
16       THE RECORDER:  Proposed findings?  40
17   days after the letter goes out.
18       CHAIRPERSON KILGORE:  So the transcript
19   will be ready -- there will be a letter going out
20   when the transcript is ready, and everyone has 40
21   days from that date to submit proposed findings of
22   fact and conclusions of law.
23       MR. FRANCISCO:  And I would propose
24   that -- if it's all right, Madam Chairman?

1         CHAIRPERSON KILGORE:  Go ahead.
2         MR. FRANCISCO:  -- that the transcript
3    not be prepared until both parties have a chance to
4    supplement their discovery response.
5         MR. BENNINGER:  And we will go back and
6    get documentation with names and anything else that
7    we think that would satisfy you.  If it doesn't
8    answer the questions, please advise us.
9         CHAIRPERSON KILGORE:  The record is
10   going to be open for one week for Mr. Karlin to redo
11   his exhibit notebook, so if you can get yours in
12   within one week, we will close the record and the
13   transcript will be prepared from there.
14        MS. RHODES:  Do you want an order
15   reflecting it's open for that reason?
16        CHAIRPERSON KILGORE:  Yes.
17        MR. FRANCISCO:  Yeah, go ahead.
18        MS. RHODES:  Okay.
19        CHAIRPERSON KILGORE:  We'll do that.
20   Would you do that, prepare an order?
21        MS. RHODES:  Sure.
22        CHAIRPERSON KILGORE:  So with that,
23   then, this will be adjourned.
24        (WHEREUPON, at 5:36 p.m., the hearing

1    was concluded.)
2         (WHEREUPON, Nace Exhibits Number 43
3    through 45 were marked post-hearing for purposes of
4    identification and admitted into the record.)
5         (WHEREUPON, Burke Exhibits 1 though 9
6    were marked post-hearing for purposes of
7         identification and admitted into the record.)

D. MICHAEL BURKE and BARRY J. NACE HEARING
10/10/11

SHEET 96   PAGE 378

REPORTER'S CERTIFICATE

STATE OF:  WEST VIRGINIA
COUNTY OF:  BERKELEY

      I, Lisa J. Chambers, a Certified Court
Reporter and Notary Public within and for the County
and State aforesaid, do hereby certify that the
foregoing recorded proceedings were transcribed by
me, or under my supervision, to the best of my
ability.

Lisa J. Chambers
Lisa J. Chambers

      Certified Court Reporter
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
LISA J. CHAMBERS
#1 WOODVALE HEIGHTS
HURRICANE, WV 25526
My commission expires August 16, 2015

CHAMBERS COURT REPORTING
(304) 757-8367